Thomas P. Schlosser WSBA #06276
Thane D. Somerville WSBA #31468
MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE
811 First Avenue, Suite 218
Seattle, WA 98104
Tel:    206-386-5200
Fax:    206-386-7322
t.schlosser@msaj.com
t.somerville@msaj.com
Attorneys for Plaintiff Hoopa Valley Tribe

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | | |
|---|---|---|
| HOOPA VALLEY TRIBE, | ) | Civ. No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | COMPLAINT FOR |
| v. | ) | DECLARATORY AND |
| | ) | INJUNCTIVE RELIEF |
| UNITED STATES BUREAU OF | ) | |
| RECLAMATION; DAVID BERNHARDT, in his | ) | Administrative Procedure Act Case |
| official capacity as Secretary of the Interior; | ) | |
| BRENDA BURMAN, in her official capacity as | ) | |
| Commissioner of the United States Bureau of | ) | |
| Reclamation; ERNEST CONANT, in his official | ) | |
| capacity as U.S. Bureau of Reclamation | ) | |
| California-Great Basin Regional Director; and | ) | |
| UNITED STATES DEPARTMENT OF THE | ) | |
| INTERIOR | ) | |
| | ) | |
| Defendants. | ) | |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 1

## I.   **INTRODUCTION**

1.     Plaintiff Hoopa Valley Tribe ("Hoopa") hereby sues Defendants United States Bureau of Reclamation, David Bernhardt, in his official capacity as Secretary of the Interior, Brenda Burman, in her official capacity as Commissioner of the United States Bureau of Reclamation, Ernest Conant, in his official capacity as United States Bureau of Reclamation California-Great Basin Regional Director, and United States Department of the Interior (collectively herein, "Reclamation") for violations of the Central Valley Project Improvement Act (CVPIA)[1], the WIIN Act[2], the National Environmental Policy Act (NEPA)[3], and the Administrative Procedure Act (APA).[4]

2.     Hoopa seeks an order and judgment setting aside, declaring invalid, and rescinding Reclamation's conversion of certain time-limited Central Valley Project ("CVP") renewal contracts into permanent repayment contracts with water contractors (including but not limited to Westlands Water District Contract No. 14-06-200-495A-IR1-P) due to Reclamation's failure to comply with the CVPIA, NEPA, and APA.   Hoopa further seeks an order enjoining Reclamation from converting or amending any additional CVP contracts that Reclamation is in the process of converting into permanent repayment contracts absent full compliance with the CVPIA, NEPA, WIIN Act, and APA as discussed herein.

3.     In approving conversion of the renewal contracts into permanent repayment contracts, Reclamation has failed to comply with Section 3404(c)(2) of the CVPIA, which mandates incorporation of all requirements imposed by existing law as contract terms.  Relevant legal requirements include the CVPIA fishery mitigation, protection, and restoration (herein, "restoration") measures,  other legal requirements that confirm in-basin priority of Trinity River flow releases over out-of-basin diversions to Central Valley contractors, the fish and wildlife

---

[1] Pub. L. No. 102-575, §§3401-12, 106 Stat. 4600, 4706-31 (1992)
[2] Public Law 114-322, 130 Stat. 1628 (December 16, 2016),
[3] 42 U.S.C. §§ 4321 et seq.
[4] 5 U.S.C. §§ 501 et seq.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 2

1   preservation and propagation mandates in the Act of August 12, 1955, Pub. L. 84-386, 69 Stat.

2   719 (1955 Act), which authorized the Trinity River Division (TRD) of the CVP and the Trinity

3   River Hatchery (TRH), and contractors' obligations to pay the costs of implementing these

4   requirements pursuant to applicable law including CVPIA Section 3406(b)(23).

5          4.     Pursuant to Section 3404(c)(2), the legal priority of in-basin flow releases must be

6   included as conditions on supply made available for delivery to CVP contractors.  CVP

7   contractors must be explicitly contractually bound to all fishery restoration measures required

8   by existing law, including the CVPIA, and corresponding payment obligations.  Reclamation's

9   failure to include as contract terms the required fishery restoration, in-basin flow, and payment

10  obligations imposed by existing law violates the clear statutory language of CVPIA Section

11  3404(c)(2).  Failure to specifically include the requirements of existing law as contract terms in

12  the permanent contracts will directly impair Hoopa interests in the fish and water resources of

13  the Trinity River that support its federally reserved rights.

14         5.     Diversions of water from the Trinity River to the Central Valley have had and

15  continue to have a devastating impact on the fish, water, and other environmental resources of

16  the Trinity River that Hoopa relies upon.  The action of converting the currently time-limited

17  CVP contracts into permanent contracts is an action with significant environmental impacts that

18  requires NEPA review.  Reclamation has discretion in determining and negotiating the terms

19  and conditions of the contract conversions, and must comply with NEPA, including preparation

20  of an Environmental Impact Statement ("EIS") and/or an Environmental Assessment ("EA")

21  and evaluating appropriate alternatives before approving the contract conversions.  Reclamation

22  has failed to prepare an EIS, EA, or to comply with NEPA in any way whatsoever.

23         6.     Because of its violations of CVPIA Section 3404(c)(2) and NEPA, Reclamation's

24  approvals of the contract conversions also violate the APA as the approvals are arbitrary,

25  capricious, an abuse of discretion, or otherwise not in accordance with law, and without

26  observance of the procedure required by law.  5 U.S.C. 704, 706.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 3

7.      Due to Reclamation's legal violations, Reclamation's approvals of the permanent contracts are legally invalid.  Reclamation's approvals and the contracts must be set aside by this Court and the matter remanded to Reclamation for further action consistent with law.

## II.      JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

8.      Jurisdiction:  This case presents federal law claims by an Indian tribe challenging federal agency action.  This Court has jurisdiction pursuant to 5 U.S.C. §§ 702 - 706, 28 U.S.C. § 1331, 28 U.S.C. § 1346, 28 U.S.C. § 1361 - 1362, and 28 U.S.C. § 2201 - 2202.

9.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e)(1) because Hoopa and its Reservation are located in Humboldt County and because no real property is involved in this action.

10.     Intradistrict Assignment:  this case is properly assigned to the Eureka Division under Civil L.R. 3-2 because Hoopa and its Reservation are located in Humboldt County.

11.     There exists now between the parties an actual, justiciable controversy in which Hoopa is entitled to have a declaration of its rights and of Reclamation's obligations and in which Hoopa is entitled to declaratory and injunctive relief based on the allegations herein.

12.     This Complaint is timely filed within the applicable six-year statute of limitations set forth in 28 U.S.C. § 2401(a).

## III.      STANDING

13.     Hoopa, a federally-recognized Indian tribe, has standing to assert its claims herein.  Since time immemorial, Hoopa and its members, the Hupa people, have used and continue to use the Klamath-Trinity River system and its anadromous fishery resource for subsistence, cultural, ceremonial, religious, and commercial purposes.  The lower twelve miles of the Trinity River and a stretch of the Klamath River flow through the Hoopa Valley Reservation.

14.     Since time immemorial, the fishery resources of the Trinity and Klamath Rivers have been the mainstay of the life and culture of Hoopa and its people.  The fishery is "not

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 4

much less necessary to the existence of the Indians than the atmosphere they breathed." *Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir. 1981) (quoting *United States v. Winans*, 198 U.S. 371, 381 (1905)).  The salmon fishery holds significant commercial and economic value in Hoopa's culture and economy.  *See* Memorandum from John D. Leshy, Solicitor of the Department of the Interior to the Secretary of the Interior (Oct. 4, 1993) (M-36979) (hereinafter "1993 Solicitor Opinion").

15.   The principal purpose of Hoopa's Reservation was to set aside sufficient resources of the Trinity and Klamath Rivers for the Indians to be self-sufficient and achieve a moderate living based on fish.  *See* 1993 Solicitor Opinion 3, 15, 18-21, *cited with approval, Parravano v. Babbitt*, 70 F.3d 539, 542 (9th Cir. 1995), *cert. denied*, 518 U.S. 1016 (1996). Hoopa's federal reserved fishing right carries with it a corresponding right to Trinity and Klamath River flow levels that are sufficient to support a productive habitat for Hoopa's anadromous fishery, including but not limited to salmon and steelhead, including those produced by the TRH, and other culturally important salmon and non-salmonid species.

16.   Reclamation diverts water through the Trinity River Division (TRD) of the CVP, which would otherwise flow downstream through Hoopa's Reservation, and sends it out of the Trinity River Basin to implement the contracts at issue in this case.  Congress and the Department of the Interior have repeatedly affirmed and required protection of in-basin flows in the Trinity River from impacts of Reclamation's TRD/CVP out-of-basin diversions.  In the TRD's authorizing legislation in 1955 (Pub. L. 84-386, 69 Stat. 719), Congress conditioned out-of-basin diversions on preservation and propagation of fish and wildlife in the Trinity River Basin as well as on a separate provision for the annual release of not less than 50,000 acre-feet from Trinity Reservoir to be made available to Humboldt County and downstream water users including Hoopa.[5]  In 1979, Interior Solicitor Krulitz explained that the provisos of Section 2 of

---

[5]  1955 Trinity River Division Central Valley Project Act (the "1955 Act"), Pub. L. No. 84-386, 69 Stat. 719, § 2.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 5

the 1955 Act limit the integration of the TRD into the CVP and require the Secretary to exercise a priority for use of all TRD water necessary to protect fish and other in-basin needs over TRD diversions to the Central Valley for use in the CVP.[6]

17.     In 1981, the Secretary of the Interior ordered increased flows into the Trinity River from the TRD for the benefit of Hoopa and its fishery resources. The increased flows were to be used in a study to determine what TRD releases in addition to the initial flow release regimen established in the 1955 Act were needed for the preservation and propagation of the Trinity River fishery. A 1981 Secretarial Order found that:

> [T]he [Hoopa] and Yurok Indians have rights to fish from the Trinity and Klamath Rivers and to adequate water to make their fishing rights meaningful. These rights are tribal assets which the Secretary, as trustee, has an obligation to manage for the benefit of the tribes. The Secretary may not abrogate these rights even if the benefit to a portion of the public from such abrogation would be greater than the loss to the Indians. . . . There are responsibilities arising from congressional enactments, which are augmented by the federal trust responsibility to the Hupa and Yurok tribes, that compel restoration of the river's salmon and steelhead resources to pre-project levels.

18.     In 1984, Congress authorized the Secretary to adopt and implement a program to "achieve the long-term goal of restoring fish and wildlife populations in the Trinity River Basin to a level approximating that which existed immediately before the start of the construction of the [TRD] . . . and to maintain such levels."[7]

19.     In 1992, Congress enacted the CVPIA which dramatically altered the structure and purpose of the CVP. CVPIA Section 3406(a) amended the project purposes of the CVP set forth in 50 Stat. 844, 850, §2 (Act of August 21, 1937) by adding "mitigation, protection, and restoration of fish and wildlife" to the purposes of "improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored waters thereof, for construction under the provisions of the Federal

---

[6] Memorandum from Solicitor to Assistant Secretary, Land and Water Resources, Dec. 7, 1979 (the "1979 Opinion")

[7] Trinity River Basin Fish and Wildlife Management Act of 1984, Pub. L. No. 98-541, 98 Stat. 2721, § 2(a).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 6

reclamation laws of such distribution systems as the Secretary of the Interior deems necessary in connection with lands  for which said stored waters are to be delivered, for the reclamation of arid and semiarid lands and lands of Indian reservations . . .".  In CVPIA Section 3406(b)(23), Congress required the Secretary to take specific actions "in order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the [1984 Act]."[8] The 1984 Act actions identified in section 3406(b)(23) included completion by the Secretary, in consultation with Hoopa, of the Trinity River Flow Evaluation Study ordered by the Secretarial Decision of January 14, 1981; obtaining Hoopa's concurrence in the study results, and implementing the recommendations and associated operating criteria and procedures accordingly. The 1984 Act also requires the Secretary to modernize and increase the effectiveness of the TRH.  CVPIA Section 3406(b)(23) mandates that "[c]osts associated with implementation of this paragraph shall be reimbursable as operation and maintenance expenditures pursuant to existing law" (emphasis added).

20.    In the CVPIA, Congress also required that:  "Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the [CVP], the Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts."  CVPIA, § 3404(c)(2).  Congress further required environmental review pursuant to NEPA prior to renewal of CVP contracts. CVPIA, § 3404(c)(1), § 3409.

21.    Hoopa's rights to water and fish in the Trinity River, confirmed by Congress, the Secretaries of Interior and Commerce and multiple court cases, are directly threatened by Reclamation's failures to comply with the CVPIA, NEPA, and APA as related to the long-term (permanent) contracts at issue here.  The TRD diverts water that would otherwise flow through the Trinity River Basin and through Hoopa's Reservation.  The diversion of vast amounts of water from the Trinity River Basin through TRD facilities to out-of-basin water contractors

---

[8] Section 3406(b)(23) is reproduced in Exhibit 1.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 7

directly harms Hoopa and its interests.  The TRH is a source of fish to implement Hoopa fishing rights.  The Congressional directive of restoring Trinity River fish and wildlife populations to pre-project levels has not yet been achieved.  Reclamation's failure to comply with applicable statutory, regulatory, and contractual requirements directly harms Hoopa and its interests in the fish and water resources of the Trinity River.

22.   The CVPIA, the 1955 Act, and other provisions of existing law affirmatively protect Hoopa's vested property rights in the Trinity River fishery and the priority that exists for in-basin uses in the Trinity River over out-of-basin diversions to the CVP.  Here, Reclamation unlawfully seeks to circumvent and nullify the applicable legal protections by failing in its affirmative legal duty to incorporate the requirements imposed by existing law, including but not limited to the CVPIA and the WIIN Act, into the contracts at issue.

23.   Reclamation further seeks to avoid its duty to analyze the environmental impacts of the continued out-of-basin diversions as well as appropriate alternatives to such continued diversions (including the appropriate quantity of such diversions) and appropriate mitigation.  In converting contracts to permanent repayment contracts, or renewing contracts in their existing quantities, NEPA requires Reclamation  to evaluate alternatives that would implement  the conversions in ways that will assure fulfillment of the congressionally mandated Trinity River fish and wildlife restoration, preservation and propagation requirements as well as its federal trust responsibilities to Hoopa.

24.   Reclamation's failure to comply with its legal duties affirmatively harms Hoopa. An order of this Court finding Reclamation's acts and omissions unlawful, rescinding the unlawful contracts, and remanding to Reclamation with a direction to comply with its legal responsibilities would redress the injury that Hoopa alleges in this action.

25.   Hoopa also incorporates by reference all allegations below in support of its standing.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 8

## IV.   **PARTIES**

26.     Plaintiff Hoopa Valley Tribe is a federally-recognized Indian tribe located on the Hoopa Valley Reservation which is within Humboldt County, California.  The Trinity River and a stretch of the Klamath River flows through the Reservation.  Hoopa and its members have federal reserved rights to take hatchery and natural fish and a corresponding water right to protect and implement their rights to take hatchery and natural fish in the Trinity and Klamath Rivers.   Hoopa's interests are further described herein.

27.     Defendants in this action are:

A.     United States Bureau of Reclamation is a federal agency within the United States Department of the Interior that has primary management authority over the CVP and TRD and has a fiduciary trust responsibility to protect and preserve Hoopa's reserved rights, as well as an obligation to comply with NEPA in connection with its CVP management actions.  The United States Bureau of Reclamation approved, and is planning to approve, contracts challenged in this litigation without complying with the CVPIA, NEPA, the WIIN Act, or the APA.

B.     David Bernhardt is sued in his official capacity as Secretary of the Interior.  He oversees the Department of the Interior and Bureau of Reclamation and is responsible for the operation of the CVP and TRD, subject to the mandates of the CVPIA and other applicable federal law.

C.     Brenda Burman is sued in her official capacity as the Commissioner of the United States Bureau of Reclamation.

D.     Ernest Conant is sued in his official capacity as Regional Director of the California-Great Basin Region of the United States Bureau of Reclamation.

E.     United States Department of the Interior is a cabinet-level federal agency and the parent agency of the United States Bureau of Reclamation.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 9

## V.     STATUTORY AND REGULATORY BACKGROUND

## THE CENTRAL VALLEY PROJECT IMPROVEMENT ACT (CVPIA)

28.     Section 3402 of the CVPIA states that the purposes of the CVPIA are to:

(a)  protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California;

(b)  address impacts of the CVP on fish, wildlife, and associated habitats;

(c)  improve the operational flexibility of the CVP;

(d)  increase water-related benefits provided by the CVP to the State of California through expanded use of voluntary water transfers and improved water conservation;

(e)  contribute to the State of California's interim and long-term efforts to protect the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and

(f)  achieve a reasonable balance among competing demands for use of CVP water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors.

29.     Section 3406(b)(23) of the CVPIA specifically applies the federal government's trust responsibilities for Hoopa's Trinity River fishery resources to Reclamation and mandated implementation of the Trinity River Mainstem Fishery Restoration Program and associated TRD flow releases according to the terms concurred in by Hoopa in the December 18, 2000, Record of Decision executed on the Hoopa Valley Reservation by the Secretary and Hoopa's Chairman.  See Exhibit 1.

30.     Section 3404(c)(1) requires Reclamation to conduct environmental review prior to renewal of any long-term water contract.  Such appropriate environmental review includes, but is not limited to, the directive to the Secretary to prepare a programmatic EIS pursuant to Section 3409 of the CVPIA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 10

31.     Section 3404(c)(2) requires that:  "Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the CVP, the Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts.  The Secretary shall also administer all existing, new, and renewed contracts in conformance with the requirements and goals of this title."

## THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

32.     NEPA is "our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  Congress directed "that, to the fullest extent possible . . . the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in [NEPA] . . . ."  42 U.S.C. § 4332.

33.     The purposes of NEPA are to: (1) declare a national policy which will encourage productive and enjoyable harmony between man and his environment; (2) promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; and to (3) enrich the understanding of the ecological systems and natural resources important to the Nation.  42 U.S.C. § 4321.  NEPA recognizes that "each person should enjoy a healthful environment" and ensures that the federal government uses all practicable means to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations" and "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings."  *Id.* § 4331(b)-(c).

34.     To fulfill these purposes, NEPA requires that:  (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 11

35.     NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2(C).

36.     "Major Federal actions" subject to NEPA include both new and continuing activities.  40 C.F.R. § 1508.18(a).

37.     To determine whether the nature and extent of a proposed action's environmental effects requires preparing an EIS, federal agencies may first prepare an EA.  40 C.F.R. § 1501.4(b)-(c).  If, on the basis of the EA, the agency finds that the proposed action will produce "no significant impact" on the environment, then an EIS need not be prepared.  *Id.* § 1501.4(e).

38.     An agency's NEPA analysis must assess the direct, indirect, and cumulative impacts of its action.  40 C.F.R. § 1508.8.  As part of its NEPA review, an agency is also required to prepare a detailed statement regarding the alternatives to the proposed action.  42 U.S.C. § 4332(2)(C)(iii), (E).  An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," including a "no-action" alternative.  40 C.F.R. § 1502.14.

## THE ADMINISTRATIVE PROCEDURE ACT (APA)

39.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action."  5 U.S.C. § 702.  Final agency actions "for which there is no other adequate remedy in a court" are reviewable under the APA.  *Id.* § 704.

40.     Under the APA, a reviewing court shall set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law.  5 U.S.C. §706.  A reviewing court shall compel agency action unlawfully withheld or unreasonably delayed.  *Id.*

## THE WATER INFRASTRUCTURE IMPROVEMENTS OF THE NATION (WIIN) ACT

41.     In 2016, Congress enacted the WIIN Act. The WIIN Act directs Reclamation to convert existing CVP water service contracts to permanent repayment contracts upon the request of the contractor, under mutually agreeable terms and conditions.  WIIN Act, §4011(a).  The Secretary's administrative implementation of the WIIN Act must be consistent with and may not

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 12

alter existing applicable federal and state laws. WIIN Act, § 4001(a), (b).  WIIN Act § 4012 provides that the Act "shall not be interpreted or implemented in a manner that …(2) affects or modifies any obligation under the Central Valley Project Improvement Act (Public Law 102–575; 106 Stat. 4706." This includes, but is not limited to: (1) the CVP's environmental restoration purpose established by CVPIA §3406(a): (2) associated contractor cost obligations, particularly regarding the Trinity River; and (3) the CVPIA's §3404(c)(2) mandate to incorporate such terms in renewed contracts.

42.     The WIIN Act shall not be interpreted or implemented in a manner that (1) preempts or modifies any obligation of the United States under state law; (2) affects or modifies any obligation under the CVPIA, with an exception related to Stanislaus River predator management unrelated to this case; (3) overrides, modifies, or amends applicability of the ESA; (4) would cause additional adverse effects on listed fish species beyond the range of effects anticipated to occur to the listed fish species for the duration of the applicable biological opinion, using the best available scientific and commercial data available; or (5) overrides, modifies, or amends any obligation of the Pacific Fisheries Management Council.  WIIN Act, §4012(a).

## VI.     FACTUAL ALLEGATIONS

### A.  The TRD's Out-of-Basin Diversions, Which Support the Contracts at Issue, Continue to Imperil Hoopa's Fish and Water Resources in Violation of Law.

43.     Hoopa and its people have lived along the Trinity River, and relied upon its fish resources, since time immemorial.  The United States government located and set aside the Hoopa Valley Reservation, which the Trinity River flows through, on August 21, 1864.  *Mattz v. Arnett*, 412 U.S. 481, 490, fn. 9 (1973); *Short v. United States*, 202 Ct. Cl. 870, 875-980 (1973). On June 23, 1876, President Grant issued an Executive Order formally setting aside the Reservation for "Indian purposes."  *Short*, 202 Ct. Cl. at 877.  Traditional salmon fishing is one

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 13

of the "Indian purposes" for which the Reservation was created.  *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995).

44.  In 1864, the United States determined the Reservation a suitable permanent homeland for two principal reasons.  First, the Reservation is within the heart of Hoopa's aboriginal lands, which Hupa Indians occupied and fished upon for generations.[9]  *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995).  Hupa Indians possessed fishing and hunting rights long before contact with white settlers and their salmon fishery was "not much less necessary to [their existence] than the atmosphere they breathed."  *Id.* at 542, *quoting Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir. 1991).  Second, the Reservation set aside resources of the Trinity and Klamath rivers for Hupa people to be self-sufficient and achieve a moderate living based on fish.  *United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986).

45.  Hoopa's rights entitle Hoopa and its people to take fish from the Trinity and Klamath Rivers for ceremonial, subsistence, and commercial purposes.  *Eberhardt*, 789 F.2d at 1359.  In 1993, the Interior Solicitor Leshy examined the "history of the [Hoopa] reservation, the Indians' dependence on the Klamath and Trinity River fisheries, the United States' awareness of that dependence, and the federal intent to create the reservation in order to protect the Indians' ability to maintain a way of life, which included reliance on the fisheries.  1993 Solicitor Opinion, p. 3.  Solicitor Leshy found: "[T]he Government intended to reserve for the [Hoopa] a fishing right which includes a right to harvest a sufficient share of the resource to sustain a moderate standard of living."  *Id.* at p. 21.  Hoopa's rights are not satisfied simply by the presence of fish in the river, but rather by the harvesting of an adequate supply of fish by Hoopa's people.  *United States v. Washington*, 853 F.3d 946, 958, 965-66 (9th Cir. 2017)*, affirmed per curiam*, 584 U.S. ____ (2018) ("moderate living" standard requires protection of continued supply of fish for the Tribes).

_____

[9]  Hupa are the people of the federally-recognized Hoopa Valley Tribe.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 14

46.     In 1955, Congress authorized development of the Trinity River Division (TRD) as a part of the CVP – the extensive system of dams, canals, and reservoirs that divert, store, and regulate water for California's Central Valley.  Through the TRD, Reclamation diverts substantial quantities of water from the Trinity River and sends such water out-of-basin to CVP contractors.  The TRD, which includes Trinity Dam and Lewiston Dam on the Trinity River upstream of the Hoopa Valley Reservation, became operational in 1964, approximately 100 years after the United States set aside the Hoopa Reservation as a permanent homeland for Hupa Indians, reserving Trinity River water and fish for their subsistence and livelihood.  The TRH was an integral part of the TRD to replace fish lost by blocking 109 miles of habitat.

47. Throughout the planning process for the TRD, the Trinity fishery was understood to be a significant concern that needed to be protected:

> Although the two major functions of the [TRD] are to provide an additional supply of irrigation water and to generate hydroelectric energy, there are other important benefits to be gained by the construction and operation of the proposed development.  The present fishery resources of the Trinity River are an economic asset to the Trinity River Basin, as well as to the whole north coastal area, and therefore would require that the proposed development be operated to their advantage.

House Doc. No. 53, 83d Cong., 1st Sess., "Letter from the Secretary of the Interior transmitting the Report and Findings of the Trinity River Division of the Central Valley Project, California, Pursuant to Section 9(A) of the Reclamation Project Act of 1939" at 76.

48.   Both the House and Senate, in their deliberations on the TRD, reported that the fishery resources of the Trinity River are an asset to the Trinity River basin as well as to the whole north coastal area and that the TRD was planned with a view to maintaining and improving fishery conditions.  House Rept. No. 602, 84th Cong., 1st Sess. at 2 (May 19, 1955); Senate Rept. No. 1154, 84th Cong., 1st Sess. at 5.

49.   When Congress authorized the TRD in 1955, Congress recognized the critical importance of the fishery resources of the Trinity River and the need to protect them.  Congress intended the TRD be designed "with a view to maintaining and improving fishery conditions."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 15

1    *San Luis & Delta-Mendota Water Authority v. Haugrud*, 848 F.3d 1216, 1223 (9th Cir. 2017).

2    Section 2 of the 1955 Act provides that "the Secretary is authorized and directed to adopt

3    appropriate measures to insure the preservation and propagation of fish and wildlife . . . ."

4    Section 2 of the 1955 Act also provides that "not less than 50,000 acre-feet shall be released

5    annually from the Trinity Reservoir and made available to Humboldt County and downstream

6    water users."  These two provisos address distinct in-basin releases that have priority over out-

7    of-basin diversions.  *See* Solicitor Memorandum M-37030 regarding "Trinity River Division

8    Authorization's 50,000 Acre-Foot Proviso and the 1959 Contract Between the Bureau of

9    Reclamation and Humboldt County" (December 23, 2014).

10        50.  The TRD is the only source of CVP water imported to the Central Valley. The

11   original TRD legislation would have authorized both the TRD and the San Luis Unit (SLU). [10]

12   However the SLU planning report was delayed and the TRD proceeded to authorization in 1955

13   (Pub. L. 84-386). The SLU was eventually authorized by Public Law 86-488, 74 Stat.156 (June

14   3, 1960). The water[11] and energy[12] developed by the TRD are integral to the development,

15   ────────────────────

16   [10] Subcommittee on Irrigation and Reclamation of the Committee on Interior and Insular Affairs*,
     Hearing on H.R. 4663 to authorize the Trinity River division, Central Valley Project*, page 93,
     84th Cong., 1st Sess., page 3. (April 13, 1955).

17

18   [11] House Report No. 602, 84th Cong., 1st Sess. on H.R. 4664 (May 19, 1955*) at 4, "Under the
     plan of development and operation an average of 704,000 acre-feet of Trinity River water would
19   be diverted annually to the Sacramento River Basin . . . [of which] 525,000 acre-feet annually
     would be available for use on lands of the west side of the San Joaquin Valley."

20

21   [12] San Luis Unit, Central Valley Project, California: A Report on the feasibility of Water Supply
     Development, U.S. Department of the Interior, Bureau of Reclamation GPO 968842 (1956) at 3
22   and 7-8 "Power from the Trinity River Division is contemplated as the major source for the San
     Luis Unit pumping requirements."  "As stated in . . . [the] January 19, 1955 report, which was
23   adopted by Secretary McKay as his proposed report on the Trinity River Division, assurance of
     power for San Luis pumping, on advantageous terms would be basic in such arrangements. Since
24   there are no existing arrangements to sell falling water in connection with the Trinity River
     development, estimates in this report are based on power supplies from Federally-constructed
25   powerplants."  1956 Feasibility Report on the San Luis Unit *Letter from Secretary of the Interior
     to the President, August 1, 195*6: "The Unit will provide a full water supply to 440,000 acres of
26

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 16

construction, and operation of the SLU[13] whose member districts, including the Westlands Water District, have contracts with Reclamation for CVP water service. Those contracts include Contract No. 14-06-200-495A-IR1-P.  Congress conditioned the use of TRD water and energy for the benefit of the SLU and other CVP purposes by establishing first priorities to TRD water for Trinity River fish and wildlife resources and California's North Coast's economy. The Bureau of Reclamation disobeyed or ignored or rejected those priorities for decades.

51.  Construction, operation and maintenance of the TRD and the SLU caused widespread catastrophic environmental impacts in both the Trinity basin and in the Central Valley. Damming the Trinity River and over-diverting water to the Central Valley devastated Trinity basin fish and wildlife and caused economic hardship in North Coast Communities.

52.  The TRD Act and the SLU Act further confirm the nexus between: (1) Hoopa's property rights and interest in the Trinity River and its fishery; and (2) interests purported to be established by Reclamation in contracts with the Westlands Water District and other contractors in the SLU.

53.  In 1979, Interior Solicitor Krulitz explained that the provisos of Section 2 of the 1955 Act limit the integration of the TRD into the CVP and require the Secretary to exercise a priority for use of all TRD water necessary to protect fish and other in-basin needs:

> On occasion the Congress has specifically limited the Secretary's discretion in meeting the general CVP priorities.  For example, in authorizing the Trinity River Division of the CVP in 1955, Congress specifically provided that in-basin flows (in excess of a statutorily prescribed minimum) determined by the Secretary to be necessary to meet in-basin needs take precedence over needs to be served by out-of-basin diversion.  See Pub.

---

land along the west side of the San Joaquin valley. Most of this area is presently irrigated from ground water, but due to the rapidly lowering water levels, it is estimated that less than 150,000 acres can be sustained in permanent irrigated agriculture under present conditions.

[13]  *Id.* at 93. Congressman Sisk of California: "This particular project, the Trinity and the San Luis project, have already been considered as definite parts of and an integral part of and feature of the Central Valley project from its very inception."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 17

L. No. 84-386, § 2. In that case, Congress' usual direction that the Trinity River Division be integrated into the overall CVP, set forth at the beginning of section 2, is expressly modified by and made subject to the <u>provisos</u> that follow giving specific direction to the Secretary regarding in-basin needs.

Memorandum from Solicitor to Assistant Secretary, Land and Water Resources, Dec. 7, 1979.

54.   Contrary to the intent of Congress, the TRD development, operations, and resulting out-of-basin water diversions decimated fish populations including those required to fulfill Hoopa reserved fishing rights.  The TRD diverted an average of 88% of the annual inflow out of the Trinity River and into the Sacramento River Basin during its first ten years of operation. *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 861 (9th Cir. 2004).  The TRD also permanently eliminated fish access to 109 miles of habitat upstream of Lewiston Dam previously used by anadromous fish for holding, spawning, and rearing. Within a decade of the TRD's completion, salmonid populations dramatically decreased.  In 1980, the U.S. Fish and Wildlife Service estimated that the Trinity River fish population suffered a reduction of 60% to 80% and fishery habitat loss of 80% to 90%.  *Id.* at 862-63.

55.   The reduction in salmon populations had, and continues to have, a devastating impact on Hoopa.  In 1981, relying on an environmental study, the authority provided by the 1955 Act, § 2, and the federal trust obligation to protect Hoopa's reserved rights, the Secretary of the Interior ordered an increase in annual flows released from the TRD to the Trinity River downstream of Lewiston Dam.  1981 Secretarial Order.  The Secretary confirmed that mitigation is required to provide fish harvest opportunities to Hoopa for both subsistence and commercial purposes and that flow is critical to restoration, preservation, and propagation of the Trinity River fishery resource.

56.   In 1984, Congress affirmed and authorized the Secretary's restoration goal in the Trinity River Basin Fish and Wildlife Management Act ("1984 Act"), Pub. L. No. 98-541, 98 Stat. 2721.  Congress found that "the Secretary requires additional authority to implement a basin-wide fish and wildlife management program in order to achieve the long-term goal of restoring fish and wildlife populations in the Trinity River Basin to a level approximating that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 18

which existed immediately before the start of the construction of the Trinity River division."
1984 Act, § 1(6).  Congress directed the Secretary to develop and implement a fish and wildlife
management program for the Trinity River Basin designed to restore the fish and wildlife
populations in such basin to the levels approximating those which existed immediately before the
start of the construction [of the TRD] and to maintain those levels."  1984 Act, § 2(a).  The 1984
Act directed the "design, construction, operation and maintenance of facilities to—(A)
rehabilitate fish habitats in the Trinity River between Lewistown Dam and Weitchpec; (B)
rehabilitate fish habitats in the tributaries of such river below Lewiston Dam and in the south
fork of such river; and (C) modernize and otherwise increase the effectiveness of the Trinity
River Fish Hatchery."

57.  In 1992, Congress enacted the CVPIA which, among other things, sought "to protect,
restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity
River basins . . . ."  CVPIA, § 3402(a).  In Section 3406(b)(23), Congress required actions to
"meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe,
and to meet the fishery restoration goals of the [1984 Act]."  Section 3406(b)(23) required
Hoopa's concurrence on certain flow measures proposed for implementation.

58.  Subject to certain exceptions not relevant to this case, CVPIA section 3404(a)
prohibited any new contracts for CVP water for any purpose other than fish and wildlife before .
. . the provisions of subsections 3406(b)-(d) . . . were met." Section 3406(b) enumerated twenty-
three fish and wildlife restoration activities subject to that requirement. Section 3406(b)(23)[14]

59.  Congress, in CVPIA section 3404(c)(2), requires that:  "Upon renewal of any long-
term repayment or water service contract providing for the delivery of water from the [CVP], the
Secretary shall incorporate all requirements imposed by existing law, including provisions of this
title, within such renewed contracts."  CVPIA, § 3404(c)(2).   The Secretary shall also administer

---

[14] The WIIN Act amended CVPIA to delete two programs--(b)(14) and (18)--under 3406(b),
resulting in 3406(b)(23) being re-designated as 3406(b)(21) WIIN Act section 4010(g)(1)(B).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 19

all existing, new, and renewed contracts in conformance with the requirements and goals of this title.  *Id.*  Congress further required environmental review pursuant to NEPA prior to renewal of CVP contracts.  CVPIA, § 3404(c)(1), § 3409.

60.  In 1996, Congress enacted the Trinity River Basin and Wildlife Management Reauthorization Act (the "1996 Act").  Pub. L. No. 104-143, 110 Stat. 1338 (1996).  The 1996 Act amended the scope of the 1984 Act's mandate to include rehabilitation of fish habitat "in the Klamath River downstream of the confluence with the Trinity River."  1996 Act, § 3(b).  The 1996 Act also confirmed that "Trinity Basin fisheries restoration is to be measured not only by returning adult anadromous spawners, but by the ability of dependent tribal, commercial, and sport fisheries to participate fully, through enhanced in-river and ocean harvest opportunities, in the benefits of restoration."  1996 Act, Section 2.

61.  In 2000, Interior Secretary Babbitt signed a Record of Decision on Trinity River Mainstem Fishery Restoration (the "TRROD") which provided for flows intended to restore fishery habitat in the Trinity River downstream of Lewiston Dam.  Secretary Babbitt found that the Preferred Alternative was the "action which best meets the statutory and trust obligation [to Hoopa] of the Department to restore and maintain the Trinity River's anadromous fishery resources."  TRROD, p. 2.  In section 3406(b)(23) of the CVPIA, Congress required Hoopa's concurrence to make the TRROD effective, expressly establishing Hoopa's role as a co-manager of the Trinity River resources.

62.  The United States government, including the Department of the Interior, and its agencies, have a trust obligation to preserve, protect, and to restore Hoopa's rights.  The Supreme Court has long recognized "the distinctive obligation of trust" that the federal government owes to Indian tribes and federally protected rights.  *Seminole Nation v. United States*, 316 U.S. 286 (1942).  In carrying out its obligations to the Indians, the United States is charged with "moral obligations of the highest responsibility and trust."  *Id.* at 296-97.  This trust

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 20

obligation extends to any federal government action affecting Indians or their rights.  *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy*, 898 F.2d 1410, 1420 (9th Cir. 1990).

63.  The Ninth Circuit Court of Appeals has specifically recognized that the federal government is trustee of the Hoopa Valley Tribe's federal reserved fishing and water rights. *Parravano*, 70 F.3d at 546;  *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1214-15 (9th Cir. 2000).

64.  In 1995, Reclamation's Regional Solicitor explained in a memorandum to the Bureau of Reclamation's Mid-Pacific Regional Director that "Reclamation must exercise its statutory and contractual authority to the fullest extent to protect [Hoopa's] tribal fisheries and tribal water rights."  Memorandum on "Certain Legal Rights and Obligations Related to the U.S. Bureau of Reclamation, Klamath Project for Use in Preparation of the Klamath Project Operations Plan" (July 25, 1995).  That direction applies no less to Reclamation's management actions relating to the Trinity River.

65.  Congress has specifically recognized the federal government's trust obligation to Hoopa and has affirmatively legislated direct protection of Hoopa' rights and interests in Trinity River fish and water resources in Section 2 of the 1955 Act, the 1984 Act, and Section 3406(b)(23) of the CVPIA.  "We also find significant section 3406(b)(23)'s reference to the Hoopa Valley Tribe – and its exclusion of all other tribes."  *Haugrud*, 848 F.3d at 1232.

66.  Since the beginning of the TRD, Congress has mandated that the Interior Department, including Reclamation, act to ensure the preservation and protection of fish populations in the Trinity River.  In addition to its general fiduciary trust obligation to protect and preserve Hoopa's reserved rights, Congress imposed a specific requirement on the Interior Department in the 1955 Act to mitigate TRD impacts on Hoopa's fishery upstream of Lewiston. In addition, the 1984 Act directed the Secretary to develop and implement a program that would restore Trinity River fish populations to pre-project (TRD) levels and to modernize and increase the effectiveness of the TRH.  In 1992, Congress affirmatively recognized the federal

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 21

government's specific trust obligation to Hoopa and protection of its fishery resource.  In the 1996 Act, Congress confirmed that the purpose of the program authorized by the 1984 Act was not merely to preserve fish for preservation's sake, but to provide a harvestable population of salmon for Hupa people as well as other tribal and non-tribal fishers.  Congress and the Secretary have repeatedly and explicitly recognized the specific trust obligation that exists regarding protection of Hoopa's trust fishing resource from impacts of the TRD.

67.  Yet, today, fish populations are not at pre-project levels nor anything close to them.  SONCC Coho salmon, a population that includes Klamath and Trinity River Coho, was estimated in 1940 to range between 150,000 and 400,000 naturally spawning fish annually.  *See* Threatened Status for SONCC ESU of Coho Salmon, 62 Fed. Reg. 24588, 24588 (May 6, 1997) ("Listing Notice").  In 1997, NMFS concluded that "Coho populations in this ESU are very depressed, currently numbering approximately 10,000 naturally produced adults." *Id*.  The perilous situation of the SONCC Coho salmon prompted NMFS in 1997 to list the fish under the ESA as threatened.  In listing the Coho, NMFS noted that "water diversions" and "water withdrawals" for irrigation were "major activities responsible for the decline of Coho salmon in Oregon and California." *Id*. at 24,592.  SONCC coho remain listed as threatened under the ESA due to their continued depressed populations.

68.  In 1957, the Secretary concluded that the 1955 Act's mandate for preservation and propagation of Trinity River basin fish and wildlife required, as an authorized feature of the TRD, the construction and operation of the Trinity River Hatchery (TRH) near Lewiston, California, to mitigate for loss of anadromous fish production in 109 miles of stream habitat permanently blocked by TRD facilities.

69.  Although the TRH was authorized and constructed as a feature of the TRD to mitigate those habitat impacts, Reclamation failed to oversee and manage the performance of the State of California's Department of Fish and Wildlife with whom it had contracted to run the TRH. The condition of the TRH has deteriorated during the decades of mismanagement.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 22

Reclamation has failed to fulfill the mandates of the 1984 Act to modernize and increase the effectiveness of the TRH (Public Law 98-541 §2(a)(1)(C)) or require CVP contractors to pay the cost pursuant to CVPIA section 3406(b)(23).

70.  A 2012 California Hatchery Review Report reported, with regard to the Trinity River, that:

> Mitigation goals for lost adult production were determined from pre-project studies of anadromous fish population in the basin.  The USFWS and CDFG (1956) estimated that 5,000 coho; 3,000 spring Chinook; 8,000 summer Chinook and 24,000 fall Chinook; and 10,000 steelhead (no run timing was designated) passed above the Lewiston Dam site prior to its construction.  Total annual adult production goals (catch plus escapement) for TRH [Trinity River Hatchery] were further defined in 1980 to be 7,500 coho, 6,000 spring Chinook, 70,000 fall Chinook and 22,000 steelhead (Frederickson et al. 1980).  Escapement goals to the hatchery were further defined in 1983 as 2,100 coho, 3,000 spring Chinook, 9,000 fall Chinook and 10,000 steelhead (USFWS 1983).

71.  Average returns of hatchery fish to Trinity River above Willow Creek in recently completed brood cycles (run years 2015-2018) fall far short of the 1983 goals for all species (which goals still less than the estimated pre-project escapement levels).  Significantly an average of only 6,200 fall Chinook returned to TRH between 2010 and 2019.  This has substantially deprived Hoopa of its right to take fish.

72.  In 2004, the Ninth Circuit Court of Appeals recognized that:  "Restoration of the Trinity River fishery, and the ESA-listed species that inhabit it . . . . are unlawfully long overdue."  *Westlands*, 376 F.3d at 878.  Today, Hupa people are still not able to harvest meaningful quantities of fish to support their families or to provide the moderate livelihood based on fish that was promised to them by the federal government long before development of the TRD.

B.      In Approving Conversion of the CVP Contracts to Permanent Contracts, Reclamation Failed to Comply With CVPIA Section 3404(c)(2).

73.  Reclamation must comply with its legal responsibilities relating to restoration and preservation of the Trinity River fishery, specifically including CVPIA section 3404(c)(2) and NEPA.  In addition to conducting appropriate environmental review, Reclamation must include

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 23

all existing requirements of law relating to the Trinity River fishery restoration program and the TRH and payments therefore, as well as the in-basin priority of Trinity River flows over out-of-basin diversions, in the converted contracts.

74.   On February 28, 2020, Reclamation approved the conversion of 14 CVP contracts into permanent water service contracts including a contract with Westlands Water District, Contract No. 14-06-200-495A-IRI-P in the amount of 1,150,000 acre-feet per year.  A table of all fourteen contract conversions approved on February 28, 2020 is found at Exhibit 2 to this Complaint.

75.      Reclamation is likewise believed to be in the process of converting an additional 26 CVP contracts, which are shown in a table on Exhibit 3 to this Complaint.

76.   The permanent contracts approved by Reclamation violate CVPIA section 3404(c)(2) because they fail to incorporate the requirements imposed by existing law, including the fishery restoration provisions of the CVPIA and associated payment obligations, within such renewed contracts.  Section 3404(c)(2) requires compliance with and incorporation of fishery restoration requirements, including those applicable to the Trinity River, in all long-term contracts.

77.   The permanent contracts also fail to include terms subordinating the out-of-basin water deliveries to CVP contractors to in-basin flows that have legal priority pursuant to the CVPIA and the 1955 Act.  Failure to affirmatively incorporate the applicable legal requirements relating to protection of the Trinity River and Hoopa's trust resources into the contracts is a clear and express violation of CVPIA section 3404(c)(2).

78.   Contract provisions approved by Reclamation in the converted contracts are in direct conflict with CVPIA and other existing legal requirements relating to Trinity River flows and fishery restoration measures.  For example, paragraph 37 of the converted contract with Westlands Water District states:

> By entering into this Contract, the Contractor does not waive its rights to contest the validity or application in connection with the performance of the terms and conditions of this Contract of any Federal law or regulation; Provided, That the Contractor agrees to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 24

comply with the terms and conditions of this Contract unless and until relief from application of such Federal law or regulation to the implementing provision of the Contract is granted by a court of competent jurisdiction.

This language is in direct conflict with the requirement of Section 3404(c)(2) of the CVPIA that expressly requires full incorporation of the existing requirements of federal law, which would include the CVPIA fishery restoration measures and legal requirements confirming priority of in-basin flows pursuant to the CVPIA and 1955 Act over out-of-basin diversions.

79.   The contracts also unlawfully fail to explicitly include terms regarding CVP contractors' payment obligations regarding implementation of the CVPIA's fishery restoration programs.

80.   Reclamation is legally required to operate the TRD and CVP in a manner that subordinates out-of-basin uses of TRD water to the Trinity River's in-basin needs.  Reclamation is attempting to write those priorities out of the law by enacting permanent contracts that fail to recognize and incorporate those applicable priorities and legal requirements as contract terms. This expressly violates CVPIA section 3404(c)(2) and renders the contract conversions unlawful.

81.   Hoopa seeks to prevent further deleterious impacts to its fishery from Reclamation's unlawful contracting actions.  Reclamation has violated Section 3404(c)(2) of the CVPIA by ignoring and failing to comply with its mandatory duty to "incorporate all requirements imposed by existing law, including provisions of this title [the CVPIA], within such renewed contracts." This is no minor violation; Section 3404(c)(2) is designed to ensure that CVP contracts, and any out-of-basin diversions authorized therein, will remain expressly subject to the fishery restoration requirements and the in-basin flow priorities contained in existing laws including the 1955 Act, the CVPIA, and the TRROD.  Reclamation's attempt to execute permanent water contracts without these required terms is an unlawful effort to evade the established fishery restoration measures and in-basin priorities affirmatively designed to protect Hoopa and the Trinity River resources it relies upon.  The contracts, as approved, are unlawful.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 25

82.     Hoopa wrote to Regional Director Conant on December 16, 2019 and on March 24, 2020 pointing out the need to incorporate appropriate provisions into the contracts at issue. These entreaties were ignored, contrary to 43 USC 485h(f). Further, the contracts lack validation, which is required by 43 U.S.C. § 511.

C.      In Approving Conversion of the CVP Contracts to Permanent Contracts, Reclamation Failed to Comply With NEPA.

83.   Hoopa seeks to enforce Reclamation's mandatory obligation to evaluate the environmental impacts of its water contracting actions pursuant to the CVPIA and NEPA and to evaluate alternatives to its actions that would better protect the imperiled Trinity River resources that are impacted by the out-of-basin diversions resulting from the contracts.

84.   In 1999, Reclamation issued a programmatic EIS pursuant to the CVPIA.  However, that programmatic EIS did not evaluate the environmental effects of converting Reclamation's existing CVP contracts to permanent contracts, but provided that future NEPA review would occur at the level of specific actions, including new contracts and contract renewals consistent with NEPA's tiering provisions.

85.   In 2000, following consultation with Reclamation pursuant to section 7 of the ESA (16 U.S.C. § 1536), the United States Fish and Wildlife Service released a biological opinion for the implementation of the CVPIA and the continued operation and maintenance of the CVP, which stated that:

> Once the long-term contract renewal negotiations are completed, the renewals will be subject to a separate, tiered analysis that is consistent with the NEPA tiering in the PEIS. No contracts will be renewed until the appropriate environmental review has been completed.  Reclamation will consult either formally or informally with the Service before executing a contract.  The site specific, tiered analysis will address direct and indirect effects of contract renewal.

86.   Reclamation has not prepared an EIS, EA, or otherwise complied with NEPA in any respect prior to making the contracts at issue permanent and its failure to comply with NEPA is ongoing with respect to contracts that remain in the process of conversion to permanent.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 26

87.   The out-of-basin diversion of water to the Central Valley from the Trinity River basin, which would otherwise flow through the Trinity River, significantly impacts the fish, water, environmental, and socioeconomic resources of the Trinity River basin.  The conversion of CVP contracts to permanent contracts will perpetuate these adverse impacts.  Locking in the contracts for all time without environmental analysis of any kind violates NEPA.

88.   The importance of the Trinity River and its resources to Hoopa and to the fulfillment of the Hoopa Valley Reservation as a permanent homeland for Hoopa and its people, the recognition and confirmation by Congress of the federal government's trust responsibilities to Hoopa, and the imperiled status of the Trinity River fishery provide unique characteristics that support NEPA review.  40 C.F.R. § 1508.27(b)(3).

89.   The conversion and locking-in of the water contracts is highly controversial, which supports NEPA review.  40 C.F.R. § 1508.27(b)(4).

90.   Locking-in the contracts as permanent contracts without NEPA review forecloses inquiry into possible future changes in climate and to species status and possible ways to mitigate impacts resulting from such changes.  40 C.F.R. § 1508.27(b)(5).

91.   Reclamation's conversion of each contract establishes a precedent for future actions with significant effects and represents a decision in principle about future consideration, which supports NEPA review.  40 C.F.R. § 1508.27(b)(6).  Reclamation is considering conversion of dozens of CVP contracts.  Each contract conversion establishes a precedent for future actions with significant effects.

92.   Each contract conversion is related to the conversion of the dozens of other CVP contracts, which demand water supply from sources that include the Trinity River, in addition to other past, ongoing, and reasonably foreseeable future actions that affect the Trinity River Basin and its resources.  The cumulative impact warrants NEPA review.  40 C.F.R. § 1508.27(b)(7).

93.   Salmon are not only a source of subsistence and economy for Hoopa, but are also a cultural and spiritual resource.  In addition, salmon species in the Trinity River are in imperiled

condition.  Some, such as SONCC coho, are already listed under the Endangered Species Act while others, such as Chinook species, are being reviewed for possible listing.  These factors further support NEPA review.  40 C.F.R. § 1508.27(b)(8), (9).

94.  The conversion of the contracts also separately threatens violations of Federal and State laws and requirements imposed for the protection of the environment including Section 3404(c)(2) of the CVPIA and the fish protection measures and in-basin flow requirements found in the CVPIA, the TRROD, and the 1955 Act.  As discussed herein, the converted contracts do not incorporate all requirements imposed by existing law in violation of Section 3404(c)(2).  The locking-in of the contracts also threatens the requirements of the 1984 Act as well as the ESA. 40 C.F.R. § 1508.27(b)(10).

95.  Reclamation's failure to prepare an EIS or EA on the conversion of the contracts constitutes failure to proceed in the manner required by NEPA because entering into each contract was a major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C).  Reclamation's failure to prepare an EIS or EA on the conversion of the contracts also constitutes agency action unlawfully withheld or unreasonably delayed.

96.  Reclamation's failure to prepare an EIS or an EA foreclosed its analysis of alternatives to the proposed action in violation of NEPA.  40 C.F.R. § 1502.14(a).  In light of the continuing failure to meet the goals and requirements of the 1984 Act and to restore the Trinity River fishery to pre-TRD levels, and given the confirmed impact that out-of-basin water diversions have on Trinity River resources, the failure to consider alternatives to permanently locking-in the water diversions to CVP contractors (as opposed to alternatives that either reduce or otherwise mitigate the continuing effects of such diversions on environmental resources) is unlawful.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Violations of CVPIA and the APA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 28

97.  Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in this Complaint.

98.  Reclamation violated and is violating Section 3404(c)(2) of the CVPIA and the APA by executing or otherwise approving the conversion of CVP renewal contracts into permanent water service contracts without expressly incorporating all requirements imposed by existing law, specifically including requirements imposed by the 1955 Act, 1984 Act, CVPIA, and TRROD, which impose specific fishery restoration measures and payment obligations and which confirm the in-basin priority of Trinity River flow releases over out-of-basin diversions to the Central Valley contractors, as terms within such contracts. Specifically, the contracts fail to (1) secure recognition of fishery restoration as a project purpose; (2) memorialize in the contract the O&M cost obligation under CVPIA §3406 (b)(23); (3) specify the 2000 TRROD, the 2017 ROD and 1955 Act Proviso 2 water as expressly acknowledged and accepted by the contractors; (4) memorialize the 1979 Krulitz opinion confirming Trinity Basin priority; (5) address TRH failures and mismanagement; and (6) declare TRH modernization and improved effectiveness is an O&M expense per CVPIA §3406 (b)(23).

99.  Reclamation's actions and omissions, specifically including their failure to comply with the CVPIA as described herein, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law and are reviewable in this Court under the APA, 5 U.S.C. §§ 702 - 706.

100.  Due to Reclamation's violations of the CVPIA and the APA, Reclamation's approvals of the contracts are unlawful, and the contracts are legally invalid and must be set aside by this Court.

## SECOND CLAIM FOR RELIEF

### Violations of NEPA and APA

101.  Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in this Complaint.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 29

102.   Reclamation's execution and/or approval of the conversion of CVP renewal contracts into permanent water service contracts constitutes a major federal action or actions that will significantly affect the quality of the human environment.  Reclamation has a duty under NEPA to prepare an EIS or an EA before approving conversion of the contracts.

103.   Reclamation failed to prepare an EIS or an EA before approving the contracts in violation of NEPA.

104.   Reclamation failed to develop or consider alternatives to the proposed contract conversion actions in violation of NEPA.

105.   Reclamation's approvals of the conversion of the CVP contracts to permanent water service contracts without any compliance with NEPA is unlawful under NEPA and the APA.

106.   Reclamation's failure to comply with NEPA prior to its execution and/or approval of the contract conversions constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and procedures required by law and are reviewable in this Court under the APA.  5 U.S.C. §§ 702 - 706.

107.   Due to Reclamation's violations of NEPA and the APA, Reclamation's approval of the contracts is unlawful, and the contracts are legally invalid and must be set aside by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Hoopa respectfully requests that this Court:

    A.    Find and declare that Reclamation has failed to comply with Sections 3404(c)(2) of the CVPIA by executing or otherwise approving the conversion of CVP renewal contracts into permanent water service contracts without expressly incorporating all requirements imposed by existing law, specifically including requirements imposed by the 1955 Act, 1984 Act, CVPIA, and TRROD, which impose specific fishery restoration measures and payment obligations and which

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 30

1    confirm the in-basin priority of Trinity River flow releases over out-of-basin

2    diversions to the Central Valley contractors, as terms within such contracts;

3  B.    Find and declare that Reclamation's failure to prepare an EIS or an EA to assess,

4    disclose, and consider the environmental effects of the contract conversions, and

5    alternatives to the contract conversions, violates NEPA;

6  C.    Find and declare that Reclamation's approvals of the contract conversions are

7    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

8    law, and without observance of procedure required by law;

9  D.    Vacate, set aside, rescind, and nullify all of Reclamation's contract conversions

10    challenged herein;

11  E.    Enjoin Reclamation from taking any action pursuant to the contract conversions,

12    until Reclamation has fully complied with NEPA and Section 3404(c)(2) of the

13    CVPIA;

14  F.    Enjoin Reclamation from converting any other contracts absent full compliance

15    with CVPIA Section 3404(c)(2) and NEPA;

16  G.    Grant other preliminary and/or permanent injunctive relief;

17  H.    Award Hoopa its costs of litigation, including reasonable attorneys' fees; and

18  I.    Grant Hoopa such additional relief as the Court may deem just and proper.

19  DATED this 13th day of August 2020.

20

21                    MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE

22                    _/s/ Thomas P. Schlosser_
                     Thomas P. Schlosser WSBA #06276
23                    Attorneys for Plaintiff Hoopa Valley Tribe

24

25

26

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 31