EXHIBIT 4

10/26/95 09:42 ☎202 293 6492  HALL ESTILL DAVE PHELMAN  Case 1:20-cv-01814-JLT-EPG  Document 97-4  Filed 10/31/22  Page 2 of 5  ☒003/016

03/20/91 15:44  DOI/SOL  ☒002



# UNITED STATES DEPARTMENT OF THE INTERIOR
## OFFICE OF THE SOLICITOR
### WASHINGTON, D.C. 20240

DEC 7 1979

Memorandum

To: Assistant Secretary, Land and Water Resources

From: Solicitor

Subject: Proposed Contract with Grasslands Water District

A question has been raised whether the Department may amend its contract with the Grasslands Water District in the Central Valley Project (CVP) to provide that, in critically dry years, the District be accorded equal priority with agricultural contractors. The District is usually delivered 50,000 acre-feet of water primarily for waterfowl management, under the terms of the Act of August 27, 1954, Pub. L. No. 83-674, 68 Stat. 879, 16 U.S.C. § 695d, et seq., which was recently amended by the Fish and Wildlife Improvement Act of 1978, Pub. L. No. 95-616, 92 Stat. 3115.

The question is whether equal priority is consistent with the applicable CVP authorizations which establish general categories of priorities for CVP operations, as follows: (1) river regulation, improvement of navigation, and flood control; (2) irrigation and "domestic uses;" (3) power; and (4) fish and wildlife and "other beneficial uses."1/

The 1954 Act provides that the "entire Central Valley Project" theretofore authorized and reauthorized, "is hereby reauthorized and declared to be for the purposes set forth in said acts, and also for the use of the waters thereof for fish and wildlife purposes, subject to such priorities as are applicable [under previous authorizations]." One of my predecessors held that the express reference to the use of waters for fish and wildlife in the 1954 Act is "simply a more definitive specification" of "other beneficial uses" which were an authorized project purpose (and lowest priority) ever since the 1937 reauthorization of the project. See 50 Stat. 844, 850; Opinion by Acting Solicitor Armstrong, "Allocations for fish and wildlife conservation on Central Valley Project," Nov. 15, 1954, p. 3. The Solicitor went on to point out: "The condition in [section 1 of] Public Law 674 that the use

---

1/ See Pub. L. No. 75-392, 50 Stat. 844 (Aug. 26, 1937).

-2-

of such waters for wildlife conservation purposes shall be subject to such priorities as are applicable under prior authorizations also is simply a specific recognition by the Congress of the existence of the priorities originally specified."

I agree with and reaffirm this opinion. It does not, however, directly address the question here presented. For the same reason, the provisions of section 6 of the 1954 Act, which authorized contracts to supply CVP water to certain wildlife areas on an "if and when available" basis, begs the question presented here of how much water can be made "available" by the Secretary under general CVP priorities. As noted above, the 1954 Act was amended in 1978, but in a way not relevant here.

A narrow, technical reading of the CVP statutory priorities might suggest that in every situation throughout the CVP deficiencies shared equally by irrigation and fish and wildlife are unlawful; in other words, to require that a higher priority must be totally satisfied before a lower one can be met. I am unaware of any legislative history of CVP statutory authorities which supports such a theory.

The Secretary has never applied the priorities or operated the project that way. Rather, the allocation of relative shortages or benefits among priorities in any specific situation has been regarded as a discretionary matter within the Secretary's judgment.

For example, this kind of narrow interpretation — placing total emphasis on flood control (the highest priority) — would reduce water storage in reservoirs for irrigation. Maximizing flood protection would dictate that reservoirs be kept nearly empty certain times of the year in the event massive precipitation and runoff occurred. Operation that way would limit storage of water for irrigation and other uses later in the year. But reservoirs are not operated to wring every conceivable bit of flood storage capability out of the storage space; instead, they are operated according to Corps of Engineers criteria which strike a reasonable balance between the need for stored water and the remote possibility of huge storms.

To give a specific example, the Folsom Reservoir on the American River above Sacramento is not sufficient, in the judgment of the Corps of Engineers and the Bureau, to protect Sacramento from the worst conceivable flood (the so-called "standard project flood"). Additional flood control is one justification for the proposed Auburn dam, authorized to be built upstream from Folsom. Yet Folsom reservoir is not, in advance of completion of the Auburn dam, kept at its lowest possible storage level in the spring even though additional protection from

-3-

an unexpected, and highly improbable, standard project flood (estimated to occur once every thousand years) might be obtained if it were. 2/

To take another example, many CVP contracts provide that municipal and industrial uses are cut in critically dry years _after_ irrigation is cut, even though irrigation and "domestic uses" are of equal statutory priority. To take a third, more immediate example, in the 1976-77 drought Grasslands was delivered water on an equal priority with municipal and industrial users, and ahead of irrigators, because of very serious threat to migratory waterfowl.

Operating a huge, multi-purpose project like the CVP is a complicated undertaking, which precludes applying the order of priorities in any individual situation in an absolute, inflexible way. Rather, the Bureau has strived to coordinate disparate functions in a way which serves them all in the project as a whole, while maintaining a balance which fairly reflects the authorized priorities of purpose. The fact that Congress has typically provided, in adding new features to the project, that the new features shall be integrated into the overall project reinforces this view that it is the project as a whole which supplies the context for applying the statutory priorities. 3/

On occasion the Congress has specifically limited the Secretary's discretion in meeting the general CVP priorities. For example, in authorizing the Trinity River Division of the CVP in 1955, Congress specifically provided that in-basin flows (in excess of a statutorily prescribed minimum) determined by the Secretary to be necessary to meet in-basin needs take precedence over needs to be served by out-of-basin diversion. See Pub. L. No. 84-386, §2. In that case, Congress'

---

2/ While Congress specifically provided that the Auburn Project be operated for flood control in accordance with Corps of Engineers criteria, 43 U.S.C. § 616bbb, Congress made no such direction in the Folsom authorization. See 58 Stat. 900.

3/ See, e.g., Pub. L. No. 84-386, 69 Stat. 719 (Aug. 12, 1955) (Trinity River Division authorization), § 2, 43 U.S.C. § 616bbb; Pub. L. No. 89-161, 79 Stat. 615 (Sept. 2, 1965) (Auburn-Folsom South Unit authorization), § 2. The Auburn-Folsom South provision is typical, providing in pertinent part that the unit be "integrated and coordinated, from both a financial and an operational standpoint, with the operation of other features of the Central Valley project ... in such manner as will effectuate the fullest, most beneficial, and most economic utilization of the water resources hereby made available." 43 U.S.C. § 616bbb.

-4-

usual direction that the Trinity River Division be integrated into the overall CVP, set forth at the beginning of section 2, is expressly modified by and made subject to the provisos that follow giving specific direction to the Secretary regarding in-basin needs.

Applying the general statutory priorities in the context of the project as a whole accords both with past practice and Congress' intent. The priorities have meaning in the sense that it would be improper for the Secretary to devote most CVP-stored water primarily to power production or fish and wildlife protection while shorting other purposes of a higher priority. The record shows that the vast bulk of the CVP yield of nearly 8 million acre-feet is devoted to irrigation and other uses of a higher statutory plane than fish and wildlife protection. Thus the statutory priorities are fairly being met, even if they have not slavishly dictated every individual decision in the thousands of operating judgments that must be made in a project this large and complex.

In short, the congressional priorities must not be applied in the context of a single contract or a single small facet of an enormous project, but from the perspective of project operation as a whole. For this reason, it is plain that the Grasslands contract is consistent with the statutory priorities.

*Leo Krulitz*
SOLICITOR