Thane D. Somerville WSBA #31468 *pro hac vice*
Thomas P. Schlosser WSBA #06276 *pro hac vice*
MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE
811 First Avenue, Suite 218
Seattle, WA 98104
Tel:    206-386-5200
Fax:    206-386-7322
t.somerville@msaj.com
t.schlosser@msaj.com
Attorneys for Plaintiff Hoopa Valley Tribe

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOOPA VALLEY TRIBE,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES BUREAU OF RECLAMATION; DEBRA ANNE HAALAND, in her official capacity as Secretary of the Interior; MARIA CAMILLE CALIMLIM TOUTON, in her official capacity as Commissioner of the United States Bureau of Reclamation; ERNEST A. CONANT, in his official capacity as United States Bureau of Reclamation California-Great Basin Regional Director; and UNITED STATES DEPARTMENT OF THE INTERIOR<br><br>    Defendants. | Civ. No. 1:20-cv-1814-JLT-EPG<br><br>MEMORANDUM IN SUPPORT OF PLAINTIFF HOOPA VALLEY TRIBE'S MOTION FOR PRELIMINARY INJUNCTION<br><br>Date:  January 20, 2023<br>Time:  9:00 AM<br>Courtoom:    4 – 7th Floor, Fresno<br>Judge:        Hon. Jennifer L. Thurston |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

I.     INTRODUCTION ............................................................................................. 1

II.    FACTUAL AND PROCEDURAL BACKGROUND .......................................... 4

    A.    Federal Indian Law and Reclamation Law Established Hoopa's Vested Property Rights in the Trinity River Fishery. ................................................... 5

    B.    The TRD Harmed the Trinity Fishery and Severely Damaged Hoopa. ........................ 6

    C.    To Protect Tribal Rights, the Secretary and Congress Took Action to Restore Fish and Fish Habitat to Pre-Project Levels. .............................. 7

    D.    To Protect Tribal Rights, the Secretary and Congress Took Action to Restore Fish and Fish Habitat to Pre-Project Levels. .............................. 8

    E.    Hoopa and the U.S. Fish and Wildlife Service Jointly Prepare and, in June 1999, Finalize the Trinity River Flow Study ...................................... 9

    F.    The Secretary and Hoopa Concur in the Recommendations and Sign the ROD. ........ 10

    G.    Federal Defendants Have Unlawfully Decided to Significantly Modify the Timing and Amounts of ROD Flow Releases In the Absence of Hoopa Concurrence. .......... 11

III.   ARGUMENT ................................................................................................. 12

    A.    This Court Should Issue A Preliminary Injunction to Prevent Irreparable Harm Resulting From Defendants' Decision to Approve the Trinity River Winter Flow Variability Project, Which Will Unlawfully Modify and Limit Flow Releases Necessary for Restoration of the Trinity River Fishery in the Absence of Hoopa's Required Concurrence. ....................................................................... 12

    B.    Hoopa Is Likely to Prevail on the Merits of Its Claim That, Pursuant to the Statutory Delegation of Sovereignty Found in CVPIA §3406(b)(23), Flows Prescribed In the Trinity River ROD May Not Be Modified by the WFV Project Absent Hoopa's Concurrence. ............................................................................. 12

    C.    Hoopa Will Suffer Irreparable Harm Absent Injunctive Relief. ................................ 17

    D.    The Balance of Hardships Tips Strongly in Hoopa's Favor. ..................................... 19

    E.    An Injunction Would Be In the Public Interest. ....................................................... 20

    F.    No Bond Should Be Required In This Action to Protect Hoopa Sovereignty and Trinity River Resources. ..................................................................... 21

IV.   CONCLUSION ............................................................................................. 22

**TABLE OF AUTHORITIES**

**Cases**

*Alliance for Wild Rockies v. Cottrell*
  622 F.3d 1045 (9th Cir. 2010) ............................................................... 17

*Blake v. Arnett*
  663 F.2d 906 (9th Cir. 1991) ................................................................. 5

*Bugenig v. Hoopa Valley Tribe*
  266 F.3d 1201 (9th Cir. 2001) ............................................................... 14

*County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*
  502 U.S. 251 (1992) .............................................................................. 13

*Davis v. Minetta*
  302 F.3d 1104 (10th Cir. 2002) ............................................................. 21

*Environmental Defense Fund v. Corps of Engineers*
  331 F. Supp. 925 (D.D.C. 1971) ........................................................... 21

*Lockheed Missile & Space Co. v. Hughes Aircraft Co.*
  887 F. Supp. 1320 (N.D. Cal. 1995) .................................................... 12

*Mattz v. Arnett*
  412 U.S. 481 (1973) ............................................................................... 5

*Montana v. Blackfeet Tribe*
  471 U.S. 759 (1985) ............................................................................. 13

*Parravano v. Babbitt*
  70 F.3d 539 (9th Cir. 1995) ................................................................... 5

*People ex rel. Van de Kamp v. Tahoe Regional Planning Authority*
  766 F.2d 1316 (9th Cir. 1985) ............................................................. 21

*Ramah Navajo School Board v. Bur. of Revenue*
  458 U.S. 832 (1982) ............................................................................. 13

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*
  826 F.3d 1030 (8th Cir. 2016) ............................................................. 21

*Short v. United States*
  202 Ct. Cl. 870 (1973) ........................................................................... 5

*State of Alabama ex rel. Baxley v. Corps of Engineers*
  411 F. Supp. 1261 (N.D. Ala. 1976) .................................................... 21

*United States v. Eberhardt*
  789 F.2d 1354 (9th Cir. 1986) ............................................................... 5

*United States v. Washington*
  853 F.3d 946 (9th Cir. 2017)

*affirmed per curiam*, 584 U.S. \_\_\_\_ (2018) ............................................................ 6

*Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*
439 U.S 463 (1979) ............................................................................................. 13

*Westlands Water Dist. v. U.S. Dep't of the Interior*
376 F.3d 853 (9th Cir. 2004) ......................................................................... 7, 15

*Wilderness Society v. Tyrrel*
701 F. Supp. 1473 (E.D. Cal. 1988) ..................................................................... 21

*Winter v. Natural Resources Defense Council*
555 U.S. 7 (2008) ......................................................................................... 12, 19

**Statutes**

25 U.S.C. §1901 ..................................................................................................... 13

Central Valley Project Improvement Act ("CVPIA")
Pub Law No. 102-575, § 3404-3406, (1992) ............................................... passim

Trinity River Basin Fish and Wildlife Management Act ("1984 Act")
Pub. L. No. 98-541, 98 Stat. 2721 ........................................................................ 7

**Other Authorities**

Solicitor Opinion
M-36979 (1993) ................................................................................................... 5

# I.     INTRODUCTION

The 2000 Trinity River Record of Decision (ROD) prescribes specific permanent minimum flow releases and operating criteria and procedures (OCAP) designed to restore the fishery in specific portions of the Trinity River located below Lewiston Dam, which were devastated by the development and operation of the Trinity River Division (TRD) of the Central Valley Project (CVP).[1]  The ROD's schedule of minimum flow releases is based on recommendations of a comprehensive scientific flow study co-authored by the Hoopa Valley Tribe and completed in the 1990's, known as the Trinity River Flow Evaluation Report ("Flow Study").[2]  In section 3406(b)(23) of the 1992 Central Valley Project Improvement Act (CVPIA), Public Law 102-575, Title XXXIV, Congress directed the Secretary of the Interior to implement the recommended flows and OCAP, but only if the Hoopa Valley Tribe concurred in the recommendations.  Absent Hoopa's concurrence, as required by section 3406(b)(23), the Secretary was powerless to implement the recommended flows and OCAP.[3]

Hoopa concurred in the recommendations, signing the Trinity River ROD along with the Secretary of the Interior in 2000, at a sacred location in Hoopa's homeland on the banks of the Trinity River.[4]  In CVPIA Section 3406(b)(23), Congress expressly required that the Secretary obtain Hoopa's concurrence before the permanent flow releases could be implemented.   It would have been a shock, and entirely unlawful, if the Secretary, shortly after having obtained Hoopa's concurrence in the permanent flow regime, unilaterally proceeded to modify or

---

[1]  The ROD is reproduced at Exhibit 2 to the Declaration of Thane Somerville, filed herewith.

[2]  Relevant excerpts of the Flow Study are reproduced at Exhibit 3 to the Declaration of Thane Somerville, filed herewith.

[3]   The complete text of CVPIA Section 3406(b)(23) is reproduced at Exhibit 1 to the Declaration of Thane Somerville, filed herewith.

[4]  A map showing the location of the Hoopa Valley Reservation is attached as Exhibit 5 to the Declaration of Thane Somerville, filed herewith.

PLAINTIFF'S MEMORANDUM IN SUPPORT
OF PRELIMINARY INJUNCTION - 1

disregard the mandated flow schedule the next week or the next month without Hoopa's approval. Such a unilateral modification of the restoration program concurred in by Hoopa would have made a mockery of the statutorily mandated concurrence requirement. In fact, no Secretary of the Interior has attempted such an action until now.

Little more than two decades after signing the ROD, the federal Defendants now take the position that they can unilaterally modify the flow regime called for in the ROD without obtaining Hoopa's concurrence. This is no more lawful today than it would have been the day after the ROD was signed. Congress, in CVPIA § 3406(b)(23) expressly acted with the purpose to fulfill its trust responsibility to Hoopa and to protect Hoopa's fishery resources. Hoopa is singularly identified by name in CVPIA § 3406(b)(23) to the exclusion of all other Indian tribes and all other interests in the Trinity River basin. Congress required the affirmative concurrence of only one entity, the Hoopa Valley Tribe, in order to implement the flow recommendations. Congress delegated Hoopa that sovereignty to be a check on the Department of the Interior's Bureau of Reclamation which for decades had over-diverted Trinity River water to the Central Valley with devastating consequences to the Trinity River fishery that the United States holds in trust for Hoopa. Congress expressly stated in CVPIA §3406(b)(23) that the concurred in flow-regime would be permanent.

On December 7, 2022, the Trinity Management Council (TMC) (an advisory body to the Secretary of the Interior) voted in favor of the Trinity River Winter Flow Variability (WFV) Project, which would result in significant substantive modifications to when, how, and the use to which restoration flows prescribed by the ROD are released from Trinity River Division reservoirs for Trinity River fishery restoration.[5] Hoopa does not concur in the modifications to the ROD flows called for in the Trinity River WFV Project. Hoopa informed federal Defendants of its non-concurrence on multiple occasions. Declarations of Joe Davis and

---

[5] A more complete description of the WFV Project is found at Exhibit 4 to the Declaration of Thane Somerville.

Michael Orcutt.  Hoopa again lodged its non-concurrence at the December 7, 2022, TMC meeting, voting against the WFV Project.  Hoopa had also previously submitted other oral and written comments in opposition to the proposal, expressing its non-concurrence.   On December 9, 2022, Hoopa received a letter from the TMC to the Bureau of Reclamation that incorporates the WFV Project into the 2023 water year flow schedule and confirmed that the federal Defendants could begin such winter flow releases as early as December 15, 2022. Orcutt Declaration, Exh. 1.  In discussions since December 9, Hoopa requested that Defendants deny the WFV Project recommended by the TMC and honor Hoopa's right of concurrence. [6]

The WFV Project would significantly and substantively alter the flow regime prescribed in the ROD that was concurred in by Hoopa in 2000.  In fact, as much as 16—27% of the entire annual flow volume prescribed under the ROD would be re-allocated to winter flow releases, depriving the river of that water in the Spring and Summer months as called for in the ROD. Orcutt Declaration, Exh. 1.   Federal Defendants lack authority to substantively modify ROD flows and OCAP in the absence of Hoopa's concurrence.  Following the December 7 TMC vote, and receipt of the December 9 TMC letter, Hoopa made additional efforts to administratively stop the decision from going forward in hopes to avoid the need for this request for injunctive relief.[7]  But federal Defendants have thus far refused to modify the decision.

The amount of water provided by the ROD is expressly limited.  The re-allocation of substantial water called for in the WFV Project means that water intended to be released in certain months of the year under the ROD will not be available because it has been re-allocated

---

[6] Following discussions of the parties, Defendants committed, through a December 15, 2022 e-mail from their counsel, that:  "[the Interior Department/Defendants] commit to give [Hoopa] at least 5 business days notice before any decision is made with respect to the Trinity River (sic) Council's vote to recommend the winter flows, and at least 10 business days notice before the implementation of any such decision."  Declaration of Thane Somerville, Exh. 7.  However, the specter of implementation of the WFV Project in absence of Hoopa concurrence remains.

[7]  See December 9, 2022 Letter from Hoopa Chairman to Secretary Haaland, Exhibit 4 to Declaration of Joe Davis; see also December 14, 2022 Letter from Hoopa Chairman to Secretary Haaland, Exhibit 5 to Declaration of Joe Davis.

for release in different months of the years pursuant to the WFV Project.   Federal Defendants' proposal to release tens of thousands of acre-feet of water in the winter (before the water year type is even known) means that water will not be available for its intended purposes (as described in the Flow Study and ROD) later in the Spring and early Summer.  If the water currently called for in the ROD is ultimately necessary in Spring and Summer, it will no longer be available because it will already have been used in the winter under the WFV Project.   This re-allocation of water, in conflict with the prescriptions and management objectives of the ROD, in the absence of Hoopa's concurrence is unlawful.

Federal Defendants intend to commence implementation of the WFV Project and its substantial flow releases imminently.   If not enjoined, this unlawful re-allocation of water will cause irreparable harm to the Trinity River, its fishery, and thus to Hoopa.  Once the water is released, it is forever lost for use for its intended purposes.  This is, by definition, irreparable harm that warrants the issuance of preliminary injunctive relief.

## II.       FACTUAL AND PROCEDURAL BACKGROUND

On December 7, 2022, the TMC voted in favor of approving the WFV Project and, on December 9, the TMC forwarded its recommendation to the Bureau of Reclamation.  On December 12, Plaintiff's and Defendants' representatives conferred via video conference call regarding the WFV Project and Hoopa concurrence.  Further communications were exchanged between December 13-15, 2022, including the December 15 e-mail referenced in footnote 6 above.  Another meet and confer of the parties' representatives and counsel occurred on December 16, 2022, during which Defendants' counsel again confirmed that no action would be taken by Defendants to implement the WFV Project for a minimum of 15 business days (3 full weeks) following delivery of a written notice from Defendants to the Tribe.  To date, Defendants have declined to reject the WFV Project and have not sought Hoopa concurrence regarding the WFV Project.  Thus, the threat of irreparable harm remains.

The federal Defendants decision to approve the WFV Project will result in Reclamation making substantial releases of water (between 16 - 27% of total annual flow volumes) from Lewiston Dam and making that water wholly unavailable for use later in the year as currently prescribed by the Trinity River ROD. The Hoopa Valley Tribe does not concur in this substantive modification to the ROD flows and OCAP and it expressed its opposition/non-concurrence prior to, at, and after the December 7 TMC meeting. Pursuant to CVPIA §3406(b)(23), ROD flows (including their total volumes and their timing) may not be substantively modified absent Hoopa's concurrence. Thus, the federal Defendants' decision to approve and implement the WFV Project in the absence of Hoopa concurrence is unlawful. The factual and legal background regarding Hoopa's statutory concurrence right is described below.

A. **Federal Indian Law and Reclamation Law Established Hoopa's Vested Property Rights in the Trinity River Fishery.**

Hoopa and its people have lived along the Trinity River, and relied upon its fish resources, since time immemorial. The United States government located and set aside the Hoopa Valley Reservation, which the Trinity River flows through, on August 21, 1864. *Mattz v. Arnett*, 412 U.S. 481, 490, fn. 9 (1973); *Short v. United States*, 202 Ct. Cl. 870, 875-980 (1973). On June 23, 1876, President Grant issued an Executive Order formally setting aside the Reservation for "Indian purposes." *Short*, 202 Ct. Cl. at 877. Traditional salmon fishing is one of the "Indian purposes" for which the Reservation was created. *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995).

In 1864, the United States determined the Reservation a suitable permanent homeland for two principal reasons. First, the Reservation is within the heart of Hoopa's aboriginal lands, which Hupa Indians occupied and fished upon for generations.[8] *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995). Hupa Indians possessed fishing and hunting rights long before contact with white settlers and their salmon fishery was "not much less necessary to [their existence]

---

[8] Hupa are the people of the federally-recognized Hoopa Valley Tribe.

than the atmosphere they breathed." *Id.* at 542, *quoting Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir. 1991). Second, the Reservation set aside resources of the Trinity and Klamath rivers for Hupa people to be self-sufficient and achieve a moderate living based on fish. *United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986).

Hoopa's rights entitle Hoopa and its people to take fish from the Trinity and Klamath Rivers for ceremonial, subsistence, and commercial purposes. *Eberhardt*, 789 F.2d at 1359. In 1993, the Interior Solicitor Leshy examined the "history of the [Hoopa] reservation, the Indians' dependence on the Klamath and Trinity River fisheries, the United States' awareness of that dependence, and the federal intent to create the reservation in order to protect the Indians' ability to maintain a way of life, which included reliance on the fisheries. 1993 Solicitor Opinion M-36979, p. 3. Solicitor Leshy found: "[T]he Government intended to reserve for the [Hoopa] a fishing right which includes a right to harvest a sufficient share of the resource to sustain a moderate standard of living." *Id.* at p. 21. Hoopa's rights are not satisfied simply by the presence of fish in the river, but rather by the harvesting of an adequate supply of fish by Hoopa's people. *United States v. Washington*, 853 F.3d 946, 958, 965-66 (9th Cir. 2017), *affirmed per curiam*, 584 U.S. ____ (2018) ("moderate living" standard requires protection of continued supply of fish for the Tribes).

## B. The TRD Harmed the Trinity Fishery and Severely Damaged Hoopa.

In 1955, Congress authorized development of the TRD as a feature of the CVP – the extensive system of federal dams, canals, and reservoirs that divert, store, and regulate water in California rivers and streams. Through the TRD, Reclamation diverts substantial quantities of water from the Trinity River and exports it to California's Central Valley. The TRD is the only source of CVP water imported to the Central Valley. The TRD, which includes Trinity Dam and Lewiston Dam on the Trinity River upstream of the Hoopa Valley Reservation, became operational in 1964, approximately 100 years after the United States set aside the Hoopa Valley

Reservation as a permanent homeland for Hupa Indians, reserving Trinity River water and fish for their subsistence and livelihood.

Reclamation's construction, operation and maintenance of the CVP's TRD caused widespread catastrophic environmental impacts in both the Trinity basin and in the Central Valley. Damming the Trinity River and over-diverting water to the Central Valley devastated Trinity basin fish and wildlife and caused economic hardship in North Coast Communities. Contrary to the intent of Congress, the TRD's development, operations, and resulting out-of-basin water diversions decimated fish populations including those required to fulfill Hoopa reserved fishing rights. The TRD diverted an average of 88% of the annual inflow out of the Trinity River and into the Sacramento River Basin during its first ten years of operation. *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 861 (9th Cir. 2004). The TRD also permanently eliminated fish access to 109 miles of habitat upstream of Lewiston Dam previously used by anadromous fish for holding, spawning, and rearing. Within a decade of the TRD's completion, salmonid populations dramatically decreased. In 1980, the U.S. Fish and Wildlife Service estimated that the Trinity River fish population suffered a reduction of 60% to 80% and fishery habitat loss of 80% to 90%. *Id.* at 862-63. The reduction in salmon populations had, and continues to have, a devastating impact on Hoopa.

### C. To Protect Tribal Rights, the Secretary and Congress Took Action to Restore Fish and Fish Habitat to Pre-Project Levels.

In 1981, following an environmental study, the Secretary ordered an increase in annual flows released from the TRD to the Trinity River downstream of Lewiston Dam. Under the 1981 Secretarial Order, flows released from the TRD in normal water years increased from 120,500 acre-feet annually to 340,000 acre-feet annually. The Secretary also directed initiation of the Flow Study to study and develop a flow regime and other measures to improve habitat conditions in the Trinity River.

In 1984, Congress affirmed and authorized the Secretary's restoration goal in the Trinity River Basin Fish and Wildlife Management Act ("1984 Act"), Pub. L. No. 98-541, 98 Stat. 2721. Congress found that "the Secretary requires additional authority [beyond that provided in the 1955 Act] to implement a basin-wide fish and wildlife management program in order to achieve the long-term goal of restoring fish and wildlife populations in the Trinity River basin to a level approximating that which existed immediately before the construction of the [TRD]." Section 2(a) of the 1984 Act directed the Secretary to formulate and implement a program designed to restore the fish and wildlife populations in the Trinity Basin to pre-TRD levels. Congress required the program to include: (1) rehabilitation of fish habitats in the Trinity River between Lewiston Dam and Weitchpec; (2) rehabilitation of fish habitats in tributaries of the Trinity River below Lewiston Dam; and (3) modernization and improved effectiveness of the Trinity River Fish Hatchery. 1984 Act, § 2(a)(1). The 1984 Act focused on restoration of fish habitat in the mainstem Trinity River and its tributaries, which would help to achieve the goal of restoring Trinity River fish populations.

**D. To Protect Tribal Rights, the Secretary and Congress Took Action to Restore Fish and Fish Habitat to Pre-Project Levels.**

In 1992, Congress passed the CVPIA.[9] Section 3406(b)(23) of the CVPIA, directly at issue here, required the Secretary to take specific actions "in order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the [1984 Act.]." CVPIA, §3406(b)(23). First, the Secretary was directed to release, during water years 1992 through 1996, an instream release of not less than 340,000 acre-feet for the purpose of fishery restoration, propagation, and maintenance. This was the amount of flow directed by the Secretary in 1981 and which releases continued up to passage of the CVPIA. Second, Congress directed the Secretary, "after consultation with the Hoopa

---

[9] The full text of CVPIA Section 3406(b)(23) is included as Exhibit 1 to the Declaration of Thane Somerville.

Valley Tribe," to complete the Flow Study by September 30, 1996 "in a manner which insures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and [TRD] operating criteria and procedures for the restoration and maintenance of the Trinity River fishery." CVPIA §3406(b)(23)(A). Third, following completion of the Flow Study and its recommendations, Congress directed that: "If the Secretary and the Hoopa Valley Tribe concur in these recommendations, any increase to the minimum Trinity River instream fishery releases established under this paragraph and the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly." CVPIA §3406(b)(23)(B).

**E. Hoopa and the U.S. Fish and Wildlife Service Jointly Prepare and, in June 1999, Finalize the Trinity River Flow Study**

Pursuant to the authority of CVPIA section 3406(b)(23), the Secretary made the Hoopa Valley Tribe and the U.S. Fish and Wildlife Service coauthors of the Flow Study, which they completed, and the Department published in 1999.[10]

Prior to TRD development, the Trinity River was a "dynamic alluvial river," in which plentiful salmon spawning and rearing habitat existed. *See* Flow Study, Executive Summary, p. xxvi. In the Flow Study, scientists analyzed the fundamental attributes of an alluvial river and how those attributes could be restored (in part) through carefully managed flow releases. *See* Flow Study, Executive Summary. The Flow Study recommended a variable flow regime and management actions (dependent on water year type) to rehabilitate habitat in the mainstem channel of the Trinity River between Lewison Dam and the Klamath confluence at Weitchpec. *See* Flow Study, Chapter 8, Recommendations. The Flow Study recommended a total minimum annual volume of water dependent on water year type but also provided detailed recommendations for specific volumes of releases at specific times of year, along with a discussion of the purpose and benefits of providing those specific volumes at specific times. See

---

[10]  Excerpts of the Flow Study are included as Exhibit 3 to the Declaration of Thane Somerville.

Flow Study, Tables 8.5 – 8.7.  The flow recommendations in the Flow Study were carefully developed by Hoopa and federal scientists at Congress' direction to achieve specific management objectives and habitat-restorative purposes on the mainstem Trinity River.  *See* Flow Study, Chapter 8, Tables 8.2-8.3.  The Flow Study allocated all available annual flow amounts in the recommended flow regimes to meet the intended objectives.

    **F.  The Secretary and Hoopa Concur in the Recommendations and Sign the ROD.**

In the Trinity River ROD, the Secretary and Hoopa accepted and concurred in the recommendations in the Flow Study.  Those adopted recommendations were "based on the extensive scientific studies contained in the [Flow Study]" and offered "the most practical and scientifically based restoration strategy."  ROD, p. 8.  The ROD "represents the culmination of over two decades of efforts aimed at understanding the necessary instream flow and physical habitat restoration requirements in order to restore the Trinity River anadromous fishery."  Appendix B of the ROD contains detailed release prescriptions (sometimes on a day-by-day basis) that track the recommendations in the Flow Study.  For the time-period of October 16 through April 21, a uniform flow of 300 cfs was adopted across all water years per the Flow Study recommendations.  As described in Chapter 8 of the Flow Study, providing lower flows in those time periods in and around winter allowed for correspondingly higher flows to occur in Spring and Summer months, after the water-year type was known.

The flows in the ROD do not contain any surplus water that can be repurposed without compromising the ROD's intended objectives.  Orcutt Declaration. Increasing ROD flows in one time-period of the year will necessarily result in decreasing ROD flows in other times of year. *Id.* The ROD is a binding contractual commitment, a modern-day treaty, between the Hoopa Valley Tribe and the Department of the Interior.   The federal Defendants cannot modify the ROD, or the flows (total amount and schedule for release) without the concurrence of the Hoopa Valley Tribe.

### G. Federal Defendants Have Unlawfully Decided to Significantly Modify the Timing and Amounts of ROD Flow Releases in the Absence of Hoopa Concurrence.

In 2021, federal Defendants formally proposed implementation of the Trinity River WFV Project. Hoopa informed federal Defendants that "Hoopa does not concur in the proposed modification of ROD flow release hydrographs as currently proposed." Davis Declaration, Exh. 1, Hoopa Letter, June 18, 2021, p. 2. Hoopa advised that: "The current variability flow release proposal would use ROD flows that are prescribed for specific restoration outcomes as described in the [Flow Study]. However, that water is not available for any purpose or use other than the ROD prescription." *Id.*, p.3. Hoopa advised that additional scientific review was necessary before any decision by either federal Defendants or Hoopa could be made. *Id.*, p. 4. Hoopa renewed its concerns, objections and non-concurrence on many occasions in 2021 and 2022. Davis Declaration. To date, federal Defendants have declined to conduct such additional scientific review and have disregarded Hoopa's objections and concurrence rights.

In late 2021, a TMC vote to recommend the WFV Project failed to pass. Thereafter, federal Defendants independently declined to implement the WFV Project in the 2022 water year (October 1, 2021 – September 30, 2022). However, on December 7, 2022, the TMC voted to recommend implementing the WFV Project during the current 2023 water year – beginning as early as December 15, 2022. Hoopa again registered its opposition at the TMC meeting. Hoopa wrote to the federal Defendants communicating its non-concurrence, requesting them to honor Hoopa's sovereign concurrence rights, and asking them not to implement the WFV Project. Davis Declaration, Exh. 4. Hoopa also met virtually with Federal representatives on December 12 and re-iterated the concurrence requirement. Davis Declaration. Further communications between the parties' representatives occurred between December 13-16. As of this date, Federal Defendants have thus far declined to honor Hoopa's concurrence rights as related to the proposed implementation of the WFV Project and corresponding modification of ROD flows. To protect its sovereignty and Trinity River fish and water resources upon which its people rely, Hoopa now

seeks preliminary injunctive relief to preserve the status quo and prevent implementation of the WFV Project pending completion of judicial review.

## III.    ARGUMENT

**A. This Court Should Issue a Preliminary Injunction to Prevent Irreparable Harm Resulting From Defendants' Decision to Approve the Trinity River Winter Flow Variability Project, Which Will Unlawfully Modify and Limit Flow Releases Necessary for Restoration of the Trinity River Fishery in the Absence of Hoopa's Required Concurrence.**

This Court should issue the Preliminary Injunction requested by Hoopa to prevent irreparable harm to Hoopa and the Trinity River fish and water resources upon which its people rely. A plaintiff seeking a Preliminary Injunction must establish that plaintiff is likely to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in plaintiff's favor, and that an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). Here, each of the four requirements is met.

**B. Hoopa Is Likely to Prevail on the Merits of Its Claim That, Pursuant to the Statutory Delegation of Sovereignty Found in CVPIA §3406(b)(23), Flows Prescribed in the Trinity River ROD May Not Be Modified by the WFV Project Absent Hoopa's Concurrence.**

In CVPIA Section 3406(b)(23)(A), Congress directed the Secretary to complete the Flow Study, in consultation with the Hoopa Valley Tribe, "in a manner which insures the development of recommendations, based on the best available scientific data, regarding _permanent_ instream fishery flow requirements . . . for the restoration and maintenance of the Trinity River fishery." (emphasis added). Following completion of the flow recommendations by the Secretary, Congress directed in CVPIA § 3406(b)(23)(B) that: "_If the Secretary and the Hoopa Valley Tribe concur_ in these recommendations, any increase to the minimum Trinity River instream fishery releases established under this paragraph . . . _shall be implemented accordingly_." (emphasis added). And if Hoopa did not concur in the flow release recommendations, the minimum

instream fishery releases expressly specified under Section 3406(b)(23) could not be changed absent act of Congress, appropriate judicial decree, or the agreement of the Hoopa Valley Tribe. CVPIA § 3406(b)(23)(B). Congress expressly stated that these statutory provisions were promulgated "in order to meet Federal trust responsibilities and to protect the fishery resources of the Hoopa Valley Tribe." CVPIA § 3406(b)(23).

The letter and intent of CVPIA § 3406(b)(23) is clear. Hoopa's concurrence was required to implement the fishery flow recommendations referenced in Section 3406(b)(23). If, and only if, Hoopa concurred, those flow recommendations were to be implemented by the Secretary. Hoopa is the only Indian tribe referenced in the statute. *Id.* Congress was acting to fulfill its trust responsibility to Hoopa. *Id.* Congress was acting to protect Hoopa's fishery resources. *Id.* And Congress mandated only Hoopa's concurrence to implement the flows. *Id.*

CVPIA section 3406(b)(23) is a statutory delegation of enhanced sovereignty by Congress to the Hoopa Valley Tribe as related to implementation of the Trinity River restoration mandated in that statute. The United States Constitution vests Congress with "plenary and exclusive power over Indian affairs." *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation,* 439 U.S 463, 470 (1979). Congress' authority over Indian affairs includes the responsibility for protecting tribal resources because of their vital importance to the existence and integrity of Indian tribes. Congress meets that responsibility through "statutes, treaties, and the general course of dealing with Indian tribes." 25 U.S.C. §1901. As a statute passed for the benefit of the Hoopa Valley Tribe, CVPIA section 3406(b)(23) is to be construed liberally in Hoopa's favor. *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992) (stating, "a principle deeply rooted in this Court's Indian jurisprudence [is that] 'Statutes are to be construed liberally in favor of the Indians . . . .'", quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 767-68 (1985)); *Ramah Navajo School Board v. Bur. of Revenue,* 458 U.S. 832, 846 (1982) ("We have consistently admonished that federal statutes and regulations relating to tribes and tribal activities must be construed

generously in order to comport with . . . traditional notions of [Indian] sovereignty and with the federal policy of encouraging tribal independence.")

In Section 3406(b)(23), Congress affirmatively and expressly confirmed in reclamation law a trust responsibility to the Hoopa Valley Tribe. And further, Congress ensured that Reclamation would continue to carry out the provisions of 3406(b)(23) in conformance with the federal trust responsibilities by vesting Hoopa with sovereign authority to concur as a condition to implementing the recommended flows and OCAP discussed in Section 3406(b)(23). This delegation of sovereignty in section 3406(b)(23) ensured that the Secretary and subordinate agencies would only implement the recommendations with Hoopa's approval and that, once approved, the permanent flow requirements and OCAP could only be modified with Hoopa's concurrence.[11]

Following its passage by Congress, the Secretary acted in accordance with CVPIA § 3406(b)(23). The Secretary, acting through the U.S. Fish & Wildlife Service completed the flow recommendations together in partnership with Hoopa who was a co-author of the Flow Study. The Flow Study provided a comprehensive scientific analysis of the minimum flows necessary to restore fish in the Trinity River below Lewiston Dam to pre-TRD levels as mandated by Congress. The Flow Study not only evaluated and recommended quantity of flow releases but also the timing of flow releases.

---

[11] The CVPIA was not the first time Congress made an explicit delegation of authority to Hoopa. Just four years prior to the CVPIA, Congress passed the Hoopa-Yurok Settlement Act, Pub. L. 100-580(1988), 102 Stat. 2924. In a case challenging Hoopa's delegated sovereignty, the Court of Appeals concluded that the delegation was valid and was needed to resolve confusion over who had the right to "make management decisions relating to the lands and resources of the . . . reservation as a whole." Senate Report at 9. The Senate Report explains that Congress' understanding of the law governing the Reservation was that, "absent statutory delegations," the Hoopas could not manage the Square. *Id.* The ratification and confirmation of the Tribe's Constitution was exactly that: a "statutory delegation[ ]" of authority to the Tribe to "make management decisions relating to the lands and resources of the 'Square.' " *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1213 (9th Cir. 2001).

In 2000, standing on sacred ground in Hoopa's homeland on the banks of the Trinity River, Secretary Bruce Babbitt signed the Trinity River ROD, expressing the Secretary's intent to implement the recommendations of the Flow Study. But Congress required more than the Secretary's approval to implement the recommended flows and OCAP; Congress required Hoopa's concurrence. And Hoopa gave its concurrence, acting through the signature of Hoopa's Chairperson, on the Trinity River ROD. Only with that signature of Hoopa's Chairperson, expressing Hoopa's concurrence, could the ROD be implemented. And now, only with Hoopa's approval may the ROD be changed.

The Ninth Circuit Court of Appeals rejected Central Valley water districts' challenge to the legality of the ROD. *Westlands Water District v. U.S. Dep't of Interior*, 376 F.3d 853 (9th Cir. 2004). The Court found: "Twenty years have passed since Congress passed the first major Act calling for restoration of the Trinity River and rehabilitation of its fish populations, and almost another decade has elapsed since Congress set a minimum flow level for the River to force rehabilitative action. Flow increases to the River have been under study by the Department of the Interior since 1981. Restoration of the Trinity River fishery, and the ESA-listed species that inhabit it are unlawfully long overdue." Following the Ninth Circuit's ruling, the ROD and its prescribed flows and OCAP concurred in by Hoopa went into effect and remains in effect.

Pursuant to CVPIA § 3406(b)(23), the flow releases called for in the ROD, and concurred in by Hoopa, were to be permanent. Now, little more than two decades later, the federal Defendants take the position that they can unilaterally change the ROD flows that were comprehensively studied and recommended in the Flow Study co-authored by Hoopa and ultimately concurred in by Hoopa in the ROD. The federal Defendants position completely undermines the letter, spirit, and intent of section 3406(b)(23), which was to ensure that the permanent instream fishery flow releases would be implemented only if Hoopa concurred.

An illustration: What if, one-week or one-month after signing the ROD, the Secretary decided to unilaterally modify the ROD flows, and started implementing a different flow regime

or flow schedule not concurred in by Hoopa. It should be obvious that this would have been unlawful. Such an act by the Secretary, just shortly after obtaining Hoopa's concurrence to a specific flow regime (both volumes and timing), would have made a mockery of the concurrence requirement prescribed by Congress. The fact that two decades have now passed since the ROD was signed and Hoopa's concurrence obtained, does not change the analysis. Federal Defendants' disregard of Hoopa's concurrence right is unlawful.

Hoopa concurred in a specific flow regime, including both total annual volumes and specific time periods for specific flow releases, which is set forth in the ROD. That flow regime was based on the recommendations made in the Flow Study called for by Congress and which Hoopa was a co-author of. There is no dispute that the proposed flows in the Trinity River WFV Project are a substantive modification of the ROD flows. Indeed, the very purpose of the WFV Project is to re-allocate ROD flows - taking significant quantities of water allocated for release in one time of year and re-allocating those quantities to a different time of year. As much as 16 – 27% of the total annual volume of ROD flows would be re-allocated to winter months, depriving a corresponding amount of flow from being released in Spring or Summer as currently required by the ROD. Orcutt Declaration, Exh. 1. Such a re-allocation and re-purposing of ROD flows in the absence of Hoopa's concurrence is plainly unlawful.

Hoopa has not concurred in, and expressly does not concur, in the flow regime called for in the Trinity River WFV Project. Federal Defendants know that Hoopa does not concur. But the federal Defendants now apparently take the position that Hoopa's concurrence is no longer required – that they can modify the flows unilaterally regardless of Hoopa's concurrence and regardless of how such a modification would conflict with the purpose of the ROD flows and the scientific studies that underlie them. Federal Defendants in their actions now view the concurrence requirement as optional and transitory – but instead, as directed by Congress, it is mandatory and durable. Congress required the Secretary of the Interior to obtain Hoopa's concurrence as an affirmative recognition and delegation of sovereignty to Hoopa. Congress

acted, expressly, to fulfill its trust responsibility to Hoopa and to protect Hoopa's trust resources. The Secretary cannot now administratively terminate Congress' mandates or Hoopa's sovereignty.

Having obtained Hoopa's concurrence, the Secretary could not unilaterally change the flow regime one week after signing the ROD. And the Secretary cannot change the flow regime now, two decades later, absent Hoopa' concurrence. In unilaterally modifying the ROD flows, the federal Defendants have violated CVPIA § 3406(b)(23), and acted arbitrarily, capriciously, and unlawfully, and without observance of procedure required by law under the APA. Hoopa is likely to prevail on its claim that federal Defendants have unlawfully ignored the sovereignty delegated to Hoopa in CVPIA § 3406(b)(23) by approving the WFV Project in the absence of its concurrence. The WFV Project, with its call to re-allocate and re-purpose flows prescribed in the Trinity River ROD, may not proceed in the absence of Hoopa's concurrence.

### C. Hoopa Will Suffer Irreparable Harm Absent Injunctive Relief.

"[T]he Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can seldom be remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1053 (9th Cir. 2010). Absent a preliminary injunction, the Trinity River and its fishery (and thus Hoopa) will suffer irreparable harm because a substantial amount water required by the ROD to be available in Spring and Summer months (as much as 16 – 27% of total annual ROD volumes) will be lost forever by being unlawfully released in winter. Orcutt Declaration; Davis Declaration. No money nor other relief can recover the water that will irretrievably lost by federal Defendants decision to release it down the river prior to the time it is now required under the ROD. The status quo must now be maintained.

Absent an injunction, Hoopa will also suffer irreparable injury to its sovereignty as delegated to it by Congress in CVPIA 3406(b)(23). Davis Declaration. Congress mandated that

the Secretary obtain Hoopa concurrence in order to implement the ROD.  As described above, this concurrence obligation, in order to have any meaning, applies to initial approval of the recommended flows and OCAP, and also to future substantive modifications to the flows and OCAP set forth in the ROD.  If, after having obtained Hoopa concurrence in the first instance, the Secretary could simply unilaterally change the ROD without Hoopa agreement, the concurrence mandate prescribed by Congress in Section 3406(b)(23) would be meaningless.  The ROD flows, approved with Hoopa's concurrence, were intended to be permanent.  And they may be changed only with Hoopa's concurrence.

Hoopa does not concur in the WFV Project.  Absent an injunction, the federal Defendants intend to commence the WFV Project.  Allowing the WFV Project to proceed in absence of Hoopa concurrence causes irreparable harm to the concurrence right provided by Congress.  By expressly granting Hoopa the right of concurrence in Section 3406(b)(23), Congress delegated sovereignty to Hoopa.  The federal Defendants may not act in derogation of that Congressional delegation of sovereignty by unilaterally changing the ROD flows in the absence of Hoopa's concurrence.  The status quo, preservation of Hoopa's sovereign and statutory concurrence right, must be maintained pending full judicial review.

The Trinity River ROD, and the flow releases provided for therein, are based on extensive scientific evaluation that culminated in the Flow Study.  Hoopa was an author of the recommendations in the Flow Study and Hoopa concurred in their approval and implementation in the ROD.  The ROD not only set the total minimum annual amounts of water necessary for Trinity River restoration under the ROD, but it also set a schedule and timeframes for when that water would be released.   This schedule and timing for flows was developed to maximize the success of the restoration program and to limit any continuing harm to fish.

The total amount of water available under the ROD varies based on the type of water year.  The water year runs from October 1 – September 30.   However, the type of water year is not known until April.  Thus, the ROD sets a constant base flow amount until the water year

determination is known and then the amount of flows in the Spring and Summer is dependent on the water year determination. Any water released downstream early in the water year will obviously not be available later in the water year.

Under the current WFV Project, the schedule for ROD flows will be substantively changed without Hoopa's concurrence – moving a large amount of water (minimum 60,000 acre-feet, equivalent to 16% of total annual volume) to winter months, leaving it unavailable for use in the Spring and Summer, after the water year is known. If it turns out that fishery managers have a need in the Spring and Summer for the water used in winter pursuant to the WFV Project, there will be no recourse under the ROD. The fish will simply have to go without such water and will suffer the consequent harms.

The Federal Defendants decision to approve the WFV Project will deprive the Trinity River and its fishery of flows that are required by the Trinity River ROD to be released in the Spring and Summer. Once released in winter, that water will be lost forever. The releases are approved and Defendants could commence implementation at any time (subject to the 15 business days advance notice to Hoopa that Defendants' committed to, see fn. 6 above). Thus, a preliminary injunction is necessary to prevent the Defendants from releasing such flows in conflict with the ROD.

### D. The Balance of Hardships Tips Strongly in Hoopa's Favor.

In deciding whether to grant a preliminary injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Here, Defendants would suffer no harm if enjoined from implementing the Trinity River WFV Project. Rather, they would remain bound to implement and release flows as called for in the Trinity River ROD, the document that has guided Trinity River restoration actions pursuant to its science-based flow recommendations, for over twenty years. In contrast, the consequences of depriving the Trinity River of the flows

called for in the Trinity River ROD could be catastrophic to the Hoopa Valley Tribe, its

sovereignty, and the fishery upon which it depends.  Once that water is released, it is gone

forever.

Relief is necessary immediately.  Once releases pursuant to the WFV Project are made,

that amount of water is lost to ROD implementation for the rest of the water year, leaving the

river and its fishery in a precarious state during later months.  The Trinity River ROD and the

scientific studies that preceded it carefully allocated the limited flows available to best meet the

needs of fish.  Increasing flows in one season will necessarily decrease flows in a different time

of year.  Such modification of the Trinity ROD flows may not occur without the concurrence of

the Hoopa Valley Tribe.  A preliminary injunction is necessary and warranted.

### E.  An Injunction Would Be In the Public Interest.

The public interest favors Hoopa's motion.  The public interest is an important factor to

weigh in deciding whether courts should grant preliminary injunctions.  Here, failure to grant

injunctive relief would place the public's interest in protection and restoration of the Trinity

River fishery, as mandated by Congress, and as directed in the Trinity River ROD, at significant

risk.  The public interest supports preservation, protection, and restoration of Trinity River fish

stocks.  The Hoopa Valley Tribe and the federal government have dedicated extensive resources

over decades towards restoration of the Trinity River fishery.  Specific flow measures were

studied and agreed upon by Hoopa and the United States to be of critical importance to fishery

restoration.  Now, notwithstanding Hoopa's non-concurrence, the Defendants propose to

abandon that flow regime, shifting certain flow releases to winter, while necessarily depriving

the Trinity River of flows at other times of year.  Taking actions that undermine the Trinity River

ROD, and its science-based program of restoration flows and other restoration measures, is not in

the public interest.  Nor is it in the public interest for the federal Defendants to derogate Hoopa's

authority in this matter through an unlawful termination of the statutory delegation of sovereignty to Hoopa.

### F. No Bond Should Be Required In This Action to Protect Hoopa Sovereignty and Trinity River Resources.

Rule 65 references the posting of security upon issuance of a temporary restraining order or preliminary injunction, however the Court has authority to dispense with the security or to require mere nominal security. *People ex rel. Van de Kamp v. Tahoe Regional Planning Authority*, 766 F.2d 1319, 1325-26 (9th Cir. 1985). Courts often waive the bond requirement or require nominal security in public interest litigation against federal agencies. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (district court has discretion to waive bond requirement based on its evaluation of public interest); *Davis v. Minetta*, 302 F.3d 1104 (10th Cir. 2002) (where a party is seeking to vindicate the public interest, a minimal bond amount should be considered when granting a preliminary injunction); *Wilderness Society v. Tyrrel*, 701 F. Supp. 1473, 1492 (E.D. Cal. 1988) (setting bond of $100 for preliminary injunction barring timber sale); *Environmental Defense Fund v. Corps of Engineers*, 331 F. Supp. 925, 927 (D.D.C. 1971) ($1 bond for preliminary injunction restraining construction of 253-mile long waterway project). In setting a $1 bond, the court commented in *State of Alabama ex rel. Baxley v. Corps of Engineers*, 411 F. Supp. 1261, 1276 (N.D. Ala. 1976): "This Court is simply unwilling to close the courthouse door in public interest litigation by imposing a burdensome security requirement on plaintiffs who otherwise have standing to review governmental action."

Here, the Court should waive the security requirement or impose nominal security. Hoopa brings this action on behalf of itself and its members in protecting the Trinity River, its fishery, and Hoopa trust resources and sovereignty from harm caused by unlawful federal government action. Hoopa's action is consistent with and supportive of the public interest in protecting the river and the fishery. Hoopa has demonstrated high likelihood of success on the

merits and the Defendants would suffer no cognizable prejudice from the requested injunctive relief.  A waiver of security or imposition of nominal security is warranted.

## IV.    CONCLUSION

Plaintiff Hoopa Valley Tribe requests that this Court enter a preliminary injunction that bars Defendants from implementing the Trinity River WFV Project in the absence of the concurrence of the Hoopa Valley Tribe.  This relief is necessary to prevent irreparable harm that would result from these unlawful releases of water that are otherwise allocated to fishery restoration flows in the Trinity River ROD, and to Hoopa's sovereignty.

Dated this 16th day of December 2022.

MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE

_/s/ Thane D. Somerville_
Thane D. Somerville WSBA #31468
Thomas P. Schlosser WSBA #06276
811 First Avenue, Suite 218
Seattle, WA 98104
Tel:  206-386-5200/Fax:  206-386-7322
t.somerville@msaj.com
t.schlosser@msaj.com
Attorneys for Plaintiff Hoopa Valley Tribe

# CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

_/s/ Thane D. Somerville_
Thane D. Somerville