TODD KIM, Assistant Attorney General
Environment and Natural Resources Division

JEFFREY S. THOMAS, Trial Attorney (VA Bar No. 86439)
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-3553
Facsimile: (202) 305-0506
jeffrey.thomas2 @usdoj.gov
*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

HOOPA VALLEY TRIBE,

Plaintiff,

v.

UNITED STATES BUREAU OF RECLAMATION; DEBRA ANNE HAALAND, in his official capacity as Secretary of the Interior; MARIA CAMILLE CALIMLIM TOUTON, in her official capacity as Commissioner of the United States Bureau of Reclamation; ERNEST A. CONANT, in his official capacity as U.S. Bureau of Reclamation California-Great Basin Regional Director; and UNITED STATES DEPARTMENT OF THE INTERIOR

Defendants.

Case No. 1:20−cv−01814−JLT-EPG

**FEDERAL DEFENDANTS' RESPONSE IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I. INTRODUCTION AND SUMMARY OF ARGUMENT ..... 1

II. BACKGROUND ..... 4

III. LEGAL STANDARDS ..... 9

IV. ARGUMENT ..... 10

A. Plaintiff is Unlikely to Succeed on the Merits ..... 10

B. Plaintiff will not suffer irreparable harm if the Winter Flow Project is implemented ..... 14

1. Plaintiff cannot obtain an injunction simply to prevent the alleged violation of a statute ..... 16

2. Plaintiff's claim that the water released in the winter will be lost forever and will create harmful conditions in the spring and summer is false ..... 16

C. The Balance of Equities and Public Interest Tip Sharply in Favor of Federal Defendants ..... 19

V. CONCLUSION ..... 21

**TABLE OF AUTHORITIES**

**Cases**

*All. the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 14

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987).......... 19

*Banga v. Kanios*,
No. 16-CV-04270-RS, 2018 WL 11360090 (N.D. Cal. Jan. 16, 2018).......... 18

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .......... 19

*Ctr. for Biological Diversity v. Hays*,
No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739 (E.D. Cal. Oct. 8, 2015).......... 19, 20

*Ctr. for Food Safety v. Vilsack*,
636 F.3d 1166 (9th Cir. 2011) .......... 19

*Dietary Supplemental Coal., Inc. v. Sullivan*,
978 F.2d 560 (9th Cir. 1992) .......... 5

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) .......... 23

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) .......... 19

*Earth Island Inst. v. Gould*,
No. 1:14-cv-01140-KJM-SKO, 2014 WL 4082021 (E. D. Cal. Aug. 19, 2014).......... 19

*Earth Island Inst. v. U.S. Forest Serv.*,
351 F.3d 1291 (9th Cir. 2003) .......... 19

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) .......... 13

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010).......... 13

*Munaf v. Geren*,
553 U.S. 674 (2008).......... 13

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
636 F.3d 1150 (9th Cir. 2011) .......... 20

*Parravano v. Babbitt*,
70 F.3d 539 (9th Cir. 1995) .......... 9

*San Luis & Delta-Mendota Water Auth. v. Haugrud*,
848 F.3d 1216 (9th Cir. 2017) .......... 7

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
No. 1:15-CV-01290-LJO-GSA, 2017 WL 1375232 (E.D. Cal. Apr. 17, 2017) ......................... 7

*United States v. Eberhardt*,
789 F.2d 1354 (9th Cir. 1986) ......................................................................................... 9

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ......................................................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................................................................... 13, 14, 19

**Statutes**

Pub. L. No. 102-575, 106 Stat. 4600 (1992) ............................................................... 9, 24

Pub. L. No. 104-143, 110 Stat. 1338 (1996) ..................................................................... 9

Pub. L. No. 386, 69 Stat. 719 (1955) ............................................................................... 8

Pub. L. No. 84-386, 69 Stat. 719, 84 Cong. Ch. 872 ........................................................ 7

Pub. L. No. 96-335, 94 Stat. 1062 (1980) ......................................................................... 9

Pub. L. No. 98-541, 98 Stat. 2721 (1984) ......................................................................... 9

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

On December 7, 2022, the Trinity Management Council, comprised of six federal, state, and local bodies plus the Yurok Tribe and Plaintiff, the Hoopa Valley Tribe, voted by a 7-1 margin to recommend that the Department of the Interior ("Interior") implement the Winter Flow Project, an adaptive management proposal authorized by the 2000 Trinity River Mainstem Fishery Restoration Record of Decision ("2000 ROD"). The Winter Flow Project is based on the best available current science and designed to improve natural river conditions and survival rates for fish in the Trinity River consistent with the goals of the 2000 ROD and its underlying authorities. As the sole dissenter, Plaintiff claims Interior cannot adopt the Trinity Management Council's recommendation without its concurrence, which it argues is derived from § 3406(b)(23) of the Central Valley Project Improvement Act ("CVPIA"). Plaintiff asks this Court to take the extraordinary step of enjoining Interior from adopting the Trinity Management Council's recommendation and implementing the Winter Flow Project. The Court should deny Plaintiff's request for an injunction for several reasons.[1]

First, Plaintiff has already agreed to the fishery restoration recommendations and implementing procedures that resulted in the action it seeks to enjoin. When Plaintiff concurred in the 2000 ROD, *see* ECF No. 111-2, and agreed to the Bylaws of the Trinity Management

[1] For this Court to have jurisdiction to resolve an Administrative Procedure Act claim, the Plaintiff must be challenging a final agency action. *See Dietary Supplemental Coal., Inc. v. Sullivan*, 978 F.2d 560, 562 (9th Cir. 1992) ("In interpreting the finality requirement, we look to whether the agency action represents the final administrative work. This requirement insures judicial review will not interfere with the agency's decision-making process."). Here, Interior has made no final decision on whether to adopt the recommendation of the Trinity Management Council to implement the Winter Flow Project. Further no determination has been made whether such a decision would constitute a final agency action subject to challenge. Therefore, as of the date of this filing, this matter is premature and unripe.

Council, *see* Exhibit A, it provided its concurrence to the recommendations and implementing procedures established by the 2000 ROD, including the establishment of the Trinity Management Council. Despite its current arguments, Plaintiff thus gave authority to the Trinity Management Council to vote to recommend implementation of the Winter Flow Project, a vote that falls squarely within the recommendations and procedures established by the 2000 ROD and the Trinity Management Council's Bylaws. Additionally, once Plaintiff concurred, there was no mechanism in the 2000 ROD or § 3406(b)(23) of the CVPIA for Plaintiff to withdraw its concurrence to the 2000 ROD or the Trinity Management Council's operating procedures. Because Plaintiff has already agreed to the recommendations and implementation procedures it now challenges, it cannot show that it is likely to succeed on the merits.

Second, the Winter Flow Project represents an adaptive management proposal consistent with the 2000 ROD based on the most current and best available science to help restore the Trinity River and its fish populations. Because this action is designed to help fish populations, the threat of an irreparable environmental injury will actually *increase* if the Court grants Plaintiff's motion. Additionally, the Winter Flow Project has only been recommended as a one-year pilot project for Water Year (WY) 2023 that may be adopted, modified, or discontinued in the future based on emerging data and conditions on the ground. Plaintiff cannot show that the proposed adaptive management action to adjust the timing (but not volume) of water releases – an adjustment that is designed to address the status quo's recognized negative effects to salmon restoration efforts – during a single winter will cause irreparable harm. Additionally, Plaintiff cannot show that the release of water during a single winter pursuant to the 2000 ROD will cause irreparable harm because Interior has authority to release water in the spring or summer if

necessary to protect and propagate fish populations.[2]

Third, the equities and the public interest are best served by the implementation of the Winter Flow Project. The scientists who work on the Trinity River Restoration Program ("Restoration Program") believe the Winter Flow Project will benefit the geomorphology of the Trinity River and will also make the river more hospitable for the growth and outmigration of juvenile fish. *See infra* at 18 – 20. Having reviewed the recommendations of the Restoration Program's scientists, the Yurok Tribe, the U.S. Fish & Wildlife Service ("USFWS"), the U.S. Bureau of Reclamation ("Reclamation"), the U.S. Forest Service ("USFS"), NOAA National Marine Fisheries Service ("NOAA"), the State of California, and Trinity County, all of whom are members of the Trinity Management Council, voted to implement the Winter Flow Project. *See, e.g.*, Draft Minutes of the Trinity Management Council Meeting, December 7-8, 2022, attached as Ex. B; *see also* Tanya Sommer Letter to Ernest Conant and Paul Souza, December 9, 2022, attached as Ex. C. As evidenced by their votes in favor of the Winter Flow Project, the super-majority of Trinity Management Council members believe the Winter Flow Project best serves the restoration of the Trinity River. *See* Ex. B. The lone dissenter was Plaintiff; it voted against the Winter Flow Project, at least in part, to highlight its legal arguments about the supposed need for concurrence under § 3406(b)(23).[3] Because seven out of eight Trinity

[2] *See San Luis & Delta-Mendota Water Auth. v. Jewell*, No. 1:15-CV-01290-LJO-GSA, 2017 WL 1375232, at *4 (E.D. Cal. Apr. 17, 2017) (recognizing that section 2 of the 1955 Act that established the Trinity River Division of the Central Valley Project (Pub. L. No. 84-386) provided additional authority to release water to preserve and propagate fish and wildlife); *see also San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1228 (9th Cir. 2017), as corrected (Mar. 23, 2017)); Solicitor Tompkins, U.S. Dep't of the Interior, M-37030, *Trinity River Division Authorization's 50,000 Acre-Foot Proviso and the 1959 Contract between the Bureau of Reclamation and Humboldt County* (Dec. 14, 2014).

[3] Plaintiff has made repeated calls for Defendants to adopt wholesale its interpretation of § 3406(b)(23), which asserts that Plaintiff has an ongoing right of concurrence, amounting to an

Management Council members (including various federal, state, and tribal fisheries experts) agree the Winter Flow Project will likely have geomorphological benefits for the Trinity River and will likely protect and propagate fish and because the best current scientific data supports implementation of the Winter Flow Project, the equities and the public interest weigh against an injunction. *See* Ex. B. Moreover, if Interior decides to adopt the Trinity Management Council's recommendation and implement the Winter Flow Project, that decision will be based on the agency's substantial scientific and operational expertise in river restoration and managing fish populations, all of which is harnessed to advance the public's interest.

For these reasons, which are more fully discussed below, the Court should deny Plaintiff's motion for preliminary injunction.

## II. BACKGROUND

As California's population increased throughout the early twentieth century, the State and Federal Government searched for ways to divert water to support emerging population and agricultural centers. Based on reports from Interior in the early 1950s, Congress subsequently concluded that water "surplus" to the present and future needs of the Trinity and Klamath Basins – an estimated 700,000 acre-feet per year and considered "wasting to the Pacific Ocean" – could be diverted to the Central Valley "without detrimental effect to the fishery resources." *See* H.R. Rep. No. 602, at 4-5 (1955); S. Rep. No. 1154, at 5 (1955). Based on Interior's reports Congress authorized construction of the Trinity River Division of the Central Valley Project ("CVP") in 1955. *See* Act of Aug. 12, 1955, Pub. L. No. 386, ch. 872, 69 Stat. 719, 719-21

override of all decisions by the Trinity Management Council, even those that fall within the parameters of the 2000 ROD and its implementation plan. *See, e.g.*, ECF Nos. 110, 110-3, 110-4, 110-5.

(1955). The Trinity River Division began operations in 1963 after the completion of the Lewiston Dam.

Once the Trinity River Division became operational, fisheries resource managers almost immediately observed declines in the numbers of naturally produced adult salmonids returning to the Trinity River Basin. To address the declining fish populations, Congress passed several pieces of legislation including: (1) the Trinity River Stream Rectification Act (Pub. L. No. 96-335, 94 Stat. 1062 (1980)); (2) the Trinity River Basin Fish and Wildlife Management Act (Pub. L. No. 98-541, as amended by Pub. L. No. 104-143, 110 Stat. 1338 (1996)); and (3) the CVPIA (Pub. L. No. 102-575, 106 Stat. 4600 (1992)). Each of these Acts was designed to restore and rehabilitate fish populations in the Trinity River Basin. The CVPIA was Congress' most comprehensive effort "to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins." Pub. L. No. 102-575Pub. L. No. 102–575, §§ 3402(a), 3406(b)(23).[4]

Section 3406(b)(23) of the CVPIA, which directs the Secretary to take action "in consultation with other State and Federal agencies, Indian tribes, and affected interests," provides that:

> [I]n order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the Act of October 24, 1984, [Pub. L.] 98-541, provide through the Trinity River Division, for water years 1992 through 1996, an instream release of water to the Trinity

---

[4] The fishery resources of the Klamath River Basin, including its main tributary the Trinity River, have been the cornerstone of the Hoopa Valley and Yurok Tribes' culture, religion, and economy since time immemorial. *See, e.g.*, *Parravano v. Babbitt*, 70 F.3d 539, 542 (9th Cir. 1995); *United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986); Solicitor Leshy, U.S. Dep't of the Interior, M-36979, *Fishing Rights of the Yurok and Hoopa Valley Tribes* (Oct. 3, 1993). The CVPIA recognized the importance of protecting and restoring the Trinity River fishery in part based on the federal government's tribal trust responsibility.

> River of not less than [340,000] acre-feet per year for the purposes of fishery restoration, propagation, and maintenance and,
>
> (A) [B]y September 30, 1996, the Secretary [of the Interior (hereinafter, 'Secretary')], after consultation with the Hoopa Valley Tribe, shall complete the Trinity River Flow Evaluation Study currently being conducted by the [U.S.] Fish and Wildlife Service under the mandate of the Secretarial Decision of January 14, 1981, in a manner which insures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and Trinity River Division operating criteria and procedures for the restoration and maintenance of the Trinity River fishery; and
>
> (B) [N]ot later than December 31, 1996, the Secretary shall forward the recommendations of the Trinity River Flow Evaluation Study, referred to in subparagraph (A) of this paragraph, to the Committee on Energy and Natural Resources and the Select Committee on Indian Affairs of the Senate and the Committee on Interior and Insular Affairs and the Committee on Merchant Marine and Fisheries of the House of Representatives. If the Secretary and the Hoopa Valley Tribe concur in these recommendations, any increase to the minimum Trinity River instream fishery releases established under this paragraph and the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly. If the Hoopa Valley Tribe and the Secretary do not concur, the minimum Trinity River instream fishery releases established under this paragraph shall remain in effect unless increased by an Act of Congress, appropriate judicial decree, or agreement between the Secretary and the Hoopa Valley Tribe.

Pub. L. No. 102-575Pub. L. No. 102-575. This provision of the CVPIA does several things. First, § 3406(b)(23) established minimum, annual instream releases of 340,000 acre-feet of water to the Trinity River for the years between 1992 and 1996. Second, it established a deadline for the U.S. Fish and Wildlife Service to complete the Trinity River Flow Evaluation Study ("Flow Study"). Third, it instructed the Secretary to consult with the Hoopa Valley Tribe about the Flow Study before completing it. Fourth, it set a deadline for the Secretary to forward the recommendations of the Flow Study to several Congressional committees. Fifth, it provided that

if the Secretary agreed and the Hoopa Valley Tribe concurred with the recommendations of the Flow Study, those recommendations – including increases to the minimum 340,000 acre-feet of water established by § 3406(b)(23)(A) to be releases into the Trinity River from the Trinity River Division – shall be implemented without further Congressional action. Sixth, it provided that if the Secretary and the Hoopa Valley Tribe did not mutually agree with the recommendations of the Flow Study, the minimum annual volume of 340,000 acre-feet of water established by § 3406(b)(23)(A) would remain in effect unless increased by further Act of Congress, a judicial decree, or by the agreement of the Secretary and the Hoopa Valley Tribe at a later date.

The Flow Study, which was completed in 1999 by Defendants and the Hoopa Valley Tribe, *see* ECF No. 111-3, resulted in the 2000 ROD, which generally adopted the Flow Study's recommendations, including: (1) "Variable annual instream flows for the Trinity River" from Trinity River Division releases that vary based on annual basin hydrology and that included significantly increased volumes; (2) various non-flow restoration measures (*i.e.*, channel rehabilitation, sediment management, watershed restoration, and infrastructure improvement); and (3) operating procedures for managing the Trinity River Division fishery restoration efforts. Notably, the 2000 ROD increased the minimum volume to be released into the Trinity River from the Trinity River Division of 340,000 acre-feet ("af") per year set by the CVPIA to 369,000 af per year in critically dry years; 453,000 af per year in dry years; 647,000 af per year in normal years; 701,000 af per year in wet years; and 815,000 af per year in extremely wet years. The 2000 ROD also adopted an Adaptive Environmental Assessment and Management Program ("adaptive management program") that allowed for adjustments to be made to the fishery restoration plan based on continuing scientific monitoring and studies. To implement the adaptive management program, the ROD established an organizational structure that included an

adaptive environmental assessment and management team, the Trinity Adaptive Management Working Group, Independent Review Panels, and the Trinity Management Council. All of these groups are a part of the Restoration Program, established by Interior through the 2000 ROD. The Trinity Management Council – which includes eight permanent members: the USFWS, Reclamation, the USFS, NNMFS, the Hoopa Valley Tribe, the Yurok Tribe, the State of California and Trinity County – is responsible for the oversight and direction of the Restoration Program and makes recommendations to the Secretary, who retains ultimate control over the Restoration Program, on how to implement the 2000 ROD, including adaptive management actions to improve fishery restoration efforts.

The Hoopa Valley Tribe concurred in the 2000 ROD including the increased flows, the operating procedures, and the establishment of the Restoration Program and the Trinity Management Council. *See* Pl.'s First Am. & Suppl. Compl. for Declaratory & Injunctive Relief ¶¶ 15, 33, ECF No. 97; *see also* Mem. in Supp. Pl.'s Mot. for Prelim. Inj., ECF No. 108-1 ("Pl.'s Mem.") ("Hoopa concurred in the recommendations, signing the Trinity River ROD along with the Secretary of the Interior in 2000. . . ."). Additionally, on October 29, 2003, the Hoopa Valley Tribe signed the Bylaws creating the Trinity Management Council and establishing its procedures. *See* Ex. A, at 7 (showing that Mike Orcutt, who is one of Plaintiff's declarants in this case, signed the Trinity Management Council Bylaws on behalf of the Hoopa Valley Tribe). Beginning in 2016, the Restoration Program began to investigate how changes to flow management could improve juvenile salmon growth and survival. *See* Decl. of Michael Dixon ¶ 5, Dec. 30, 2022, attached as Ex. D. The Restoration Program's scientific research revealed that the timing and volume of certain dam releases for restoration purposes suppresses juvenile salmon growth. *Id.* ¶¶ 6, 8. Because the 2000 ROD requires the use of an adaptive management

program to restoration, the Restoration Program developed the Winter Flow Project to improve the habitat for growth and outmigration of juvenile fish, among other positive effects. On December 7, 2022, the Trinity Management Council voted to implement the Winter Flow Project. Representatives of Reclamation, the USFWS, the NOAA, the USFS, the Yurok Tribe, the State of California and Trinity County voted in favor on the Winter Flow Project. The Hoopa Valley Tribe was the lone dissenting vote.

In response to attempts to engage with Plaintiff regarding the Winter Flow Project prior to the Trinity Management Council vote in December, Plaintiff stated it will not discuss the Winter Flow Project with Reclamation staff until the Secretary confirms, in writing, that the Trinity Management Council's decision to implement the Winter Flow Project cannot move forward without Plaintiff's concurrence. *See* Mike Orcutt Email to Mike Dixon, Nov. 18, 2022, attached as Ex. E; *see also* Chairman Joe Davis Letter to Asst. Sec. Bryan Newland, Oct. 4, 2022, attached as Ex. F. Plaintiff filed its motion to enjoin implementation of the Winter Flow Project, urging its interpretation of its concurrence role. *See* ECF No. 108-1.

## III. LEGAL STANDARDS

"A preliminary injunction is an 'extraordinary and drastic remedy'" that may issue only upon Plaintiff carrying its burden of making "a clear showing that [it] is entitled to such relief." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). This exacting standard applies with full force to cases where plaintiff alleges it will suffer environmental injuries. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010); *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (*en banc*), *overruled in part on other grounds by*, *Winter*, 555 U.S. 7.

Under the traditional four-factor inquiry, a party moving for a preliminary injunction

must clearly establish that: (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. In some circumstances, the Ninth Circuit has applied a "sliding scale test" for movants who raise "serious questions" on the merits, but that test applies only if the movant carries its burden on the other three elements, and only if the balance of equities "tips sharply" in its favor. *All. for the Wild Rockies v. Cottrell* ("*AWR*"), 632 F.3d 1127, 1134-35 (9th Cir. 2011). But regardless of how the success on the merits requirement is applied, Plaintiff's motion must be denied unless it makes a "clear showing" that it satisfies all four requirements for extraordinary relief. *Winter*, 555 U.S. at 22.

## IV. ARGUMENT

Far from making the necessary clear showing on each of the four requirements for extraordinary relief, Plaintiff does not satisfy any of the *Winter* factors.

### A. Plaintiff is Unlikely to Succeed on the Merits

Because the Winter Flow Project is an adaptive management measure expressly incorporated in the 2000 ROD, in which the Tribe already concurred, the proposed action falls within Plaintiffs' concurrence to the 2000 ROD and its procedures. Implementation of the Winter Flows Project consistent with the Trinity Management Council's recommendation (if adopted by the Secretary or her designee) does not present any broader question about any potential continuing concurrence authority.

While Plaintiff acknowledges (and Federal Defendants do not dispute) Plaintiff's essential role in the development of the recommendations adopted by the 2000 ROD, *see* Pl.'s Mem. 9-10, 15, Plaintiff wholly ignores that the 2000 ROD (1) established the Trinity

Management Council; (2) directed the Trinity Management Council to "guide overall implementation" of the ROD's restoration measures; (3) adopted "[v]ariable annual instream flows for the Trinity River"; and (4) provided for adaptive management. Because Plaintiff expressly concurred in the 2000 ROD as provided for by § 3406(b)(23) of the CVPIA,[5] and because the Winter Flow Project (if implemented) flows directly from the 2000 ROD to which Plaintiff has already concurred, Plaintiff's claim cannot be sustained and Plaintiff's request for an injunction should therefore be denied.[6]

The 2000 ROD is, among other things, an agreement between Federal Defendants and the Hoopa Valley Tribe to adopt the recommendations of the Flow Study and the associated environmental impact studies to increase minimum annual volumes and establish operating criteria and procedures for Trinity River management and fishery restoration.[7] As noted above, the 2000 ROD establishes minimum annual flow volumes, as set forth in Table 1 of the ROD. *See* ECF No. 111-2 at 12. Those minimum annual volumes in Table 1 cannot be adjusted; however, the "schedule for releasing water" within each annual flow period can be adjusted based on the best science available to the Restoration Program. *Id.* The 2000 ROD also adopts and incorporates by reference the "implementation plan" contained in the Final Trinity River

[5] *See* 2000 ROD, ECF No. 111-2 at 26 ("By Tribal Resolution # 00-94 dated December 18, 2000, the Hoopa Valley Tribe formally concurred in and agreed with the underlying recommendations and this decision."); *see also* Pl.'s Memo. Supp. Mot. for Prelim. Inj., ECF No. 108-1 at 1, 10, 13-15; Decl. of Joe Davis ¶ 12, December 16, 2022, ECF No. 110 ("Hoopa concurred in the recommended flows and operating criteria and procedures in the *ROD*, which were based on the Trinity River Flow Study prepared and completed by Hoopa and federal scientists." (emphasis added)).

[6] Federal Defendants retain and preserve additional arguments related to the broader concurrence issue, which will be addressed when they file their response to the Amended Complaint, which is currently due by January 13, 2023.

[7] The 2000 ROD also has non-flow restoration measures that are designed to alter and restore pre-dam geomorphological conditions.

Mainstem Fishery Restoration Environmental Impact Statement ("Impact Statement"), attached as Ex. G, which establishes the basic operating procedures for the Restoration Program. ECF No. 111-2 at 12 . ("The Implementation Plan contained in the [Impact Statement] pages C-1 through C-39 describes in detail the activities which comprise this comprehensive program for Trinity River mainstem fishery restoration and is adopted as part of this decision."). The 2000 ROD also establishes an adaptive management program, defined above, for overseeing Trinity River restoration, which is designed to "ensure the proper implementation of the[] [ROD's] measures, conduct appropriate scientific monitoring and evaluation efforts, and recommend possible adjustments to the annual flow schedule within the designated flow volumes provided for in this ROD or other measures in order to ensure that the restoration and maintenance of the Trinity River anadromous fishery continues based on the best available scientific information and analysis." *Id.* at 3.[8] And the 2000 ROD also establishes the Trinity Management Council to oversee the adaptive management program and recommend any changes to the Secretary, who, per the ROD, retained ultimate control over the Restoration Program. *Id.* at 11 ("Although the Secretary retains ultimate authority over this program, by this Record of Decision, the Trinity Management Council is established which will guide overall implementation of the management actions of the Implementation Plan.").

The 2000 ROD both provided for variable annual instream flows and also fully embraced adaptive management approach to Trinity River restoration, a central component of the implementation plan. The 2000 ROD, which incorporated the Impact Statement, recognized that the science of ecosystem management in a controlled river was still developing at the turn of the

[8] The 2000 ROD repeatedly recognized that "adjustments may be made to certain elements of the fishery restoration plan based on continuing scientific monitoring and studies." ECF No. 111-2 at 12.

century, and would continue to develop with new data and advancements. *See* Ex. G, at C-17 – C-18. Given that, the implementation plan gave Restoration Program scientists the flexibility to study the river and its populations, and to adjust the management plan based on real-time data. *Id.* at C-18 – C-19. And while the 2000 ROD included average daily flow rates for the Trinity River Division releases to the Trinity River, *see id.*, Attachment 1 at C-37 – C-38, it also recognized that the "daily releases may be changed in magnitude and/ or duration at a future date to achieve fishery resource restoration goals in the Trinity River." *Id.* at C-5 – C-7. The 2000 ROD provided that changes in the scheduled flow releases "will be identified and referred to Reclamation for action by the TMC [*i.e.* the Trinity Management Council]." *Id.* at C-5. Thus, it is the Trinity Management Council that decides whether to recommend the adoption of changes to the implementation plan proposed by the Restoration Program's scientists.

Here, it is undisputed that Plaintiff concurred in the 2000 ROD's recommendations and overall decision. *See* supra, n. 4. The 2000 ROD established the Trinity Management Council and vested the Trinity Management Council with the power to recommend changes to the implementation plan to the Secretary, including changes to flow releases based on adaptive management. Plaintiff signed not only the 2000 ROD but also the Trinity Management Council Bylaws, agreeing to be one of eight voting members. *See* Ex. G, at C-21; *see also* Trinity Management Council Bylaws, Ex. A, at § 300. Plaintiff also agreed that "[n]o member [of the Trinity Management Council] shall have more than one vote[,]" and that "[a]n affirmative vote of 7 is required to pass a motion when all 8 members are present." *Id.* at § 603.

Here, Restoration Program scientists reviewed the data they had been collecting from nearly two decades of river management, and they concluded that adjusting annual water delivery schedules should be undertaken in order to better effectuate the restoration goals of the

2000 ROD. *See* Chad E. Abel, Kyle DeJuilio, Kenneth Linke, Seth Naman, and Emily Thorn, *Trinity River Winter Flow Project Final Report*, August 2022, attached as Ex. H. The Trinity Management Council reviewed the Winter Flow Project and voted 7-1 to adopt the recommended changes to the water delivery schedule for WY 2023. According to the Trinity Management Council's Bylaws, Hoopa's lone dissent was insufficient to prevent the motion from passing. And Plaintiff appeared to recognize in a June 18, 2021 letter it drafted to the Winter Flow Scoping Team that a one-year adaptive management experiment, like the Winter Flow Project, would not require Plaintiff's concurrence. *See* Ex. 1 to Decl. of Joe Davis ECF No. 110-1 at 3.

Simply put, Plaintiff concurred in the 2000 ROD, which allows certain operational changes (including annual flow schedules) to be made upon the recommendation of the Trinity Management Council. In 2003 (and again in 2019 when the Bylaws were amended), Plaintiff agreed to the voting procedures of the Trinity Management Council. There is no procedure that allows Plaintiff – or any of the other voting parties – to override a decision approved by the other seven voting members. Simply because Plaintiff voted no on the Winter Flow Project does not mean that Interior will violate the 2000 ROD in which Plaintiff has already concurred if it decides to implement the Winter Flow Project. Therefore, the Court should deny Plaintiff's motion for preliminary injunction because Plaintiff has already given the concurrence envisioned by § 3406(b)(23) of the CVPIA to the action it is now challenging.

**B. Plaintiff will not suffer irreparable harm if the Winter Flow Project is implemented**

Irreparable harm is "traditionally defined as harm for which there is no adequate legal remedy." *Banga v. Kanios*, No. 16-CV-04270-RS, 2018 WL 11360090, at *2 (N.D. Cal. Jan. 16, 2018) (citation omitted). The mere "possibility" that a plaintiff may suffer harm is insufficient.

*Winter*, 555 U.S. at 22. Plaintiff "must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *E.g.*, *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Earth Island Inst. v. Gould*, No. 1:14-cv-01140-KJM-SKO, 2014 WL 4082021, at *6, *8 (E. D. Cal. Aug. 19, 2014). And even when a plaintiff alleges an environmental injury, there is no presumption of irreparable harm. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544–45 (1987); *see also Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1299 (9th Cir. 2003). That is especially true where, as here, the public interest weighs against granting a preliminary injunction. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010). Here, Plaintiff cannot obtain the injunctive relief it seeks because it has failed to show that it will suffer an irreparable harm if the Court does not enjoin the Winter Flow Project. *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173–74 (9th Cir. 2011); *see also Ctr. for Biological Diversity v. Hays*, No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739, at *10 (E.D. Cal. Oct. 8, 2015).

Plaintiff alleges that it will be irreparably harmed if the Winter Flow Project is allowed to proceed because: (1) it has a statutory right to concurrence under § 3406(b)(23) of the CVPIA that will be irrevocably violated if the Secretary implements the Winter Flow Project without Plaintiff's concurrence, Decl. of Joe Davis ¶ 25, and (2) the river and its fish will be harmed because "[o]nce the water is released down the river, it will be lost forever – and will no longer be available for its intended uses later in the water year."[9] Decl. of Joe Davis ¶ 25 . Neither

[9] Plaintiff has previously suggested that the Federal Defendants are creating an unnecessary, emergency situation by not committing to a timeframe when water will be released. *See* Pl.'s Opp'n to Mot. Ext. of Time, ECF No. 114. However, implementation of the Winter Flow Project is time-sensitive and is dependent on a precipitation-producing event or series of events. *See*Decl. of Michael Dixon ¶ 15. Releasing the flow volumes for the Winter Flow Project is not as easy as flipping a switch. In fact, operationally Interior needs to make a decision at least 72 hours in advance of storm-triggering event. Because implementation depends largely on the

claim has merit.

**1. Plaintiff cannot obtain an injunction simply to prevent the alleged violation of a statute**

As to its first alleged injury – *i.e.* that Plaintiff has a continuing right of concurrence that will be violated absent an injunction of the Trinity Management Council's recommended action to the Secretary – Plaintiff is asking that an injunction issue simply to prevent an alleged violation § 3406(b)(23) of the CVPIA. An alleged statutory violation like the one claimed by Plaintiff is, standing alone, insufficient to warrant injunctive relief.[10] *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1162 (9th Cir. 2011) (holding that courts "do not presume irreparable harm simply because a defendant violates a statute."). Plaintiff's argument that it will be irreparably harmed if its right to concurrence is ignored is the equivalent of Plaintiff saying it will be irreparably harmed simply because the statute has allegedly been violated. *See generally Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."). More is needed to show irreparable harm but Plaintiff cannot make that showing because its assertion that the Winter Flow Project will harm the fishery is without merit.

**2. Plaintiff's claim that the water released in the winter will be lost forever and will create harmful conditions in the spring and summer is false**

The Court should reject Plaintiff's assertion that the release of water as called for in the

---

weather, Reclamation cannot forecast weeks in advance when a sufficient storm event will occur. *Id.* Additionally, historically, a sufficient storm event usually only occurs once a year so if Interior misses the precipitation event for winter 2023, it may not have another opportunity to implement the Winter Flow Project this year. *Id.*

[10] The CVPIA is not a civil rights statute or another type of statute where Congress has authorized injunctive relief in the text.

Winter Flow Project will create harmful conditions in the spring and summer for at least three reasons: (1) Restoration Program scientists, independent experts and data, and the Trinity Management Council have established that existing spring flow release patterns negatively affect juvenile salmonid fish growth and outmigration and that the Winter Flow Project will improve conditions; (2) Plaintiff's claim that the water released in the winter will be needed in the spring and summer is wholly speculative; and (3) even assuming the water may be later needed, Plaintiff has conceded there are additional authorities that would allow Federal Defendants to release more water to protect the fish.

First, the scientific data demonstrates that late spring and summer high flows suppress salmon growth and unnaturally delay migration to the ocean, decreasing their chance of survival. *See* Thomas Gast & Associates, *Analysis and model evaluation of long-term data collected at the Willow Creek outmigrant trap: Report 20190910YTFP for the Trinity River Restoration Program (TRRP)* (2021), www.trrp.net/library/document?id=2492 (last visited Dec. 30, 202). The Winter Flow Study would amend the implementation plan to avoid these "late spring and summer high flows," in an attempt to replicate the natural, pre-dam flows of the river. As discussed *infra* at 18–19, the Winter Flow Study will also have numerous other beneficial impacts to the river and to fish populations by, among other things, replicating natural flow variability and temperatures and enhancing natural cleaning and gravel movement. Thus, the irreparable harm standard is not met here because the Trinity Management Council's science-based determination, relying on previous years of studying seasonal flows, is that the modification would avert ongoing harm to salmon from the current flow release pattern and would also improve the overall health of the Trinity River. Additionally, if the modification does not help as expected, then pursuant to the Trinity Management Council's adaptive

management approach, the Winter Flows Proposal would not be recommended in the future, and previous seasonal flows could resume.

Second, Plaintiff's own motion concedes that any harm to the river or its fish populations is purely speculative because any water released in the winter may not ultimately be necessary for the spring and summer months. *See* Pl.'s Mem. 4 ("*If* the water currently called for in the ROD *is ultimately necessary* in Spring and Summer, it will no longer be available because it will already have been used in the winter under the W[inter] F[low][] Project." (emphasis added)). Because the water released in the winter may not be missed in the spring and summer, Plaintiff cannot be granted a preliminary injunction based on a purely hypothetical injury. In fact, the Winter Flow Project is designed so that base-flows in the spring and summer will remain unchanged so it is unlikely that Plaintiff's concern about suppressed spring and summer flows will ever be realized. Decl. of Michael Dixon ¶ 13.

Third, Plaintiff has admitted that there are additional sources of water that Reclamation could use in the spring and summer if ultimately water must be released in the warmer, drier months to affect the goals of restoration. *See* ECF No. 110-1 at 4 (Plaintiff claims that Reclamation can use 1955 Act Proviso 1 and Proviso 2[11] water to provide additional releases beyond that contemplated by the 2000 ROD). So, per Plaintiff's own admission, Federal Defendants could voluntarily release more water than is mandated by the 2000 ROD if there proved to be insufficient water in the spring and summer to meet Federal Defendants' statutory obligations to protect and propagate fish populations. Additionally, this Court could also order additional spring and summer releases if it ultimately decides in Plaintiff's favor on the merits. Therefore, contrary to Plaintiff's representations, the water released pursuant to the Winter Flow

---

[11] *See supra* n. 2.

Project will not create harmful conditions in the spring and summer and is not "lost forever." Pl.'s Mem. 17. Rather, the water released during the winter can be supplemented with additional water either by court order or by Federal Defendants if they determine additional releases are necessary to meet their restoration and preservation obligations. Given this, Plaintiff has failed to demonstrate an immediate, irreparable injury.

**C. The Balance of Equities and Public Interest Tip Sharply in Favor of Federal Defendants.**

Finally, Plaintiff fails to satisfy the third and fourth *Winter* factors, which generally merge when the government is a party. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Here, the equities and the public interest tip strongly in Federal Defendants' favor.

Restoration Program scientists have concluded that the timing and volume of certain existing Trinity River water releases under the 2000 ROD can be detrimental to overall fish restoration because those existing flows are held static and artificially low during the time of year when flows would naturally be most variable. *See* Decl. of Michael Dixon ¶ 6; *see also* Exhibit H, at 18. Additionally, Restoration Program scientists have learned that 47 percent to 87 percent of juvenile chinook have already migrated downstream of the restoration reach of the Trinity River before water is traditionally released on April 15; therefore, the earlier releases contemplated by the Winter Flow Project will benefit more rearing and outmigration fish. *See* Decl. of Michael Dixon ¶ 9; *see also* Exhibit H, at 14. Also, status quo restoration flow management results in artificially low temperatures in the spring and summer, which hinders salmon growth (and ultimate survivability). *See* Decl. of Michael Dixon ¶ 8; *see also* Exhibit H, at 3, 5, 6–7. As explained in the Declaration of Dr. Michael Dixon and the Winter Flow Report itself, the Winter Flow Project will accomplish six primary goals:

- Better match natural flow variability during winter and spring runoff events and synchronize ecological processes between tributaries and the mainstem Trinity River;

- Enhance natural cleaning and transport of river gravels, reduce buildup of sediment at tributary mouths, and increase effectiveness of peak flows by having a dam-controlled flow peak coincide with a major storm event;

- Reduce cold water releases in spring/summer that suppress juvenile salmon metabolism, reduce growth rates of their prey, and disrupts the breeding of other aquatic species including foothill yellow-legged frog;

- Allow the river to naturally warm earlier in the season to provide proper environmental cues that smolts rely on to time their outmigration to the ocean;

- Increase food availability for juvenile salmon through earlier production of macroinvertebrate prey species through floodplain inundation

- Inundate natural and constructed floodplains and other productive off-channel rearing habitats for juvenile salmon to provide diversity of foraging habitats and temperatures and increase overall habitat capacity.

*See* Decl. of Michael Dixon ¶ 8. Restoration Program scientists predict that by mimicking natural flow variability and temperatures and targeting releases to have a larger impact on the most fish that fish survival rates will increase, which will help effectuate the goals of the CVPIA to "to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River Basins." Pub. L. No. 102–575, § 3402(a). The Winter Flow Project is the best available science that supplements the 2000 ROD and underlying science regarding how best to protect and maximize fish populations, and it will also have beneficial impacts to the overall health of the Trinity River.

Here, seven other entities who are vested in the restoration of the Trinity River – including federal and state fisheries agencies and the Yurok Tribe – voted to adopt the Winter Flow Project because they believe it will improve the Restoration Program's efforts and will increase fish populations. *See* Ex. B . The super-majority of Restoration Program stakeholders

believe the Winter Flow Project will foster the public's interest in river restoration and the propagation of fish. The Trinity Management Council's vote, standing alone, is a tangible expression of the public interest. Plaintiff cannot claim ownership of the public's interest particularly when another sovereign Tribe, the State of California, Trinity County, and four federal agencies, all of whom have an interest in the fish of the Trinity River, disagree.

## V. CONCLUSION

Because Plaintiff has already concurred in the 2000 ROD and its implementing procedures, its § 3406(b)(23) claim relating to the Winter Flow Project – an adaptive management decision based on the best current science that falls within the authority of the 2000 ROD and its procedures – has no merit. Additionally, Plaintiff has failed to demonstrate a real and immediate injury that cannot be remedied, if necessary, after implementation of the Winter Flow Project. Specifically, Plaintiff cannot show that the water that Reclamation plans to release in winter will be needed in the spring and summer. Moreover, even if that water does become needed later in the year, nothing stops Defendants, through their voluntary actions, or the Court, through an order, from releasing more water. Finally, the equities and the public interest will be served by implementation of the Winter Flow Project. The Winter Flow Project offers the best, current science on how to make certain adjustments to the Trinity River Diversion releases consistent with the 2000 ROD in order to protect and restore the fishery resources of the Trinity River, and the super-majority of stakeholders believe the Project will serve the public's interests.

For all these reasons, the Court should deny Plaintiff's motion for preliminary injunction.

Dated: December 30, 2022

Respectfully submitted,

TODD KIM
Assistant Attorney General

*/s/ J. Scott Thomas*
JEFFREY SCOTT THOMAS
Trial Attorney
U.S. Department of Justice
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-3553
Facsimile: (202) 305-0506
jeffrey.thomas2 @usdoj.gov

*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2022, I electronically filed the **FEDERAL DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the ECF system, which will automatically send email notification to the attorneys of record.

*/s/ J. Scott Thomas*
JEFFREY SCOTT THOMAS