Thane D. Somerville, WSBA #31468 (*pro hac vice*)
Thomas P. Schlosser, WSBA #06276 (*pro hac vice*)
MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE
811 First Avenue, Suite 218
Seattle, WA 98104
Tel:    206-386-5200
Fax:    206-386-7322
t.somerville@msaj.com
t.schlosser@msaj.com
Attorneys for Plaintiff Hoopa Valley Tribe

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOOPA VALLEY TRIBE, | ) Case No. 1:20−cv−01814−JLT-EPG |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) ~~FIRST~~ SECOND AMENDED AND |
| | ) SUPPLEMENTAL COMPLAINT |
| | ) FOR DECLARATORY AND |
| UNITED STATES BUREAU OF | ) INJUNCTIVE RELIEF |
| RECLAMATION; DEBRA ANNE HAALAND, | ) |
| in her official capacity as Secretary of the | ) Judge Jennifer L. Thurston |
| Interior; MARIA CAMILLE CALIMLIM | ) |
| TOUTON, in her official capacity as | ) |
| Commissioner of the United States Bureau of | ) |
| Reclamation; ERNEST A. CONANT, in his | ) |
| official capacity as U.S. Bureau of Reclamation | ) |
| California-Great Basin Regional Director; and | ) |
| UNITED STATES DEPARTMENT OF THE | ) |
| INTERIOR | ) |
| | ) |
| Defendants. | ) |

## I.    **INTRODUCTION**

1.    Plaintiff Hoopa Valley Tribe ("Hoopa") hereby sues Defendants United States Bureau of Reclamation, Debra Anne Haaland, in her official capacity as Secretary of the Interior, Maria Camille Calimlim Touton, in her official capacity as Commissioner of the

United States Bureau of Reclamation, Ernest A. Conant, in his official capacity as United States Bureau of Reclamation California-Great Basin Regional Director, and United States Department of the Interior (collectively herein, "Reclamation") for violations of the Central Valley Project Improvement Act (CVPIA)[1], the WIIN Act[2], the National Environmental Policy Act (NEPA)[3], reclamation law[4], including but not limited to Reclamation's authority to contract for the delivery of  water[5], Trinity River Basin Fish and Wildlife Management Act of 1984, Pub. L. No. 98-541, 98 Stat. 2721 (1984 Act), as amended by the Trinity River Basin Fish and Wildlife Management Reauthorization Act, Pub. L. 104-143, 110 Stat. 1338 (May 15, 1996) (1996 Act), Executive Order 12866[6], and the Administrative Procedure Act (APA).[7]  In addition to injunctive relief, this action seeks relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to resolve actual and existing controversies regarding the rights and responsibilities of the parties hereto.

2.    Reclamation has unlawfully:

(1) violated Hoopa's congressionally delegated sovereignty, in CVPIA section 3406(b)(23) and the Trinity River Record of Decision, over property rights in the Trinity River fishery owned by Hoopa since time immemorial and held in trust for Hoopa's benefit by the United States; for example, by failing to seek and obtain Hoopa concurrence prior to approving the Trinity River Winter Flow Variability (WFV) Project;

(2) violated mandates and requirements in federal law and regulations for the restoration and maintenance of Hoopa's fishery that is vital to Hoopa's culture, religion and

---

[1]  Pub. L. No. 102-575, §§3401-12, 106 Stat. 4600, 4706-31 (1992).
[2] Pub. L. No. 114-322, Subtitle J, 130 Stat. 1628 (December 16, 2016).
[3] 42 U.S.C. §§ 4321 *et seq.*
[4] Act of June 17, 1902 (32 Stat. 388) and Acts amendatory thereof and supplementary thereto and known as the reclamation law. *See also* Pub. L. No. 102-575, §§3403(d) and 43 U.S.C. § 371(b).
[5] 43 U.S.C. §511, 42 Stat. 541 (May 15, 1922) (1922 Act).
[6] Regulatory Planning and Review, 58 FR 51735 (October 4, 1993).
[7] 5 U.S.C. §§ 551 *et seq.*

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 2

economy, which Reclamation damaged by construction and operation of the Central Valley Project (CVP), [8] including the mandates in the 1984 and 1996 Acts to design, construct, operate and maintain facilities to modernize and otherwise increase the effectiveness of the Trinity River Fish Hatchery (TRH);

(3) failed to comply with CVPIA section 3404(c)(2), which mandates incorporation of all requirements imposed by existing law as terms in Reclamation contracts for CVP water, including: (i) the CVPIA's fishery mitigation, protection, and restoration (herein, "restoration") measures; (ii)  other legal requirements that confirm in-basin priority of Trinity River flow releases over out-of-basin diversions; (iii) the fish and wildlife preservation and propagation mandates in the Act of August 12, 1955, Pub. L. 84-386, 69 Stat. 719 (1955 Act), which authorized the Trinity River Division (TRD) of the CVP and the TRH; (iv) Hoopa's concurrence authority provided in CVPIA section 3406(b)(23); and (v) Reclamation's obligations pursuant to CVPIA Section 3406(b)(23)[9] to allocate and collect as reimbursable operation and maintenance expenditures the costs of implementing the CVP's purpose to mitigate, protect, and restore Trinity River fish and wildlife, including the modernization and increased effectiveness of the TRH, in order to meet Federal trust responsibilities to Hoopa;

(4) failed to collect at least $340 million in accumulated reimbursable environmental restoration costs—and forfeited potentially several times that in future costs-- owed by CVP contractors to restore California's environment, including Hoopa's fishery, damaged by Reclamation's construction and operation of the CVP;

---

[8] The Act of August 26, 1937, ch.832, 50 Stat.844, transferred authority for the Central Valley Project "from the Secretary of War to the Secretary of the Interior" and established purposes and priorities for water and power use developed by the CVP.
[9]  The WIIN Act amended CVPIA to delete two programs--(b)(14) and (18)--under 3406(b), resulting in 3406(b)(23) being re-designated as 3406(b)(21). WIIN Act section 4010(g)(1)(B). For the sake of clarity and consistency with decades of references in administrative documents and case law, Plaintiff uses the designation 3406(b)(23) herein. Section 3406(b)(23) is reproduced in Exhibit 1.

(5) failed to include in contracts for CVP water itemized and quantified rates and charges for environmental restoration costs;

(6) unlawfully declared that environmental restoration actions prescribed by CVPIA section 3406, including Trinity fishery restoration, are complete;

(7) failed to comply with NEPA when Reclamation acted to convert certain time-limited CVPIA interim renewal water service contracts into permanent repayment contracts with CVP contractors (including but not limited to Westlands Water District ("Westlands") Contract No. 14-06-200-495A-IR1-P) and also failed to comply with NEPA prior to approving the Trinity River WFV Project;

(8) deemed Westlands' contracts to be binding on the United States prior to Westlands having furnished to Reclamation a judicial decree validating those contracts pursuant to federal law; and

(9) persisted in holding itself bound after those Westlands contracts were denied validation by a court of competent jurisdiction[10], and after Reclamation's WIIN Act contracting authority had expired.[11]

3.      Hoopa seeks an order and judgment declaring invalid and rescinding the illegal conduct described in paragraph 2.   Hoopa further seeks an order and judgment setting aside, declaring invalid, and rescinding Reclamation's conversions of time-limited Central Valley Project ("CVP") renewal contracts into permanent repayment contracts with water contractors (including but not limited to Westlands Water District Contract No. 14-06-200-495A-IR1-P) due to Reclamation's failure to comply with the CVPIA, NEPA, WIIN Act, APA, and other federal laws as alleged herein.  Hoopa further seeks an order enjoining Reclamation from engaging in this illegal conduct in any ongoing or future contract actions for CVP water.

---

[10] *Westlands Water District v. All Persons*, Case No. 19CECG03887, Fresno County Superior Court, Plaintiff's complaint for validation judgment dismissed, March 15, 2022. Exhibit 2.
[11] Pursuant to section 4013, the WIIN Act expired on December 16, 2021.

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 4

## II.      JURISDICTION AND VENUE

4.      <u>Jurisdiction</u>:  This case presents federal law claims by an Indian tribe challenging federal agency action.  This Court has jurisdiction pursuant to 5 U.S.C. §§ 702 - 706, 28 U.S.C. § 1331, 28 U.S.C. § 1346, 28 U.S.C. § 1361 - 1362, and 28 U.S.C. § 2201 - 2202. This Complaint is timely filed within the applicable six-year statute of limitations set forth in 28 U.S.C. § 2401(a.) There exists now between the parties an actual, justiciable controversy in which Hoopa is entitled to have a declaration of its rights and of Reclamation's obligations and in which Hoopa is entitled to declaratory and injunctive relief based on the allegations herein.

5.      <u>Venue</u>: Pursuant to 28 U.S.C. § 1391(e)(1), Hoopa filed this action originally in the Northern District of California because Hoopa and its Reservation and fishery are located in Humboldt County and because no real property is involved in this action. Upon Reclamation's motion to transfer and over Hoopa's objection, the Northern District transferred this case to this Court on December 21, 2020 (Doc. 32).

## III.      STANDING

6.      Hoopa, a federally-recognized Indian tribe, has standing to assert its claims herein.  Since time immemorial, Hoopa and its members, the Hupa[12] people, have used and continue to use the Klamath-Trinity River system and its anadromous fishery resource for subsistence, cultural, ceremonial, religious, and commercial purposes.  The lower twelve miles of the Trinity River and a stretch of the Klamath River flow through the Hoopa Valley Reservation.  *See* Map Exhibit 3.

7.      Since time immemorial, the fishery resources of the Trinity and Klamath Rivers have been the mainstay of the life and culture of Hoopa and its people.  The fishery is "not

---

[12] "Hupa" refers to the people. Byron Nelson, Jr. *Our Home Forever, The Hupa Indians of Northern California*, 3, Howe Brothers (1988). The Hoopa Valley Tribe is the name by which the Tribe is recognized by the Federal government. Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 86 Fed. Reg. 7554 (January 29, 2021).

much less necessary to the existence of the Indians than the atmosphere they breathed." *Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir. 1981) (quoting *United States v. Winans*, 198 U.S. 371, 381 (1905)).  The salmon fishery holds significant commercial and economic value in Hoopa's culture and economy.  *See* Memorandum from John D. Leshy, Solicitor of the Department of the Interior to the Secretary of the Interior (Oct. 4, 1993) (M-36979) (hereinafter "1993 Solicitor Opinion").

8.     The principal purpose of Hoopa's Reservation is to set aside sufficient resources of the Trinity and Klamath Rivers for the Indians to be self-sufficient and achieve a moderate living based on fish.  *See* 1993 Solicitor Opinion 3, 15, 18-21, *cited with approval, Parravano v. Babbitt*, 70 F.3d 539, 542 (9th Cir. 1995), *cert. denied*, 518 U.S. 1016 (1996).  Hoopa's federal reserved fishing right carries with it a corresponding right to Trinity and Klamath River flow levels that are sufficient to support a productive habitat for Hoopa's anadromous fishery, including but not limited to salmon and steelhead, including those produced by the TRH, and other culturally important salmon and non-salmonid species.

9.     The TRD diverts water that would otherwise flow downstream through Hoopa's Reservation into the Klamath River, and exports it to California's Central Valley. The Trinity River is the CVP's only imported water supply. The 1955 Act established conditions and limits on Reclamation's use of water developed by the TRD that protect Hoopa and its property rights in the Trinity River fishery. In 1979, the Department of the Interior's Solicitor, Leo Krulitz, confirmed that the provisos in Section 2 of the 1955 Act require the Secretary to exercise a priority for use of all TRD water necessary to protect fish and wildlife and other in-basin needs over TRD diversions to the Central Valley for CVP purposes. [13]  The 1955 Act also established a separate and additional obligation on Reclamation, memorialized in a 1959 contract between

---

[13] U.S. Department of the Interior, Office of the Solicitor, Memorandum from Solicitor to Assistant Secretary, Land and Water Resources re Proposed Contract with Grasslands Water District, Dec. 7, 1979 (the "1979 Opinion") Exhibit 4.

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 6

Reclamation and Humboldt County[14], to release annually and make available to Hoopa, Humboldt County and other downstream users not less than 50,000 acre-feet of TRD water for beneficial use by them.[15]

10.     The 1955 Act authorized the Trinity River Hatchery (TRH) to mitigate the permanent loss of 109 miles of anadromous fish spawning habitat upstream of the TRD.[16] CVPIA sections 3406(a) and 3406(b)(23) [17] require Reclamation to allocate as separable and reimbursable, the costs of modernization and increased effectiveness of the TRH, as well as the costs of restoring natural fish production.[18]

11.     In 1981, the Secretary of the Interior ordered increased flows into the Trinity River from the TRD for the benefit of Hoopa and its fishery resources.[19] The increased flows were to be used in a study to determine what TRD releases in addition to the initial flow release regimen established in the 1955 Act were needed for the preservation and propagation of the Trinity River fishery. The 1981 Secretarial Order found that:

> [T]he [Hoopa] and Yurok Indians have rights to fish from the Trinity and
> Klamath Rivers and to adequate water to make their fishing rights meaningful.
> These rights are tribal assets which the Secretary, as trustee, has an obligation to
> manage for the benefit of the tribes.  The Secretary may not abrogate these rights
> even if the benefit to a portion of the public from such abrogation would be
> greater than the loss to the Indians. . . . There are responsibilities arising from

---

[14] Exhibit 5.

[15] U.S. Department of the Interior, Office of the Solicitor, Opinion M-37030 "Trinity River Division Authorization's 50,000 Acre-Foot Proviso and the 1959 Contract between the Bureau of Reclamation and Humboldt County" (December 23, 2014).

[16] U.S. Department of the Interior, Office of the Secretary, Memorandum to the Secretary from the Director, Fish and Wildlife Service re: Fish Protective Facilities, Trinity River Division, Central Valley Project. Approved by Secretary of the Interior Fred. A. Seaton (January 22, 1957). Exhibit 6. *See also*, TRH Environmental Impact Statement "Trinity River Basin Fish and Wildlife Management Program", U.S. Fish and Wildlife Service (1983).

[17] CVPIA section 3406(b)(23) specifically incorporated the requirements of the 1984 Act, which among other things, established a goal of restoring Trinity River fishery production to pre-TRD levels of abundance (§ 2(a)) and the TRH improvements § 2(a)(1)(C).

[18] 1979 Opinion, Exhibit 4, *supra*.

[19] Exhibit 7, Memorandum to Solicitor and Assistant Secretaries from Executive Secretary re Trinity River Fishery Mitigation (January 15, 1981) (1981 Order).

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 7

congressional enactments, which are augmented by the federal trust responsibility to the Hupa and Yurok tribes, that compel restoration of the river's salmon and steelhead resources to pre-project levels.

12.     The 1984 Act directed the Secretary to adopt and implement a program to "achieve the long-term goal of restoring fish and wildlife populations in the Trinity River Basin to a level approximating that which existed immediately before the start of the construction of the [TRD] . . . and to maintain such levels."[20]

13.     CVPIA Section 3406(b)(23) directed the Secretary, subject to Hoopa's concurrence, to take specific actions "in order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the [1984 Act]." The 1984 Act required two actions: (1) development of a program to restore natural fish production; and (2) modernize and increase the effectiveness of the TRH. In section 3(c) of the 1996 Act, Congress directed that the two programs work in concert by requiring Reclamation "to modernize and otherwise increase the effectiveness of the Trinity River Fish Hatchery so that it can best serve its purpose of mitigation of fish habitat loss above Lewiston Dam while not impairing efforts to restore and maintain natural reproducing anadromous fish stocks within the basin."

14.     In recognition that the United States holds Hoopa's property rights in the Trinity River fishery in trust, Congress delegated sovereignty to Hoopa in CVPIA section 3406(b)(23), making the Secretary's adoption of the Trinity River fishery restoration ROD subject to Hoopa's concurrence.  Doing so ensured that the Trinity River fishery restoration decision made jointly by the Federal trustee and its tribal beneficiary would endure, and could be modified only with Hoopa's concurrence.

15.     Accordingly, the Secretary of the Interior made Hoopa a coauthor with the Fish and Wildlife Service of the Trinity River Flow Evaluation Study ordered by the Secretarial

---

[20]  Trinity River Basin Fish and Wildlife Management Act of 1984, Pub. L. No. 98-541, 98 Stat. 2721, § 2(a) (1984 Act).

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 8

Decision of January 14, 1981. Upon completion of that Study and identification of specific operating criteria and procedures including the specific times of year the Trinity ROD water was to be released for the restoration and maintenance of the Trinity River fishery, Hoopa and the Secretary solemnly concurred in a plan for restoration of natural fish production on December 18, 2000, at a sacred ceremonial site on Hoopa's reservation. Hoopa considers the record of that decision akin to a modern treaty with its federal trustee.

16.     Hoopa has made numerous requests that Reclamation obtain Hoopa's concurrence on Reclamation's actions that affect restoration and maintenance of Hoopa's fishery. This includes recent proposals and imminent proposed action to modify flow releases under the Trinity River ROD.  Reclamation has repeatedly refused to recognize Hoopa's concurrence rights under CVPIA section 3406(b)(23). In addition, Reclamation has ignored, evaded or rejected Hoopa's repeated requests for Reclamation to fulfill its second obligation, to develop and implement a plan with Hoopa's concurrence to fulfill Congress' mandates to modernize and increase the effectiveness of the TRH, which is necessary to mitigate TRD impacts on Hoopa and its fishing rights.

17.     CVPIA Section 3406(b)(23) provides that "[c]osts associated with implementation of this paragraph [that is, both natural production and TRH hatchery improvement costs] shall be reimbursable as operation and maintenance expenditures pursuant to existing law" (emphasis added).

18.     In the CVPIA, Congress also required that:  "Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the [CVP], the Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts."  CVPIA section 3404(c)(2).

19.     Hoopa is a direct beneficiary of the numerous existing legal protections described herein that relate expressly to its fishing and water rights and generally to the Trinity and Klamath Rivers that flow within its Reservation.  Hoopa's ability to exercise and benefit from

its rights to water and fish in the Trinity River, confirmed by Congress, the Secretaries of Interior and Commerce and multiple court cases[21], is harmed by Reclamation's failures to memorialize in the long-term (permanent) contracts at issue here: (1) Reclamation's affirmative obligations to protect Hoopa's sovereignty and vested property rights in the Trinity River fishery; (2) the statutory priority for in-basin uses in the Trinity River over TRD out-of-basin diversions; and (3) the limits that Reclamation's obligations to Hoopa and Hoopa's delegated sovereignty place on Reclamation's authority to operate the CVP for the benefit of contractors. Defendants' failure to include these legal requirements as terms of the permanent contracts challenged herein causes, by itself, immediate injury to Hoopa as it unlawfully deprives Hoopa of the contractual protection of its interests that is mandated by CVPIA section 3404(c)(2).

20.     Congress required environmental review pursuant to NEPA prior to Reclamation making long-term contracts for CVP water supplies. CVPIA §§ 3404(c)(1) and § 3409. Notwithstanding Reclamation's specific federal trust responsibility to Hoopa in CVPIA section 3406(b)(23), Reclamation failed to analyze the environmental impacts of contract conversions on Hoopa's rights and interest in congressionally mandated Trinity River fish and wildlife restoration, preservation and propagation requirements.

21.     Reclamation's failure to comply with its legal duties, including by converting CVPIA interim renewal contacts into permanent contracts without including terms in those contracts required by the WIIN Act that account for and obtain the agreement of the contractors to pay all present and future reimbursable costs of Trinity River fishery restoration activities, affirmatively harms Hoopa.  Failure to include these reimbursement obligations and collection requirements as permanent contract terms directly impairs funding for the Trinity River Restoration Program and Trinity River Hatchery, operations that are critical to protection of Hoopa fishing rights.

---

[21] *See, e.g., Parravano v. Babbitt*, 70 F.3d 539 (9th Cir. 1995); *Baley v. United States*, 942 F.3d 1312 (Fed. Cir. 2019).

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 10

22.     Reclamation's failure to collect from the contractors the costs of implementing section 3406(b)(23) (that is, both natural production and TRH hatchery improvement costs) as operation & maintenance expenditures, as required by statute, has unlawfully deprived the Trinity River Restoration Program and the TRH of funds necessary to effectively implement those programs, to meet the requirements of the 1984 Act, 1996 Act, and CVPIA section 3406(b)(23); and to protect Hoopa trust resources.  Congress mandated collection of these funds from the contractors as the means to implement the unique provisions of section 3406(b)(23) for Hoopa's benefit.  Reclamation's failure to collect the funds as mandated by Congress directly harms Hoopa, its trust resources, and its interests in the Trinity River and its fishery.

23.     An order of this Court finding Reclamation's acts and omissions unlawful, rescinding the unlawful contracts, and remanding to Reclamation with a direction to comply with its legal responsibilities would redress the injury that Hoopa alleges in this action.

24.     Hoopa also incorporates by reference all allegations below in support of its standing.

## IV.     **PARTIES**

25.     Plaintiff Hoopa Valley Tribe is a federally-recognized Indian tribe located on the Hoopa Valley Reservation which is within Humboldt County, California. Hoopa and its members have federal reserved rights to take hatchery and natural fish in the Trinity and Klamath Rivers and a corresponding water right to protect and implement their rights.  Hoopa's interests are further described herein.

26.     Defendants in this action are:

A.     United States Bureau of Reclamation, which is a federal agency within the United States Department of the Interior that has primary management authority over the CVP and TRD and has a fiduciary trust responsibility to protect and preserve Hoopa's reserved rights, as well as an obligation to comply with NEPA in connection with its CVP management actions. The United States Bureau of Reclamation approved, and is planning to approve, contracts

challenged in this litigation in violation of federal law, including the CVPIA, NEPA, the WIIN Act, and the APA;

      B.     Debra Anne Haaland, who is sued in her official capacity as Secretary of the Interior.  She oversees the Department of the Interior and Bureau of Reclamation and is responsible for the operation of the CVP and TRD, subject to the mandates of the CVPIA and other applicable federal law;

      C.     Maria Camille Calimlim Touton, who is sued in her official capacity as the Commissioner of the United States Bureau of Reclamation;

      D.     Ernest A. Conant, who is sued in his official capacity as Regional Director of the California-Great Basin Region of the United States Bureau of Reclamation; and

      E.     United States Department of the Interior is a cabinet-level federal agency and the parent agency of the United States Bureau of Reclamation.

## V.    STATUTORY AND REGULATORY BACKGROUND

### THE TRINITY RIVER DIVISON AUTHORIZATION ACT

27.    The Act of August 12, 1955, Public Law 84-386, 69 Stat. 719 (1955 Act), which authorized the construction and operation of the TRD of the CVP, among other things, directed the Secretary of the Interior to ensure the preservation and propagation of Trinity River basin fish and wildlife, authorized construction of the Trinity River hatchery, and limited the TRD's integration with, and diversion of water to the Central Valley by prioritizing in-basin needs over out-of-basin diversions of Trinity River water.

### TRINITY RIVER BASIN, CALIFORNIA, FISH AND WILDLIFE ACT

28.    The Act of October 24, 1984, Public Law 98-541, 98 Stat. 2721 (1984 Act), as amended by the Act of May 15, 1996, Public Law 104-143, 110 Stat. 1338 (Trinity River Basin Fish and Wildlife Management Reauthorization Act of 1995) (1996 Act) directed the Secretary

of the Interior, among other things, to (1) develop a fish and wildlife management program designed to restore the fish and wildlife populations in the Trinity River basin to the levels approximating those that existed immediately before the start of the construction of the Trinity River Division, as measured by returning adult anadromous fish spawners and the ability of dependent tribal, commercial, and sport fishers to enjoy the benefits of restoration through a harvestable fishery resource; (2) modernize and otherwise increase the effectiveness of the Trinity River Fish Hatchery; and (3) integrate natural and hatchery fish production.

### THE CENTRAL VALLEY PROJECT IMPROVEMENT ACT (CVPIA)

29.    CVPIA section 3402 establishes the purposes of the CVPIA. Among them are to:

(a)  protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California;

(b)  address impacts of the CVP on fish, wildlife, and associated habitats;

30.    CVPIA section 3404(c)(1) requires Reclamation to conduct an environmental review prior to renewal of any long-term water contract.  The required review includes, but is not limited to, a programmatic EIS.  CVPIA section 3409.

31.    CVPIA section 3404(c)(2) provides that:  "Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the CVP, the Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts.  The Secretary shall also administer all existing, new, and renewed contracts in conformance with the requirements and goals of this title." The permanent contracts at issue in this case are long-term contracts.[22]

32.    CVPIA Section 3406(a) amends the CVP's purposes and priorities for use for CVP water set forth in 50 Stat. 844, 850, §2 (Act of August 21, 1937) by adding as a new

---

[22] Reclamation Manual Section PEC 105 states "basic principles and general policies for the Bureau of Reclamation's water-related contracting program, for the benefit of promoting clarity and consistency in the program's implementation." PEC 105 Section 4.H provides this definition: "Long-Term Contract. A contract with a term of more than 10 years."

SECOND~~FIRST~~ AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 13

purpose, "mitigation, protection, and restoration of fish and wildlife", by giving that purpose

equal priority in the CVP with irrigation and domestic uses and senior priority over power, and

by making the costs of implementing that purpose separable and reimbursable.

33.     CVPIA section 3406(b)(23) specifically incorporates the federal government's

trust responsibilities for Hoopa's Trinity River fishery resources into the Reclamation program

and requires certain actions to "meet Federal trust responsibilities to protect the fishery

resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the Act of

October 24, 1984, Pub. L. 98-541 (the 1984 Act)," as amended by the 1996 Act, including

implementation of the Trinity River Mainstem Fishery Restoration Program and associated

TRD flow releases according to the terms concurred in by Hoopa in the December 18, 2000,

Record of Decision executed on the Hoopa Valley Reservation by the Secretary of the Interior

and Hoopa's Chairman.  Exhibit 8.

34.     CVPIA section 3406(b)(23) further provides that "[c]osts associated with

implementation of this paragraph shall be reimbursable as operation and maintenance

expenditures pursuant to existing law."

### THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

35.     NEPA is "our basic national charter for protection of the environment."  40

C.F.R. § 1500.1(a).  Congress directed "that, to the fullest extent possible . . . the policies,

regulations, and public laws of the United States shall be interpreted and administered in

accordance with the policies set forth in [NEPA] . . . ."  42 U.S.C. § 4332.

36.     The purposes of NEPA are to: (1) declare a national policy which will encourage

productive and enjoyable harmony between man and his environment; (2) promote efforts

which will prevent or eliminate damage to the environment and biosphere and stimulate the

health and welfare of man; and to (3) enrich the understanding of the ecological systems and

natural resources important to the Nation.  42 U.S.C. § 4321.  NEPA recognizes that "each

person should enjoy a healthful environment" and ensures that the federal government uses all

practicable means to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations" and "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." *Id.* § 4331(b)-(c).

37. To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

38. NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2(C).

39. "Major Federal actions" subject to NEPA include both new and continuing activities. 40 C.F.R. § 1508.18(a).

40. To determine whether the nature and extent of a proposed action's environmental effects requires preparing an EIS, federal agencies may first prepare an EA. 40 C.F.R. § 1501.4(b)-(c). If, on the basis of the EA, the agency finds that the proposed action will produce "no significant impact" on the environment, then an EIS need not be prepared. *Id.* § 1501.4(e).

41. An agency's NEPA analysis must assess the direct, indirect, and cumulative impacts of its action. 40 C.F.R. § 1508.8. As part of its NEPA review, an agency is also required to prepare a detailed statement regarding the alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii), (E). An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," including a "no-action" alternative. 40 C.F.R. § 1502.14.

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 15

## THE ADMINISTRATIVE PROCEDURE ACT (APA)

42.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702.  Final agency actions "for which there is no other adequate remedy in a court" are reviewable under the APA. *Id.* § 704.

43.     Under the APA, a reviewing court shall set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. §706.  A reviewing court shall compel agency action unlawfully withheld or unreasonably delayed. *Id.*

## THE WATER INFRASTRUCTURE IMPROVEMENTS OF THE NATION (WIIN) ACT

44.     The 2016 WIIN Act provides that "[u]pon request of the contractor, the Secretary of the Interior shall convert any water service contract in effect on the date of enactment of this subtitle and between the United States and a water users' association to allow for prepayment of the repayment contract pursuant to paragraph (2) *under mutually agreeable terms and conditions*" (emphasis added).  WIIN Act, §4011(a).  Section 4011(a)(2) of the WIIN Act requires contract terms that provide for the repayment, either in lump sum or by accelerated prepayment, of accrued and future Trinity River restoration costs, whether construction costs or other capitalized costs. Section 4011(b) of the WIIN Act provides that such costs are to be determined pursuant to "a final cost allocation by the Secretary of the Interior. In the event that the final cost allocation indicates that the costs properly assignable to the contractor are greater than what has been paid by the contractor, the contractor shall be obligated to pay the remaining allocated costs." The Secretary's administrative implementation of the WIIN Act must be consistent with and may not alter existing applicable federal and state laws. WIIN Act, § 4001(a), (b).

45.     WIIN Act § 4012 provides that the Act "shall not be interpreted or implemented in a manner that … (2) affects or modifies any obligation under the Central Valley Project

Improvement Act (Public Law 102–575; 106 Stat. 4706)" with an exception related to Stanislaus River predator management unrelated to this case. The CVPIA obligations include, but are not limited to: (1) the CVP's fish and wildlife mitigation, protection and restoration purpose established by CVPIA §3406(a): (2) associated contractor cost reimbursement obligations, particularly regarding Hoopa's interest in the Trinity River fishery;  (3) the CVPIA's §3404(c)(2) mandate to incorporate such terms in renewed contracts; (4)  the ESA compliance; (5) mitigation of adverse effects on listed fish species beyond the range of effects anticipated to occur to the listed fish species for the duration of the applicable biological opinion, using the best available scientific and commercial data available; and (6) Pacific Fisheries Management Council obligations.

46.     The WIIN Act's authority to convert CVP contracts expired by its terms (Section 4013) on December 16, 2021.

## <u>COORDINATED OPERATIONS ACT OF 1986</u>

47.     The Coordinated Operations Act of 1986 (COA)[23] directed the Secretary of the Interior to undertake a cost allocation study of the CVP and to implement the allocations no later than January 1, 1988, with the goal of obtaining required, complete project repayment by 2030. Reclamation did not comply with the COA. In 2013, the Department of the Interior Inspector General (IG) warned Reclamation that its ongoing contracting and rate setting practices would likely fail to meet the congressional mandate and therefore Reclamation would fail to fulfill its responsibility to obtain required, complete project repayment by 2030.[24] In fact, Reclamation did not publish the Central Valley Project Final Cost Allocation Study (CAS) until January 2020.[25] However, Reclamation's CAS did not allocate CVPIA costs as required. Instead, it stated that the allocation would occur "through a separate process based on the results

---

[23] Public Law 99-546 §102, 100 Stat. 3050 (October 27, 1986).
[24] Office of Inspector General Report "Central Valley Project, California: Repayment Status and Payoff", No. WR-EV-BOR-0003-2012 (March 2013).
[25] https://www.usbr.gov/mp/cvp/docs/cvp-final-cost-allocation-study-2020.pdf. Exhibit 9.

of the CAS." *Id.* at section 3.6. The CAS unlawfully declared the CVPIA to be a "separate program". [26]

## CONTRACT VALIDATION MANDATE 43 U.S.C. § 511

48.    "The United States holds all water rights to CVP water. To access CVP water, water-users . . . must enter into water-service contracts with the United States. *See* 43 U.S.C. §511" [27] (Act of May 15, 1922, ch.190, 42 Stat. 541 (1922 Act)). The 1922 Act provides that a contract for Reclamation water shall not be binding on the United States unless the contractor obtains a judicial decree from a court of competent jurisdiction confirming the contractor's authority to make the contract. The requirement for judicial validation is to protect, among other things, against fraudulent borrowing.

49.    All contracts for CVP water, including WIIN Act contracts, incorporate this validation requirement as a contract term. For example, Article 47 of Westlands' contract No. 14-06-200-495A-IR1-P provides:

> Promptly after the execution of this amended Contract, the Contractor will provide to the Contracting Officer a certified copy of a final decree of a court of competent jurisdiction in the State of California, confirming the proceedings on the part of the Contractor for the authorization of the execution of this amended Contract. This amended Contract shall not be binding on the United States until the Contractor secures a final decree.

## EXECUTIVE ORDER 12866

50.    President Clinton issued Executive Order 12866[28] to begin a Federal Government program to "reform and make more efficient the regulatory process. The objectives of this Executive order are to enhance planning and coordination with respect to both new and existing

---

[26] CAS Section 5.12. Neither the CAS nor the Bureau of Reclamation Manual, *infra,* defines "special program" at all, let alone in the context of reclamation project cost allocation and accounting.
[27] *Westlands Water Dist. V. United States*, 153 F.Supp.2d 1133, 1149 (E.D. Cal. 2001).
[28] Executive Order 12866 of September 30, 1993, Regulatory Planning and Review. Federal Register Vol. 58 No. 190 Monday, October 4, 1993, Presidential Documents.

regulations; to reaffirm the primacy of Federal agencies in the regulatory decision-making process; *to restore the integrity and legitimacy of regulatory review and oversight; and to make the process more accessible and open to the public*. (Emphasis added.) *Id.*

51.    Sections 6(B) and (f) of Executive Order 12866 require the Office of Management and Budget's Office of Information & Regulatory Affairs to review any significant regulatory action that has an annual effect on the economy of $100 million or more or adversely and materially affects the environment, public health or safety, or tribal governments, among others, before an agency may proceed with the action.

**BUREAU OF RECLAMATION MANUAL**

52.    As described by the Bureau of Reclamation, the Reclamation Manual[29] is compilation of a series of Policy and Directives and Standards, which assign program responsibility and establish and document Bureau of Reclamation-wide methods of doing business that are applicable to CVP contracts. All requirements in the Reclamation Manual are mandatory. *Id.*

**SEPARABLE COSTS REMAINING BENEFITS METHODLOGLY**

53.    Reclamation adopted the Separable Costs Remaining Benefits (SCRB) method for allocating costs of multi-purpose projects in 1954. Reclamation used the SCRB method in CVP cost allocations in 1956, 1960, 1970, and 1975.[30] The SCRB method allocates project costs among its authorized purposes. Reclamation considers the SCRB method to be the most comprehensive and generally preferred method of allocating costs. Accordingly, Reclamation was obligated to use the SCRB method in the CAS to identify and assign all project costs that

---

[29]https://www.usbr.gov/recman/#:~:text=What%20is%20the%20Reclamation%20Manual,the%20Reclamation%20Manual%20are%20mandatory. Exhibit 10.

[30] Central Valley Project Cost Allocation Study, Past Discussions, https://www.usbr.gov/mp/cvp/docs.html. Exhibit 11.

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 19

provide only one project benefit to the appropriate project purpose (separable costs), and then equitably distribute those costs that provide benefits to more than one purpose (joint costs) among authorized project purposes. CAS ES-2, Sections 1.1.2 and 4.2. In the case of the CVPIA, Congress specified costs as reimbursable or nonreimbursable, and assigned reimbursable costs to water and power customers for repayment. Non-reimbursable costs are not subject to repayment.

## VI.   FACTUAL ALLEGATIONS

### A.  Federal Indian Law and Reclamation Law Established Hoopa's Vested Property Rights in the Trinity River Fishery.

54.     Hoopa and its people have lived along the Trinity River, and relied upon its fish resources, since time immemorial.  The United States government located and set aside the Hoopa Valley Reservation, which the Trinity River flows through, on August 21, 1864.  *Mattz v. Arnett*, 412 U.S. 481, 490, fn. 9 (1973); *Short v. United States*, 202 Ct. Cl. 870, 875-980 (1973).  On June 23, 1876, President Grant issued an Executive Order formally setting aside the Reservation for "Indian purposes."  *Short*, 202 Ct. Cl. at 877.  Traditional salmon fishing is one of the "Indian purposes" for which the Reservation was created.  *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995).

55.  In 1864, the United States determined the Reservation a suitable permanent homeland for two principal reasons.  First, the Reservation is within the heart of Hoopa's aboriginal lands, which Hupa Indians occupied and fished upon for generations.[31]  *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995).  Hupa Indians possessed fishing and hunting rights long before contact with white settlers and their salmon fishery was "not much less necessary to [their existence] than the atmosphere they breathed."  *Id.* at 542, *quoting Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir. 1991).  Second, the Reservation set aside resources of the Trinity and

---

[31]  Hupa are the people of the federally-recognized Hoopa Valley Tribe.

SECOND~~FIRST~~ AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 20

Klamath rivers for Hupa people to be self-sufficient and achieve a moderate living based on fish. *United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986).

56.   Hoopa's rights entitle Hoopa and its people to take fish from the Trinity and Klamath Rivers for ceremonial, subsistence, and commercial purposes. *Eberhardt*, 789 F.2d at 1359.  In 1993, the Interior Solicitor Leshy examined the "history of the [Hoopa] reservation, the Indians' dependence on the Klamath and Trinity River fisheries, the United States' awareness of that dependence, and the federal intent to create the reservation in order to protect the Indians' ability to maintain a way of life, which included reliance on the fisheries.  1993 Solicitor Opinion, p. 3. Solicitor Leshy found: "[T]he Government intended to reserve for the [Hoopa] a fishing right which includes a right to harvest a sufficient share of the resource to sustain a moderate standard of living." *Id.* at p. 21.  Hoopa's rights are not satisfied simply by the presence of fish in the river, but rather by the harvesting of an adequate supply of fish by Hoopa's people.  *United States v. Washington*, 853 F.3d 946, 958, 965-66 (9th Cir. 2017)*, affirmed per curiam*, 584 U.S. ____ (2018) ("moderate living" standard requires protection of continued supply of fish for the Tribes).

B. <u>The TRD Harmed the Trinity Fishery and Damaged Hoopa.</u>

57.   In 1955, Congress authorized development of the Trinity River Division (TRD) as a part of the CVP – the extensive system of dams, canals, and reservoirs that divert, store, and regulate water for California's Central Valley.  Through the TRD, Reclamation diverts substantial quantities of water from the Trinity River and sends such water out-of-basin to CVP contractors.  The TRD is the only source of CVP water imported to the Central Valley. The TRD, which includes Trinity Dam and Lewiston Dam on the Trinity River upstream of the Hoopa Valley Reservation, became operational in 1964, approximately 100 years after the

United States set aside the Hoopa Valley Reservation as a permanent homeland for Hupa Indians, reserving Trinity River water and fish for their subsistence and livelihood.

58. Throughout the planning process for the TRD, the Trinity fishery was understood to be a significant concern that needed to be protected:

> Although the two major functions of the [TRD] are to provide an additional supply of irrigation water and to generate hydroelectric energy, there are other important benefits to be gained by the construction and operation of the proposed development. The present fishery resources of the Trinity River are an economic asset to the Trinity River Basin, as well as to the whole north coastal area, and therefore would require that the proposed development be operated to their advantage.

House Doc. No. 53, 83d Cong., 1st Sess., "Letter from the Secretary of the Interior transmitting the Report and Findings of the Trinity River Division of the Central Valley Project, California, Pursuant to Section 9(A) of the Reclamation Project Act of 1939" at 76.

59. Both the House and Senate, in their deliberations on the TRD, reported that the fishery resources of the Trinity River are an asset to the Trinity River basin as well as to the whole north coastal area and that the TRD was planned with a view to maintaining and improving fishery conditions. House Rept. No. 602, 84th Cong., 1st Sess. at 2 (May 19, 1955); Senate Rept. No. 1154, 84th Cong., 1st Sess. at 5.

60. When Congress authorized the TRD in the 1955 Act, Congress recognized the critical importance of the fishery resources of the Trinity River and the need to protect them. Congress intended the TRD be designed "with a view to maintaining and improving fishery conditions." *San Luis & Delta-Mendota Water Authority v. Haugrud*, 848 F.3d 1216, 1223 (9th Cir. 2017). To do so, Section 2 of the 1955 Act authorized TRD flow releases for the fishery downstream of the TRD and construction and operation of a mitigation hatchery at Lewiston Dam to replace 109 miles of anadromous fish spawning habitat upstream of Lewiston Dam.[32] Section 2 of the 1955 Act also provides that "not less than 50,000 acre-feet shall be released annually from the Trinity Reservoir and made available to Humboldt County and downstream

---

[32] Paragraph 10 and Footnote 14, *supra*.

water users." These two provisos address distinct in-basin releases that have priority over out-of-basin diversions. *See* Solicitor Memorandum M-37030 regarding "Trinity River Division Authorization's 50,000 Acre-Foot Proviso and the 1959 Contract Between the Bureau of Reclamation and Humboldt County" (December 23, 2014). The Bureau of Reclamation has unlawfully disobeyed, ignored, or rejected those priorities.

61.   Reclamation's construction, operation and maintenance of the CVP's TRD caused widespread catastrophic environmental impacts in both the Trinity basin and in the Central Valley. Damming the Trinity River and over-diverting water to the Central Valley devastated Trinity basin fish and wildlife and caused economic hardship in North Coast Communities.

62.   In 1979, Interior Solicitor Krulitz confirmed that CVP operations are limited by the provisos of Section 2 of the 1955 Act:

> On occasion the Congress has specifically limited the Secretary's discretion in meeting the general CVP priorities.  For example, in authorizing the Trinity River Division of the CVP in 1955, Congress specifically provided that in-basin flows (in excess of a statutorily prescribed minimum) determined by the Secretary to be necessary to meet in-basin needs take precedence over needs to be served by out-of-basin diversion.  See Pub. L. No. 84-386, § 2. In that case, Congress' usual direction that the Trinity River Division be integrated into the overall CVP, set forth at the beginning of section 2, is expressly modified by and made subject to the provisos that follow giving specific direction to the Secretary regarding in-basin needs.

1979 Opinion, Exhibit 4.

63.   Contrary to the intent of Congress, the TRD's development, operations, and resulting out-of-basin water diversions decimated fish populations including those required to fulfill Hoopa reserved fishing rights.  The TRD diverted an average of 88% of the annual inflow out of the Trinity River and into the Sacramento River Basin during its first ten years of operation. *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 861 (9th Cir. 2004).  The TRD also permanently eliminated fish access to 109 miles of habitat upstream of Lewiston Dam previously used by anadromous fish for holding, spawning, and rearing. Within a decade of the TRD's completion, salmonid populations dramatically decreased.  In 1980, the U.S. Fish and

SECOND~~FIRST~~ AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 23

Wildlife Service estimated that the Trinity River fish population suffered a reduction of 60% to 80% and fishery habitat loss of 80% to 90%.  *Id.* at 862-63.

64.  The reduction in salmon populations had, and continues to have, a devastating impact on Hoopa.

C.  Administrative and Statutory Actions Intended to Restore the Trinity River Fishery and fulfill Hoopa's property rights.

65. In 1981, relying on an environmental study, the authority provided by the 1955 Act, § 2, and the federal trust obligation to protect Hoopa's reserved rights, the Secretary of the Interior ordered an increase in annual flows released from the TRD to the Trinity River downstream of Lewiston Dam.  1981 Secretarial Order. Exhibit 7.  The Secretary confirmed that mitigation is required to provide fish harvest opportunities to Hoopa for both subsistence and commercial purposes and that flow is critical to restoration, preservation, and propagation of the Trinity River fishery resource.

66.  In 1984, Congress affirmed and authorized the Secretary's restoration goal in the Trinity River Basin Fish and Wildlife Management Act ("1984 Act"), Pub. L. No. 98-541, 98 Stat. 2721.  Congress found that "the Secretary requires additional authority to implement a basin-wide fish and wildlife management program in order to achieve the long-term goal of restoring fish and wildlife populations in the Trinity River Basin to a level approximating that which existed immediately before the start of the construction of the Trinity River division." 1984 Act, § 1(6).  Congress directed the Secretary to develop and implement a fish and wildlife management program for the Trinity River Basin designed to restore the fish and wildlife populations in such basin to the levels approximating those which existed immediately before the start of the construction [of the TRD] and to maintain those levels."  1984 Act, § 2(a).  The 1984 Act directed the "design, construction, operation and maintenance of facilities to—(A) rehabilitate fish habitats in the Trinity River between Lewistown Dam and Weitchpec; (B) rehabilitate fish habitats in the tributaries of such river below Lewiston Dam and in the south

fork of such river; and (C) modernize and otherwise increase the effectiveness of the Trinity

River Fish Hatchery."

67.  In 1992, Congress enacted the CVPIA which, among other things, sought "to protect,

restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity

River basins . . . ."  CVPIA, § 3402(a).  In Section 3406(b)(23), Congress required actions to

"meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe,

and to meet the fishery restoration goals of the [1984 Act]."  Section 3406(b)(23) required

Hoopa's concurrence on certain flow and restoration measures proposed for implementation.

68. Subject to certain exceptions not relevant to this case, CVPIA section 3404(a)

prohibited any new contracts for CVP water for any purpose other than fish and wildlife before .

. . the provisions of subsections 3406(b)-(d) . . . were met." Section 3406(b) enumerated twenty-

three fish and wildlife restoration activities subject to that requirement. Section 3406(b)(23).

69.  Congress, in CVPIA section 3404(c)(2), requires that:  "Upon renewal of any long-

term repayment or water service contract providing for the delivery of water from the [CVP], the

Secretary shall incorporate all requirements imposed by existing law, including provisions of this

title, within such renewed contracts."  CVPIA, § 3404(c)(2).   The Secretary shall also administer

all existing, new, and renewed contracts in conformance with the requirements and goals of this

title.  *Id.*  Congress further required environmental review pursuant to NEPA prior to renewal of

CVP contracts.  CVPIA, § 3404(c)(1), § 3409.

70.  In 1996, Congress enacted the Trinity River Basin and Wildlife Management

Reauthorization Act (the "1996 Act").  Pub. L. No. 104-143, 110 Stat. 1338 (1996).  The 1996

Act amended the scope of the 1984 Act's mandate to include rehabilitation of fish habitat "in the

Klamath River downstream of the confluence with the Trinity River."  1996 Act, § 3(b).  The

1996 Act also confirmed that "Trinity Basin fisheries restoration is to be measured not only by

returning adult anadromous spawners, but by the ability of dependent tribal, commercial, and

sport fisheries to participate fully, through enhanced in-river and ocean harvest opportunities, in the benefits of restoration." 1996 Act, Section 2.

71. In 2000, Interior Secretary Babbitt signed a Record of Decision on Trinity River Mainstem Fishery Restoration (the "TRROD") which provided for flows intended to restore fishery habitat in the Trinity River downstream of Lewiston Dam. Secretary Babbitt found that the Preferred Alternative was the "action which best meets the statutory and trust obligation [to Hoopa] of the Department to restore and maintain the Trinity River's anadromous fishery resources." TRROD, p. 2. In section 3406(b)(23) of the CVPIA, Congress required Hoopa's concurrence to make the TRROD effective, expressly establishing Hoopa's role as a co-manager of the Trinity River resources.

72. The United States government, including the Department of the Interior, and its agencies, have a trust obligation to preserve, protect, and to restore Hoopa's rights. The Supreme Court has long recognized "the distinctive obligation of trust" that the federal government owes to Indian tribes and federally protected rights. *Seminole Nation v. United States*, 316 U.S. 286 (1942). In carrying out its obligations to the Indians, the United States is charged with "moral obligations of the highest responsibility and trust." *Id.* at 296-97. This trust obligation extends to any federal government action affecting Indians or their rights. *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy*, 898 F.2d 1410, 1420 (9th Cir. 1990).

73. The Ninth Circuit Court of Appeals has specifically recognized that the federal government is trustee of the Hoopa Valley Tribe's federal reserved fishing and water rights. *Parravano*, 70 F.3d at 546; *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1214-15 (9th Cir. 2000).

74. In 1995, Reclamation's Regional Solicitor explained in a memorandum to the Bureau of Reclamation's Mid-Pacific Regional Director that "Reclamation must exercise its statutory and contractual authority to the fullest extent to protect [Hoopa's] tribal fisheries and tribal water rights." Memorandum on "Certain Legal Rights and Obligations Related to the U.S. Bureau of

SECOND~~FIRST~~ AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 26

Reclamation, Klamath Project for Use in Preparation of the Klamath Project Operations Plan" (July 25, 1995). That direction applies no less to Reclamation's management actions relating to the Trinity River.

75. Congress has specifically recognized the federal government's trust obligation to Hoopa and has affirmatively legislated direct protection of Hoopa' rights and interests in Trinity River fish and water resources in Section 2 of the 1955 Act, the 1984 Act, and Section 3406(b)(23) of the CVPIA. "We also find significant section 3406(b)(23)'s reference to the Hoopa Valley Tribe – and its exclusion of all other tribes." *Haugrud*, 848 F.3d at 1232.

76. Since the beginning of the TRD, Congress has mandated that the Interior Department, including Reclamation, act to ensure the preservation and propagation of fish populations in the Trinity River. In addition to its general fiduciary trust obligation to protect and preserve Hoopa's reserved rights, Congress imposed a specific requirement on the Interior Department in the 1955 Act to mitigate TRD impacts on Hoopa's fishery upstream of Lewiston. In addition, the 1984 Act directed the Secretary to develop and implement a program that would restore Trinity River fish populations to pre-project (TRD) levels and to modernize and increase the effectiveness of the TRH. In 1992, Congress affirmatively recognized the federal government's specific trust obligation to Hoopa and protection of its fishery resource. In the 1996 Act, Congress confirmed that the purpose of the program authorized by the 1984 Act was not merely to preserve fish for preservation's sake, but to provide a harvestable population of salmon for Hupa people as well as other tribal and non-tribal fishers. Congress and the Secretary have repeatedly and explicitly recognized the specific trust obligation that exists regarding protection of Hoopa's trust fishing resource from impacts of the TRD.

77. Yet, today, fish populations are not at pre-project levels nor anything close to them. SONCC Coho salmon, a population that includes Klamath and Trinity River Coho, was estimated in 1940 to range between 150,000 and 400,000 naturally spawning fish annually. *See* Threatened Status for SONCC ESU of Coho Salmon, 62 Fed. Reg. 24588, 24588 (May 6, 1997)

("Listing Notice"). In 1997, NMFS concluded that "Coho populations in this ESU are very depressed, currently numbering approximately 10,000 naturally produced adults." *Id*. The perilous situation of the SONCC Coho salmon prompted NMFS in 1997 to list the fish under the ESA as threatened. In listing the Coho, NMFS noted that "water diversions" and "water withdrawals" for irrigation were "major activities responsible for the decline of Coho salmon in Oregon and California." *Id.* at 24,592. SONCC Coho remain listed as threatened under the ESA due to their continued depressed populations.

78. In 1957, the Secretary concluded that the 1955 Act's mandate for preservation and propagation of Trinity River basin fish and wildlife required, as an authorized feature of the TRD, the construction and operation of the Trinity River Hatchery (TRH) near Lewiston, California, to mitigate for loss of anadromous fish production in 109 miles of stream habitat permanently blocked by TRD facilities.

79. Although the TRH was authorized and constructed as a feature of the TRD to mitigate those habitat impacts, Reclamation failed to oversee and manage the performance of the State of California's Department of Fish and Wildlife with whom it had contracted to run the TRH. The condition of the TRH has deteriorated during decades of mismanagement. Reclamation has failed to fulfill the mandates of the 1955 Act to use the TRD to preserve and propagate the Trinity River fishery. Reclamation further failed to implement the 1984 Act's mandate to modernize and increase the effectiveness of the TRH or require CVP contractors to pay the costs of doing so pursuant to CVPIA section 3406(b)(23).

80. A 2012 California Hatchery Review Report reported, with regard to the Trinity River, that:

> Mitigation goals for lost adult production were determined from pre-project studies of anadromous fish population in the basin. The USFWS and CDFG (1956) estimated that 5,000 coho; 3,000 spring Chinook; 8,000 summer Chinook and 24,000 fall Chinook; and 10,000 steelhead (no run timing was designated) passed above the Lewiston Dam site prior to its construction. Total annual adult production goals (catch plus escapement) for TRH [Trinity River Hatchery] were further defined in 1980 to be 7,500 coho, 6,000

SECOND~~FIRST~~ AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 28

spring Chinook, 70,000 fall Chinook and 22,000 steelhead (Frederickson et al. 1980). Escapement goals to the hatchery were further defined in 1983 as 2,100 coho, 3,000 spring Chinook, 9,000 fall Chinook and 10,000 steelhead (USFWS 1983).

81.  Average returns of hatchery fish to Trinity River above Willow Creek in recently completed brood cycles (run years 2015-2018) fall far short of the 1983 goals for all species (which goals still less than the estimated pre-project escapement levels).  Significantly an average of only 6,200 fall Chinook returned to TRH between 2010 and 2019.  This has substantially deprived Hoopa of its right to take fish.

82.  Biological Opinions (BiOps) for TRH the Coho program and the Chinook and steelhead mitigation operations as they affect listed Coho were finalized in 2020[33] in response to the final Hatchery and Genetics Plan for TRH of 2017[34].  These BiOps included prescribed non-discretionary "Terms and Conditions" for TRH operations.  Collectively, these regulatory documents are essential to the modernization and increased effectiveness of the TRH required by the 1984 Act as amended by the 1996 Act.   They address phases leading to the restored abundance of natural origin Coho and how management should respond to key performance indicators.  For example, BOR is specifically required to "... annually monitor the abundance, timing, distribution, and origin of Trinity River coho salmon adults escaping to the Trinity River watershed using methods sufficient to provide estimates of the status of the natural- and

[33] NMFS.  2020.  Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response. 4d Limit for the Trinity River Coho Salmon Hatchery and Genetic Management Plan. NMFS Consultation Number: WCRO-2019-03414. Action Agency: NOAA's National Marine Fisheries Service.

NMFS. 2020. Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response. Artificial propagation of Steelhead and Chinook Salmon at Trinity River Hatchery.  NMFS Consultation Number: WCR-2018-9118.  Action Agency: Bureau of Reclamation.

[34] California Department of Fish and Wildlife (CDFW). 2017. Hatchery and Genetics Management Plan for Trinity River Hatchery Coho Salmon. Available from the Reclamation Northern California Area Office. Shasta Lake, CA.

hatchery-origin components of the three Trinity River populations." This fundamental science would best inform the status of natural origin Coho Salmon and establish appropriate production levels at TRH. However, Reclamation has not submitted its monitoring plan detailing how it would implement this term and condition by the 31 December 2021 due date. As a result, Hoopa has been further deprived in its ability to access the reserved fishery due to protracted depressed levels of TRH Coho Salmon production.

83. Pursuant to the HGMP and related BiOp for Steelhead and Chinook programs at TRH, juvenile releases of steelhead were reduced from 800,000 yearlings to 448,000 starting with the 2015 release year. This action was to be evaluated after six years of implementation ending in 2020. Evaluation of the "… effects of TRH juvenile (Chinook and Steelhead) releases on SONCC Coho Salmon in: 1) the Trinity River; and 2) the lower Klamath estuary, Klamath River plume, and Pacific Ocean…" would be informative of future TRH production levels for steelhead at TRH. Reclamation has yet to investigate this question even though the 2020 milestone for an initial evaluation has long passed.

84. Having identified ways in which Reclamation failed to implement mandated changes, Hoopa proposed solutions and continued to provide leadership as it collaborated with Reclamation and state and tribal governments on TRH improvements and production outcomes. On 15 July 2020, Tribal representatives participated in an inter-governmental discussion regarding the reconstitution of a TRH Governance Board. The earlier Board was formed by MOA in September of 2014, yet in less than a year, Reclamation undermined the Board by acting unilaterally to overrule the TRH Coho production levels adopted by the Board. This outcome is the kind of bad faith by Reclamation that Hoopa's delegated sovereign right of concurrence is intended to prevent. On July 20, 2021, Hoopa notified Reclamation that the governance board needed to be reconstituted consistent with Hoopa's sovereignty. Reclamation has failed to do so. TRH modernization and increased effectiveness have not occurred, and restoration goals remain unfulfilled.

85. Reclamation failed to install a weir to enable integration of natural and hatchery fish production, as required by section 3(c) of the 1996 Act and specified in the TRH HGMP (footnote 34).  In addition, Hoopa's request that Reclamation establish an investigation plan for an integration weir at Junction City has been pending for more than a year.  Furthermore, despite clear recommendations stated in the CAHSRG Report[35], Reclamation has failed to produce a plan to avoid introgression among spring and fall Chinook.  This is a particularly urgent need given the recent listing of spring run Chinook under CESA and an open petition to list under the federal ESA.  Specifically, Reclamation has failed to implement the HSRG's recommendation, in which Hoopa concurs, that Reclamation keep the entry to the hatchery open during the traditional two -week spawning break in early October and culling all entrants to prevent them from spawning in the wild in competition with natural spawners.

86.  In 2004, the Ninth Circuit Court of Appeals recognized that:  "Restoration of the Trinity River fishery, and the ESA-listed species that inhabit it . . . . are unlawfully long overdue."  *Westlands*, 376 F.3d at 878.  Today, because of Reclamation's misconduct, Hupa people are still not able to harvest meaningful quantities of fish to support their families or to provide the moderate livelihood based on fish, a right that federal law vested in Hoopa long before development of the TRD.

D.   <u>In Approving Conversion of the CVP Contracts to Permanent Contracts, Reclamation Failed to Comply With CVPIA Section 3404(c)(2).</u>

87.  Reclamation must comply with its legal responsibilities relating to restoration and preservation of the Trinity River fishery, specifically including CVPIA section 3404(c)(2) and NEPA.  In addition to conducting appropriate environmental review, Reclamation must include all existing requirements of law relating to the Trinity River fishery restoration program and the

---

[35]  California Hatchery Scientific Review Group (California HSRG).  2012.  California Hatchery Review Report. Prepared for the US Fish and Wildlife Service and Pacific States Marine Fisheries Commission.  June 2012.

TRH and payments therefore, as well as the in-basin priority of Trinity River flows over out-of-basin diversions, in the converted contracts for CVP water.

88.  Between February 28, 2020 and March 2, 2021, Reclamation approved the conversion of 68 CVP contracts into permanent water service contracts including a contract with Westlands Water District, Contract No. 14-06-200-495A-IRI-P in the amount of 1,150,000 acre-feet per year.  Exhibit 12.

89.  The permanent contracts approved by Reclamation violate CVPIA section 3404(c)(2) because they fail to incorporate the requirements imposed by existing law, including fishery restoration mandates and outcomes, the statutory priority for in-basin flows over out-of-basin diversions, fishery restoration cost reimbursement, and recognition of Hoopa's delegated sovereignty to be a decision-maker in Reclamation's operations of the TRD that affect Hoopa's fishery.

90.     Moreover, contract provisions approved by Reclamation in the converted contracts contradict CVPIA section 3404(c)(2)'s mandate. For example, paragraph 37 of the converted contract with Westlands Water District states:

> By entering into this Contract, the Contractor does not waive its rights to contest the validity or application in connection with the performance of the terms and conditions of this Contract of any Federal law or regulation; Provided, That the Contractor agrees to comply with the terms and conditions of this Contract unless and until relief from application of such Federal law or regulation to the implementing provision of the Contract is granted by a court of competent jurisdiction.

Had Reclamation complied with CVPIA section 3404(c)(2)'s mandate in this regard, the converted contract would prevent the future disputes that Article 37 invites.

91.  Reclamation's omission of statutory obligations from the permanent contracts violates CVPIA section 3404(c)(2). Reclamation's breach of CVPIA section 3404(c)(2) of the CVPIA is no minor violation because that provision is designed to ensure that CVP contracts, and any out-of-basin diversions provided for therein, will remain expressly subordinate to the

fishery restoration requirements and the in-basin flow priorities contained in existing law. Accordingly, the contracts, as approved, are unlawful.

92.     Hoopa wrote to Regional Director Conant on December 16, 2019 and on March 24, 2020 (Exhibits 13 and 14) pointing out the need to incorporate appropriate provisions into the contracts at issue. Reclamation failed to confer with Hoopa, contrary to 43 USC 485h(f) and the Indian Policy of the Bureau of Reclamation.[36]

E.     In Approving Conversion of the CVP Contracts to Permanent Contracts, Reclamation Failed to Comply With NEPA.

93.  Hoopa seeks to enforce Reclamation's mandatory obligation to evaluate the environmental impacts of its water contracting actions pursuant to the CVPIA and NEPA and to evaluate alternatives to its actions that would better protect the imperiled Trinity River resources that are impacted by the out-of-basin diversions resulting from the contracts.

94.  In 1999, Reclamation issued a programmatic EIS pursuant to the CVPIA.  However, that programmatic EIS did not evaluate the environmental effects of converting Reclamation's existing CVP contracts to permanent contracts, but provided that future NEPA review would occur at the level of specific actions, including new contracts and contract renewals consistent with NEPA's tiering provisions.

95.  In 2000, following consultation with Reclamation pursuant to section 7 of the ESA (16 U.S.C. § 1536), the United States Fish and Wildlife Service released a biological opinion for the implementation of the CVPIA and the continued operation and maintenance of the CVP, which stated that:

> Once the long-term contract renewal negotiations are completed, the renewals will be subject to a separate, tiered analysis that is consistent with the NEPA tiering in the PEIS. No contracts will be renewed until the appropriate environmental review has been completed.  Reclamation will consult either formally or informally with the Service before executing a contract.  The site specific, tiered analysis will address direct and indirect effects of contract renewal.

---

[36] Reclamation Policy Manual NIA P10 Exhibit 15: https://www.usbr.gov/recman/nia/nia-p10.pdf.

96.  Reclamation has not prepared an EIS, EA, or otherwise complied with NEPA in any respect prior to making the contracts at issue permanent and its failure to comply with NEPA is ongoing with respect to contracts that remain in the process of conversion to permanent.

97.  The out-of-basin diversion of water to the Central Valley from the Trinity River basin, which would otherwise flow through the Trinity River, significantly impacts the fish, water, environmental, and socioeconomic resources of the Trinity River basin.  The conversion of CVP contracts to permanent contracts will perpetuate these adverse impacts.  Locking in the contracts for all time without environmental analysis of any kind violates NEPA.

98.  The importance of the Trinity River and its resources to Hoopa and to the fulfillment of the Hoopa Valley Reservation as a permanent homeland for Hoopa and its people, the recognition and confirmation by Congress of the federal government's trust responsibilities to Hoopa, and the imperiled status of the Trinity River fishery provide unique characteristics that support NEPA review.  40 C.F.R. § 1508.27(b)(3).

99.  The conversion and locking-in of the water contracts is highly controversial, which supports NEPA review.  40 C.F.R. § 1508.27(b)(4).

100.  Locking-in the contracts as permanent contracts without NEPA review forecloses inquiry into possible future changes in climate and to species status and possible ways to mitigate impacts resulting from such changes.  40 C.F.R. § 1508.27(b)(5).

101.  Reclamation's conversion of each contract establishes a precedent for future actions with significant effects and represents a decision in principle about future consideration, which supports NEPA review.  40 C.F.R. § 1508.27(b)(6).  Reclamation is considering conversion of dozens of CVP contracts.  Each contract conversion establishes a precedent for future actions with significant effects.

102.  Each contract conversion is related to the conversion of the dozens of other CVP contracts, which demand water supply from sources that include the Trinity River, in addition to

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 34

other past, ongoing, and reasonably foreseeable future actions that affect the Trinity River Basin and its resources.  The cumulative impact warrants NEPA review.  40 C.F.R. § 1508.27(b)(7).

103.  Salmon are not only a source of subsistence and economy for Hoopa, but are also a cultural and spiritual resource.  In addition, salmon species in the Trinity River are in imperiled condition.  Some, such as SONCC coho, are already listed under the Endangered Species Act while others, such as Chinook species, are being reviewed for possible listing.  These factors further support NEPA review.  40 C.F.R. § 1508.27(b)(8), (9).

104.  Reclamation's failure to prepare an EIS or EA on the conversion of the contracts constitutes failure to proceed in the manner required by NEPA because entering into each contract was a major federal action significantly affecting the quality of the human environment.  42 U.S.C. § 4332(2)(C).  Reclamation's failure to prepare an EIS or EA on the conversion of the contracts also constitutes agency action unlawfully withheld or unreasonably delayed.

105.  Reclamation's failure to prepare an EIS or an EA foreclosed its analysis of alternatives to the proposed action in violation of NEPA.  40 C.F.R. § 1502.14(a).  Reclamation's failure to conduct the required NEPA review prevented consideration of alternatives that would meet the requirements in the 1984 Act, *supra*, to restore the Trinity River fishery to pre-TRD levels. Reclamation further failed to consider the impacts of out-of-basin water diversions on Trinity River resources, and the cumulative impacts from permanently locking-in commitments to CVP contractors (as opposed to alternatives that either reduce or otherwise mitigate the continuing effects of such diversions on environmental resources).

F.      Reclamation Approved the Trinity River WFV Project In Absence of Seeking or Obtaining Hoopa Concurrence and in Absence of NEPA Compliance.

106.    In 2021, Reclamation[37] proposed implementation of the Trinity River WFV Project, which would significantly alter the flow regime prescribed in the ROD that was concurred in by Hoopa in 2000.

---

[37]  While Hoopa refers to "Reclamation" in this section for consistency purposes, Hoopa notes

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 35

107.    On June 18, 2021, Hoopa informed Reclamation that "Hoopa does not concur in the proposed modification of ROD flow release hydrographs as currently proposed."  Hoopa added:  "The current variability flow release proposal would use ROD flows that are prescribed for specific restoration outcomes as described in the [Flow Study].  However, that water is not available for any purpose or use other than the ROD prescription."  Hoopa further advised that additional scientific review was necessary before any decision by Reclamation or Hoopa could be made."  Exhibit 30.

108.    In September 2021, Reclamation released a Draft Environmental Assessment pursuant to NEPA to evaluate the proposed agency action of approving and implementing the WFV Project. Exhibit 31.

109.    The Trinity Management Council (TMC) is a federal advisory body tasked with making recommendations to the Secretary of the Interior regarding implementation of the ROD.

110.  In late 2021, a TMC vote to recommend the WFV Project failed to pass and Reclamation declined to implement the WFV Project in the 2022 water year (October 1, 2021 – September 30, 2022).

111.    On October 4, 2022, Hoopa met with Defendants' representatives regarding Hoopa's concurrence right and followed up with a letter reiterating Hoopa's view that the WFV Project is subject to and cannot proceed absent the Secretary seeking and obtaining Hoopa concurrence.  Exhibit 32.

112.  On December 7, 2022, the TMC voted to recommend implementing the WFV Project during the 2023 water year, beginning as early as December 15, 2022.  At the TMC meeting, Hoopa voted in opposition to the WFV Project approval recommendation.

---

that decision-making authority to implement the ROD is held by the Secretary of the Interior subject to the concurrence rights and authority held by the Hoopa Valley Tribe.  The Secretary has delegated her authority to Reclamation and USFWS Regional Directors.

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 36

113.    On December 9, 2022, the TMC forwarded its recommendation for approval of the WFV Project and implementation commencing December 15, 2022 to Reclamation.  Exhibit 33.

114.    On December 9, 2022, Hoopa wrote a letter to Secretary Haaland, stating that the Secretary's "authority to implement the [WFV Project] . . . is subject to your obtaining [Hoopa's] concurrence pursuant to CVPIA section 3406(b)(23)."  Exhibit 34.

115.    On December 14, 2022, Hoopa again wrote to Secretary Haaland asking her to "confirm[] in writing to Hoopa that Hoopa's right of concurrence is valid and binding on the Secretary of the Interior, that the Secretary will direct her officers and agents to seek Hoopa's concurrence in the WFV project, and if Hoopa does not concur, the WFV project shall not be implemented."  Exhibit 35.

116.    On January 30, 2023, Reclamation took final agency action to approve the WFV Project.  Exhibit 36.  See Dkt. #132.  Reclamation did not seek or obtain Hoopa concurrence to approve or implement the WFV Project.

117.  The Trinity River ROD, and the flow releases provided for therein, are based on comprehensive scientific evaluation in the 1999 Trinity River Flow Evaluation Report, of which Hoopa is co-author. In 2004, the Ninth Circuit Court of Appeals summarized the complex and diligent process by which Hoopa and the Secretary of the Interior produced the 2000 ROD that Federal Defendants now seek to change unilaterally in violation of Hoopa's delegated sovereign right of concurrence:

> The number and length of the studies on the Trinity River, including the EIS, are staggering, and bear evidence of the years of thorough scrutiny given by the federal agencies to the question of how best to rehabilitate the Trinity River fishery without unduly compromising the interests of others who have claim on Trinity River water. We acknowledge, as the district court highlighted, concerns that the federal agencies actively subverted the NEPA process, but our review of the EIS shows that the public had adequate opportunity to demand full discussion of issues of concern.

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 37

> Twenty years have passed since Congress passed the first major Act calling for restoration of the Trinity River and rehabilitation of its fish populations, and almost another decade has elapsed since Congress set a minimum flow level for the River to force rehabilitative action. Flow increases to the River have been under study by the Department of the Interior since 1981. "[R]estoration of the Trinity River fishery, and the ESA-listed species that inhabit it ... are unlawfully long overdue." *Order*, 275 F.Supp.2d at 1232.

*Westlands Water District v. U.S. Dept. of Interior*, 376 F. 3d 853, 878 (9th Cir. 2004).

118.  The ROD not only set the total minimum annual amounts of water necessary for Trinity River restoration under the ROD, but it also set a daily schedule and timeframes for when that water would be released.  This schedule and timing for flows was developed to maximize the success of the restoration program and to limit any continuing harm to fish.

119.   The total amount of water available under the ROD varies based on the type of water year.  The water year runs from October 1 – September 30.  However, the type of water year is not known until April.  Thus, the ROD sets a constant base flow amount until the water year determination is known and then the amount of flows in the Spring and Summer is dependent on the water year determination.  Any water released downstream early in the water year will not be available for intended uses later in the water year.

120.  The WFV Project, as approved, authorizes the re-allocation and re-purposing of significant amounts of water from spring and summer months to winter months.  The WFV Project authorizes the shifting of 60,000 – 220,000 acre-feet of water (depending on water year type) from spring/summer months to winter months.  Thus, as much as 16-27% of the entire annual flow volume prescribed under the ROD would be re-allocated to winter flow releases, depriving the river and fish of that water in the spring and summer months as called for in the ROD, resulting in irreparable harm to the Trinity River, its fishery, and Hoopa.

121.   The WFV Project will make a substantial amount of water, which is currently dedicated to ROD purposes in Spring/Summer months, wholly unavailable for such intended uses in Spring/Summer months.  If it turns out that fishery managers have a need in the Spring

SECOND~~FIRST~~ AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 38

and Summer for water used in winter pursuant to the WFV Project, there will be no recourse under the ROD and the fish in the Trinity River will be left without adequate water and will suffer irreparable harm accordingly.

122.   Reclamation has never modified the ROD flow regime in this manner before. Reclamation's action here is without precedent in the history of the Trinity River Restoration Program.

123.   Reclamation has failed to issue a Finding of No Significant Impact (FONSI), or to make a FONSI publicly available for thirty days, prior to approving and/or implementing the WFV Project. Reclamation has also failed to prepare an Environmental Impact Statement related to the WFV Project despite the fact that it is an unprecedented and controversial major Federal action significantly affecting the quality of the human environment.

124.   Reclamation has failed to evaluate the environmental impact of commencing the WFV Project in mid-February, as opposed to mid-December when it was intended to commence. The asserted benefits of the WFV Project would appear to be lost by starting it two months late.

125.   At no time since the WFV Project was first proposed in 2021, or after the TMC recommended its approval in December 2022, has Reclamation sought or obtained Hoopa concurrence related to the WFV Project.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of Reclamation Law, the CVPIA and the APA.

126.  Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in this Complaint.

127.  Reclamation violated and is violating Section 3404(c)(2) of the CVPIA and the APA by executing or otherwise approving the conversion of CVP renewal contracts into permanent water service contracts without expressly incorporating all requirements imposed by

existing law, specifically including requirements imposed by the 1955 Act, 1984 Act, CVPIA, and TRROD, which impose specific fishery restoration measures and payment obligations and which confirm the in-basin priority of Trinity River flow releases over out-of-basin diversions to the Central Valley contractors, as terms within such contracts. Specifically, Reclamation failed to include in the approved contracts as binding terms: (1) fishery restoration as a CVP purpose with separable costs that are reimbursable as annual operation and maintenance expenditures; (2) limits established by CVPIA section 3406(b)(23) on Reclamation's authority to operate the CVP's TRD in cases where Reclamation's actions to operate and manage the Trinity River Division are subject to Hoopa's concurrence because those actions affect Hoopa's vested property rights in the Trinity River fishery or  Hoopa rights under the TRROD; (3) the senior priority for TRD water use in the Trinity River basin; (4) Hoopa's concurrence authority established by CVPIA 3406(b)(23); (5) the 2000 TRROD, the 2017 ROD, and 1955 Act Proviso 2 TRD water allocation to Humboldt County and downstream water users, including Hoopa; and (6) the reimbursement obligation for the modernization and improved effectiveness of the TRH as a separable cost payable as an annual operation and maintenance expenditure pursuant to CVPIA §3406 (b)(23).

128.    Reclamation violated and is violating the CVPIA by attributing certain costs of implementing Trinity River restoration activities in CVPIA section 3406(b)(23) to CVPIA section 3406(b)(1). CVPIA section 3406(b)(23) sets out specific mandates to meet the federal trust responsibility to Hoopa's anadromous fishery that the United States holds in trust for Hoopa and that Reclamation damaged by constructing and operating the CVP. The mandates require Reclamation to obtain Hoopa's concurrence in TRD flow releases and operating criteria and procedures for the restoration and maintenance of Hoopa's fishery. In addition, 3406(b)(23) makes the costs of the restoration activities reimbursable annually as operation and maintenance expenditures by CVP contractors. Nonetheless, Reclamation attributed Trinity Restoration costs to Reclamation's Habitat Restoration Program (HRP) under CVPIA section 3406(b)(1). This is

1  unlawful for a number of reasons. First, Reclamation's HRP pertains to "[a]ctivities authorized

2  under section 3406(b)(1) to mitigate the other adverse environmental impacts of the CVP on

3  ESA-listed species *other than anadromous fish*" (emphasis added). Public Draft Workplan Fiscal

4  Year 2021 Obligation Plan for CVPIA Authorities Central Valley Project, California Interior

5  Region 10 – California-Great Basin Exhibit 16  https://www.usbr.gov/mp/cvpia/docs/fy2021-

6  obligation-plan.pdf PDF page 8. *See also* Bay-Delta Office Completion memo at 2, *infra*, note 48

7  ("The objective of the HRP is to improve conditions for impacted federally listed species and

8  habitats, with a focus on terrestrial species and aquatic *species other than anadromous fish*"

9  (emphasis added). Second, CVPIA section (b)(1) provides for anadromous fish restoration in the

10  Central Valley watershed. The Trinity River is tributary to the Klamath River, not the Central

11  Valley. Third, the restoration programs under CVPIA section (b)(1) and (b)(23) have different

12  water supplies, separate fisheries with separate Reclamation impacts, and separate standards for

13  restoration outcomes. Fourth, CVPIA section 3406(b)(1) does not include a trust mandate for

14  Hoopa's protection and may be beyond the scope of Hoopa's delegated sovereignty in CVPIA

15  section 3406(b)(23).

16       129.    Reclamation's actions and omissions, specifically including their failure to

17  comply with the CVPIA as described herein, is arbitrary, capricious, an abuse of discretion, and

18  otherwise not in accordance with the law and are reviewable in this Court under the APA, 5

19  U.S.C. §§ 702 - 706.

20       130.  Due to Reclamation's violations of the CVPIA and the APA, Reclamation's

21  approvals of the contracts are unlawful, and the contracts are legally invalid and must be

22  declared unlawful and set aside by this Court.

## SECOND CLAIM FOR RELIEF

## Violations of NEPA and APA

25       131.  Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in

26  this Complaint.

132.   Reclamation's execution and/or approval of the conversion of CVP renewal contracts into permanent contracts constitutes a major federal action or actions that will significantly affect the quality of the human environment.  Reclamation has a duty under NEPA to prepare an EIS or an EA before approving conversion of the contracts.

133.   Reclamation failed to prepare an EIS or an EA before approving the contracts in violation of NEPA.

134.   Reclamation failed to develop or consider alternatives to the proposed contract conversion actions in violation of NEPA.

135.   Reclamation's approvals of the conversion of the CVP contracts to permanent water service contracts without any compliance with NEPA is unlawful under NEPA and the APA.

136.   Diversions of water from the Trinity River to the Central Valley *without fulfillment of the statutory mandates enumerated herein*, have had and will continue to have a devastating impact on Hoopa's sovereignty and the fish, water, and other environmental resources of the Trinity River that Hoopa relies upon.  The action of converting the currently time-limited CVP contracts into permanent contracts is an action with significant environmental impacts that requires NEPA review.  Reclamation has discretion in determining and negotiating the terms and conditions of the contract conversions, and must comply with NEPA, including preparation of an Environmental Impact Statement ("EIS") and/or an Environmental Assessment ("EA") and evaluating appropriate alternatives before approving the contract conversions. Reclamation has failed to prepare an EIS, EA, or to comply with NEPA in any way whatsoever.

137.   Reclamation's failure to comply with NEPA prior to its execution and/or approval of the contract conversions constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and procedures required by law and are reviewable in this Court under the APA.  5 U.S.C. §§ 702 - 706.

138.  Due to Reclamation's violations of NEPA and the APA, Reclamation's approval of the contracts is unlawful, and the contracts are legally invalid and must be declared unlawful and set aside by this Court.

139.  Reclamation also failed to comply with NEPA and its implementing regulations in connection with its approval of the Trinity River WFV.

140.  40 C.F.R. §1501.6(a)(1) requires preparation and public disclosure of a FONSI if the agency determines, based on the environmental assessment, not to prepare an environmental impact statement (EIS). 40 C.F.R. §1501.6(a)(2)(ii) requires an agency to make a FONSI available for public review for 30 days before the agency makes its final determination whether to prepare an EIS and before the action may begin where "the nature of the proposed action is one without precedent."  Reclamation did not comply with these requirements.

141.    The WFV Project is "major Federal actions significantly affecting the quality of the human environment" as it will significantly and substantially re-allocate and re-purpose flows required for specific biological and ecological purposes in Spring and Summer months. Instead, the WFV Project will release that water (60,000 – 220,000) acre-feet in winter months, making it wholly unavailable for its intended ROD purposes in Spring/Summer months.  The WFV Project is controversial and unprecedented.  An environmental impact statement is required.

142.  Reclamation's failure to comply with NEPA relating to its approval and implementation of the WFV Project constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and procedures required by law and is reviewable in this Court under the APA.  5 U.S.C. §§ 702-706.

143.  Due to Reclamation's violations of NEPA and the APA, Reclamation's approval and implementation of the WFV Project is unlawful and must be declared unlawful, set aside, and enjoined by this Court.

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 43

**THIRD CLAIM FOR RELIEF**

**Violations of WIIN Act, CVPIA, and APA**

144.    Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in this complaint.

145.    In approving the conversion of the CVPIA interim renewal contacts into permanent contracts, Reclamation failed to comply with Section 4011 of the WIIN Act, which requires terms and conditions in the converted contracts: (1) for repayment of all accrued and future CVP construction and other capitalized costs; and (2) terms by which the contractor is required to reimburse as operation and maintenance expenditures all costs to restore the Trinity River fishery. Required contract terms include: the contractors' obligation to comply with and pay for CVPIA fishery mitigation, protection, restoration, and maintenance measures established in CVPIA section 3406.

146.    Reclamation violated the WIIN Act by not allocating to CVP contractors at least $340,872,120.00 of CVPIA costs in Reclamation's CAS[38], and providing for its repayment in WIIN Act contracts. That sum of CVPIA costs includes accrued reimbursable construction and other capitalized costs of implementing environmental restoration mandates in CVPIA section 3406, in particular, the Trinity River restoration mandate in CVPIA Section 3406(b)(23), which requires collection of those costs as annual operation and maintenance expenditures. Reclamation's failure to allocate and collect those costs resulted in their reimbursement, and future reimbursements, being excluded as contract terms in WIIN Act contracts. Their omission from prepayment costs and prospective Rates and Charges[39]  violates WINN Act Section 4011

---

[38] Plaintiff believes that that sum represents accrued, unallocated CVPIA costs through 2016.

[39] For example, Westlands Water District Contract No. 14-06-200-495A-IR1-P) Exhibit D "Repayment Obligation – Current Calculation under WIIN Act Section 4011(a)(2)" does not provide for payment of those costs. To the contrary, Recital 14 of that contract states that the United States has determined that the Contractor has fulfilled all of its obligations under the

and CVPIA Sections 3404(c)(2), 3406, and, specifically as to Hoopa, 3406(b)(23).

147. Due to Reclamation's violations of the WIIN Act, the CVPIA and the APA, Reclamation's approvals of the contracts are unlawful, and the contracts are legally invalid and must be declared unlawful and set aside by this Court.

## FOURTH CLAIM FOR RELIEF

## Violations of the CVPIA, WIIN Act, SCRB method and APA

148. Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in this Complaint.

149. CVPIA Section 3406(a) amended the CVP's purposes and priorities set forth in 50 Stat. 844, 850, §2 (Act of August 21, 1937) by adding as a new and separate purpose, "mitigation, protection, and restoration of fish and wildlife", and by giving that purpose equal priority in the CVP with irrigation and domestic uses and senior priority over power.

150. According to the SCRB method, the costs associated with that new and separate CVP purpose are separable costs because they provide only one project benefit to a specific project purpose: mitigation, protection, and restoration of fish and wildlife. None of the expenditures benefit any other CVP purpose. They are reimbursable by CVP contractors as "specifically authorized under the CVPIA and have specific cost recovery assignments."[40] Nonetheless, Reclamation accounted for and allocated CVPIA costs in excess of CVP Restoration Fund assessments as nonreimbursable joint costs rather than reimbursable separable

---

Existing Contract"; Section 1.l of the contract states that the "Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in Exhibit D, which is incorporated herein by reference", and Section 7(a) of the contract refers to the "Contractor's full prepayment of the Prepayment Obligation pursuant to section 4011" of the WIIN Act. As to prospective rates and charges, Exhibit B omits any obligation for ongoing Trinity River restoration costs or other costs pursuant to section 3406 that are in excess of CVP Restoration Fund assessments.

[40] CAS Section 5.12. *See also*, CVPIA section 3406(b)(23) regarding Trinity River restoration: "Costs associated with this paragraph shall be reimbursable as operation and maintenance expenditures pursuant to existing law."

costs. Having excluded those costs entirely from the CAS, Reclamation reduced reimbursement by hundreds of millions of dollars of essential restoration funding on which completion of Trinity River restoration depends, and executed the WIIN Act contracts without allocating and accounting for that money as required by the SCRB method, the WIIN Act and the CVPIA.[41]

151.    Reclamation's failure to comply with the SCRB method, the WIIN Act, and the CVPIA prior to its execution and/or approval of the contract conversions constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and procedures required by law and are reviewable in this Court under the APA. 5 U.S.C. §§702 - 706.

152.    Due to Reclamation's violations, Reclamation's approvals of the contracts are unlawful, and the contracts are legally invalid and must be declared unlawful and set aside by this Court.

## FIFTH CLAIM FOR RELIEF

## Violations of Executive Order 12866 and APA

153.    Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in this Complaint.

154.    While the CAS failed to allocate CVPIA costs, the CAS states that the "results of the CAS [presumably including the adoption of the SCRB method as a best practice] *will* be used to allocate these costs at some future point in time where applicable" (emphasis added). *Id.* at Section 3.6. However, in CAS Section 5.12, Reclamation incorrectly states that "The treatment of CVPIA costs *are* described in Reclamation's Business Practice Guidelines for CVPIA Receipts, Program Accounting, Cost Allocation, and Cost Recovery (BPG)" (emphasis added). When Reclamation published the CAS in January 2020, the BPG did not exist and the $340 million in CVPIA costs remain unallocated. Further Reclamation knew that cost allocation is a

---

[41] Exhibit 17. See also page 2 of White Paper re CVPIA True Up (final). Exhibit 18; Supplemental White Paper re CVPIA True UP_final Exhibit 19.

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 46

prerequisite to Reclamation billing and collecting CVPIA costs. Accordingly, in the CAS, Reclamation misrepresents that BPG had been processed pursuant to Executive Order 12866 and were in effect at the time of the CAS's publication.[42]

155.    Knowing that it had not allocated or collected accrued CVPIA costs or quantified CVP contractors' future obligation for CVPIA costs in the WIIN Act contracts, Reclamation nonetheless proceeded to execute the WIIN Act contracts, including Westlands' February 28, 2020, Contract No. 14-06-200-495A-IR1-P.

156.    Any decision by Reclamation regarding accrued and future CVPIA costs is within the scope of Executive Order 12866 because that decision represents a significant regulatory action that could have an annual effect on the economy of $100 million or more or adversely and materially affects the environment, public health or safety, or tribal governments.  Accordingly, on November 5, 2020, more than eight months after Reclamation executed Westlands' and other contracts without accounting for or collecting accrued CVPIA reimbursable costs or quantifying reimbursement of such future costs, Reclamation initiated compliance with Executive Order 12866 by submitting proposed BPG to OMB's Office of Information and Regulatory Affairs.[43]

157.  Three months later on February 11, 2021, in the midst of the required regulatory review, Reclamation suddenly withdrew the proposed BPG. *Id.* Reclamation has denied Hoopa's repeated requests for information about who authorized Reclamation to withdraw the BPG, under what authority Reclamation acted, and why Reclamation withdrew and then failed to resubmit proposed BPG to OMB. Since then, Reclamation has failed to comply with Executive

---

[42] *See* CAS, Exhibit 9,  at vii, Acronyms and Abbreviations: "BPG: Business Practice Guidelines for the CVPIA Receipts, Program Accounting, Cost Allocation, and Cost Recovery"; CAS Section 5.12 "CVPIA costs *are* described in Reclamation's Business Practice Guidelines for CVPIA Receipts, Program Accounting, Cost Allocation, and Cost Recovery (BPG)" (emphasis added); CAS Section 12.6 "The allocation of CVPIA costs *is* specified in the BPG" (emphasis added).
[43]   https://mobile.reginfo.gov/public/Forward?SearchTarget=RegReview&textfield=1006-ZA02+&Image61.x=9&Image61.y=9.

Order 12866.

158.     Had Reclamation complied with Executive Order 12866, OMB would have learned that Reclamation had neither allocated, billed or collected accrued CVPIA costs nor accounted for future CVPIA costs in the contracts as required by WIIN Act section 4011 and CVPIA section 3404(c)(2). OMB would then have been able to assess whether and how Reclamation's actions may have an annual effect on the economy of $100 million or more, deviated from the SCRB method, or adversely and materially affect the environment, public health or safety, or tribal governments, particularly Hoopa, because of Reclamation's failure to fully implement the CVPIA's contractor reimbursement requirements for environmental restoration costs.[44]

159.     Reclamation's failure to comply with Executive Order 12866 at all, let alone prior to executing contract conversions at issue in this case constitutes arbitrary and capricious agency action, is an ongoing abuse of discretion, and is contrary to law and procedures required by law and are reviewable in this Court under the APA. 5 U.S.C. §§702 - 706.

160.  Due to Reclamation's violations, Reclamation's approvals of the contracts are unlawful, and the contracts are legally invalid and must be declared unlawful and set aside by this Court.

### SIXTH CLAIM FOR RELIEF

### Violations of 43 U.S.C. § 511

161.     Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in

---

[44] On May 20, 2021, Susan E. Leetmaa, OMB's Reclamation Program Examiner, reported to Hoopa: "A few months ago, Reclamation withdrew their proposal to revise their accounting practices. If the new leadership determines they want to proceed with the accounting change, it will have to come back to OMB for review, at which point I'll continue my analysis of the proposal. I haven't had the time to go through the Hoopa Valley Tribe's analysis with a fine tooth comb, to determine the accuracy of their analysis. I can say that in my initial analysis of Reclamation's proposal I found that the proposal would indeed increase federal outlays . . . ." Exhibit 20.

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 48

this Complaint.

162.     Reclamation violated the 1922 Act when it failed to obtain at all, let alone "promptly" after the February 28, 2020, execution of Westlands contract No. 14-06-200-495A-IR1-P the validation decree required by both the 1922 Act and Article 47 of the contract. On October 25, 2019, four months before Reclamation executed the contract, Westlands had sought judicial validation of an unsigned and incomplete draft contract that lacked required financial information. *Westlands Water District v. All Persons*, Case No. 19CECG03887, Fresno County Superior Court. Trinity and San Joaquin Counties and non-governmental organizations appeared to oppose validation. On February 27, 2020, the day *before* Reclamation executed the Westlands contract, the Superior Court issued a "tentative ruling" to deny validation, citing five substantive reasons for denial. (Exhibit 2).[45]   On March 16, 2020, the court adopted the February 27, 2020 tentative ruling as the "final order." *Id.*  On March 15, 2022, after further litigation, the Superior Court entered judgment dismissing Westlands complaint for validation.  *Id.*[46]

163.     Without a validation decree, Westlands' contract is not binding on the United States and is voidable.  Moreover, Reclamation is barred from delivering water pursuant to those contracts[47] *Barcellos & Wolfsen, Inc. v. Westlands Water Dist*., 491 F. Supp. 263, 265 n. 1 (E.D. Cal.1980) (stating Section 46 of the Omnibus Adjustment Act of 1926 provides. "'no water shall be delivered pursuant to any contract entered into with an irrigation district until such contracts have been confirmed by a State court of competent jurisdiction.' See 43 U.S.C. § 511.")

164.     Reclamation knew in early 2020 that Westlands had been denied validation.

---

[45] The court found that the contract, among other things lacked "material terms", for example: "Given the estimate for the repayment amount is over $362,000,000 . . . the absence of the actual final amount and payment schedule render the proposed contract lacking in material terms and incomplete." The court further concluded that Westlands had violated California's open government statute (Brown Act). *Id.*

[46] As of the date of this complaint, Reclamation still has not obtained the required validation decree. Westlands' appeal is pending. *Westlands Water District v. All Persons Interested Etc. et al*. Case Number F083632 (CON/F084202), 5th Appellate District.

[47] This does not prevent Westlands from receiving water pursuant to its preexisting interim renewal contract under CVPIA section 3404. Paragraph 3, *supra*.

Notwithstanding Westlands' failure to secure judicial validation of its repayment contracts, by letter dated May 26, 2020, (Exhibit 21) Westlands' General Manager, Thomas Birmingham, represented to Defendant Conant that judicial confirmation of Westlands' authority to enter into the Repayment Contract with Reclamation had merely been delayed, due to the Covid-19 pandemic and other undisclosed factors, but was on course for completion.

165.    Mr. Birmingham stated that "[t]he District filed an action to obtain [a judicial] decree on October 25, 2019, but for multiple reasons, the Court was not able to validate the District's proceedings prior to the Court closing for judicial business in response to the COVIDS-19 pandemic and the proclamations of emergency by Governor Newsom." *Id*.

166.    Mr. Birmingham's letter did not disclose that several parties had filed Answers opposing Westlands' validation action, and that after hearing their grounds for opposing validation, Judge Simpson had ruled on March 16, 2020, that the District's Repayment Contract could not be validated for at least five separate reasons. (Exhibit 2, s*upra.*) Nor did Mr. Birmingham's May 26, 2020, letter provide Defendant Conant with Judge Simpson's detailed ruling denying Westlands' motion for validation. Exhibit 21.

167.    Instead of disclosing these material facts revealing that the Fresno County Superior Court had concluded that Westlands' Repayment Contract could not be validated, Mr. Birmingham represented, in direct contradiction of Judge Simpson's specific findings and order rejecting validation, that "[t]he proceedings on the part of the District to authorize execution of the Repayment Contract complied with the law, and no one has initiated legal action to challenge the lawfulness of those proceedings." *Id*.

168.    Mr. Birmingham went on to represent that "[u]nder California's 'reverse validation' statute, any action seeking to challenge the District's proceedings to authorize execution of the Repayment Contract would be barred by the 60-day statute of limitations in California Code of Civil Procedure sections 860 and 863." *Id*. at 2. But Mr. Birmingham failed to disclose that there was no need for any party opposed to validation to file such a "reverse

validation" action, since Westlands had itself filed a validation action to which opposition could, and was in fact, presented by way of the four Answers that were in filed in opposition to Westlands' validation action and the four opposition memoranda that were filed in response to Westlands' subsequent validation motion.

169.    Based on these statements, Mr. Birmingham "request[ed] that [Reclamation] confirm the District's understanding that its inability to obtain a validation judgment does not render the Repayment Contract void." *Id*. Mr. Birmingham closed by reassuring Defendant Conant that "the District is confident it will obtain a final decree confirming the proceedings on its part for the authorization of the execution of the Repayment Contract." *Id*.

170.    Just two days later, without indicating that he had independently reviewed the status of the validation proceeding, Defendant Conant wrote to Mr. Birmingham, restating Mr. Birmingham's representation that "for various reasons, the court was not able to validate the District's proceedings prior to the court closing for business in response to the COVID-19 pandemic and emergency proclamations by California Governor Newsom."[48] Exhibit 22.

171.    Based solely on Mr. Birmingham's representation of the facts surrounding Westlands' inability to secure judicial validation of the repayment contract, and in disregard of the actual facts and ruling by Judge Simpson denying validation, Defendant Conant concluded his letter by stating "Reclamation confirms its understanding that the Repayment Contract will govern the rights and obligations of the United States and the District after the Repayment Contract's effective date, June 1, 2020, notwithstanding the District's inability to obtain a final decree confirming its proceedings to authorize the execution of this Repayment Contract. See, 43

---

[48] In fact, the Fresno Court limited, but did not close down its activities on March 19, 2020, three days _after_ Judge Simpson's substantive ruling. Covid-19 had nothing to do with Westlands failure to obtain a validation decree. https://www.firstlegal.com/fresno-county-superior-court-covid-19-update/.

U.S.C. § 511." *Id.*

172.    Despite Judge Simpson's Order denying Westlands' motion for validation of its repayment contract with Reclamation, on September 17, 2021, Westlands filed a Renewed Motion for Validation Judgment. The Court denied Westlands' motion. On October 27, 2021, the Honorable D. Tyler Tharpe of the Fresno County Superior Court issued a Minute Order adopting as final Judge Tharpe's Tentative Ruling dated October 26, 2021 "[t]o deny [Westlands'] renewed motion for a validation judgment, for failure to show any new or different facts, circumstances, or law that would justify renewal of its prior motion." Exhibit 2.

173.    On June 1, 2020, Fitch Ratings assigned an "A+" rating to $227 million in revenue bonds that "will provide funds to finance the payment of the capital repayment obligation of the [Westlands Water] district and certain distribution districts payable to the U.S. Bureau of Reclamation." Exhibit 23.  In its Analytical Conclusion, Fitch Ratings relied on the exchange of correspondence between Defendant Conant and Mr. Birmingham:

> The district believes, based on written communication with the USBR and prior court decisions, that the district's inability to obtain a validation judgement does not render the conversion contract void, and that the executed contract between the district and USBR, effective June 1, 2020, will govern the rights and obligations of the U.S. and the district after the effective date. *Id.*

Defendant Conant had no authority to represent, let alone commit, that a contract that had been denied validation "will govern the rights and obligations of the U.S. and the district after the effective date."

174.    By letter of June 24, 2020, (Exhibit 24) San Joaquin County, a party to the validation proceeding, wrote to Defendant Conant, notifying him of "Westlands Water District's serious misrepresentation in its May 26, 2020 letter" to Defendant Conant, adding that the letter contained "materially false and misleading statements."  As to COVID-related court closures, the County pointed out that "[o]n March 16, 2020, *before* its now-concluded temporary closing, the

SECOND~~FIRST~~ AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 52

Fresno Superior Court finalized its order *denying Westlands' motion to validate its Converted Contract* . . . That ruling was on the merits of the validation request." (Emphasis in original.) The County then summarized each of the five bases on which the Court denied validation. The County concluded its letter with this:

> Westlands contract is the largest in the Central Valley Project. Its heavily criticized proposal for contract conversion is of great concern to water users throughout California, especially in the Delta region and the *Trinity River watershed*. We trust that the Bureau will take this matter seriously, and decline to enable Westlands to evade the court order requirement in view of the material misrepresentations and omissions in its May 26, letter. (Emphasis added.)

175.    Reclamation's failure to comply with the 1922 Act constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and procedures required by law and are reviewable in this Court under the APA. 5 U.S.C. §§702 - 706.

## SEVENTH CLAIM FOR RELIEF

## Expiration of the WIIN Act, Violation of APA

176.    Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in this Complaint.

177.    Reclamation knows and has known that since February 28, 2020, the contract execution date, state court judges have twice denied validation of the Westlands' contract. And Reclamation has not received the validation decree required under federal law and the contract itself. Without the decree for validation, the contract cannot bind the United States. Nonetheless, Reclamation has held itself out to the public, generally, and Westlands' lenders, specifically, that the United States is bound by the contract.  Plaintiff seeks a declaration that the Westlands' contract is not binding on the United States.

178.    Reclamation's conduct under these circumstances constitutes arbitrary and capricious agency action, is an ongoing abuse of discretion, is contrary to law and procedures required by law, and is reviewable in this Court under the APA. 5 U.S.C. §§702 - 706.  Plaintiff

seeks a declaration that the Westlands' contract is not binding on the United States.

**EIGHTH CLAIM FOR RELIEF**

**Unlawful "CVPIA Completion Memos" – Violation of CVPIA, APA**

179.    Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in this Complaint.

180.    At the end of the Trump Administration, between January 15 and 19, 2021, Reclamation executed a series of documents ("CVPIA Completion Memos,")[49] all of whose findings and recommendations were approved by then Secretary David Bernhardt. Secretary Bernhardt concluded that nearly all CVPIA environmental restoration mandates had been completed.

181.    Hoopa claims that the CVPIA Completion Memos are both unlawful and factually incorrect, and have profound adverse implications for California's environment and Hoopa's rights.

182.    By way of background, in 2004, the Office of Management and Budget established a procedure for evaluating performance of federal programs such as the environmental mitigation programs prescribed in CVPIA section 3406. In 2009 Reclamation published a CVPIA program performance evaluation. "Central Valley Project Improvement Act Program Activity Review Report" (CPAR) (August 25, 2009).  Exhibit 29.  Reclamation

---

[49] Memorandum to Assistant Secretary, Fish & Wildlife and Parks,  and Assistant Secretary, Water & Science, from Secretary re: Concurrence in Central Valley Project Improvement Act Recommendations (January 19, 2021) (Exhibit 25); Memorandum to Secretary from Assistant Secretary, Fish & Wildlife and Parks, and Assistant Secretary, Water & Science re: Central Valley Project Improvement Act Completion under Section 3407(d)(2)(A) (January 14 and 15, 2021) (Exhibit 26); Memorandum to Ernest A. Conant, Regional Director, California Great Basin from Bay-Delta Office re: Central Valley Project Improvement Act (January 15, 2021) (Exhibit 27); Memorandum to Regional Director, California-Great Basin Region from Associate Solicitor, Division of Water Resources re: Interpretation of Central Valley Project Improvement Act Sections 3406 and 3407 (January 14, 2021) (Exhibit 28).  Collectively these are the "CVPIA Completion Memos."

conducted that review using OMB's "Program Assessment Rating Tool" (PART). PART is a means to "hold agencies accountable for accomplishing results." *Id.* at 11.

183.    The Hoopa provision of the CVPIA (section 3406(b)(23)) and the 1984 and 1996 Acts incorporated therein require the restoration of natural fish populations and their integration with hatchery fish populations in the Trinity River basin to levels approximating those that existed immediately prior to the construction of the TRD and to maintain those levels. Achievement of that outcome includes full implementation of the Trinity River Mainstem Fishery Restoration Record of Decision (2000), completion of modernization and improved effectiveness of the TRH, and annual reimbursement by CVP contractors of costs associated with Trinity River fishery restoration as operation and maintenance expenditures pursuant to existing law. None of these responsibilities are complete.  As a prime example, the modernization and improved effectiveness of the TRH mandated in the 1984 Act, 1996 Act, and section 3406(b)(23) has not occurred.

184.    PART reviews programs using the following metrics: Performance Goal, Time Frame, Outcome Measure, Output Measure and Output Targets. In the 2009 CPAR review of the Trinity River program, *Id.* at 32-33, the Performance Goal is to "[a]ssist in meeting the Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe and the fishery restoration goals of P.L. 98-541 …." The Time Frame is both "Time Certain" and "Annual."[50] The Outcome Measure is "[n]umbers of natural and hatchery produced adult spawner escapement to the Trinity River; numbers of adult fish derived from the Trinity River harvestable for the benefit of tribal, commercial, and sport fishing." The "Output Measure" is "[c]ompletion of flow study; TAF per ROD flows". "Output Targets" are "[i]nfrastructure improvements to allow full implementation of ROD flows (369 – 815 TAF) (Time Certain)." *Id.* at 32.

---

[50] CPAR explains that "'Annual' activities, by definition, do not have an associated time frame because they occur every year and will continue into the future, such as providing refuge water supply each year. Other performance goals are "time certain", that is, a discrete and definable conclusion exists, such as removing a dam.'" *Id.* at 4.

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 55

185.    The 2009 CPAR makes two "basic conclusion about the CVPIA:

1. That the 'time certain' provisions of the Act should be the primary factor in the determination of whether the provisions of Section 3407(d)(2) have been satisfied, but that the funding requirements of "annual" provisions should also be weighed in the funding reduction determination.

2. That as of the date of this report [2009], there is no basis to conclude that the provisions of Section 3407(d)(2) have been satisfied and that therefore, there is no basis at this time on which to reduce contractors' required payments into the Restoration Fund.

186.    The CVPIA Completion Memos are a radical departure from CPAR and PART. For example, the Bay-Delta Office Completion memo, *supra*, note 48, reduces the CVPIA's Trinity River restoration mandate to the "Trinity River Flow Evaluation Study" which it describes as a program of flow releases. In fact, the restoration mandate entails these outputs: TRD fishery flow releases, construction and maintenance of habitat for all fresh water life history stages of anadromous fish, periodic spawning gravel introduction, scientific monitoring, adaptive management, TRH modernization and improved effectiveness, and reimbursement of restoration costs by CVP contractors, the planning and implementation of which require Hoopa's concurrence. That *output* must produce the *outcome* of fish populations that existed immediately prior to the TRD's construction. Reclamation has not achieved the CVPIA's restoration mandate for the Trinity River.  Nor has Reclamation satisfied direct statutory mandates such as the requirement to modernize and improve the effectiveness of the TRH, as required by the 1984 Act, 1996 Act, and section 3406(b)(23).

187.    The effect of Reclamation's Bay-Delta Office incorrect representation of the status of the CVPIA's Trinity River restoration mandate, along with other CVPIA restoration mandates, harms Hoopa because, among other reasons, CVPIA section 3407(d)(2)(A) provides that "upon completion of the fish, wildlife, and habitat mitigation and restoration actions

mandated under section 3406 . . . the Secretary shall reduce" CVP contractors' restoration costs. Reclamation's premature and unlawful declaration of completed restoration is not only an environmental injustice but also a violation of Hoopa's vested rights in the Trinity River fishery. If not corrected, the CVP contractors, who have reaped billions of dollars from the transfer of Trinity River water to the Central Valley at enormous environmental cost will escape financial responsibility established by Congress in the CVPIA to pay the costs of environmental restoration. In that case restoration will terminate or Congress will have to appropriate the shortfall by transferring financial responsibility from CVP contractors to the federal taxpayer. This has already occurred with Reclamation's elimination of at least $340 million of accrued contactor CVPIA reimbursement obligations. Para. 2, 9 and 15 *supra*.

188.   The Bay-Delta Office Completion memo purports to be "consistent with legal guidance provided by" the withdrawn Associate Solicitor's January 14, 2021, legal memorandum (FN 49). Bay-Delta memo at 1. But the Associate Solicitor's memo dispenses with the nuanced analysis of the 2009 CPAR and concludes that "Where section 3406 requires the agency to `develop and implement' a program, 'completion' occurs under section 3407(d)(2)(A) when the program has been developed and implemented."

189.   Reclamation's CVPIA Completion Memos ignore all but one of the CPAR metrics, "completion of flow study." Infrastructure improvements are identified as Time Certain Output Targets. The other metrics, Performance Goal and Outcome Measure" are Annual, not Time Certain.

190.   Reclamation's replacement of the analytical framework of the 2009 CPAR with the Associate Solicitor's incorrect conclusion that to implement-a-program-is-to-complete-it constitutes arbitrary and capricious agency action, is an ongoing abuse of discretion, and is contrary to law and procedures required by law and are reviewable in this Court under the APA. 5 U.S.C. §§702 - 706.

191.   Reclamation's retaining the remaining CVPIA Completion Memos in place as

Reclamation policy following the withdrawal of the Associate Solicitor's memorandum constitutes arbitrary and capricious agency action, is an ongoing abuse of discretion, and is contrary to law and procedures required by law and are reviewable in this Court under the APA. 5 U.S.C. §§702 - 706.

192.     Defendant Haaland has failed or refused to fulfill Hoopa's requests that she rescind the CVPIA Completion Memos and otherwise take administrative action compliant with the mandates of the CVPIA and NEPA.[51] Her conduct constitutes arbitrary and capricious agency action, is an ongoing abuse of discretion, and is contrary to law and procedures required by law and are reviewable in this Court under the APA. 5 U.S.C. §§702 - 706.

**NINTH CLAIM FOR RELIEF**

**Violation of Hoopa's Delegated Sovereignty in CVPIA; Violation of APA**

193.     Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in this Complaint.

194.     The United States Constitution vests Congress with "plenary and exclusive power over Indian affairs." *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 470 (1979). The Constitution establishes the federal government's "power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders." *United States v. Sandoval*, 231 U.S. 28, 46 (1913). Congress has found that its authority over Indian affairs includes the responsibility for protecting tribal resources because of their vital importance to the existence and integrity of Indian tribes. Congress meets that responsibility through "statutes, treaties, and the general course of dealing with Indian tribes." 25 U.S.C. 1901. In addition, as part of its commitment to supporting tribal self-determination and self-governance, the United States the United States Department of Justice respects and seeks to

_____

[51] By memorandum of June 11, 2021, from Daniel Cordalis, Deputy Solicitor for Water Resources, to Regional Director Conant, Ernest Conant, rescinded the Associate Solicitor's January 14, 2021 memorandum. The remaining CVPIA Completion Memos are still in effect.

preserve tribal cultures. *See* "Department of Justice Policy on Indian Sovereignty and Government-to-Government Relations," 61 Fed. Reg. 29424, 29426 (1996).

195.    Congress has assigned agencies within the Department of the Interior missions that may at times be in conflict. In *Nevada v. United States*, 463 U.S. 110 (1983), the Supreme Court reviewed a conflict between Secretary of the Interior's responsibilities to  administer Indian Affairs on the one hand and reclamation projects on the other hand. The Court observed that "[i]t may well appear that Congress was requiring the Secretary of the Interior to carry water on at least two shoulders when it delegated to him both the responsibility for the supervision of the Indian tribes and the commencement of reclamation projects in areas adjacent to reservation lands." *Id.* at 128 (1983).

196.    Less than a decade after the conflict identified in *Nevada v. U.S.*, Congress adopted the Hoopa trust provisions in CVPIA section 3406(b)(23) to avoid a conflict between the federal trust responsibility to Hoopa and the operation of Reclamation's CVP. Congress used its plenary power to resolve the dilemma in *Nevada*'s statement that "the Government cannot follow the fastidious standards of a private fiduciary, who would breach his duties to his single beneficiary solely by representing potentially conflicting interests without the beneficiary's consent." *Id.* Congress did so by explicitly importing the federal trust responsibility into the CVPIA. The Secretary now carried not only CVPIA operations, but also restoration of the Trinity River fishery, and meeting the trust responsibility to Hoopa on *one* shoulder. Congress eliminated any legal or programmatic conflict about the Secretary's Reclamation and Indian Affairs responsibilities; Congress made meeting the federal trust responsibility to Hoopa *Reclamation*'s mission. CVPIA section 3406(b)(23) was expressly enacted by Congress "in order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe." And through CVPIA section 3406(b)(23)(B) "concurrence" mandate, Congress required Reclamation to share decision making with Hoopa on matters involving administration of the

1    CVP's Trinity River Division Trinity River that affect Hoopa's fishery.

2        197.    That was not the end of the matter, however. CVPIA section 3406(b)(23) also

3    delegated permanent authority to Hoopa to require Reclamation to obtain Hoopa's concurrence

4    in all decisions involving Reclamation's management of the Trinity River Division operation and

5    maintenance that affect Hoopa's fishery and its timely restoration to pre-project levels of

6    abundance.[52] Accordingly, just as the HYSA section 1300i-7 made a statutory delegation of

7    sovereignty to Hoopa, CVPIA section 3406(b)(23) delegated sovereignty to Hoopa to participate

8    in governance of the Trinity River Division through its authority to concur in Secretarial

9    management decision that affect the restoration and maintenance of the Trinity River fishery.

10       198.  Pursuant to CVPIA §3406(b)(23), Reclamation may not take action to modify the

11   permanent fishery flow requirements or operating criteria and procedures prescribed in the ROD

12   in the absence of Hoopa concurrence.

13       199.  Reclamation has taken action and has threatened to take imminent action, including

14   modifications to flow releases called for in the Trinity River ROD, that fails to honor Hoopa's

15   concurrence rights as provided in CVPIA section 3406(b)(23).

16       200.  Specifically, on January 30, 2023, Reclamation took final agency action to approve

17   the Trinity River WFV Project in the absence of seeking or obtaining Hoopa concurrence as

18   required by CVPIA §3406(b)(23).  Reclamation's approval and/or implementation of the WFV

---

19
20   [52] The CVPIA was not the first time Congress made an explicit delegation of authority to
      Hoopa. Just four years prior to the CVPIA, Congress passed the Hoopa-Yurok Settlement
21   Act, Pub. L. 100-580(1988), 102 Stat. 2924. In a case challenging Hoopa's delegated
      sovereignty, the Court of Appeals concluded that the delegation was valid and was
22   needed to resolve confusion over who had the right to "make management decisions
      relating to the lands and resources of the . . . reservation as a whole." Senate Report at 9.
23   The Senate Report explains that Congress' understanding of the law governing the
      Reservation was that, "absent statutory delegations," the Hoopas could not manage the
24   Square. *Id.* The ratification and confirmation of the Tribe's Constitution was exactly that:
      a "statutory delegation[ ]" of authority to the Tribe to "make management decisions
25   relating to the lands and resources of the 'Square.' "

26   *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1213 (9th Cir. 2001).

1   Project in the absence of seeking and obtaining Hoopa concurrence is unlawful final agency

2   action reviewable and remediable under the APA.

3       201. The obligation to seek and obtain Hoopa's concurrence is a discrete action that is

4   required by CVPIA §3406(b)(23).  Reclamation's failure to seek or obtain Hoopa concurrence

5   prior to approving and/or implementing the WFV Project constitutes an unlawful failure to act,

6   which is final agency action reviewable and remediable under the APA.  5 U.S.C. §§702-706,

7   §551(13); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004).

8       202.  Reclamation's failure to comply with the CVPIA section 3406(b)(23)'s delegation

9   of sovereignty to Hoopa in its administration of the TRD and execution of WIIN Act contracts

10  and CVPIA contracts, and Reclamation's approval of the WFV Project without seeking or

11  obtaining Hoopa concurrence, violate a specific, rights-creating and duty imposing statute that is

12  uniquely applicable to Hoopa (*See*, *Navajo Nation v. U.S. Department of the Interior*, 26 F.4th

13  794, 812 (9th Cir. 2022)) and constitutes arbitrary and capricious agency action, is an ongoing

14  abuse of discretion, and is contrary to law and procedures required by law and are reviewable in

15  this Court under the APA. 5 U.S.C. §§702 - 706.

16      203.  Hoopa seeks and is entitled to a declaratory judgment confirming its concurrence

17  rights as provided by Congress in CVPIA section 3406(b)(23) and preliminary and permanent

18  injunctive relief to enjoin the WFV Project in the absence of Hoopa concurrence.

19                           **TENTH CLAIM FOR RELIEF**

20                     **Violation of 1984 Act, 1996 Act and APA**

21      204. Hoopa re-alleges, as if fully set forth herein, each and every allegation set forth in

22  this Complaint.

23      205. The 1984 Act, as amended in the 1996 Act, requires the "design, construction,

24  operation, and maintenance of facilities to . . .  modernize and otherwise increase the

25  effectiveness of the Trinity River Fish Hatchery, so that it can best serve its purpose of

26  mitigation of fish habitat loss above Lewiston Dam while not impairing efforts to restore and

1   maintain naturally reproducing anadromous fish stocks within the basin."

2   206.   Reclamation has failed to fulfill its statutory obligation to design, construct,

3   operate and maintain facilities to modernize and otherwise increase the effectiveness of the

4   Trinity River Fish Hatchery.  This failure has prevented restoration of fish populations in the

5   Trinity River Basin to levels approximately those which existed immediately before

6   development of the TRD, as required by the 1984 Act, as amended by the 1996 Act.

7   207.   Reclamation's failure to fulfill its statutory obligation to design, construct, operate

8   and maintain facilities to modernize and otherwise increase the effectiveness of the Trinity River

9   Fish Hatchery constitutes statutorily required agency action unlawfully withheld or unreasonably

10   delayed under the APA.

11   208.   Hoopa seeks and is entitled to a declaratory judgment that Reclamation has failed

12   to fulfill its statutory obligation to design, construct, operate and maintain facilities to modernize

13   and otherwise increase the effectiveness of the Trinity River Fish Hatchery.

14   <u>**PRAYER FOR RELIEF**</u>

15   WHEREFORE, plaintiff Hoopa respectfully requests that this Court:

16   A.   Find and declare that Defendants failed to comply with Sections 3404(c)(2) of

17   the CVPIA by executing or otherwise approving the conversion of CVP renewal

18   contracts into permanent water service contracts without expressly incorporating

19   all requirements imposed by existing law, specifically including requirements

20   imposed by the 1955 Act, 1984 Act, as amended, CVPIA, and TRROD, which

21   impose specific fishery restoration measures and payment obligations and which

22   confirm the in-basin priority of Trinity River flow releases over out-of-basin

23   diversions to the Central Valley contractors, as terms within such contracts;

24   B.   Find and declare that Defendants' failure to prepare an EIS or an EA to assess,

25   disclose, and consider the environmental effects of the contract conversions, and

26   alternatives to the contract conversions, violates NEPA;

SECOND~~FIRST~~ AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 62

C.      Find and declare that Defendants' approvals of the contract conversions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law;

D.      Vacate, set aside, rescind, and nullify all of Defendants' contract conversions challenged herein;

E.      Find and declare that the Westlands Water District contracts are void and unenforceable against the United States because they have been denied validation as required by the contracts themselves and federal law.

F.      Find and declare that with the expiration of the WIIN Act Defendants no longer have authority to convert CVPIA contracts to permanent contracts.

G.      Enjoin Defendants from taking any action pursuant to the contract conversions, until Defendants have fully complied with all requirements of law and specifically including NEPA and Section 3404(c)(2) of the CVPIA;

H.      Take judicial notice that Reclamation's contracting authority under the WIIN Act expired on December 16, 2021; and enjoin Defendants from converting or amending any other contracts because the WIIN Act authority to do so has expired.

I.      Find that Reclamation may continue to deliver CVP water pursuant to the CVPIA interim renewal contracts that were in effect immediately prior to the execution of the WIIN Act contracts.

J.      Enjoin Defendants exclusively to contract for CVP water pursuant to the CVPIA, in particular section 3404.

K.      Enjoin Defendants to account for, allocate, and collect costs of environmental restoration actions mandated by CVPIA section 3406 as separable reimbursable costs, pursuant to the SCRB method adopted in the Final CVPIA Cost Allocation Study (January 2020).

L.      Declare that CVPIA Business Practices Guidelines promulgated by Reclamation are governed by the SCRB method.

M.     Find and declare that the CVPIA section 3406(b)(23) requires Defendants to obtain Hoopa's concurrence in the management and operation of the CVP's Trinity River Division, including its limited integration with other units and divisions of the CVP, to the extent that they affect the Trinity River fishery and Hoopa's rights to the fishery.

N.     Find and declare that Defendants have failed to fulfill their statutory obligation to design, construct, operate and maintain facilities to modernize and otherwise increase the effectiveness of the Trinity River Fish Hatchery

O.     Enjoin the Defendants to complete CVPIA Business Practices Guidelines pursuant to Executive Order 12866;

O.P.   Enjoin the Defendants from approving and/or implementing the Trinity River WFV Project in the absence of seeking and obtaining Hoopa concurrence as required by CVPIA §3406(b)(23), and in absence of NEPA compliance.

Q.     Grant other preliminary and/or permanent injunctive relief;

R.     Award Hoopa its costs of litigation, including reasonable attorneys' fees; and

S.     Grant Hoopa such additional relief as the Court may deem just and proper.

DATED this 31st____ day of February 202332.

MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE

*/s/ Thane D. Somerville*_____
Thane D. Somerville
Thomas P. Schlosser
811 First Avenue, Suite 218
Seattle, WA 98104
Tel: 206-386-5200
t.somerville@msaj.com
t.schlosser@msaj.com
Attorneys for Hoopa Valley Tribe

SECONDFIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF - 64

**CERTIFICATE OF CONSENT TO FILE PER FEDERAL RULE OF CIVIL PROCEDURE (FRCP) 15(a)(2)**

I, Thane D. Somerville, hereby certify as follows:

1. I am a counsel of record for Plaintiff in this proceeding.

2. On ~~October 24, 2022~~_____, 2023, I transmitted Plaintiff's proposed Second ~~First~~ Amended and Supplemental Complaint for Declaratory and Injunctive Relief ("SFAC") to ~~Defendants' counsel, J. Scott Thomas, and asked for~~counsel for Defendants and Defendant-Intervenor and asked for their clients' ~~Defendants'~~ written consent to Plaintiff's filing of the FAC per FRCP 15(a)(2).

3. On ~~October 28, 2022~~_____, I received written consent from Defendants' and Defendant-Intervenors' counsel~~, J. Scott Thomas,~~ authorizing Plaintiff to file the SFAC pursuant to FRCP 15(a)(2).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed this _____31ˢᵗ day of ~~October, 202~~_____, 2023~~2~~ at Seattle, Washington


/s/ Thane D. Somerville_____

Thane D. Somerville

1

2

3

4

**CERTIFICATE OF SERVICE**

5      I hereby certify that on ~~October 31~~_____, 202~~3~~2, I electronically filed the foregoing

6  with the Clerk of the Court using the CM/ECF system, which will send notification of such to the

7  attorneys of record.

8

9

10

___/s/ Thane D. Somerville_____
Thane D. Somerville

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26