UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOOPA VALLEY TRIBE,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES BUREAU OF RELCAMATION, et al.,<br><br>    Defendants. | Case No.: 1:20-cv-01814-JLT-EPG<br><br>ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION<br><br>(Doc. 108) |

## I.   INTRODUCTION

This lawsuit concerns management of the Trinity River Division ("TRD") of the federal Central Valley Project ("CVP"). In the operative second amended complaint ("SAC"), the Hoopa Valley Tribe ("Plaintiff" or "Hoopa") advances several categories of claims. (*See* Doc. [142].) At the core of this lawsuit are allegations that the United States Bureau of Reclamation ("Reclamation") and related federal entities and officials (collectively, "Federal Defendants") violated various provisions of federal law by entering into certain contracts with water users for delivery of water from the CVP. (SAC, ¶¶ 126–78.) In addition, Hoopa alleges that Reclamation has violated "delegated sovereignty" set forth in Section 3406(b)(23) of the of the Central Valley Project Improvement Act ("CVPIA"), Public Law 102-575 (1992), by taking steps to modify the daily flow regime set forth in the 2000 Record of Decision on Trinity River Mainstem Fishery

1

1  Restoration ("TRROD") without Hoopa's concurrence. (*See, e.g.*, SAC, ¶¶193–203.)

2  On December 16, 2022, Hoopa filed a motion for preliminary injunction ("PI Motion") to block Reclamation from implementing the challenged changes to the TRROD daily flow regime. (Doc. 108.) Plaintiff bases its request for injunctive relief on its ninth claim for relief, entitled "Violation of Hoopa's Delegated Sovereignty in CVPIA; Violation of [Administrative Procedure Act (APA)]," which alleges, among other things that "on January 30, 2023, Reclamation took final agency action to approve the Trinity River [Winter Flow Variability ("WFV")] Project in the absence of seeking or obtaining Hoopa concurrence as required by CVPIA § 3406(b)(23)." (SAC, ¶ 200.)

On December 7, 2022, the Trinity Management Council ("TMC"), an advisory body set up by the TRROD, voted 7-1 in favor of recommending implementation WFV Project. (*See* SAC, ¶ 112; *see also* Docs. 118-2 at 10 (12/7/22 TMC minutes), 118-1 (TMC Bylaws).) Hoopa was the sole "no" vote. (SAC, ¶ 112.) The TMC then then forwarded its recommendation to Reclamation. (SAC, ¶¶ 109, 112.) On January 30, 2023, Federal Defendants adopted the TMC's recommendation, over Hoopa's objections. (*Id.*, ¶¶ 114–16.) Implementation is planned to begin sometime after February 13, 2023. (Doc. 132; *see also* Doc. 127 at 2 n.1.)[1]

Federal Defendants oppose injunctive relief. Though there is no dispute that CVPIA § 3406(b)(23) gave Hoopa concurrence rights in connection with the *adoption* of the TRROD, (*see* Doc. 118 at 14–15), Federal Defendants insist that by giving its concurrence to the TRROD in 2000, Hoopa likewise consented to the adaptive management protocols established in the TRROD, including the creation of the TMC to act as an advisory board with the power to recommend certain types of flow changes. (*See generally* Doc. 118.) Therefore, Federal Defendants argue, the WFV Project can be implemented without further "concurrence" from Plaintiff. (Doc. 118 at 1–2.)

Plaintiff deems Federal Defendants' arguments "wholly meritless" and maintains that pursuant to CVPA § 3406(b)(23) the Secretary cannot approve a recommendation to modify the

---

[1] Hoopa's motion indicates that the WFV Project was designed to begin as early as December 15, 2022. However, the parties were able to reach an agreement to provide Hoopa with fifteen days' notice of any plans to implement the Project, thereby avoiding the need for Hoopa to move for a temporary restraining order. (*See* Doc. 108 at 2.)

2

TRROD without Hoopa's concurrence. (Doc. 120 at 4.) Hoopa argues that "nothing in the TMC bylaws, the implementation plan, or any other related document negates or takes away Hoopa concurrence rights provided in the statute." (*Id.*)

The Court finds the matter suitable for decision on the papers pursuant to Local Rule 230(g).[2] For the reasons set forth below, the motion for preliminary injunction is DENIED.

## II. LEGAL STANDARD

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'"); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 97 (9th Cir. 2008) (en banc)).[3] The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened

---

[2] It is within the Court's discretion to deny a motion for preliminary injunction without a hearing when there are no material factual disputes. *See, e.g.*, *Dex Media W., Inc. v. City of Seattle*, 790 F. Supp. 2d 1276, 1278 n.1 (W.D. Wash. 2011) (collecting cases).

[3] The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test." *All. for the Wild Rockies*, 632 F.3d at 1134. "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

injury as a prerequisite to preliminary injunctive relief."). Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

### III. DISCUSSION

**A. Jurisdictional Issues**

  1. Ripeness

  At the time Federal Defendants filed their opposition to the PI Motion, Reclamation had yet to adopt the TMC's recommendation, so Federal Defendants argued therein that the claim upon which this motion is premised was not at that time ripe for decision. (*See* Doc. 118 at 5 n.1.) The Court shared this concern and ordered supplemental briefing on the issue of ripeness. (Doc. 124.) The parties filed responsive briefs on January 25, 2022. (Docs. 128, 129.) The subsequent adoption of the TMC's recommendation and amendment of the complaint[4] alters that factual backdrop. The Court can no longer contemplate any reason why the case is not now *ripe* for review.

  2. Final Agency Action

  Federal Defendants nonetheless argue that the case is unfit for adjudication because there has been no "final agency action" as contemplated by the APA. As mentioned in the Court's request for supplemental briefing (Doc. 124 at 3–4), the Court's jurisdiction to adjudicate the claim upon which the pending motion is based—the ninth cause of action—derives from the APA. Though that claim also relies upon CVPIA § 3406(b)(23), the CVPIA does not itself create a private right of action, so the APA governs judicial review of any claim alleging that the CVPIA was violated. *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1197, 1212 (E.D. Cal. 2009), aff'd sub nom. *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676 (9th Cir. 2012). Under section 702 of the APA, "[a] person suffering wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review." 5 U.S.C. § 702. "When, as here,

---

[4] Federal Defendants anticipated that if the WFV Project was ultimately adopted, Plaintiff might amend the complaint to cure the ripeness issue. (*See* Doc. 129 at 5.) Plaintiff has now done so without objection. (*See* Docs. 140, 142.)

4

review is sought not pursuant to specific authorization in the substantive statute . . . the 'agency action' in question must be 'final agency action.'" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (citing 5 U.S.C. § 704)); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61–62, (2004) ("To maintain a cause of action under the APA, a plaintiff must challenge 'agency action' that is 'final.'"). In the Ninth Circuit, the final agency action requirement "has been treated as jurisdictional." *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 571 (9th Cir. 2019).

"Agency action" is defined in the APA, 5 U.S.C. § 551(13), to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." An "agency action" falls under one of "five categories of decisions made or outcomes implemented by an agency—'agency rule, order, license, sanction [or] relief.' " *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (quoting 5 U.S.C. § 551(13)). As the Supreme Court explained in *Norton*:

> All of those categories involve circumscribed, discrete agency actions, as their definitions make clear:
>
> 1. "[a rule is] an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy;
>
> 2. [an order is] a final disposition . . . in a matter other than rule making;
>
> 3. [a license is] a permit . . . or other form of permission;
>
> 4. [a sanction is] a prohibition . . . or taking [of] other compulsory or restrictive action; and
>
> 5. [a relief is] (a) a grant of money, assistance, license, authority, etc., or (b) recognition of a claim, right, immunity, etc., or (c) a taking of other action on the application or petition of, and beneficial to, a person."

*Norton*, 542 U.S. at 62 (quoting 5 U.S.C. §§ 551(4), (6), (8), (10), (11)). "While this definition is 'expansive,' federal courts "have long recognized that the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800–01 (9th Cir. 2013) (citing *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)).

5

For an action to be "final agency action" under the APA, two conditions must be met:

> 1. The action must mark the 'consummation' of the agency's decision making process and must not be of a merely tentative or interlocutory nature, and
>
> 2. The action must be (a) "one by which rights or obligations have been determined," or (b) "from which legal consequences flow."

*Bennett v. Spear*, 520 U.S. 154, 178 (1997). In other words, if the agency action is purely advisory and in no way affects the legal rights of the relevant actors it is not a "final agency action" under the APA. *Id.* In the Ninth Circuit, the core question is whether the agency has completed its decision-making process and whether the result of that process is one that will directly affect the parties. *Oregon Nat. Desert As'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). There are at least three circumstances in which an agency's action may be deemed final:

> 1. If the action "amounts to a definitive statement of the agency's position" or
>
> 2. If the action "has a direct and immediate effect on the day-to-day operations" of the subject party, or
>
> 3. If, based on the action, "immediate compliance with the terms is expected."

*Id.* A reviewing court should "focus on the practical and legal effects of the agency action" and should interpret the finality requirement "in a pragmatic and flexible manner." *Id.*

Federal Defendants argue that there has been no final agency action here, but the cases they rely upon are distinguishable. First, Federal Defendants cite a Fourth Circuit case, *Village of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186 (4th Cir. 2013), in which a community challenged how the U.S. Army Corps ("Corps") maintained an area within Wilmington Harbor. In 2000, the Corps formally approved revisions to a plan to widen, deepen, and realign Wilmington Harbor. *Id*. at 193. Concerned that the project would worsen ongoing effects of channel maintenance on nearby beaches, local communities sought and obtained commitments from the Corps, including that the Corps would make use of sand recovered from maintenance dredging by "nourishing" nearby beaches with that sand. *See id*. 189–90, 193. Crucially, the plaintiffs did not challenge the 2000 approval of the project plans; rather, they

6

1   challenged the Corps' performance of the "nourishment" activities in 2010. *Id*. at 193–94. The
2   Fourth Circuit held that the alleged action did not fall within any of the categories that qualify as
3   "agency action" because that kind of day-to-day operational activity was not a "determination."
4   *Id*.

5   Relatedly, Federal Defendants cite *Chemical Weapons Working Group, Inc. v. U.S. Dep't*
6   *of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997). In the late 1980s, the Army adopted a plan to
7   dispose of chemical weapons on-site at a particular location by means of incineration. *Id*. at 1487.
8   In 1996, the plaintiffs sued to block the Army from conducting trial burns in accordance with the
9   original plan. *Id*. at 1488. Among other things, the Tenth Circuit found that the claim was non-
10  justiciable because the Army's decision to commence trial burns did not qualify as final agency
11  action given that the record did not suggest "the Army has ever revisited the question of how
12  precisely it planned to destroy the chemical weapons [ ] since its 1989 Final Environmental
13  Impact Statement." *Id*. at 1494.

14  Similarly, in *Wild Fish Conservancy*, the Ninth Circuit found no discrete agency action
15  where the plaintiffs were "merely" alleging that Federal Defendants operated two dams in a
16  manner that obstructs fish passage through a particular creek during some or all parts of the year.
17  730 F.3d at 801. This was in part because, though "the act of closing the gates" on the dams "has
18  immediate physical consequences, such action is not fairly analogous to a 'rule, order, license,
19  sanction, [or] relief.'" *Id*. In addition the act was not "final" because it did not mark the
20  consummation of the agency's decisionmaking. Rather, the opening and closing of the dam gates
21  constituted "day-to-day operations that merely implemented [existing] operational plans" for
22  those dams. *Id*.

23  Federal Defendants argue that these cases control here because the WFV Project will
24  "implement actions already contemplated by the 2000 ROD" and therefore is simply a form of
25  performance under the ROD, rather than a "final disposition." (Doc. 129 at 8.)[5] However, unlike

---

[5] In the Court's view, Federal Defendants are, at least in some respects, making contradictory arguments by suggesting on the one hand that any challenge to the WFV Project was not ripe until Federal Defendants "adopted" the recommendation to implement the Project, while simultaneously arguing that Reclamation's eventual adoption does not constitute an "agency action" or "final agency action."

7

the projects discussed in *Village of Bald Head*, *Chemical Weapons Working Group*, or *Wild Fish Conservancy*, the record here suggests that recommendations made by the TMC—at least those related to the WFV Project—*were formally adopted by Federal Defendants*. (Doc. 132 (notifying the Court and the parties that "Federal Defendants have adopted the Trinity Management Council's recommendation"); *see also* Doc. 118-7 (TRROD Implementation Plan) ("All agencies will retain their existing authorities. However, when the TMC recommends a particular project or program, agencies will be expected to undertake those projects. If agencies do not implement the recommended actions or projects, they must explain to the TMC in writing why they have not done so.").) On the present record, the Court is unable to see how Reclamation's "adoption" decision would not constitute an "order" insofar as it is "a final disposition . . . in a matter other than rule making" that qualifies as an "agency action" under the APA. The record also suggests that the determination to proceed with the WFV Project is the "consummation" of a decision-making process that has real, practical, consequences and is therefore "final agency action."

The Court notes, however, that it does not necessarily need to issue a definitive decision on the above issue at this stage of the case because the motion fails on the likelihood of success prong. *See Tele-Physicians, P.C. v. Hailey*, No. 19-CV-1177-AJB-BGS, 2019 WL 3220160, at *3 (S.D. Cal. July 17, 2019) (where court was "uncertain" if it had subject matter jurisdiction, motion for injunctive relief was rejected because movants were unlikely to succeed on the merits); see also *Sec'y of Navy v. Avrech*, 418 U.S. 676, 678 (1974) (declining to decide difficult jurisdictional issue where merits question is far more obvious).[6]

**B.      Plaintiff is not Likely to Succeed on the Merits**

       1.      <u>Relevant Background</u>

Plaintiff maintains that it retains a right of concurrence regarding the flow changes

---

[6] The Court also finds it unnecessary to definitively address at this time Plaintiff's more unusual allegation that Federal Defendants' failure to seek Plaintiff's concurrence in the WFV Project qualifies as a "failure to act" that is independently cognizable under the APA. The Court notes, however, that facts and circumstances of this case do not obviously fit within the failure to act caselaw. Among other things, an APA "failure to act" claim "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All*., 542 U.S. 55, 64 (2004). If Plaintiff intends to pursue a failure to act theory in this case, it will have to contend with the Court's findings herein, namely that CVPIA § 3406(b)(23) does not appear to articulate the kind of concurrence requirement upon which Plaintiff's theory would have to rest.

8

recommended by the TMC. This assertion is premised on the language of CVPIA § 3406(b)(23), which provides in full:

> (b) . . . . The Secretary, in consultation with other State and Federal agencies, Indian tribes, and affected interests, is [ ] authorized and directed to:
>
> ***
>
> (23) In order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the Act of October 24, 1984, Pub. L. 98-541, provide through the Trinity River Division, for water years 1992 through 1996, an instream release of water to the Trinity River of not less than 340,000 acre-feet per year for the purposes of fishery restoration, propagation, and maintenance and,
>
>> (A) By September 30, 1996, the Secretary, after consultation with the Hoopa Valley Tribe, shall complete the Trinity River Flow Evaluation Study currently being conducted by the U.S. Fish and Wildlife Service under the mandate of the Secretarial Decision of January 14, 1981, in a manner which insures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and Trinity River Division operating criteria and procedures for the restoration and maintenance of the Trinity River fishery; and
>>
>> (B) Not later than December 31, 1996, the Secretary shall forward the recommendations of the Trinity River Flow Evaluation Study, referred to in subparagraph (A) of this paragraph, to the Committee on Energy and Natural Resources and the Select Committee on Indian Affairs of the Senate and the Committee on Interior and Insular Affairs and the Committee on Merchant Marine and Fisheries of the House of Representatives. If the Secretary and the Hoopa Valley Tribe concur in these recommendations, any increase to the minimum Trinity River instream fishery releases established under this paragraph and the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly. If the Hoopa Valley Tribe and the Secretary do not concur, the minimum Trinity River instream fishery releases established under this paragraph shall remain in effect unless increased by an Act of Congress, appropriate judicial decree, or agreement between the Secretary and the Hoopa Valley Tribe. Costs associated with implementation of this paragraph shall be reimbursable as operation and maintenance expenditures pursuant to existing law.
>
> If the Secretary and the State of California determine that long-term natural fishery productivity in all Central Valley Project controlled rivers and streams resulting from implementation of this section exceeds that which existed in

9

> the absence of Central Valley Project facilities, the costs of implementing those measures which are determined to provide such enhancement shall become credits to offset reimbursable costs associated with implementation of this subsection.

Broken down, §3406(b)(23) accomplishes several things. First, it directs the Secretary of the Interior ("Secretary") to release into the Trinity River "not less than 340,000 acre-feet per year for the purposes of fishery restoration, propagation, and maintenance" from 1992 (the year of the CVPIA's passage) to at least 1996. Second, it requires completion of the Trinity River Flow Evaluation Study ("Flow Study") "after consultation with the Hoopa Valley Tribe" and "in a manner which ensures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and Trinity River Division operating criteria and procedures for the restoration and maintenance of the Trinity River fishery." *Id*., § 3406(b)(23)(A). Finally, if the Secretary and the Hoopa Valley Tribe concur in the recommendations contained within the Flow Study, the Secretary "shall" implement: (a) any recommended increases to the 340,000 acre-foot-per year minimum Trinity River instream fishery releases established under § 3406(b)(23), and (b) the operating criteria and procedures set forth in the Flow Study. *Id*., § 3406(b)(23)(A). Alternatively, if the Secretary and Hoopa did not mutually agree with the recommendations of the Flow Evaluation Study, the minimum annual volume of 340,000 acre-feet would remain in place absent an Act of Congress, a judicial decree, or a subsequent agreement between the Secretary and Hoopa. *Id*.

The Flow Study was completed in 1999 by Federal Defendants and Plaintiff. (Doc. 138-1 ("Flow Study").) The Flow Study made several recommendations relevant here. First, it recommended that the 340,000 acre-foot per year minimum set forth in CVPIA 3406(b)(23) be increased significantly, according to water year type as follows:

| Water Year Class | Annual Instream Volume |
|---|---|
| Extremely Wet | 815,200 |
| Wet | 701,000 |
| Normal | 646,900 |
| Dry | 452,600 |
| Critically Dry | 368,600 |

(Flow Study at p. xxxi.) Second, the Flow Study included in its Appendix M daily flow schedule that prescribe specific, daily release volumes from Lewiston Dam to the Trinity River. Specifically, from October 1 through October 15 each year, releases were set at 450 cubic feet per second (cfs); from October 16 through April 21 of each year, releases were set at 300 cfs. (*Id*. at p. M-2–M-3.) Finally, the Flow Study recommended the use of Adaptive Environmental Assessment and Management (AEAM)[7] to "guide future management and ensure the restoration and maintenance of the fishery resources of the Trinity River." (*Id*. at p. xxv.) In invoking AEAM, the Flow Study acknowledged:

> Alluvial river systems are complex and dynamic. While our understanding of these systems and our predictive capabilities are extensive some uncertainty over how the river and the fishery resources will react to the proposed recommendations still exists. Nonetheless resource managers must make decisions and implement plans despite these uncertainties. ***AEAM provides a structured mechanism for fine-tuning management recommendations in relation to the recommended flows***, sediment management, and channel rehabilitation activities."

(*Id*. at p xxxv (emphasis added).)

The Flow Study laid out the central components of the recommended AEAM program, including the formation of the TMC, which would be supported by other teams, including a Technical Modeling an Analysis Team, and a Scientific Advisory Board. (*Id*. at p. 287–88.) According to the Flow Study, "[t]he TMC would approve fishery restoration plans and any proposed changes to annual operating schedules submitted by the Technical Modeling and Analysis Team." (*Id*. at p. 287.)

In 2000, Reclamation issued the TRROD, which adopted the Flow Study's recommendations. (TRROD at p. 8 ("The Preferred Alternative, as described in the FEIS/EIR[8] and summarized in this ROD, adopts the recommendations contained in the [Flow Study]."); *see also* Doc. 118-7 (FEIS/EIR).) This included adoption of the increased ***annual instream volumes***

---

[7] The Flow Study defines AEAM as "a formal, systematic, and rigorous program of learning from the outcomes of management actions, accommodating change, and improving management." (Flow Study at p. N-2.)

[8] The specific implementation plan for the TRROD is set forth in a Final Environmental Impact Statement/ Environmental Impact Report ("FEIS/EIR") that is incorporated into the TRROD by reference. (TRRROD at p. 26.)

11

provided in the table above. (TRROD at p. 12-13, set forth in "Table 1"). In addition, the TRROD adopted the recommended *daily flow schedule* included in Appendix M, and the AEAM program. (*See id*. at p. 10.) The TRROD specifically discusses the AEAM as a component of the "selected alternative":

> AEAM Program, guided by a Trinity Management Council (TMC) established as part of this decision and by sound scientific principles, will ensure the proper implementation of these measures, conduct appropriate scientific monitoring and evaluation efforts, and recommend possible adjustments to the annual flow schedule within the designated flow volumes provided for in this ROD or other measures in order to ensure that the restoration and maintenance of the Trinity River anadromous fishery continues based on the best available scientific information and analysis.

(*Id*. at p.3.) The TRROD also specifically delineates what can and cannot be modified by the AEAM program:

> Based on subsequent monitoring and studies guided by the Trinity Management Council, *the schedule for releasing water on a daily basis, according to that year's hydrology, may be adjusted but the annual flow volumes established in Table 1 may not be changed*.

(*Id*. at p. 12 (emphasis added).)

Hoopa formally concurred in and agreed with the TRROD's recommendations and decisions by way of a tribal resolution dated December 18, 2000. (*See id*. at p. 26.) The then-Chairperson of the Tribe signed the TROOD on December 19, 2000. (*Id*.)

On October 29, 2003, the TMC's formal by-laws were adopted by the founding members of the TMC. (Doc. 118-1 ("TMC By-Laws".) Among the signatories was a representative of Plaintiff. (*Id*. at 9.) Section 201 of the TMC By-Laws lists the "specific purposes" of the TMC, which include "[e]stablish[ing] and guide[ing] implementation of an adaptive management program to implement and monitor the physical and biological components of the [TRROD and FEIS/EIR]" and "guid[ing] the development of recommended annual flow schedules." (*Id*. at 3.) Section 603 sets forth the voting procedure for setting policy and making decisions:

> SECTION 603. VOTING RIGHTS, MAJORITY. It is the intent of the TMC that as designated representatives of member agencies and tribes, there will be active participation in setting policy and making decisions for the Program. No member shall have more than one vote. An affirmative vote of 7 is required to pass a motion when all

>8 members are present. Six affirmative votes are required to pass a motion when only a quorum of 6 or 7 members are present.

(*Id*. at 7.)

According to the SAC, in late 2021, Reclamation proposed implementing a version of the WFV Project during the 2022 Water Year,[9] (SAC, ¶ 10), but a TMC vote to recommend implementation did not pass. (*Id*., ¶ 110.) Reclamation did not implement the WFV Project in Water Year 2022. (*Id*.)

As mentioned above, on December 7, 2022, the TMC voted 7-1 in favor of recommending implementation of the WFV Project in the 2023 Water Year, with Plaintiff voting against adoption. (*See* SAC, ¶ 112; *see also* Docs. 118-2 at 10 (12/7/22 TMC minutes).) On January 30, 2023, Federal Defendants adopted the TMC's recommendation, over Hoopa's objections. (*Id*., ¶¶ 114–16.)

### 2. Analysis

The Court now turns to Plaintiff's essential argument: that it retains "concurrence" right—that effectively amounts to a veto—over any decision to change the daily release schedule set forth at Appendix M of the Flow Study and incorporated into the TRROD. At its core, this is a statutory interpretation argument based on CVPIA § 3406(b)(23). As with all statutory interpretation questions, the Court begins with the text itself; the inquiry ends there if the text is unambiguous. *GCIU-Emp. Ret. Fund v. MNG Enterprises, Inc*., 51 F.4th 1092, 1097 (9th Cir. 2022). "If the statutory language is plain, [the court] must enforce it according to its terms." *King v. Burwell*, 576 U.S. 473, 486 (2015). In doing so, the court "must read the words in their context and with a view to their place in the overall statutory scheme." *Id*. (internal quotations and citations omitted).

The Court has quoted the text of § 3406(b)(23) above in its entirety but produces it here again, this time with emphasis on the language the Court believes is particularly important to its analysis:

///

---

[9] A "Water Year" runs from October 1 – September 30. (*See* SAC, ¶ 110.) So, for example, Water Year 2022 ran from October 1, 2021–September 30, 2022. (*Id*.)

(b) . . . . ***The Secretary***, in consultation with other State and Federal agencies, Indian tribes, and affected interests, ***is [ ] authorized and directed to***:

***

(23) In order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the Act of October 24, 1984, Pub. L. 98-541, ***provide through the Trinity River Division, for water years 1992 through 1996, an instream release of water to the Trinity River of not less than 340,000 acre-feet per year*** for the purposes of fishery restoration, propagation, and maintenance and,

(A) By September 30, 1996, ***the Secretary, after consultation with the Hoopa Valley Tribe, shall complete the Trinity River Flow Evaluation Study*** currently being conducted by the U.S. Fish and Wildlife Service under the mandate of the Secretarial Decision of January 14, 1981, ***in a manner which insures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and Trinity River Division operating criteria and procedures for the restoration and maintenance of the Trinity River fishery***; and

(B) Not later than December 31, 1996, the Secretary shall forward the recommendations of the Trinity River Flow Evaluation Study, referred to in subparagraph (A) of this paragraph, to the Committee on Energy and Natural Resources and the Select Committee on Indian Affairs of the Senate and the Committee on Interior and Insular Affairs and the Committee on Merchant Marine and Fisheries of the House of Representatives. ***If the Secretary and the Hoopa Valley Tribe concur in these recommendations, any increase to the minimum Trinity River instream fishery releases established under this paragraph and the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly.*** If the Hoopa Valley Tribe and the Secretary do not concur, the minimum Trinity River instream fishery releases established under this paragraph shall remain in effect unless increased by an Act of Congress, appropriate judicial decree, or agreement between the Secretary and the Hoopa Valley Tribe. Costs associated with implementation of this paragraph shall be reimbursable as operation and maintenance expenditures pursuant to existing law.

If the Secretary and the State of California determine that long-term natural fishery productivity in all Central Valley Project controlled rivers and streams resulting from implementation of this section exceeds that which existed in the absence of Central Valley Project facilities, the costs of implementing those measures which are determined to provide such enhancement shall become credits to offset

14

reimbursable costs associated with implementation of this subsection.

(Emphasis added.)

Though the plain language of the statute indisputably gives Hoopa a concurrence right, that right is defined by the language of the statute, which must be read in context. Specifically, Hoopa was given the right to "concur in these recommendations." § 3406(b)(23)(B). The "these recommendations" language is a direct and unambiguous reference to the anticipated recommendations of the Flow Study, which was discussed in detail in the immediately preceding paragraph. § 3406(b)(23)(A).[10]

The statute further provides that if Hoopa gives its concurrence in the Flow Study's recommendations, "any increase to the minimum Trinity River instream fishery releases established under [§ 3406(b)(23)] and the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly." It is likewise unambiguous that the "minimum Trinity River instream fishery releases" refers to the minimum 340,000 acre-feet per year that the Secretary was directed to provide unless and until new minimums were set, either by concurrence between the Secretary and Hoopa or by an Act of Congress. The "operating criteria and procedures" language references the criteria and procedures that the Flow Study was anticipated to (and would eventually) recommend.

As mentioned, the Flow Study's recommendations were eventually embodied in the TRROD and included the AEAM procedures that were followed when the TMC recommended making changes to the daily flow schedules. Nothing in the statutory language suggests that Hoopa retains an ongoing "concurrence right" regarding recommendations made or actions taken within the scope of the TRROD's AEAM procedures—*procedures with which Hoopa has already concurred*. On the present record, the Court finds that the text of § 3406(b)(23) is simply not amenable to Plaintiff's position.

---

[10] Relatedly, the statute delineates exactly what the Flow Study's recommendations would encompass. The Secretary is directed to complete the Trinity River Flow Evaluation Study (after having consulted with Plaintiff) to "develop[] recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and Trinity River Division operating criteria and procedures for the restoration and maintenance of the Trinity River fishery." § 3406(b)(23)(A).

Moreover, to the extent extrinsic evidence is even relevant given what appears at this stage to be unambiguous statutory language, the Court could not locate any reference in any of the relevant decision documents (the Flow Study, the TRROD, and the lengthy FEIS/EIR) that suggests Hoopa retains a veto power over decisions that fall within the scope of the TMC's authority.

The Court is not persuaded by any of Plaintiff's arguments in reply. For the most part, those arguments do not directly address the statutory language and are therefore largely unhelpful. For example, Plaintiff cites Section 301 of the TMC By-Laws, which states that "[a]ll federal, state, and local agencies and tribes shall retain their existing authorities, and reserve the right to comply with internal policies and procedures." (Doc. 118-1 at 4.) This generic language does nothing to change the fact that the concurrence right Hoopa claims to possess does not appear in § 3406(b)(23).

For the reasons set forth above, the Court finds that there is no likelihood of success on the merits. For the same reasons, the Court finds there are no "serious questions" going to the merits. As a result, and in the interest of expedience, the Court finds it unnecessary to address the other prongs of the injunctive relief test. Consequently, the Court **DENIES** Hoopa Valley tribe's motion for preliminary injunction. (Doc. 108)

IT IS SO ORDERED.

Dated: __**February 7, 2023**__

UNITED STATES DISTRICT JUDGE