1
2
3
4
5
6

Thane D. Somerville WSBA #31468 *pro hac vice*
Thomas P. Schlosser WSBA #06276 *pro hac vice*
MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE
811 First Avenue, Suite 218
Seattle, WA 98104
Tel:    206-386-5200
Fax:    206-386-7322
t.somerville@msaj.com
t.schlosser@msaj.com
Attorneys for Plaintiff Hoopa Valley Tribe

7

UNITED STATES DISTRICT COURT

8

FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10
11
12
13
14
15
16
17
18
19
20
21

| | |
|---|---|
| HOOPA VALLEY TRIBE, | )   Civ. No. 1:20-cv-1814-JLT-EPG |
|       Plaintiff, | ) |
|       v. | )   MEMORANDUM IN SUPPORT OF |
| UNITED STATES BUREAU OF RECLAMATION; DEBRA ANNE HAALAND, in her official capacity as Secretary of the Interior; MARIA CAMILLE CALIMLIM TOUTON, in her official capacity as Commissioner of the United States Bureau of Reclamation; ERNEST A. CONANT, in his official capacity as United States Bureau of Reclamation California-Great Basin Regional Director; and UNITED STATES DEPARTMENT OF THE INTERIOR | )   PLAINTIFF HOOPA VALLEY TRIBE'S MOTION FOR PRELIMINARY INJUNCTION |
|       Defendants. | )   Date:  March 20, 2023 |

Date:  March 20, 2023
Time:  9:00 AM
Courtoom:    4 – 7th Floor, Fresno
Judge:        Hon. Jennifer L. Thurston

22
23
24
25
26

PLAINTIFF'S MEMORANDUM IN SUPPORT
OF PRELIMINARY INJUNCTION - i

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ........................................... 3

    A.   Federal Indian Law and Reclamation Law Established Hoopa's Vested Property Rights in the Trinity River Fishery. ................................................. 4

    B.   To Protect Tribal Rights, Congress and the Secretary Took Action to Restore Fish and Fish Habitat to Pre-Project Levels. .............................................. 5

    C.   Hoopa and the U.S. Fish and Wildlife Service Jointly Prepare and, in June 1999, Finalize the Trinity River Flow Study ........................................... 6

    D.   The Secretary and Hoopa Concur in the Recommendations and Sign the ROD. ......... 6

    E.   Federal Defendants Recently Approved Significant Modification to the Timing and Amounts of ROD Flow Releases Without NEPA Compliance. ................................... 7

    F.   Hoopa Has Previously Requested this Court to Enjoin the WFV Project to Prevent Irreparable Harm. ............................................................. 8

III.    ARGUMENT .......................................................................................................... 10

    A.   This Court Should Issue a Preliminary Injunction to Prevent Irreparable Harm Resulting from Defendants' Decision to Approve the Trinity River WFV Project in the Absence of NEPA Compliance. .................................................. 10

    B.   Hoopa Is Likely to Prevail on the Merits of Its Claim That Defendants Failed to Comply with NEPA Prior to Approving the WFV Project. ......................................... 11

    C.   Hoopa Will Suffer Irreparable Harm Absent Injunctive Relief. ................................ 15

    D.   The Balance of Hardships Tips Strongly in Hoopa's Favor. ..................................... 18

    E.   An Injunction Would Be In the Public Interest. ...................................................... 18

    F.   No Bond Should Be Required in This Action to Protect Trinity River Resources. ... 19

IV.     CONCLUSION ...................................................................................................... 20

1

## TABLE OF AUTHORITIES

2

**Cases**

3
*Alliance for Wild Rockies v. Cottrell*
      622 F.3d 1045 (9th Cir. 2010) ................................................................. 15

4

*Amoco Prod. Co. v. Village of Gambell*
      480 U.S. 545 (1987)............................................................................... 16
5

6
*Blake v. Arnett*
      663 F.2d 906 (9th Cir. 1991) ................................................................... 4

7
*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*
      575 F.3d 999 (9th Cir. 2009) ................................................................. 11
8

9
*Ctr. for Food Safety v. Vilsack*
      753 F. Supp. 2d 1051 (N.D. Cal. 2010) ................................................. 16

10
*Davis v. Minetta*
      302 F.3d 1104 (10th Cir. 2002) ............................................................. 19
11

12
*Environmental Defense Fund v. Corps of Engineers*
      331 F. Supp. 925 (D.D.C. 1971) ........................................................... 19

13
*Foundation on Econ. Trends v. Heckler*
      756 F.2d 143, 244 U.S. App. D.C. 122 (D.C. Cir. 1985) ...................... 16

14

15
*High Sierra Hikers Ass'n v. Blackwell*
      390 F.3d 630 (9th Cir. 2004) ...................................................... 10, 12, 14

16
*Mattz v. Arnett*
      412 U.S. 481 (1973).................................................................................. 4

17
*Parravano v. Babbitt*
      70 F.3d 539 (9th Cir. 1995) ...................................................................... 4
18

19
*People ex rel. Van de Kamp v. Tahoe Regional Planning Authority*
      766 F.2d 1316 (9th Cir. 1985) ............................................................... 19

20
*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*
      826 F.3d 1030 (8th Cir. 2016) ............................................................... 19

21

22
*Robertson v. Methow Valley Citizens Council*
      490 U.S. 332 (1989)............................................................................... 11

23
*Save Strawberry Canyon v. Dept. of Energy*
      613 F. Supp. 2d 1177 (N.D. Cal. 2009) ................................................. 16

24
*Save the Yaak Committee v. Block*
      840 F.2d 714 (9th Cir. 1988) ................................................................. 14
25

26
*Short v. United States*
      202 Ct. Cl. 870 (1973) .............................................................................. 4

*State of Alabama ex rel. Baxley v. Corps of Engineers*
   411 F. Supp. 1261 (N.D. Ala. 1976) ........................................................ 19

*United States v. Eberhardt*
   789 F.2d 1354 (9th Cir. 1986) ................................................................... 4

*United States v. Washington*
   853 F.3d 946 (9th Cir. 2017)
   *affirmed per curiam*, 584 U.S. _____ (2018) ............................................ 5

*Wilderness Society v. Tyrrel*
   701 F. Supp. 1473 (E.D. Cal. 1988) ........................................................ 19

*Winter v. Natural Resources Defense Council*
   555 U.S. 7 (2008)........................................................................... 10, 18

**Statutes**

40 C.F.R. §§ 1500-1508 (2020) .......................................................... passim

Administrative Procedure Act (APA) .......................................................... 10

Central Valley Project Improvement Act ("CVPIA")
   Pub Law No. 102-575, § 3404-3406, (1992)......................................... passim

National Environmental Policy Act (NEPA)
   42 U.S.C. §4321 *et seq* ........................................................ 2, 11, 13, 19

**Other Authorities**

Solicitor Opinion
   M-36979 (1993)............................................................................... 4, 5

**Rules**

L.R. 231(b).......................................................................................... 9

## I.     INTRODUCTION

The 2000 Trinity River Record of Decision (ROD) prescribes specific permanent minimum flow releases and operating criteria and procedures (OCAP) designed to restore the fishery in specific portions of the Trinity River located below Lewiston Dam, which were devastated by the development and operation of the Trinity River Division (TRD) of the Central Valley Project (CVP).  *See* Dkt. #142-8 (ROD).  The ROD's schedule of minimum flow releases is based on recommendations of a comprehensive scientific flow study co-authored by the Hoopa Valley Tribe and completed in 1999, known as the Trinity River Flow Evaluation Report ("Flow Study").  *See* Dkt. #138-1 (Flow Study).  In § 3406(b)(23) of the 1992 Central Valley Project Improvement Act (CVPIA), Public Law 102-575, Title XXXIV, Congress directed the Secretary of the Interior to implement the recommended flows and OCAP, but only if the Hoopa Valley Tribe concurred in the recommendations.  Hoopa did concur in the recommendations, signing the Trinity River ROD along with the Secretary of the Interior in 2000.

The ROD, pursuant to the recommendations in the Flow Study, allocates a limited quantity of water for specific fishery restoration purposes throughout the year.  The ROD flow schedule provides for a uniform winter base flow of 300 cfs between the dates of October 16 through April 1 of each year in all water year types.  After the water year type determination is made on April 1, increased flows in Spring/Summer months occur.  Since the ROD was approved, until now, Defendants have rigorously adhered to the prescribed winter base flow schedule of 300 cfs, leaving sufficient water to achieve fishery restoration purposes prescribed in the ROD in Spring and Summer months.

On January 30, 2023, Defendants approved an unprecedented proposal known as the Trinity River Winter Flow Variability (WFV) Project.   The WFV Project would significantly and substantively alter the flow regime prescribed in the ROD.  In fact, as much as 16—27% of the entire annual flow volume prescribed under the ROD would be re-allocated to providing additional winter flow releases above and beyond the 300 cfs uniform base flow, depriving the

river of that water in the Spring and Summer months as called for in the ROD.  Specifically, in the 2023 water year, Defendants will release the additional water in the form of an elevated daily baseflow between February 15 and April 15, 2023.  Orcutt Declaration, Exhibits 1-2.[1]

The amount of water provided by the ROD is expressly limited.  The re-allocation of substantial water called for in the WFV Project means that water intended to be released in certain months of the year under the ROD will not be available because it has been re-allocated for release in prior months pursuant to the WFV Project.  Defendants' proposal to release tens of thousands of acre-feet of water prior to the dates called for in the ROD (and before the water year type is even known) means that water will not be available for its intended purposes (as described in the Flow Study and ROD) later in the Spring and early Summer.  If the water currently called for in the ROD is ultimately necessary for fish in Spring and Summer, it will no longer be available because it will already have been used pursuant to the WFV Project.

Although the WFV Project is an unprecedented proposal that would significantly affect the Trinity River environment, its fishery, tribal trust resources, and species listed under the Endangered Species Act, Defendants did not comply with the National Environmental Policy Act (NEPA), 42 U.S.C. §4321 et seq, or its implementing regulations, 40 C.F.R. Parts 1500-1508, prior to approving the WFV Project.  Despite starting a NEPA process in 2021 for a prior version of the WFV Project, Defendants failed to conduct any NEPA analysis whatsoever for the recently-approved version of the WFV Project.  Defendants did not issue any Finding of No Significant Impact (FONSI) or Environmental Impact Statement (EIS) prior to approving the

---

[1] While the WFV Project, as designed, calls for increased flow releases between December 15 and February 15 of the 2023 water year (known as the "Flow Synchronization Period"), those flow releases did not occur this year because the Defendants did not approve the WFV Project until January 30 and will not commence implementation until February 15.  Thus, the water releases under the WFV Project will occur as "elevated baseflow" through April 15, 2023.  Orcutt Declaration, Exh. 1 (Dec. 9 TMC letter); Exh. 2 (Notice re Implementation).

PLAINTIFF'S MEMORANDUM IN SUPPORT
OF PRELIMINARY INJUNCTION - 2

WFV Project.[2] Nor did Defendants provide the public with a determination of whether the WFV Project has significant environmental effects.  Defendants have wholly ignored NEPA compliance and Plaintiff is likely to prevail on its claim that Defendants have violated NEPA.

Federal Defendants intend to commence implementation of the WFV Project and its substantial flow releases imminently.  Specifically, starting February 15, 2023, and continuing through April 15, 2023, Defendants will elevate the winter base flows beyond the 300 cfs uniform flow called for in the ROD.  This will correspondingly reduce the amount of water available to achieve fishery restoration purposes specified in the ROD in later Spring/Summer months.   If not enjoined, this unlawful re-allocation of water will cause irreparable harm to the Trinity River, its fishery, and thus to Hoopa.  Declaration of Michael Orcutt.  Once water is released pursuant to the WFV Project, it is forever lost for use for its intended purposes under the ROD later in the year.  This is, by definition, irreparable harm that warrants the issuance of preliminary injunctive relief.

## II.        FACTUAL AND PROCEDURAL BACKGROUND

On January 30, 2023, Defendants approved the WFV Project.  Dkt. #142, Exh. 36. Defendants' decision to approve the WFV Project will allow Reclamation to make substantial releases of water (between 16 - 27% of total annual flow volumes) from Lewiston Dam between February 15, 2023, and April 15, 2023, which will make that water wholly unavailable for use later in the year as currently prescribed by the Trinity River ROD. Orcutt Declaration, Exhs. 1-2.

Defendants failed to comply with NEPA prior to approving the WFV Project. Defendants' decision to approve and implement the WFV Project in the absence of NEPA compliance is unlawful.  Defendants' decision will result in irreparable harm to Plaintiff given its rights and interests in the Trinity River and its fishery, as described in more detail below.

---

[2]  Defendants prepared a Draft EA following the 2021 proposal, but then cancelled that proposal in February 2022.  No Draft EA was prepared in advance of the 2023 water year WFV Project.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**A. Federal Indian Law and Reclamation Law Established Hoopa's Vested Property Rights in the Trinity River Fishery.**

Hoopa and its people have lived along the Trinity River, and relied upon its fish resources, since time immemorial. The United States government located and set aside the Hoopa Valley Reservation, which the Trinity River flows through, on August 21, 1864. *Mattz v. Arnett*, 412 U.S. 481, 490, fn. 9 (1973); *Short v. United States*, 202 Ct. Cl. 870, 875-980 (1973). On June 23, 1876, President Grant issued an Executive Order formally setting aside the Reservation for "Indian purposes." *Short*, 202 Ct. Cl. at 877. Traditional salmon fishing is one of the "Indian purposes" for which the Reservation was created. *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995).

In 1864, the United States determined the Reservation a suitable permanent homeland for two principal reasons. First, the Reservation is within the heart of Hoopa's aboriginal lands, which Hupa Indians occupied and fished upon for generations.[3] *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995). Hupa Indians possessed fishing and hunting rights long before contact with white settlers and their salmon fishery was "not much less necessary to [their existence] than the atmosphere they breathed." *Id.* at 542, *quoting Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir. 1991). Second, the Reservation set aside resources of the Trinity and Klamath rivers for Hupa people to be self-sufficient and achieve a moderate living based on fish. *United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986).

Hoopa's rights entitle Hoopa and its people to take fish from the Trinity and Klamath Rivers for ceremonial, subsistence, and commercial purposes. *Eberhardt*, 789 F.2d at 1359. In 1993, the Interior Solicitor Leshy examined the "history of the [Hoopa] reservation, the Indians' dependence on the Klamath and Trinity River fisheries, the United States' awareness of that dependence, and the federal intent to create the reservation in order to protect the Indians' ability

---

[3] Hupa are the people of the federally-recognized Hoopa Valley Tribe.

PLAINTIFF'S MEMORANDUM IN SUPPORT
OF PRELIMINARY INJUNCTION - 4

to maintain a way of life, which included reliance on the fisheries.  1993 Solicitor Opinion M-36979, p. 3.  Solicitor Leshy found: "[T]he Government intended to reserve for the [Hoopa] a fishing right which includes a right to harvest a sufficient share of the resource to sustain a moderate standard of living." *Id.* at p. 21.  Hoopa's rights are not satisfied simply by the presence of fish in the river, but rather by the harvesting of an adequate supply of fish by Hoopa's people.  *United States v. Washington*, 853 F.3d 946, 958, 965-66 (9th Cir. 2017)*, affirmed per curiam*, 584 U.S. ____ (2018) ("moderate living" standard requires protection of continued supply of fish for the Tribes).

### B.  To Protect Tribal Rights, Congress and the Secretary Took Action to Restore Fish and Fish Habitat to Pre-Project Levels.

In 1992, following decades of destruction of the Trinity River and its resources from Reclamation's TRD/CVP operations, Congress passed the CVPIA.  Section 3406(b)(23) of the CVPIA required the Secretary to take specific actions "in order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the [1984 Act.]."  CVPIA, §3406(b)(23).   First, the Secretary was directed to release, during water years 1992 through 1996, an instream release of not less than 340,000 acre-feet for the purpose of fishery restoration, propagation, and maintenance.  This was the amount of flow directed by the Secretary in 1981 and which releases continued up to passage of the CVPIA.  Second, Congress directed the Secretary, "after consultation with the Hoopa Valley Tribe," to complete the Flow Study by September 30, 1996 "in a manner which insures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and [TRD] operating criteria and procedures for the restoration and maintenance of the Trinity River fishery."  CVPIA §3406(b)(23)(A).  Third, following completion of the Flow Study and its recommendations, Congress directed that:  "If the Secretary and the Hoopa Valley Tribe concur in these recommendations, any increase to the minimum Trinity River instream fishery releases established under this paragraph and the

PLAINTIFF'S MEMORANDUM IN SUPPORT
OF PRELIMINARY INJUNCTION - 5

operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly."  CVPIA §3406(b)(23)(B).

**C.  Hoopa and the U.S. Fish and Wildlife Service Jointly Prepare and, in June 1999, Finalize the Trinity River Flow Study**

Pursuant to the authority of CVPIA § 3406(b)(23), the Secretary made the Hoopa Valley Tribe and the U.S. Fish and Wildlife Service coauthors of the Flow Study, which they completed, and the Department published in 1999.  See Dkt. #138-1.

Prior to TRD development, the Trinity River was a "dynamic alluvial river," in which plentiful salmon spawning and rearing habitat existed.  Dkt. #138-1, Executive Summary, p. xxvi.  In the Flow Study, scientists analyzed the fundamental attributes of an alluvial river and how those attributes could be restored (in part) through carefully managed flow releases.  *See* Flow Study, Executive Summary.  The Flow Study recommended a variable flow regime and management actions (dependent on water year type) to rehabilitate habitat in the mainstem channel of the Trinity River between Lewison Dam and the Klamath confluence at Weitchpec. *See* Dkt. #138-1, Chapter 8, Recommendations.  The Flow Study recommended a total minimum annual volume of water dependent on water year type and provided detailed recommendations for specific volumes of releases at specific times of year, along with a discussion of the purpose and benefits of providing those specific volumes at specific times.  *Id.*, Tables 8.5 – 8.7.  The Flow Study's recommendations were carefully developed by Hoopa and federal scientists at Congress' direction to achieve specific management objectives and habitat-restorative purposes on the mainstem Trinity River.  *Id.*, Ch. 8, Tables 8.2-8.3. The Flow Study allocated all available annual flow amounts in the recommended flow regimes to meet the intended objectives.

**D.  The Secretary and Hoopa Concur in the Recommendations and Sign the ROD.**

In the Trinity River ROD, the Secretary and Hoopa accepted and concurred in the Flow Study's recommendations.  Those adopted recommendations were "based on the extensive scientific studies contained in the [Flow Study]" and offered "the most practical and

scientifically based restoration strategy." Dkt. #142-8, ROD, p. 8.  The ROD "represents the culmination of over two decades of efforts aimed at understanding the necessary instream flow and physical habitat restoration requirements in order to restore the Trinity River anadromous fishery."    Appendix B of the ROD contains detailed release prescriptions (sometimes on a day-by-day basis) that track the recommendations in the Flow Study.  For the time-period of October 16 through April 21, a uniform flow of 300 cfs was adopted across all water years per the Flow Study recommendations.  As described in Chapter 8 of the Flow Study, providing lower flows in those time periods in and around winter allowed for correspondingly higher flows to occur in later Spring and Summer months, after the water-year type was known.  The flows in the ROD do not contain any surplus water that can be repurposed without compromising the ROD's intended objectives. Orcutt Declaration, ¶12-19. Increasing ROD flows in one time-period of the year will necessarily result in decreasing ROD flows in other times of year.  *Id.*

### E.  Federal Defendants Recently Approved Significant Modification to the Timing and Amounts of ROD Flow Releases Without NEPA Compliance.

In 2021, Defendants formally proposed implementation of the Trinity WFV Project. Reclamation initiated a NEPA process for the WFV Project on May 18, 2021, by issuing a scoping notice. Dkt. #142, Ex. 31, [Draft EA, Appendix A].  Reclamation took public comment on the WFV Project pursuant to NEPA from May 18 through June 18, 2021.  *Id.*  In September 2021, Reclamation prepared a Draft EA analyzing the impacts of the WFV Project. Dkt. #142, Ex. 31. The Draft EA states that Reclamation prepared it "to meet the requirements of [NEPA]." *Id.*, p. 1.  The Draft EA evaluated the environmental impacts of the "Proposed Action" which is the WFV Project.  *Id.*   The Draft EA adds: "If there are no significant environmental impacts identified as a result of the analyses, and Reclamation decides to select the Proposed Action [the WFV Project], a Finding of No Significant Impact (FONSI) may be signed to complete the NEPA compliance process."  *Id.*   The WFV Project was not implemented for the 2022 water year (October 1, 2021 – September 30, 2022). On February 4, 2022, Reclamation published a

status report on the EA for the WFV Project stating: "Consideration of this action has been canceled." https://www.usbr.gov/mp/nepa/nepa_project_details.php?Project_ID=50427.

In 2022, Reclamation again proposed to implement the WFV Project for the 2023 water year.  But this time, Reclamation took no steps under NEPA.  Reclamation did not issue any scoping notice, nor prepare a Draft EA.  And, even if Reclamation contends that the prior scoping and Draft EA could be used to support the WFV Project in the 2023 water year, Reclamation never completed the NEPA process to evaluate and make determinations of the impacts of the WFV Project and never issued a FONSI as required by 40 C.F.R. § 1501.6(a), or an EIS.

Reclamation's last communication to the general public, regarding the NEPA process for the WFV Project, is Reclamation's notice on its website dated February 4, 2022 that "consideration of this action [WFV Project] has been cancelled." Reclamation did not inform the public, through NEPA processes, that it proposed to implement the WFV Project for the 2023 water year.  Nor did Reclamation ever determine, as required by 40 C.F.R. § 1501.6(a), that the proposed action [WFV Project] will not have significant effects. Since Reclamation did not issue any FONSI (or EIS), it never completed the NEPA process. 40 C.F.R. §1501.6(a).  Although they did not complete a NEPA process, Defendants proceeded to approve the WFV Project on January 30, 2023, and are scheduled to commence implementation on February 15, 2023.

### F.  Hoopa Has Previously Requested this Court to Enjoin the WFV Project to Prevent Irreparable Harm.

On December 7, 2022, the Trinity Management Council (TMC) (an advisory body to the Secretary of the Interior), voted 7-1 in favor of implementing the WFV Project.  On December 9, 2022, the TMC sent a letter to Defendant Ernest Conant, Reclamation California Great Basin Regional Director and Paul Souza, US Fish and Wildlife Service Regional Director that included the TMC's recommended 2023 flow schedule incorporating the WFV Project.  Orcutt Declaration, Exh. 1.

PLAINTIFF'S MEMORANDUM IN SUPPORT
OF PRELIMINARY INJUNCTION - 8

The WFV Project was initially scheduled to commence on December 15, 2022.  On December 16, 2022, Hoopa filed a motion for Preliminary Injunction on grounds that Defendants violated CVPIA § 3406(b)(23) by failing to seek or obtain Hoopa concurrence regarding the WFV Project. Dkt. #108. On January 30, 2023, Defendants approved the TMC recommendation and notified the Court and parties of Defendants' intent to commence implementation on February 14, 2023.   Dkt. #142, Exh. 36.  Defendants did not complete environmental review or issue any FONSI (or EIS) with their approval; thus, failing to comply with NEPA.

On February 1, 2023, Plaintiff filed for leave to amend its complaint to challenge Defendants' approval of the WFV Project on grounds that it violated CVPIA § 3406(b)(23) and NEPA. Dkt. #134.  On February 7, 2023, the Court granted leave to amend (Dkt. #140) and Plaintiff filed its Second Amended and Supplemental Complaint (SAC) (Dkt. #142) that same day.

On February 7, 2023, after filing its SAC, Plaintiff filed an Amended Motion for Preliminary Injunction, or in the alternative, Temporary Restraining Order (Amended Motion), which was based on the new NEPA allegations in the SAC, requesting relief on or before February 13, 2023.  On February 8, 2023, this Court ruled that Plaintiff's Amended Motion operated as a request for a TRO and denied the requested TRO pursuant to Local Rule 231(b) on grounds that the request was untimely.[4]  Thus, since a TRO is not available to Plaintiff, Plaintiff has filed this Motion for Preliminary Injunction to address the merits of Plaintiff's NEPA

---

[4] Plaintiff filed its Amended Motion for Preliminary Injunction or, in the alternative, TRO (Dkt. #143) on the same day and approximately seven hours after it filed its SAC (Dkt. #142), which was also the same day that the Court granted Plaintiff leave to file the SAC (Dkt. #140).  Plaintiff maintains that it would have been premature and improper for Plaintiff to file a motion for injunctive relief based on the new NEPA claims prior to the Court's granting leave to file the SAC containing those new NEPA claims.  Local Rule 231(c) provides that no hearing on a TRO will normally be set absent the filing of a complaint.  The NEPA claims did not arise until Defendants issued their approval decision on January 30, 2023, without any corresponding NEPA documentation.  Plaintiff submits that it filed its Amended Motion as soon as practicable under the circumstances and pursuant to applicable rules.

allegations and the irreparable harm that will result from implementation of the WFV Project and the elevated base flows scheduled to continue through April 15, 2023.[5]

On February 8, 2022, this Court denied Plaintiff's initial Motion for Preliminary Injunction (Dkt. #108) filed December 16, 2022 which was based on Plaintiff's claim that Defendants violated CVPIA §3406(b)(23) by failing to seek or obtain Hoopa's concurrence. Dkt. #144.  This Court found Plaintiff was not likely to succeed on the merits of its CVPIA claim relating to concurrence and did not address other elements of the preliminary injunction test.  *Id.*

## III.    ARGUMENT

### A. This Court Should Issue a Preliminary Injunction to Prevent Irreparable Harm Resulting from Defendants' Decision to Approve the Trinity River WFV Project in the Absence of NEPA Compliance.

This Court should issue the Preliminary Injunction requested by Hoopa to prevent irreparable harm to Hoopa and the Trinity River fish and water resources upon which the Hupa people rely.  A plaintiff seeking a Preliminary Injunction must establish that plaintiff is likely to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in plaintiff's favor, and that an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).  Here, each of the four requirements is met.

Judicial review of an agency's compliance with NEPA is governed by the Administrative Procedure Act (APA).  *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004). Under the APA, a court may set aside an agency action if the court determines that the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'  *Id.*

---

[5] Since flow releases are scheduled to commence on February 15, 2023, the WFV releases during the 2023 water year will be made in the form of elevated baseflow releases that continue through April 15, 2023.  See Orcutt Declaration, Exhs. 1-2.   Thus, injunctive relief issued within that timeframe (that stops the increased baseflows) will preserve such water for its intended fishery restoration purposes later in the year as the ROD prescribes and prevent irreparable harm that will occur from the loss of that water under the WFV Project.

"[W]hen an agency has taken action without observance of the procedure required by law, that action will be set aside."  *Id.* at 640.

### B. Hoopa Is Likely to Prevail on the Merits of Its Claim That Defendants Failed to Comply with NEPA Prior to Approving the WFV Project.

NEPA is "our basic national charter for the protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA is "a procedural statute intended to secure environmentally informed decision-making by federal agencies."  *Cal. ex rel. Lockyer v. U.S. Dep't of Agric*., 575 F.3d 999, 1012 (9th Cir. 2009).  NEPA requires that Federal agencies consider the environmental impacts of their actions in the decision-making process and that the public has been informed regarding the decision-making process.  40 C.F.R. § 1500.1(a).

NEPA requires that: (1) agencies take a "hard look" at environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

NEPA requires federal agencies to prepare an Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  "Major Federal action" is defined as "an activity or decision subject to Federal control and responsibility [subject to exceptions not relevant here]."  40 C.F.R. §1508.1(q).  Approval of specific projects, such as the WFV Project, qualify as major federal action under NEPA.  40 C.F.R. §1508.1(q)(3)(iv).

Federal agencies may first prepare an Environmental Assessment (EA) to determine whether the nature and extent of a proposed action's environmental effects requires an EIS.  40 C.F.R. § 1501.4(b)-(c).  "An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is

unknown unless the agency finds that a categorical exclusion (§1501.4) is applicable or has decided to prepare an environmental impact statement." 40 C.F.R. §1501.5.

If, following an EA, the agency determines that the proposed action will not have significant effects, the agency must prepare and make publicly available a "finding of no significant impact" (FONSI). 40 C.F.R. § 1501.6(a). The FONSI is the document that explains why the decision-maker found that the proposed action will not have significant effects. *Id.* Unless an EIS is prepared, issuance of a FONSI (and disclosure of the reasons behind the finding of no significant effects) is mandatory under NEPA. *Id.*

Where, as here, "the nature of the proposed action is one without precedent," the agency must make the FONSI available for 30 days before the agency makes its final determination whether to prepare an EIS and before the action may begin. 40 C.F.R. §1501.6(a)(2)(ii).

Here, Reclamation started NEPA compliance when the WFV Project was proposed in 2021 but then cancelled the NEPA process in 2022 and never resumed or completed NEPA prior to approving the WFV Project in 2023. This is legal error that, in conjunction with the showing of irreparable injury that Plaintiff has made, mandates entry of a preliminary injunction against the WFV Project until NEPA is completed. *High Sierra Hikers Ass'n*, 390 F.3d at 640-646 (affirming injunction of federal permit issuance where agency failed to conduct any NEPA review).

A. **Defendants Failed to Issue Any FONSI (or EIS) Related to the WFV Project and Have Thus Violated NEPA**.

As explained in Section II.E above, Defendants commenced NEPA in 2021 by issuing a scoping notice and Draft EA but then cancelled action on the WFV Project for the 2022 water year. No further NEPA process has occurred for the WFV Project in the 2023 water year. Defendants did not issue a Draft EA or FONSI prior to approval of the WFV Project on January 30, 2023. No FONSI was disclosed to the public. And Defendants have also not prepared an Environmental Impact Statement. Nor have Defendants provided any explanation to the public

regarding their final determinations regarding the environmental effects of the Project.  Nor have they explained why they started, stopped, and then failed to resume NEPA prior to approving the WFV Project for the 2023 water year.[6]

Reclamation's last communication to the public regarding the NEPA process for the WFV Project is Reclamation's notice on its website dated February 4, 2022, that "consideration of this action [the WFV Project] has been cancelled."  Orcutt Decl., ¶26.  Reclamation did not inform the public, through NEPA processes, that it proposed to implement the WFV Project for the 2023 water year.  Nor did Reclamation ever determine, as required by 40 C.F.R. § 1501.6(a), that the proposed action [WFV Project] will not have significant effects.  Reclamation did not issue any FONSI (or EIS); thus, it never completed the NEPA process.  40 C.F.R. § 1501.6(a).

Since Reclamation did not issue any FONSI, Reclamation also did not comply with the public disclosure requirements of 40 C.F.R. §1501.6(a) which require the agency to make the FONSI (and its reasoning) available to the affected public.  And here, 40 C.F.R. §1501.6(a)(2)(ii) also applies because the "nature of the proposed action is one without precedent." Orcutt Declaration, ¶¶ 6, 44.   In such circumstances, the agency must make the FONSI available for public review for 30 days before the agency makes its final determination whether to prepare an EIS and before the action may begin.  *Id.* Here, the action must be enjoined because Reclamation did not prepare a FONSI or EIS and also, since there was no FONSI, did not comply with the public disclosure and waiting period requirements relating to FONSI issuance.

B. **Defendants Have Failed to Justify or Explain Their Decision Not to Prepare an EIS; And here, an EIS Is Required**.

An EIS must be prepared for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The agency must assess the potentially

---

[6]  As stated in the Declaration of Michael Orcutt, ¶ 27-29, Defendants have often prepared NEPA analyses and Findings of No Significant Impact for TRRP activities, including those under the ROD.  See Orcutt Declaration, Exhibits 4-8.  But inexplicably not here.

1   affected environment and degree of the effects when assessing significance.  40 C.F.R.

2   §1501.3(b).  In considering degree of effects, the agency must consider all:  short and long term

3   effects; beneficial and adverse effects; effects on public health and safety; and effects that would

4   violate Federal, State, Tribal, or local law protecting the environment.  40 C.F.R. §1501.3(b)(2).

5          In *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988), the Ninth Circuit

6   explained:

> In reviewing an agency decision not to prepare an EIS pursuant to NEPA, [the
> Court's] inquiry is whether the 'responsible agency has 'reasonably concluded'
> that the project will have **no** significant adverse environmental consequences.  If
> substantial questions are raised regarding whether the proposed action may have a
> significant effect upon the human environment, a decision not to prepare an EIS is
> unreasonable.  Additionally, an agency's decision not to prepare an EIS will be
> considered unreasonable if the agency fails to 'supply a convincing statement of
> reasons why potential effects are insignificant.'  Indeed, 'the statement of reasons
> is crucial' to determining whether the agency took a 'hard look' at the potential
> environmental impact of a project.  Thus, [the Court] will defer to an agency's
> decision only when it is 'fully informed and well-considered.' (emphasis in
> original; internal citations omitted).

*See also High Sierra Hikers Ass'n*, 390 F.3d at 640 (stating: "where an agency has decided that a

project does not require an EIS without first conducting an EA, [the Court] review[s] under the

reasonableness standard.  [The Court] will defer to an agency's decision only if it is 'fully

informed and well considered.'").

       Here, Defendants have said nothing about why they suspended and failed to resume

NEPA; nor have they given any explanation at all as to their views on the significance of the

effects of the WFV Project.  Their position on NEPA is clearly not "fully informed" or "well

considered" and it also fails to observe "procedure required by law."  *Id.*  Typically, the

explanation or statement of reasons as to why an EIS is not being prepared would occur in the

FONSI; but here, no FONSI was issued.  Since Defendants have failed to explain in any way

why they failed to prepare an EIS, their action violates NEPA and must be set aside.

1         Where Defendants have failed to provide any rationale for failing to prepare an EIS, it is

2  not Plaintiff's burden to prove the existence of significant effects.  But here, there clearly are

3  substantial questions about significant effects on the environment that warrant an EIS.  Orcutt

4  Declaration, ¶¶ 30-33.  The shifting of massive quantities of water that is dedicated to specific

5  fishery protective purposes in Spring/Summer months to other times of the year, and placing the

6  fishery at risk of not having enough water in those Spring/Summer months (because it has been

7  already used in prior winter months), meets the criteria for significance requiring analysis in a

8  full EIS.  Temperature and water quality impacts warrant examination.  *Id*.  Impacts on ESA-

9  listed species from the deprivation of flows called for in the ROD must also be fully considered.

10 Environmental justice and socioeconomic effects from impacts to affected tribal communities

11 also warrants full analysis.

12        Here, not only did Reclamation improperly fail to prepare an EIS relating to the WFV

13 Project, but Reclamation also failed to satisfy any of the preliminary steps leading up to the

14 decision of whether an EIS is required.  Reclamation did not issue a FONSI, which is the

15 required documentation of an agency decision not to prepare an EIS.  Because Reclamation has

16 failed to complete the NEPA process (and has arguably failed to conduct any NEPA process for

17 the 2023 water year for the WFV Project), the WFV Project approval must be set aside and its

18 implementation must be enjoined pending compliance with NEPA.

19     **C.  Hoopa Will Suffer Irreparable Harm Absent Injunctive Relief.**

20        "[T]he Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can

21 seldom be remedied by money damages and is often permanent or at least of long duration, i.e.,

22 irreparable."  *Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1053 (9th Cir. 2010).  While a

23 NEPA violation is analyzed under the same standard for injunctions as other types of cases,

24 courts regularly enjoin actions with potentially harmful environmental effects until NEPA review

25 is completed.  Otherwise, unless the status quo is maintained, the purposes of NEPA – to review

26 impacts in advance of taking action and making irretrievable environmental commitments  –

would be lost.  As the Court explained in *Ctr. for Food Safety v. Vilsack*, 753 F. Supp. 2d 1051

(N.D. Cal. 2010):

> "Environmental injury, by its nature, can seldom be adequately remedied by
> money damages and is often permanent or at least of long duration, i.e.,
> irreparable. If such injury is sufficiently likely, therefore, the balance of harms
> will usually favor the issuance of an injunction to protect the environment."
> *Amoco Prod. Co*., 480 U.S. at 545 (1987) (finding injunction was not warranted
> because the asserted environmental injury was "not at all probable").
>
> Additionally, Plaintiffs have demonstrated significant procedural injury stemming
> from the NEPA violations. "There is no doubt that the failure to undertake an
> [environmental review] when required to do so constitutes procedural injury to
> those affected by the environmental impacts of a project." *See Save Strawberry
> Canyon v. Dept. of Energy*, 613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2009) (finding
> that, due to the alleged NEPA violations, the plaintiff was "virtually certain to
> suffer irreparable procedural injury absent an injunction"). "The NEPA duty is
> more than a technicality; it is an extremely important statutory requirement to
> serve the public and the agency before major federal actions occur." *Foundation
> on Econ. Trends v. Heckler*, 756 F.2d 143, 157, 244 U.S. App. D.C. 122 (D.C.
> Cir. 1985)  (emphasis in original) (finding that "[i]f plaintiffs succeed on the
> merits, then the lack of an adequate environmental consideration looms as a
> serious, immediate, and irreparable injury.").
>
> Failing to conduct the required environmental review and depriving Plaintiffs and
> the public "of the opportunity to participate in the NEPA process at a time when
> such participation is required and is calculated to matter" constitutes irreparable
> harm. *See Save Strawberry Canyon*, 613 F. Supp. 2d at 1189-90 (noting that even
> if the plaintiff did not receive a preliminary injunction but ultimately wins on the
> merits, "much of the environmental harm will already have occurred and
> alternatives will have been foreclosed.")

Here, absent a preliminary injunction, the Trinity River and its fishery (and thus Hoopa)

will suffer irreparable harm because a substantial amount water required by the ROD to be

available in Spring and Summer months (as much as 16 – 27% of total annual ROD volumes)

will be lost forever by being unlawfully released as elevated baseflow between February 15 and

April 15.  Orcutt Declaration.  No money nor other relief can recover the water that will be

irretrievably lost by Defendants decision to release it down the river prior to the time it is

prescribed by the ROD.

PLAINTIFF'S MEMORANDUM IN SUPPORT
OF PRELIMINARY INJUNCTION - 16

The Trinity River ROD, and the flow releases provided for therein, are based on extensive scientific evaluation that culminated in the Flow Study. Hoopa was an author of the recommendations in the Flow Study and Hoopa concurred in their approval and implementation in the ROD. The ROD not only set the total minimum annual amounts of water necessary for Trinity River restoration under the ROD, but it also set a schedule and timeframes for when that water would be released. This schedule and timing for flows was developed to maximize the success of the restoration program and to limit any continuing harm to fish. Orcutt Declaration.

The total amount of water available under the ROD varies based on the type of water year. The water year runs from October 1 – September 30. However, the type of water year is not known until April 1. Thus, the ROD sets a constant 300 cfs base flow amount until the water year determination is known and then the amount of flows in the Spring and Summer is dependent on the water year determination. Any water released downstream early in the water year will obviously not be available later in the water year. Orcutt Declaration.

Under the current WFV Project, the schedule for ROD flows will be substantively changed – moving a large amount of water (minimum 60,000 acre-feet, equivalent to 16% of total annual volume) to prior months (specifically, for 2023 water year, between February 15 – April 15), leaving it unavailable for use later in the Spring and Summer. Orcutt Declaration. If it turns out that fishery managers have a need in the Spring and Summer for the water used in prior months pursuant to the WFV Project, there will be no recourse under the ROD. The fish will simply have to go without such water and will suffer the consequent harms.

Defendants' decision to approve the WFV Project will deprive the Trinity River and its fishery of flows that are required by the Trinity River ROD to be released in the Spring and Summer. The releases are approved and are scheduled to commence on February 15, 2023. Upon approval, Defendants intend to release enhanced base flows through April 15, 2023. Once released in the February 15 – April 15 timeframe, that water will be lost forever. A preliminary injunction is necessary to stop Defendants from releasing such flows in conflict with the ROD.

**D.  The Balance of Hardships Tips Strongly in Hoopa's Favor.**

In deciding whether to grant a preliminary injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.  Here, Defendants would suffer no harm if enjoined from implementing the Trinity River WFV Project.  Rather, they would remain bound to implement and release flows as called for in the Trinity River ROD, the document that has guided Trinity River restoration actions pursuant to its science-based flow recommendations, for over twenty years, until they satisfy their NEPA obligations.  In contrast, the consequences of depriving the Trinity River of the flows called for in the Trinity River ROD in the absence of NEPA compliance could be catastrophic to the Hoopa Valley Tribe, the Trinity River, and the fishery upon which it depends.  Once that water is released, it is gone forever.

Relief is necessary as soon as possible.  Once releases pursuant to the WFV Project are made, that amount of water is lost to ROD implementation for the rest of the water year, leaving the river and its fishery in a precarious state during later months.  The ROD and the scientific studies that preceded it carefully allocated the limited flows available to best meet the needs of fish.  Increasing flows in one season will necessarily decrease flows in a different time of year.  Such a substantial modification of the Trinity ROD flows may not occur without NEPA compliance.  A preliminary injunction is necessary and warranted.

**E.  An Injunction Would Be In the Public Interest.**

The public interest favors Hoopa's motion.  The public interest is an important factor to weigh in deciding whether courts should grant preliminary injunctions.  Here, failure to grant injunctive relief would place the public's interest in protection and restoration of the Trinity River fishery, as mandated by Congress, and as directed in the Trinity River ROD, at significant risk.  The public interest supports preservation, protection, and restoration of Trinity River fish stocks.  The Hoopa Valley Tribe and the federal government have dedicated extensive resources over decades towards restoration of the Trinity River fishery.  Specific flow measures were

studied and agreed upon by Hoopa and the United States to be of critical importance to fishery restoration.  Now, Defendants propose to abandon that flow regime, shifting certain flow releases to earlier in the year, while necessarily depriving the Trinity River of flows at later times of year.  Taking actions that undermine the ROD, and its science-based program of restoration flows and other restoration measures, is not in the public interest.  Nor is it in the public interest to engage in this radical and unprecedented change in the absence of compliance with NEPA.

### F.  No Bond Should Be Required in This Action to Protect Trinity River Resources.

Rule 65 references the posting of security upon issuance of a temporary restraining order or preliminary injunction, however the Court has authority to dispense with the security or to require mere nominal security.  *People ex rel. Van de Kamp v. Tahoe Regional Planning Authority*, 766 F.2d 1319, 1325-26 (9th Cir. 1985).  Courts often waive the bond requirement or require nominal security in public interest litigation against federal agencies.  *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (district court has discretion to waive bond requirement based on its evaluation of public interest); *Davis v. Minetta*, 302 F.3d 1104 (10th Cir. 2002) (where a party is seeking to vindicate the public interest, a minimal bond amount should be considered when granting a preliminary injunction); *Wilderness Society v. Tyrrel*, 701 F. Supp. 1473, 1492 (E.D. Cal. 1988) (setting bond of $100 for preliminary injunction barring timber sale); *Environmental Defense Fund v. Corps of Engineers*, 331 F. Supp. 925, 927 (D.D.C. 1971) ($1 bond for preliminary injunction restraining construction of 253-mile long waterway project).  In setting a $1 bond, the court commented in *State of Alabama ex rel. Baxley v. Corps of Engineers*, 411 F. Supp. 1261, 1276 (N.D. Ala. 1976):  "This Court is simply unwilling to close the courthouse door in public interest litigation by imposing a burdensome security requirement on plaintiffs who otherwise have standing to review governmental action."

Here, the Court should waive the security requirement or impose nominal security.  Hoopa brings this action on behalf of itself and its members in protecting the Trinity River, its

fishery, and Hoopa trust resources from harm caused by unlawful federal government action. Hoopa's action is consistent with and supportive of the public interest in protecting the river and the fishery.  Hoopa has demonstrated high likelihood of success on the merits and the Defendants would suffer no cognizable prejudice from the requested injunctive relief.  A waiver of security or imposition of nominal security is warranted.

## IV.    CONCLUSION

Plaintiff Hoopa Valley Tribe requests that this Court enter a preliminary injunction that bars Defendants from implementing the Trinity River WFV Project in the absence of NEPA compliance.  This relief is necessary to prevent irreparable harm that would result from these releases of water that are otherwise allocated to fishery restoration flows in the ROD.

Dated this 13th day of February 2023.

MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE

_/s/ Thane D. Somerville_
Thane D. Somerville WSBA #31468
Thomas P. Schlosser WSBA #06276
811 First Avenue, Suite 218
Seattle, WA 98104
Tel:  206-386-5200/Fax:  206-386-7322
t.somerville@msaj.com
t.schlosser@msaj.com
Attorneys for Plaintiff Hoopa Valley Tribe

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

*/s/ Thane D. Somerville*
Thane D. Somerville
