TODD KIM, Assistant Attorney General
Environment & Natural Resources Division

JEFFREY S. THOMAS, Trial Attorney (VA Bar No. 86439)
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-3553
Facsimile: (202) 305-0506
 jeffrey.thomas2 @usdoj.gov
*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HOOPA VALLEY TRIBE,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES BUREAU OF RECLAMATION; DEBRA ANNE HAALAND, in her official capacity as Secretary of the Interior; MARIA CAMILLE CALIMLIM TOUTON, in her official capacity as Commissioner of the United States Bureau of Reclamation; ERNEST A. CONANT, in his official capacity as U.S. Bureau of Reclamation California-Great Basin Regional Director; and UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>    Defendants. | Case No. 1:20−cv−01814−JLT-EPG |

**FEDERAL DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S**
**THIRD MOTION FOR PRELIMINARY INJUNCTION**

The Trinity River Winter Flow Project commenced on February 15 and will continue through April 15, providing ecologically and biologically critical water to the river's plant and animal species during the winter months. This vitally important river management initiative

1

attempts to replicate the natural flow patterns of the pre-dam river and will, among other things, ensure that the river's temperatures facilitate fish growth and survival. Consistent with the 2000 Trinity River Mainstem Fishery Restoration Record of Decision ("2000 ROD"), the Trinity Management Council, as it has done for the past twenty-two years with all types of river management projects, voted on the Winter Flow Project, and this year recommended that the project proceed by a vote of seven to one. Plaintiff, the sole dissenting member of the Trinity Management Council, is attempting to preliminary enjoin the Winter Flows for the third time.

Plaintiff, however, has failed to establish irreparable harm from the Winter Flow Project. Plaintiff alleges, that by releasing water downstream earlier in the water year, the water will be unavailable later in the year if it becomes necessary to protect fish in the summer. *See* ECF No. 146-1 at 16–17. As explained below, the scientists who manage the Trinity River Restoration Program dispute Plaintiff's generalized and conjectural allegation that fish could be harmed by adjusting the timing and release of a portion of the water volume authorized by the 2000 ROD in a particular water year from the spring/summer to the winter. In fact, the entire point of making this adjustment is to better replicate natural river flows and create a healthier environment for fish and other aquatic species consistent with the adaptive management recommendation adopted by the 2000 ROD. Those experts also opine that enjoining the Winter Flow Project now that it has started would not only deprive the river of the Project's intended benefits, but would have dire consequences for fish and egg mortality due to the sudden reduction of flows. Based on the balance of harms alone, which tips sharply in favor of the Federal Defendants, the Court should deny Plaintiff's third motion for injunctive relief.

Additionally, the Court should deny Plaintiff's third attempt to enjoin the Winter Flow Project both because Plaintiff is unlikely to prevail on the merits of its NEPA claim, as the

Winter Flow Project merely implements the 1999 Trinity River Environmental Impact Study ("EIS") and the 2000 Record of Decision ("ROD"), and because Plaintiff's requested relief is untimely.

## I. STANDARD FOR OBTAINING A PRELIMINARY INJUNCTION

"A preliminary injunction is an 'extraordinary and drastic remedy'" that can only be issued upon Plaintiff carrying its burden of making "a clear showing that [it] is entitled to such relief." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). This exacting standard applies with full force to environmental cases. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010); *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (*en banc*), *overruled in part on other grounds by Winter*, 555 U.S. 7.

Under the traditional four-factor inquiry, the movant must clearly establish that: (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. In some circumstances, the Ninth Circuit has applied a "sliding scale test" for movants who raise "serious questions" on the merits, but that test applies only if the movant carries its burden on the other three elements and only if the balance of equities "tips sharply" in its favor. *All. for the Wild Rockies v. Cottrell* ("*AWR*"), 632 F.3d 1127, 1134-35 (9th Cir. 2011). But regardless of how the success on the merits requirement is applied, Plaintiff's motion must be denied unless it makes a "clear showing" that it satisfies all four requirements for extraordinary relief. *Winter*, 555 U.S. at 22.

## II. ARGUMENT

### A. Plaintiff has failed to identify any irreparable harm

Irreparable harm is "traditionally defined as harm for which there is no adequate legal remedy." *Banga v. Kanios*, No. 16-CV-04270-RS, 2018 WL 11360090, at *2 (N.D. Cal. Jan. 16, 2018) (citation omitted). The mere "possibility" that a plaintiff may suffer harm is insufficient. *Winter*, 555 U.S. at 22. Plaintiff "must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Earth Island Inst. v. Gould*, No. 1:14-cv-01140-KJM-SKO, 2014 WL 4082021, at *6, *8 (E.D. Cal. Aug. 19, 2014). And even when a plaintiff alleges an environmental injury, there is no presumption of irreparable harm. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544–45 (1987); *see also Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1299 (9th Cir. 2003). That is especially true where, as here, the public interest weighs against granting a preliminary injunction. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010). Here, Plaintiff cannot obtain the injunctive relief it seeks because it has failed to show that it will suffer an irreparable harm if the Court does not enjoin the Winter Flow Project. *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173–74 (9th Cir. 2011); *see also Ctr. for Biological Diversity v. Hays*, No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739, at *10 (E.D. Cal. Oct. 8, 2015).

Plaintiff alleges it is being irreparably harmed by the Winter Flow Project because "[if] the water currently called for in the ROD is ultimately necessary for fish in Spring and Summer, it will no longer be available because it will already have been used pursuant to the WFV

Project."[1]  ECF No. 146-1 at 2.  The Court should reject Plaintiff's assertion that shifting a portion of this water year's volume to the winter will create harmful conditions in the spring and summer for at least three reasons: (1) Restoration Program scientists, independent experts and data, and the Trinity Management Council have established that existing spring flow release patterns negatively affect juvenile salmonid fish growth and outmigration and that the Winter Flow Project will improve conditions; (2) Plaintiff's claim that the water released in the winter will be needed in the spring and summer is wholly speculative; and (3) even assuming the water may be later needed, Federal Defendants acknowledge and even Plaintiff has conceded there are additional authorities that would allow Federal Defendants to release more water to protect the fish.

First, the scientific data demonstrates that late spring and summer high flows suppress salmon growth and unnaturally delay migration to the ocean, decreasing their chance of survival. *See* Thomas Gast & Associates, *Analysis and model evaluation of long-term data collected at the Willow Creek outmigrant trap: Report 20190910YTFP for the Trinity River Restoration Program (TRRP)* (2021), available at: www.trrp.net/library/document?id=2492 (last visited Feb. 27, 2023).  Restoration Program scientists have concluded that the timing and volume of prior water releases can be detrimental to fish restoration because those existing flows are held static and artificially low during the time of year when the river would naturally be most variable.  *See* ECF No. 118-4 ¶ 6; ECF No. 118-8 at 18; Decl. of Seth Naman ¶ 4, February 17, 2023, attached as Ex. A.  Additionally, Restoration Program scientists have learned that 47 percent to 87 percent of juvenile chinook have already migrated downstream of the restoration reach of the Trinity

---

[1] Plaintiff's characterization that certain flow schedules are "called for" in the ROD is misleading.  A basic tenet of the ROD is the Variable Annual Flow Regime – which allows the Trinity Management Council to develop flow schedules (or hydrographs) for each water year.  *See* Ex. A (citing the 2000 ROD at 12).

River before water is traditionally released on April 15; therefore, the earlier releases contemplated by the Winter Flow Project will benefit more rearing and outmigration of fish. *See* ECF No. 118-4 ¶ 6; ECF No. 118-8 at 18. Restoration flow management patterns relied on in prior years can result in artificially low temperatures in the spring and summer, which hinders salmon growth (and ultimate survivability). *See* ECF No. 118-4 ¶ 7; *see also* ECF No. 118-8 at 3, 5, and 6–7. As explained in the declarations of Dr. Michael Dixon and Mr. Seth Naman, as well as the Trinity River Winter Flow Project Final Report ("Final Report") itself, the Winter Flow Project has been developed to accomplish six primary goals:

- Better match natural flow variability during winter and spring runoff events and synchronize ecological processes between tributaries and the mainstem Trinity River;

- Enhance natural cleaning and transport of river gravels, reduce buildup of sediment at tributary mouths, and increase effectiveness of peak flows by having a dam-controlled flow peak coincide with a major storm event;

- Reduce cold water releases in spring/summer that suppress juvenile salmon metabolism, reduce growth rates of their prey, and disrupt the breeding of other aquatic species including foothill yellow-legged frog;

- Allow the river to naturally warm earlier in the season to provide better environmental cues that smolts rely on to time their outmigration to the ocean;

- Increase food availability for juvenile salmon through earlier production of macroinvertebrate prey species through floodplain inundation; and

- Inundate natural and constructed floodplains and other productive off-channel rearing habitats for juvenile salmon to provide diversity of foraging habitats and temperatures and increase overall habitat capacity.

*See* ECF No. 118-4 ¶ 9; ECF No. 118-8 at 1, 3; Ex. A ¶ 6. Restoration Program scientists predict that fish survival rates will increase by more closely mimicking natural flow variability and temperatures and targeting releases to have a larger impact on the most fish. Increased survival

rates would effectuate one of the key goals of the CVPIA to "to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River Basins." Reclamation Projects Authorization & Adjustment Act of 1992, Pub. L. No. 102–575, § 3402(a), 106 Stat. 4600, 4706. The Winter Flow Project represents the most current and best available science on how to implement the 2000 ROD's annual flow allocations through adaptive management to achieve the ROD's goals, including protecting and maximizing fish populations and improving the overall ecology of the Trinity River.

Second, Plaintiff's own motion concedes that any harm to the river or its fish populations is purely speculative because any water released in the winter may not ultimately be necessary for the spring and summer months. *See* ECF No. 146-1 at 2 ("*If* the water currently called for in the ROD is *ultimately necessary* for fish in Spring and Summer, it will no longer be available because it will already have been used pursuant to the WFV Project." (emphasis added)). Because Plaintiff admits that the water released in the winter may not be "necessary" in the spring and summer, Plaintiff's harm is purely hypothetical and does not warrant a preliminary injunction.

Third, Plaintiff has admitted and Federal Defendants acknowledge that there are additional sources of water that Reclamation could use in the spring and summer if the volume of ROD water remaining after the Winter Flow Project is not sufficient to affect the goals of restoration. *See* ECF No. 110-1 at 4 (Plaintiff claims that Reclamation can use 1955 Act Proviso 1 and Proviso 2 water to provide additional releases beyond that contemplated by the 2000 ROD). So, per Plaintiff's own admission, Federal Defendants could release additional water if there proved to be insufficient water in the spring and summer to meet Federal Defendants' statutory obligations to protect and propagate fish populations. Where, as here, Plaintiff's

alleged harms are curable, there is no irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that . . . corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); *Crocker v. Cal., Dep't of Rehab.*, No. 2:14-CV-01944-MCE, 2015 WL 106361, at *3 (E.D. Cal. Jan. 7, 2015) ("[A]ny harm suffered by Plaintiffs is curable and not irreparable.").

In addition to its claimed environmental harm, Plaintiff alleges it will suffer procedural harm under NEPA if Reclamation is allowed to proceed with the Winter Flow Project without preparing an EA or EIS. *See* ECF No. 146-1 at 2-3, 14-15. But as explained below, the NEPA claim fails because Reclamation undertook no new final agency action that required a NEPA analysis; rather, the Winter Flow Proposal represents a pilot project that adopts an intra-annual adjustment of the water year flow schedule consistent with the adaptive management prong of the 2000 ROD. More practically, though, as a member of the Trinity Council, Plaintiff (1) had access to all of the science and data underlying Reclamation's implementation of the Trinity Management Council's Winter Flow recommendation, (2) had several opportunities to comment on the Project, the most recent of which were declined; and (3) had an opportunity to vote on the Project along with the Yurok Tribe, the U.S. Fish & Wildlife Service, the U.S. Bureau of Reclamation, the U.S. Forest Service, NOAA Fisheries, Trinity County and the State of California. Therefore, Plaintiff's allegations that it was somehow procedurally harmed by Reclamation's decision not to issue a final EA on the Winter Flow Project is belied by the record, which shows that Plaintiff had ample opportunities to participate in discussions about the project and inform Reclamation's decision-making.

Because "irreparable injury is 'the single most important prerequisite for the issuance of a preliminary injunction,'" and Plaintiff has not shown it will suffer an irreparable injury before

8

the merits can be resolved, its third motion for preliminary injunction must be denied. *See Glob. Commodities Trading Grp., Inc. v. Beneficio De Arroz Choloma, S.A.*, No. 2:16-CV-01045-TLN-CKD, 2016 WL 4041219, at *3 (E.D. Cal. July 28, 2016) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)).

**B. Stopping the Winter Flow Project after it has already begun will cause harm to the environment outweighing any hypothetical harm claimed by Plaintiff.**

Plaintiff's motion fails to address that stopping the Winter Flow Project after increased flows have already begun will cause significant environmental harm. *See* Ex. A ¶ 7; *see also* Decl. of Dr. Mike Dixon ¶ 5, February 15, 2023, attached as Exhibit B. Now that baseflows have been raised, fish and other species are actively relying on those flows and will be harmed if flows are suddenly reduced. *Id.* For example, Trinity River steelhead trout – which are an essential resource for tribal and non-tribal fisheries – have already begun spawning and are relying on habitats made available by increased flows as they create their nests and lay their eggs. *Id.* Reducing flows now will withdraw water from that expanded habitat and "leave many redds (nests) high and dry, significantly undercutting the reproductive success of [the steelhead trout]." Ex. B ¶ 5. In fact, "stopping winter flows now would be significantly more harmful to fish than had the flows never been started." *Id.*

To prevail on a motion for preliminary injunction, Plaintiff must show that "when equities are balanced, [the] non-movant will not suffer more harm than [the] movant is helped by the injunction[.]" *Scott v. Cal. Supreme Ct.*, No. CIV S 04 2586LKKGGH, 2005 WL 1397390, at *1 (E.D. Cal. June 10, 2005) (citing *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 674-75 (9th Cir. 1984)). Plaintiff cannot satisfy that standard. As noted above, Plaintiff's alleged environmental harms are purely hypothetical and are contrary to the data and science which shows that the Winter Flow Project will not harm fish, but instead will help them by replicating

9

natural river flows.  *See* Ex. A ¶ 6; ECF No. 118-4 ¶¶ 4-14.  By contrast, stopping the Winter Flow Project, mid-implementation, would result in lowering water levels that species have now come to rely upon.  Doing so will result in reduced survivability rates.  *See* Ex. A ¶¶ 6-7; Ex. ¶ 5.

Because Plaintiff has only alleged speculative harms that ignore the best available science on how to promote the restoration of fish populations in the Trinity River and because an injunction at this juncture will cause environmental harm, the Court after balancing the equities should deny Plaintiff's motion.  *See*, *e.g.*, *Digital Ally, Inc. v. Corum*, No. 17-CV-02026-DDC-GLR, 2017 WL 1545671, at *5 (D. Kan. Apr. 28, 2017) ("[P]laintiff's speculative harm does not outweigh the 'certain and substantial harm' [defendant] will suffer if the injunction issues. . . .").

### C. Plaintiff is unlikely to succeed on the merits of its NEPA claim

Federal Defendants recognize that, in issuing its order on Plaintiff's first Preliminary Injunction motion the Court found that the Winter Flow Project was likely a final agency action subject to challenge.  ECF No. 144 at 8.  Federal Defendants respectfully submit, however, that upon further elucidation as set forth herein and as anticipated in likely future summary judgment briefing, Plaintiff's final agency action claim will fail and the Court will find that a NEPA analysis was not required.

The goals of the 1999 Trinity River Mainstem Fishery Restoration Environmental Impact Statement ("1999 EIS") and 2000 ROD were to ensure the restoration of the Trinity River by guaranteeing minimum annual volumes of water and allowing scientists and stakeholders to make annual operational decisions about how to distribute that water based on the best available science.  The 2000 ROD created a decision-making structure for implementing the ROD's goals by: (1) establishing the Trinity Management Council; (2) directing the Trinity Management Council to "guide overall implementation" of the ROD's restoration measures; (3) adopting

"[v]ariable annual instream flows for the Trinity River"; and (4) providing for adaptive management. ECF No. 118 at 7-11. Notably, the 2000 ROD provides that:

> Based on subsequent monitoring and studies guided by the Trinity Management Council, the schedule for releasing water on a daily basis, according to that year's hydrology, may be adjusted but the annual flow volumes established in Table 1 may not be changed.

ECF No. 111-2 at 12. The 1999 EIS and 2000 ROD anticipated that the Trinity Management Council – assisted by panels of scientific experts – would, as a matter of Trinity River operations, adjust the schedule for daily releases of water to accomplish the ROD's objectives. *Id.* Plaintiff's NEPA claim is likely to fail because the Winter Flow Project is exactly what the ROD anticipated – an operational decision by the Trinity Management Council to adjust the schedule for daily releases.

Plaintiff argues that the Winter Flow Project is a groundbreaking new policy decision; however, the 1999 EIS expressly recognized the importance of replicating natural river conditions, especially having flushing winter flows:

> Both the construction and operation of the T[rinity] R[iver] D[ivision] ["TRD"] have had severe effects on fish and wildlife habitats below Lewiston Dam. For example, prior to the TRD, large winter floods moved gravels and cobbles (i.e., coarse sediment) through the river channel. These floods maintained the broad floodplain and gravel bars of the alluvial river that provided the necessary habitats for fish and wildlife. Construction and operation of the TRD eliminated these large flows and blocked all downstream movement of gravels and cobbles; both elements are essential to maintaining fish and wildlife habitats below the dams. Concurrently, fine sediments have increased because of the loss of winter flushing flows and the high rates of watershed erosion in the middle twentieth century (caused by gold mining, logging, and other land use practices [U.S. Bureau of Land Management, 1995a]). Fine sediment accumulation reduces the quality of spawning gravels, food-producing riffles, and over-winter habitat, which is detrimental to anadromous fish production.
>
> Operation of the TRD has also affected the timing, duration, and magnitude of flows throughout the rest of the year. The altered flow

> regime has been accompanied by altered water temperatures, changes in the river's features and shape, and the encroachment of riparian vegetation onto the gravel bars. Elimination of winter flushing flows and relatively constant base flows allowed riparian vegetation to establish in the low-flow channel, which eventually led to undesirable changes in the channel shape. The pre-dam river (i.e., a broad channel with gently sloping gravel bars) changed to a narrow channel confined between steep banks. These changes have greatly reduced the diversity of the available habitats necessary to maintain all the riverine life stages of salmonids and other riverine species.

1999 EIS, Section 1.1 at 1-2, attached as Ex. C; *see also id.*, Section 3.3.1 at 3-43; Ex. A ¶ 6. Thus, the idea of better replicating natural river conditions is part and parcel of the 1999 EIS and the 2000 ROD, and those documents specifically recognized problems created by the elimination of winter flushing flows. As noted above, implementation of the 2000 ROD's flow regime and related monitoring efforts over the past 20 years have shown that significant spring/summer releases can have negative effects to juvenile salmonid growth and outmigration timing. The adjustments proposed and adopted through the Winter Flow Project for WY2023 are nothing more than an operational determination that is carrying out the dictates of the 2000 ROD and its adaptive management recommendation based on the most current scientific data about the river and its needs. It is precisely the type of river management undertaking that was contemplated by the ROD and is not a new final agency action as that term is defined by the APA.

Indeed, the Winter Flow Project is not really a distinct project. Instead, the Winter Flow Project and its corresponding Final Report simply summarizes the scientific data showing that the Trinity Management Council should consider adjusting a portion of the water volume available in WY2023 from the spring/summer to the winter. Reclamation's implementation of the Trinity Management Council's decision to adjust flow releases is not the "consummation" of a new "decision-making process," but instead implements existing agency decisions – *i.e.* the

1999 EIS and 2000 ROD. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) ("For an agency action to be final, the action must (1) 'mark the consummation of the agency's decision-making process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow.'" (citation omitted)).

Notably, for the past 22 years, Reclamation has implemented the Trinity Management Council's annual decisions about how to best distribute water in a particular year and has also taken other adaptive management steps to further the restoration goals of the 2000 ROD. *See* Ex. A ¶ 4. These implementation actions were based on evolving science and water conditions and were expressly contemplated by the ROD. No one, including the Hoopa Valley Tribe, has ever suggested that the Trinity Management Council's annual recommendations and Reclamation's operational water distribution changes were independent final agency actions requiring new NEPA review.[2] The Winter Flow Project is no different – it is an operational undertaking by Reclamation following a recommendation by the Trinity Management Council regarding water allocations for 2023. There can be no reasonable dispute that Reclamation (as well as the Trinity Management Council, including Plaintiff) has consistently interpreted the ROD as authorizing the implementation of annual flow schedules. That interpretation is entitled to deference. *See, e.g., Clason v. Johanns*, 438 F.3d 868, 871 (8th Cir. 2006) (giving the agency's construction of its own document "the same level of deference afforded to an agency's interpretation of its own regulations."); *McDonald Welding v. Webb*, 829 F.2d 593, 595 (6th Cir. 1987) (holding an agency's "construction of a word in its own solicitation document should be entitled to at least

---

[2] Plaintiff's repeated references to Reclamation's 2022 draft EA are baseless. Agencies are permitted to prepare NEPA documents even if not legally required and, in any event, the agency had the benefit of the draft EA when it prepared its Final Report. In any event, the preparation a draft EA in 2022 does not somehow create a final agency action as a matter of law for an agency undertaking in 2023 as Plaintiff attempts to suggest.

13

[as] much deference" as the deference the agency receives when it construes a statute it is responsible for administering).

Reclamation's conclusion that the Winter Flow Project is an implementation action rather than a final agency action is supported by case law. For example, in *Mayo v. Reynolds*, 875 F.3d 11 (D.C. Cir. 2017), the D.C. Circuit considered whether an annual herd management decision was a distinct agency action requiring NEPA. In that case, the Park Service and Fish and Wildlife Service published an EIS that adopted a fifteen-year plan for managing an elk herd in Grand Teton. *Id.* at 17. Like the Trinity River restoration plan in this case, the herd management plan utilized an "'adaptive management approach . . . based on established criteria and changing social, political, or biological conditions." *Id.* The *Mayo* plaintiffs asserted that the Park Service was required to prepare a new NEPA analysis every year that it implemented the fifteen-year elk-reduction program and that because no such analysis was done for the 2015 hunt authorization, the Park Service's annual authorization of hunting violated NEPA. *Id.* at 14. In response, the agencies argued that the annual hunting authorization was an implementation step of the fifteen-year plan and that "the 2007 EIS relieved the Park Service of the obligation to prepare fresh NEPA documentation each year it implements the elk-reduction program in conformity with" that plan. *Id.* at 20. The D.C. Circuit agreed with the agencies that "a new assessment under NEPA [is not required] every time [an agency] takes a step that implements a previously studied action." *Id.* at 21. The *Mayo* Court concluded that "[t]he 2007 EIS was clearly sufficient to cover elk hunting during the ensuing fifteen years under the 2007 Plan absent a material change causing unforeseen environmental consequences." *Id.*

The same should be true in this case. The 1999 EIS and 2000 ROD, both of which were developed in conjunction with and endorsed by Plaintiff, exhaustively studied the necessary

14

steps to effect Trinity River restoration. The 2000 Trinity River ROD, like the 2007 herd management EIS, included an adaptive management program that allowed the agencies to make annual decisions based on the best available science. And here, Reclamation's annual decision about how to distribute flows is an implementation decision just like the Park Service's and Fish and Wildlife Service's 2015 annual decision about the number of elk hunting permits to issue.

The recent decision in *County Commissioners of County of Sierra v. United States Department of the Interior*, No. CV 21-611 GBW/CG, --- F. Supp. 3d ----, ----, 2022 WL 2754297, at *1 (D.N.M. July 14, 2022), also demonstrates that agencies are not required to conduct new NEPA every time they take a discretionary step to implement a prior agency action. In *County of Sierra*, the plaintiffs filed a NEPA challenge to the Fish and Wildlife Service's March 2021 decision to release two problem wolves on private land in Sierra County. *Id.* at *5. The *County of Sierra* Court concluded that the Mexican Wolf Recovery Plan was the "consummation of the agency's decision-making process," and that the March 2021 decision to remove problem wolves was not an independent, final agency action, but rather was an implementation decision based on the Recovery Plan. *Id.* at *5-6. The Court dismissed Plaintiff's NEPA claim for lack of jurisdiction. *Id.* at *14.

Similarly, in *Oregon Natural Desert Ass'n v. BLM*, No. 08-1271-KI, 2011 WL 5830435, at *1 (D. Or. Nov. 15, 2011), the Bureau of Land Management ("BLM") issued an EIS that studied the reduction of "juniper-related fuels" and the restoration of "various plant communities" on approximately 336,000 acres in the Steens Mountain Cooperative Management and Protection Area ("CMPA") and Andrews Management Unit of the Andrews Resource Area. *Id.* at *2. The juniper-reduction EIS did not detail when, where or how junipers would be reduced, but it did adopt an adaptive management approach that allowed the BLM to make

15

annual decisions about juniper thinning based on the best available science. *Id.* at *16. An environmental group challenged the BLM's annual task orders and contracts to proceed with juniper treatments, claiming that additional site-specific environmental analyses were necessary each time the BLM implemented the juniper-reduction plan under a particular contract or task order. *Id.* at *17. The Court rejected the environmentalists' argument, holding that the "BLM is merely implementing the EIS and ROD and that these decisions have been analyzed in the EIS." *Id.* Specifically, the Court held that "[t]he EIS evaluates the methods of treatment, annual acreage targets, and effects of the treatment on the environment by habitat type and by each Steens Mountain resource," and that allowing the agency to utilize an adaptive management approach to determine "when, where and which of the treatment methods are appropriate" fully complied with NEPA and its goals. *Id.* The Court concluded that the individual task orders and contracts were not separate, final agency actions requiring NEPA. *Id.* Like the *Mayo* decision, the *Oregon Natural Desert Ass'n* is relevant here and demonstrates why Plaintiff is unlikely to succeed on its NEPA claim.

The *Mayo*, *County of Sierra*, and *Oregon Natural Desert Ass'n* decisions demonstrate why Reclamation's implementation step in this case was not "the consummation of the agency's decision-making process." Moreover, the Winter Flow Project is also not a "definitive statement of the agency's position," *see Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005), because the Trinity Management Council recommended and Reclamation adopted it for WY2023 only and,[3] based on the 2000 ROD's adaptive management structure the agency could alter course based on the scientific data it is actively collecting. In

---

[3] The Winter Flow Project is only a one-year (pilot) project. Any further proposals based on the Final Report or otherwise for future water years would have to be recommended by the Trinity Management Council and reviewed/adopted by the Department of the Interior.

other words, if the data shows that the Winter Flow Project is having adverse impacts rather than the anticipated beneficial impacts, Reclamation could reverse course at any time pursuant to the 2000 ROD's adaptive management procedures. The purpose of the adaptive management structure is to give the agency maximum flexibility in implementing the ROD's goals based on the most current science; the concept of adaptive management would be redundant if new or supplemental NEPA was required every time the agency implemented an action as a result of adaptive management.

### D. Plaintiff's requested relief is untimely

In addition to failing to demonstrate irreparable harm and likelihood of success on the merits, Plaintiff's third attempt at enjoining the Winter Flow Project is untimely, as the Court has already found. *See* ECF No. 145 (denying Plaintiff's second preliminary injunction motion/TRO as untimely). As noted in the Court's February 8th Minute Order, Plaintiff filed a motion for leave to amend its complaint to state a new NEPA claim on February 1st, but waited an entire week to seek injunctive relief based on that NEPA claim. *Id.* At no point before filing its third motion did Plaintiff advise the Court or parties that it intended to seek injunctive relief on "new" grounds.[4] This delay alone is sufficient to deny Plaintiff's motion as untimely. *See*, *e.g.*, *Associated Press v. Otter*, No. 1:12-CV-00255-EJL, 2012 WL 12977323, at *3 (D. Idaho June 5, 2012) (finding that a preliminary injunction motion is untimely when a plaintiff waits until the last minute to file despite knowing of its claims earlier).

---

[4] In a February 6th filing, Plaintiff signaled to the Court that it would file a motion for summary judgment in March 2023, which would presumably include Plaintiff's new NEPA claim. *See* ECF No. 139 at 4 n.1. After all, Plaintiff knew the Winter Flow Project had been adopted and would be implemented since January 31st. *See* ECF No. 132. Still, Plaintiff did not advise the Court or parties that it would be filing a new motion for preliminary injunction the very next day.

17

Additionally, according to Plaintiff's own logic, its injunctive relief based on an alleged NEPA violation could have been sought months ago. Throughout this litigation Plaintiff has represented that a decision to adopt and implement the Winter Flow Project was unnecessary for Plaintiff to challenge the Project. *See, e.g.*, ECF No. 120 at 2–3 ("Defendants argue that this injunction motion is not ripe for review because no final decision has been made to implement the WFV Project. . . . If Plaintiff were forced to wait until Defendants gave final approval to implement the WFV flows, the flows could commence implementation before Plaintiff could obtain relief from this Court. The threat of harm is imminent, and this motion is ripe for review."). The Court can and should deny Plaintiff's third motion for injunctive relief on timeliness grounds alone. *See, e.g.*, *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, No. 1:21-CV-00038-MKV, 2021 WL 535485, at *6 (S.D.N.Y. Feb. 12, 2021) ("Delay in seeking injunctive relief 'may, standing alone, preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency' upon which the availability of the remedy is predicated." (citation omitted)).

### III. CONCLUSION

The Court should deny Plaintiff's third motion for preliminary injunction because: (1) Plaintiff has not identified any non-speculative, meaningful irreparable harm that would be remedied by granting a preliminary injunction; (2) stopping the Winter Flow Project now will have real and certain negative impacts on the environment; (3) Plaintiff is unlikely to prevail on the merits of its NEPA claim; and (4) it is untimely.

Respectfully submitted this 27th day of February, 2023,

TODD KIM
Assistant Attorney General

*/s/ J. Scott Thomas*

18

JEFFREY SCOTT THOMAS
Trial Attorney
U.S. Department of Justice
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-3553
Facsimile: (202) 305-0506
jeffrey.thomas2_@usdoj.gov

*Attorney for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2023, I electronically filed the **FEDERAL DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S THIRD MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the ECF system, which will automatically send email notification to the attorneys of record.

> */s/ J. Scott Thomas*
> JEFFREY SCOTT THOMAS