TODD KIM, Assistant Attorney General
Environment and Natural Resources Division

JEFFREY S. THOMAS, Trial Attorney (VA Bar No. 86439)
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-3553
Facsimile: (202) 305-0506
 jeffrey.thomas2 @usdoj.gov
*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

HOOPA VALLEY TRIBE,

        Plaintiff,

v.

UNITED STATES BUREAU OF
RECLAMATION; DEBRA ANNE
HAALAND, in her official capacity as
Secretary of the Interior; MARIA
CAMILLE CALIMLIM TOUTON, in her
official capacity as Commissioner of the
United States Bureau of Reclamation;
ERNEST A. CONANT, in his official
capacity as U.S. Bureau of Reclamation
California-Great Basin Regional Director;
and UNITED STATES DEPARTMENT OF
THE INTERIOR,

        Defendants.

Case No. 1:20−cv−01814−JLT-EPG

## TO ALL PARTIES AND THEIR COUNSEL OF RECORD

    PLEASE TAKE NOTICE that on June 13, 2023, or as soon thereafter as counsel may be

heard, in the courtroom of the Honorable Jennifer L. Thurston, located in the United States

District Court for the Eastern District of California, Fresno Division, Federal Defendants will

and hereby do move to dismiss most of the claims in Plaintiff's Second Amended Complaint

pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  This motion is supported by

Federal Defendants' MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO DISMISS

filed contemporaneously with this notice.  Federal Defendants do not request oral argument.

**Table of Contents**

I.      BACKGROUND .................................................................................................. 2

        A.    CVP History ........................................................................................... 2

        B.    Congress enacted the CVPIA to, among other goals, ensure affected rivers
              and populations are restored ................................................................. 3

        C.    Recovery of CVP and CVPIA Costs ...................................................... 4

              1.    Authorities governing Secretary's contracting authority ........................... 4

              2.    Reclamation's methods for accounting for CVP costs ........................... 5

              3.    Reclamation's methods for accounting for CVPIA costs .......................... 7

II.     LEGAL STANDARDS ..................................................................................... 9

III.    ARGUMENT ...................................................................................................... 10

        A.    The Court should dismiss Plaintiff's First Claim for Relief (alleged
              violation of sections 3404(c)(2) and 3406(b)(23) of the CVPIA and the
              APA) for lack of jurisdiction and for failure to state a claim ............................... 10

              1.    12(b)(1): Plaintiff's challenges to the WIIN Act contract
                    conversions are non-justiciable ............................................................... 10

                    a.    Plaintiff does not have standing to bring its § 3404(c)(2) claim............ 10

                    b.    Plaintiff's § 3406(b)(23) claim (which it also includes as part of its
                          First Claim for Relief) is not justiciable .................................. 13

              2.    12(b)(6): Plaintiff's First Claim of Relief for violation of the CVPIA
                    (including both of its two sub-claims) fails as a matter of law ................ 14

                    a.    Plaintiff's § 3404(c)(2) claim fails because that provision does not
                          apply to converted contracts under the WIIN Act .................................. 15

                    b.    Plaintiff's § 3404(c) claim also fails because the disputed
                          conversion contracts incorporate federal law ......................................... 16

                    c.    Plaintiff's CVPIA § 3406(b)(23) claim (as articulated in Claim 1)
                          fails because that provision does not mandate a particular
                          accounting process .......................................................................... 17

        B.    The Court should dismiss Plaintiff's Second Claim for Relief (alleged
              violation of NEPA and the APA) for lack of jurisdiction and for failure to
              state a claim ........................................................................................... 18

1.    Plaintiff's WIIN Act-related NEPA claim fails for lack of jurisdiction and for failure to state a claim ................................................ 18

    a.    Plaintiff does not have standing to challenge WIIN Act contract conversions under NEPA ........................................................................ 18

    b.    Plaintiff's WIIN Act-related NEPA claim also fails as a matter of law because Congress mandated the contracts be converted on terms that precluded Reclamation from changing the contracts' environmental impacts ........................................................................ 20

C.    The Court should dismiss Plaintiff's Third Claim for Relief (alleged violation of the WIIN Act and the CVPIA and the APA) for lack of jurisdiction and for failure to state a claim ........................................................... 24

D.    The Court should dismiss Plaintiff's Fourth Claim for Relief (alleged violation of the WIIN Act, the CVPIA, and the APA) for lack of jurisdiction and for failure to state a claim ............................................................................. 26

E.    The Court should dismiss Plaintiff's Fifth Claim for Relief (alleged violation of Executive Order 12866 and the APA) for lack of jurisdiction and for failure to state a claim ............................................................................. 27

F.    The Court should dismiss Plaintiff's Sixth Claim for Relief (alleged violation of the Reclamation Act of 1922, 43 U.S.C. § 511) for lack of jurisdiction and for failure to state a claim ........................................................... 28

    1.    Plaintiff has failed to adequately plead standing to bring its § 511 claim ............................................................................................................ 29

    2.    Plaintiff's § 511 claim fails as a matter of law because the statute does not provide that unvalidated contracts are void *ab initio* ................. 30

G.    The Court should dismiss Plaintiff's Seventh Claim for Relief (alleged violation of the WIIN Act and the APA) for lack of jurisdiction and for failure to state a claim ............................................................................. 32

H.    The Court should dismiss Plaintiff's Eighth Claim for Relief (challenging former Secretary Bernhardt's CVPIA completion memos) for lack of jurisdiction ................................................................................................... 33

I.    The Court Should Dismiss Plaintiff's Ninth Claim (Alleged Violation of CVPIA § 3406(b)(23)) For Failure to State a Claim ............................................ 34

J.    The Court should dismiss plaintiff's Tenth Claim for Relief (Alleged Violation of the Violation of 1984 Act, 1996 Act, and APA) as moot, or stay the Claim pending completion of Federal Defendants' intended modernization efforts ................................................................................ 40

IV.    CONCLUSION .......................................................................................................... 41

# Table of Authorities

## Cases

*Air Transp. Ass'n of Am. v. FAA*,
  169 F.3d 1 (D.C. Cir. 1999) ............................................................................ 28, 31

*AquAlliance v. U.S. Bureau of Reclamation*,
  287 F. Supp. 3d 969 (E.D. Cal. 2018) ..................................................................... 1

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................... 9

*Ashley Creek Phosphate Co. v. Norton*,
  420 F.3d 934 (9th Cir. 2005) ............................................................................... 19

*Biological Diversity v. United States Bureau of Reclamation*,
  No. 1:20-cv-00706-DAD-EPG, 2021 WL 600952 (E.D. Cal. Feb. 16, 2021) .................. 30, 31

*Bugenig v. Hoopa Valley Tribe*,
  266 F.3d 1201 (9th Cir. 2001) ................................................................... 36, 37, 38

*Cir. City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001) ........................................................................................ 21, 22

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................. 11

*Concerned Irrigators v. Belle Fourche Irrigation Dist.*,
  235 F.3d 1139 (8th Cir. 2001) ............................................................................... 31

*Ctr. for Biological Diversity v. Bernhardt*,
  946 F.3d 553 (9th Cir. 2019) ................................................................................ 11

*Cunha v. IntelliCheck, LLC*,
  254 F. Supp. 3d 1124 (N.D. Cal. 2017) .................................................................. 13

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ........................................................................................ 19, 20

*Dietary Supplemental Coal., Inc. v. Sullivan*,
  978 F.2d 560 (9th Cir. 1992) ............................................................................ 25, 32

*Fireman's Fund Ins. Co. v. Garamendi*,
  790 F. Supp. 938 (N.D. Cal. 1992) ........................................................................ 14

*Fla. Audubon Soc. v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ................................................................................ 29

*Foster v. Carson*,
  347 F.3d 742 (9th Cir. 2003) ..................................................................... 33, 34, 35

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ........................................................................................ 10, 14

*Gerritsen v. Warner Bros. Ent. Inc.*,
   112 F. Supp. 3d 1011 (C.D. Cal. 2015) ......................................................... 10

*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
   691 F.3d 1008 (9th Cir. 2012) ...................................................................... 22

*Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau of Reclamation*,
   579 F.3d 1345 (Fed. Cir. 2009) ................................................................... 4, 5

*Handy v. Bernanke*,
   No. 3:11CV672-HEH, 2012 WL 7964216 n.2 (E.D. Va. Jan. 26, 2012) ............ 25, 31

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*,
   141 S. Ct. 2172 (2021) .................................................................................. 36

*Hoopa Valley Indian Tribe v. Ryan*,
   415 F.3d 986 (9th Cir. 2005) ................................................................... 38, 39

*Educational Credit Management Corporation v. Coleman*,
   560 F.3d 1000, 1005 (9th Cir. 2009) ............................................................. 14

*Ivanhoe Irrigation Dist. v. McCracken*,
   357 U.S. 275 (1958) ........................................................................................ 2

*Kim Ho Ma v. Ashcroft*,
   257 F.3d 1095 (9th Cir. 2001) ...................................................................... 38

*Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cnty.*,
   627 F.3d 1268 (9th Cir. 2010) ...................................................................... 36

*MGIC Indem. Corp. v. Weisman*,
   803 F.2d 500 (9th Cir. 1986) .......................................................................... 9

*Montana v. Blackfeet Tribe of Indians*,
   471 U.S. 759 (1985) ................................................................................ 36, 39

*Montana v. United States*,
   450 U.S. 544 (1981) ...................................................................................... 38

*Nat. Health U.S. v. Sebelius*,
   775 F. Supp. 2d 114 (D.D.C. 2011) ............................................................... 28

*Nayab v. Cap. One Bank (USA), N.A.*,
   942 F.3d 480 (9th Cir. 2019) ........................................................................ 13

*Opperman v. Path, Inc.*,
   87 F. Supp. 3d 1018 (N.D. Cal. 2014) ............................................................ 9

*Premcor USA, Inc. v. Am. Home Assurance Co.*,
   400 F.3d 523 (7th Cir. 2005) ........................................................................ 29

*Razaghi v. Razaghi Dev. Co., LLC*,
   No. 2:18-CV-01622-GMN-DJA, 2020 WL 5821829 (D. Nev. Sept. 30, 2020) ...... 16

*Redding Rancheria v. Jewell*,
  776 F.3d 706 (9th Cir. 2015) ................................................. 40

*Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*,
  768 F.3d 938 (9th Cir. 2014) ................................................... 9

*Ruffino v. United States*,
  374 F. Supp. 3d 961 (E.D. Cal. 2019) ............................... 9, 24

*Russello v. United States*,
  464 U.S. 16 (1983) ....................................................... 23, 24

*Salmon Spawning & Recovery All. v. Gutierrez*,
  545 F.3d 1220 (9th Cir. 2008) ............................................. 20

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ................................................. 2

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ................................................. 2

*San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*,
  905 F. Supp. 2d 1158 (E.D. Cal. 2012) .................................... 9

*Schroeder v. United States*,
  793 F.3d 1080 (9th Cir. 2015) ............................................. 15

*Shasta Res. Council v. U.S. Dep't of the Interior*,
  629 F. Supp. 2d 1045 (E.D. Cal. 2009) ................................. 18

*South Carolina v. Catawba Indian Tribe*,
  476 U.S. 498 (1986) ........................................................... 39

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................... 11

*Star Int'l v. Ariz. Corp. Comm'n*,
  720 F.2d 578 (9th Cir. 1983) ................................................. 9

*Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*,
  435 F. Supp. 3d 1063 (E.D. Cal. 2020) ................................. 14

*Tehama-Colusa Canal Auth. v. U.S. Dep't of Interior*,
  819 F. Supp. 2d 956 (E.D. Cal. 2011) ...................................... 3

*Toor v. Holder*,
  717 F. Supp. 2d 100 (D.D.C. 2010) ...................................... 41

*Trawler Diane Marie, Inc. v. Brown*,
  918 F. Supp. 921 (E.D.N.C. 1995) ....................................... 28

*Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*,
  340 F.3d 969 (9th Cir. 2003) ............................................... 22

*United States v. Gerlach Live Stock Co.,*
    339 U.S. 725 (1950) ................................................................... 5, 6

*United States v. Lara,*
    541 U.S. 193 (2004) ................................................................. 37, 38

*United States v. Mazurie,*
    419 U.S. 544 (1975) ...................................................................... 37

*Walker v. Fred Meyer, Inc.,*
    953 F.3d 1082 (9th Cir. 2020) ...................................................... 10

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...................................................................... 25

*Westlands Water Dist. v. U.S. Dep't of Interior,*
    376 F.3d 853 (9th Cir. 2004) .......................................................... 1

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas,*
    5 F.4th 997 (9th Cir. 2021) ..................................................... 18, 19

**Statutes**

43 U.S.C. 390aa .................................................................................. 16

43 U.S.C. § 423e ................................................................................. 32

43 U.S.C. § 485h ............................................................................... 4, 5

43 U.S.C. § 485h(c) .............................................................................. 4

43 U.S.C. § 485h(d) .............................................................................. 4

43 U.S.C. § 511 ................................................................... ii, 29, 30

43 U.S.C. §§ 371-600e .......................................................................... 4

Pub. L. No. 57-161 ............................................................................... 1

Pub. L. No. 96-335 ............................................................................... 3

Pub. L. No. 98-541 ............................................................................... 3

Pub. L. No. 99-546 ............................................................................ 6, 7

Pub. L. No. 102-575 ........................................................................... 3, 4

Pub. L. No. 104-143 ............................................................................. 3

Pub. L. No. 111-11 .............................................................................. 7

Pub. L. No. 114-322 ............................................................................. 1

Pub. L. No. 386 .................................................................................. 3

**Regulations**

58 Fed. Reg. ......................................................................................................................... 28

**Rules**

Federal Rules of Civil Procedure 12(b)(1).................................................................... 2, 9

Rule 12(b)(6)........................................................................................................................ 9

**Other Authorities**

Executive Order 12866 .............................................................................................ii, 27, 28

## MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Nearly a century ago, Congress assumed responsibility for financing one of the largest water projects ever constructed, the Central Valley Project ("CVP"), which spans more than 450 miles and supplies water to "two hundred water districts, provid[es] water for about thirty million people, irrigat[es] California's most productive agricultural region and generat[es] electricity at nine power plants." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 861 (9th Cir. 2004). The Department of the Interior ("Interior"), through the Bureau of Reclamation ("Reclamation"), manages the CVP and oversees repayment of CVP-related debts. *See AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 985 (E.D. Cal. 2018); *see also* Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388.

In this case, Plaintiff asserts a number of claims challenging Reclamation's management of the CVP. Several of Plaintiff's claims focus on Reclamation's implementation of the Water Infrastructure Improvements for the Nation Act ("WIIN Act"), which, among other things, directed the Secretary of the Interior ("Secretary") to convert water contracts to allow CVP water contractors to prepay CVP-related construction debts they owed to the United States, something that was not allowed before Congress specifically authorized prepayment. *See* Pub. L. No. 114-322, § 4011(a), 130 Stat. 1628, 1878 (2016). Plaintiff also asserts various other claims, challenging: (1) how Reclamation collects CVP and Central Valley Project Improvement Act ("CVPIA") costs, (2) Reclamation's adoption and implementation of the Winter Flow Project, (3) Reclamation's ability to manage the Trinity River Division of the CVP without Plaintiff's concurrence, (3) the validity of Westlands Water District's ("Westlands") non-validated converted contract, (4) the validity of former Secretary Bernhardt's recently withdrawn CVPIA completion memoranda, and (5) Reclamation's efforts to restore the Trinity River Fish Hatchery.

Because these claims are either non-justiciable (for mootness, ripeness, or failure to identify a concrete, imminent injury) or fail to state a claim upon which relief can plausibly be granted, they should be dismissed.

## I.      BACKGROUND

### A.  CVP History

Since the early twentieth century, "land owners, local irrigation districts, and the federal and California state governments have pumped fresh water out of the San Joaquin and Sacramento Rivers (and their tributaries) to irrigate the agricultural lands of the Central Valley and to provide drinking water to the people of California." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 983 (9th Cir. 2014). The federal government operates the CVP, which is "the largest federal water management project in the United States." *Id.* at 984 (citation omitted). The CVP along with California's related State Water Project are "perhaps the two [] most important water projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592 (9th Cir. 2014). The Federal government constructed and financed the CVP's construction. *See Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 280 (1958).

As California's population increased throughout the early twentieth century, the State and Federal Government searched for ways to divert water to support emerging population and agricultural centers. Based on reports from Interior in the early 1950s, Congress subsequently concluded that water "surplus" to the present and future needs of the Trinity and Klamath Basins – an estimated 700,000 acre-feet per year considered to be "wasting to the Pacific Ocean" – could be diverted to the Central Valley "without detrimental effect to the fishery resources." *See* H.R. Rep. No. 602, at 4-5 (1955); S. Rep. No. 1154, at 5 (1955). Based on Interior's reports Congress authorized construction of the Trinity River Division of the CVP in 1955. *See* Act of

Aug. 12, 1955, Pub. L. No. 386, ch. 872, 69 Stat. 719, 719-21 (1955).  The Trinity River

Division began operations in 1963 after the completion of the Lewiston Dam.  One of the

purposes of the Trinity River Division is "to transport Trinity River water to the Sacramento

River" for use by CVP water contractors and irrigators.  *Tehama-Colusa Canal Auth. v. U.S.*

*Dep't of Interior*, 819 F. Supp. 2d 956, 982 (E.D. Cal. 2011), *aff'd*, 721 F.3d 1086 (9th Cir.

2013).

### B.  Congress enacted the CVPIA to, among other goals, ensure affected rivers and populations are restored

Once the Trinity River Division became functional, fisheries resource managers almost

immediately observed declines in the numbers of naturally produced adult salmonids returning to

the Trinity River Basin.  To address the declining fish populations, Congress passed several

pieces of legislation including: (1) the Trinity River Stream Rectification Act (Pub. L. No. 96-

335, 94 Stat. 1062 (1980)); (2) the Trinity River Basin Fish and Wildlife Management Act (Pub.

L. No. 98-541, as amended by Pub. L. No. 104-143, 110 Stat. 1338 (1996)); and (3) the CVPIA

(Pub. L. No. 102-575, 106 Stat. 4600 (1992)).  Each of these Acts was designed to restore and

rehabilitate fish populations in the Trinity River Basin; however, the CVPIA was Congress' most

comprehensive effort "to protect, restore, and enhance fish, wildlife, and associated habitats in

the Central Valley and Trinity River basins."  Pub. L. No. 102–575, §§ 3402(a), 3406(b)(23).

Specifically, § 3406(b)(23) of the CVPIA focuses on how the Trinity River and its resources

should be restored by, among other things, ensuring adequate minimum flow volumes and

establishing procedures for restoration efforts.[1]  As a result of CVPIA § 3406(b)(23), the

Secretary and the Hoopa Valley Tribe worked collaboratively to complete the Trinity River Flow

---

[1] As Plaintiff explained in footnote 9 of its Amended Complaint, *see* ECF No. 97 at 3, the WIIN Act re-designated § 3406(b)(23) as § 3406(b)(21).  Like Plaintiff, Federal Defendants will continue to refer to the relevant provision as § 3406(b)(23).

Evaluation Study ("Flow Study") and the Trinity River Mainstem Environmental Impact

Statement ("1999 EIS") in 1999, and both parties concurred in the 2000 Trinity River Mainstem

Fishery Restoration Record of Decision ("2000 ROD"), which generally adopted the Flow

Study's recommendations and established the framework for their implementation.

### C.  Recovery of CVP and CVPIA Costs

#### 1.   Authorities governing Secretary's contracting authority

As noted above, the federal government spent billions of dollars constructing the CVP's

infrastructure, and for decades has entered into contracts with local water districts,

municipalities, landowners, and other water users to recoup costs associated with the CVP.

*Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau of Reclamation*, 579 F.3d 1345, 1351–

52 (Fed. Cir. 2009).  These costs include original capital construction costs, in addition to a

proportional share of the expenses associated with operating and maintaining the CVP ("O&M"

costs) and the costs of mitigation and restoration efforts.  *See* 43 U.S.C. § 485h(c) – (e).  The

recoupment of debt owed to the federal government for the original CVP construction costs is

the primary focus of this case because many of Plaintiff's claims at least tangentially relate to the

WIIN Act and the conversion of water contracts that allow for immediate payment of that debt.

Operation of the CVP, including the aforementioned repayment obligations, is generally

governed by the Rivers and Harbors Reauthorization Act of 1937, 50 Stat. 844, 850; the

Reclamation Act of 1902 (the "1902 Act"), 43 U.S.C. §§ 371-600e; the Reclamation Project Act

of 1939 (the "1939 Act"), 43 U.S.C. § 485h(d) & (e); and the CVPIA, Pub. L. No. 102–575, §§

3401–3412.  The 1902 and 1939 Acts establish the procedures for entering into contracts with

local water contractors, including how the Secretary is to recoup the cost of the CVP's original

infrastructure costs.  43 U.S.C. § 485h (c), (d) & (e).  The Reclamation Project Act of 1939, §

9(c), (d), & (e), codified at 43 U.S.C. § 485h, provide the Secretary with several options for entering into water contracts.  For example, 9(c)(1) and 9(d) "repayment" contracts require water contractors to repay CVP-related construction costs in fixed annual installments over a predetermined period of time, in addition to paying their share of O&M and restoration costs. *Grant Cnty.*, 579 F.3d at 1351.  By contrast, 9(c)(2) and 9(e) "water service" contracts are either short or long-term contracts for water delivery at an annual rate set by the Secretary.  *Id.* at 1352. Under traditional Reclamation law, water contractors could not prepay their portion of the CVP's original construction costs but instead were required to make annual installment payments until the debt was satisfied.  *See United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 734 (1950). Only explicit Congressional authorization permits prepayment of original capital expenses.  *Id.*

The WIIN Act explicitly authorized prepayment of debts associated with the original construction of CVP infrastructure.  WIIN Act § 4011(a).  Seventy-seven contractors chose to convert their contracts pursuant to the WIIN Act, and those contract conversions have taken place.  *See* Decl. of Lisa Holm at ¶ 5, ECF No. 125-1.  Plaintiff's Second Amended Complaint seeks to invalidate these converted contracts, including Westlands Water District Contract No. 14-06-200-495A-IR1-P, ECF No. 125-2.  *See* SAC at pp. 62-63.  The WIIN Act did not address the prepayment of any other CVP or CVPIA costs; therefore, post-WIIN Act, Reclamation must still account for and collect all other CVP and CVPIA costs.

### 2.   Reclamation's methods for accounting for CVP costs

CVP water contractors generally pay a CVP Water Rate, which is governed by the CVP rate-setting process and is comprised of three components: (1) an Operations, Maintenance and Replacement ("OM&R") cost component; (2) Operation and Maintenance deficit cost component ("O&M Deficit"); and (3) a Construction cost component.  *See* Decl. of Sabir Ahmad

at ¶ 3, ECF No. 125-3.  When the CVP Water Rate is collected, those monies are deposited into the Reclamation Fund and then appropriated back to Reclamation for the operation of CVP as determined by Congress.  *Id.*

The first and second components of CVP costs are closely related.  The OM&R cost component is an appropriate share of annual costs for routine and recurring operation and maintenance activities at Reclamation facilities within the CVP.  *Id.* ¶ 4.  The OM&R cost component is a pooled cost among CVP contractors and is allocated based on projected water deliveries and budgeted cost.  *Id.*  Budgeted OM&R costs are reconciled annually to reflect actual costs incurred during the year.  *Id.* ¶ 5.  If a contractor has a deficit, a deficit component is added to the rate to recover outstanding OM&R costs with interest.  *Id.*  That deficit component is the O&M Deficit charge and is only owed if the contractor has underpaid OM&R costs.  *Id.*

The third component of CVP costs is the construction cost component, which covers the original construction costs of CVP infrastructure that was in service at the end of fiscal year 1980.  *Id.* ¶ 6.  The construction cost component is also a pooled cost based on the facilities that contractors benefit from and is allocated to contractors based on fifty years of historic and projected deliveries and shall be recovered by the year 2030 in accordance with Pub. L. No. 99-546.  *Id.*  This specific construction cost component is what the WIIN Act allowed CVP water contractors to pay off in a lump sum or accelerated repayment.  *See* WIIN Act § 4011(a)(2)(A) ("all contracts converted pursuant to paragraph (1)(A) shall—provide for the repayment, either in lump sum or by accelerated prepayment, of the remaining construction costs identified in water project *specific irrigation rate repayment schedules*." (emphasis added)); *see also* ECF No. 125-1 ¶¶ 6-13 (noting that WIIN Act contracts only allowed for the prepayment of original CVP

infrastructure debt).  The construction cost component is detailed in "specific irrigation rate repayment schedules," namely the CVP rate-books.  *See* ECF No. 125-3 ¶ 8.

Between 2010 and 2020, Reclamation undertook a cost allocation study for the CVP to develop allocation factors to determine the final repayment obligations for CVP facilities subject to the 2030 repayment deadline established by Public Law 99-546.[2]  *See* Decl. of Steve Pavich at ¶ 2, ECF No. 125-4.  This resulted in the 2020 Central Valley Project Final Cost Allocation Study ("2020 CVP Cost Allocation Study" or "Cost Allocation Study"), ECF No. 125-5.  The Cost Allocation Study explicitly excluded allocating the costs of CVPIA facilities.  *Id.* at 25; *see also id.* at 78 ("CVPIA facility costs are excluded from the [Cost Allocation Study] and are being handled through a separate process."); *id.* at 95-98 ("Costs not allocated, including CVPIA. . . are shown separately in Table 11-1.").  Importantly, the $340,872,120 in costs Plaintiff references throughout its Second Amended Complaint, *see* ECF No. 142 ¶¶ 2(4), 146, 154, 187, are CVPIA facilities costs that were excluded from the Cost Allocation Study.  *See* ECF No. 125-5 at 25, 78, 95-98; *see also* ECF No. 125-4 ¶ 11.  As the Cost Allocation Study notes, the sub-allocation of CVPIA facilities costs will be determined "through a separate process," known as the Business Practice Guidelines.  *Id.*

### 3.  Reclamation's methods for accounting for CVPIA costs

When the CVPIA was passed, it required certain charges be assessed against CVP water and power contractors above and beyond existing CVP costs.  *E.g.*, CVPIA § 3406(b)(1).  Those charges include: (1) Pre-Renewal Charges; (2) Tiered Water Charges; (3) Water Transfer Charges; (4) Friant Surcharges (until Pub. L. 111-11 in 2009); (5) Municipal & Industrial

---

[2] Public Law 99-546, § 105 requires the Secretary to ensure that rates are reset if the existing rates are insufficient to "recover the appropriate share of the existing Federal investment in the [CVP] by the year 2030."

Surcharge; and (6) Mitigation and Restoration Charges.  *See* Decl. of Spencer Walden at ¶ 3, attached as ECF No. 125-6.  When CVPIA charges are collected, they are generally deposited into the Central Valley Project Restoration Fund ("CVP Restoration Fund"), which was statutorily created by the CVPIA.  *Id.* ¶ 2.  The CVP Restoration Fund is distinct from the Reclamation Fund where CVP costs are deposited.  *Id.*  When money is deposited into the CVP Restoration Fund, it is available for expenditures on CVPIA activities up to the amount appropriated by Congress and in accordance with the Congressionally established formula in Section 3407(a).  *Id.* ¶ 9.

The only CVPIA costs implicated by Plaintiff's Second Amended Complaint are CVPIA facility construction costs, which are treated as Mitigation and Restoration Charges.  *Id.* ¶ 11.  To be precise, Plaintiff incorrectly claims Reclamation failed to allocate and collect $340,872,120.00 of these charges.  SAC ¶¶ 154, 187.  As noted above, the Cost Allocation Study explicitly excluded these $340,872,120.00 in CVPIA facilities costs and deferred allocating those costs to the Business Practice Guidelines process, which is a separate process Reclamation is undertaking to study CVPIA costs.  ECF No. 125-6 ¶¶ 11, 14-16.

The draft 2020 Business Practice Guidelines were Reclamation's most recent effort to study how to account for CVPIA costs.  *Id.*  The primary goal of the Business Practice Guidelines is to finalize reimbursability of every CVPIA authorization (specifically those that deferred to existing law and procedures), finalize a process to split CVPIA costs between project purposes, and describe the cost recovery mechanism.  *Id.* ¶¶ 14-16.  This includes how to allocate the $340 million in CVPIA facilities costs between CVP water and power contractors. *Id.*  However, Interior withdrew the draft 2020 Business Practice Guidelines from consideration

by the Office of Management and Budget, and Reclamation has not commenced the process of revising (or revisiting altogether) the draft Business Practice Guidelines.  *Id.* ¶ 16.

## II.   LEGAL STANDARDS

Plaintiff lacks standing for various claims because it has failed to identify an injury in fact, it has failed to establish causation and redressability, some of its claims are unripe, and some of its claims are moot.  Thus, Plaintiff's claims should be dismissed for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  *See Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1036 (N.D. Cal. 2014) (Article III standing is jurisdictional); *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 905 F. Supp. 2d 1158, 1166 (E.D. Cal. 2012) ("[A] plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction."). Extrinsic evidence, including declarations, can be considered to establish a factual challenge to jurisdiction.  *See Ruffino v. United States*, 374 F. Supp. 3d 961, 967 (E.D. Cal. 2019) ("[T]he United States launches a factual attack because it relies on extrinsic evidence to challenge the complaint's allegations.").

A Rule 12(b)(6) motion tests whether "a complaint [] contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  When reviewing 12(b)(6) motions, courts must accept all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor.  *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). At the 12(b)(6) stage, courts are ordinarily limited to reviewing the face of the complaint and any matters that are judicially noticeable.  *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). However, courts are allowed to consider documents the plaintiff references throughout the

complaint or that form the basis of the plaintiff's claim. *Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1085 (9th Cir. 2020). Declarations can also be considered to address materials referenced by the complaint or materials that are subject to judicial notice. *See, e.g.*, *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1020 (C.D. Cal. 2015).

## III.    ARGUMENT

### A.  The Court should dismiss Plaintiff's First Claim for Relief (alleged violation of sections 3404(c)(2) and 3406(b)(23) of the CVPIA and the APA) for lack of jurisdiction and for failure to state a claim

Plaintiff argues it was injured by Reclamation converting water contracts pursuant to the WIIN Act without expressly incorporating certain provisions of Reclamation law into the contracts as allegedly required by § 3404(c)(2) of the CVPIA. SAC ¶ 127. It also alleges that Reclamation violated the CVPIA by improperly labelling Trinity River restoration costs as § 3406(b)(1) costs instead of § 3406(b)(23) costs. SAC ¶ 128. These CVPIA-related claims, which are both pleaded in Plaintiff's First Claim for Relief, should be dismissed.

### 1.  12(b)(1): Plaintiff's challenges to the WIIN Act contract conversions are non-justiciable

#### a.  Plaintiff does not have standing to bring its § 3404(c)(2) claim

Plaintiff's claim that Reclamation violated § 3404(c)(2) of the CVPIA by allegedly failing to incorporate the requirements of existing law into the WIIN Act contracts, *see* SAC ¶ 127, should be dismissed for lack of standing. To establish standing a plaintiff must allege that "(1) it [] suffered an 'injury in fact' . . . ; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Plaintiff's § 3404(c)(2) claim does not identify an actual and imminent injury that is fairly traceable to the contract conversions.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). To be concrete, the injury "must actually exist." *Id.* at 340. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 339 (citation omitted). And to be imminent, an injury "must be *certainly impending*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "Conjectural, hypothetical, or speculative injuries, such as '[a]llegations of possible future injury,' do not suffice." *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019) (alteration in original) (citation omitted).

Plaintiff argues that Federal Defendants' alleged failure to incorporate the requirements of existing Reclamation law, which is required for the renewal of long-term water contracts pursuant to § 3404(c)(2) of the CVPIA, into the converted contracts have harmed and will continue harm Plaintiff's substantive water and fishing rights. *See* SAC ¶¶ 8, 16, 19, 21, 55-56. Plaintiff also alleges that Reclamation's purported failure to incorporate specific statutory reimbursement and collection requirements will impair Reclamation's ability to collect funds for Trinity Restoration. *Id.* ¶¶ 21-22. But these conclusory statements are insufficient to show real, concrete threatened harms arising from the conversion of contracts to pre-pay existing debt. For example, Plaintiff has not alleged, nor could it, that the conversion process caused the water levels in the Trinity River to decrease because: (1) neither the plain language of the converted contracts nor the mutual obligations agreed to thereunder affect river water levels;[3] and (2) the

---

[3] Like the old contracts, the amended contracts do not guarantee any amount of water, but instead determine water delivery amounts based on factors such as hydrology and Reclamation's obligations under the Endangered Species Act. *See, e.g.*, ECF No. 125-2, ¶ 12 at 37–38 and ¶ 14 at 40.

2000 ROD and its procedures generally govern how much water the Trinity River receives each year and establishes mandatory, minimum volumes.  *See* 2000 ROD, ECF No. 111-2.  Plaintiff has also failed to point to any provision of the converted contracts that altered the *status quo* regarding water levels.  This failure to connect the alleged harm – *i.e.* diminished water levels – to any provision of the converted contracts that could diminish water levels is fatal.

In fact, the WIIN Act itself explicitly states that when converting contracts under § 4011(a)(1), (a)(2) or (a)(3), the Secretary can only alter the terms to allow prepayment of original infrastructure costs and cannot alter other contractual obligations, including terms affecting water uses and flows.  WIIN Act § 4011(a)(4)(C).  A comparison of Westlands' original contracts, *see* ECF No. 125-7, and Westlands' converted contract, attached as ECF No. 125-2, confirms that the conversion process complied with the WIIN Act and did not alter water delivery obligations. Under the original contract, Westlands was entitled to water delivery so long as: (i) it met its obligation to repay its portion of the CVP's construction costs and maintenance and operation expenses, and (ii) the Federal Defendants were able to deliver water without violating federal reclamation law.  Under Westlands' converted contract, Westlands prepaid its portion of the CVP's construction costs and therefore water delivery is now conditioned on Westlands: (i) paying its portion of the CVP's O&M Rate and the CVPIA's restoration charges, and (ii) the Federal Defendants being able to deliver water without violating federal reclamation law.  The only change between the old contract and the converted contract is that Westlands no longer owes the Federal Defendants its portion of the CVP's original construction costs – because it was repaid.

Because the converted contracts do not and cannot change the terms of water delivery or the Federal Defendants' obligations to protect Plaintiff's water and fishing rights, the conversion

of said contracts has not caused any harm to Plaintiff's concrete interests. Plaintiff therefore

lacks standing, and its claim under § 3404(c)(2) should be dismissed.

Additionally, to the extent Plaintiff is alleging a pure procedural harm – *i.e.*

Reclamation's purported violation of § 3404(c)(2) – that asserted statutory violation alone cannot

constitute an injury in fact. *Cunha v. IntelliCheck, LLC*, 254 F. Supp. 3d 1124, 1139 (N.D. Cal.

2017). "Article III standing requires a concrete injury even in the context of a statutory violation

. . . a bare procedural violation, divorced from any concrete harm, [does not] satisfy the injury-

in-fact requirement of Article III." *Id.* (citation omitted). Because § 3404(c)(2) does not protect

any substantive right and was not designed to protect any of Plaintiff's concrete interests, a bald

procedural violation of § 3404(c)(2) cannot confer standing. *See Nayab v. Cap. One Bank*

*(USA), N.A.*, 942 F.3d 480, 490 (9th Cir. 2019). Plaintiff has not adequately pled an injury in

fact by simply claiming a statute has been violated. Also, Plaintiff cannot identify a concrete,

substantive injury arising from the alleged violation of § 3404(c)(2) because Plaintiff

misunderstands the statutory requirement. As discussed below in Section (III)(A)(2), the Federal

Defendants did incorporate reclamation law into the converted contracts, which is all that §

3404(c)(2) requires. *See, e.g.*, ECF No. 125-2.

### b. Plaintiff's § 3406(b)(23) claim (which it also includes as part of its First Claim for Relief) is not justiciable

Plaintiff's claim that Reclamation improperly accounts for CVPIA § 3406(b)(23) costs by

treating them as § 3406(b)(1) costs is not ripe. The ripeness requirement—which, like standing,

is jurisdictional—prevents "the courts, through avoidance of premature adjudication, from

entangling themselves in abstract disagreements over administrative policies, and also to protect

the agencies from judicial interference until an administrative decision has been formalized and

its effects felt in a concrete way by the challenging parties." *Fireman's Fund Ins. Co. v.*

*Garamendi*, 790 F. Supp. 938, 946 (N.D. Cal. 1992), *aff'd*, 87 F.3d 290 (9th Cir. 1996) (citation

omitted); *see also Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*, 435 F. Supp. 3d 1063, 1076

(E.D. Cal. 2020) ("The constitutional component of ripeness is a jurisdictional prerequisite."

(citing *In re Coleman*, 560 F.3d 1000, 1005 (9th Cir. 2009))).  Here, Interior is actively

considering how to treat §§ 3406(b)(1) and (b)(23) costs, and there has been no decision on this

subject.  *See* ECF No. 125-6 ¶ 17.

      Apart from a lack of finality, Plaintiff's Second Amended Complaint attempts to explain

why § 3406(b)(23) costs should be treated separately from § 3406(b)(1) costs (*see* SAC at ¶

128), however, Plaintiff never identifies an injury it will suffer if Interior ultimately decides to

treat §§ 3406(b)(1) and (b)(23) costs the same.  As discussed above, constitutional standing

requires Plaintiff to allege that it has "suffered an 'injury in fact' that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical[,]" and is  "fairly

traceable to the challenged action of the defendant[.]"  *Laidlaw*, 528 U.S. at 180–81.  Without

identifying a real or imminent injury arising from what Plaintiff speculates will be Interior's

treatment of § 3406(b)(23) costs, Plaintiff would lack standing to challenge said treatment even

if its claim was ripe.

### 2. 12(b)(6): Plaintiff's First Claim of Relief for violation of the CVPIA (including both of its two sub-claims) fails as a matter of law

      In addition to Plaintiff's failure to establish Article III standing, Plaintiff's CVPIA claims

also fail as a matter of law.  In its first sub-claim under its First Claim for Relief, Plaintiff alleges

that Reclamation violated CVPIA § 3404(c)(2) by not expressly incorporating certain provisions

of Reclamation law into contracts converted under the WIIN Act.  SAC ¶ 127.  This claim fails

for two reasons.  First, Plaintiff has not plausibly alleged a § 3404 claim because § 3404 of the

CVPIA – which governs Reclamation's ability to enter into new contracts or renew existing

contracts for an additional term – does not apply to WIIN Act contract conversions.  Second, despite § 3404 not applying to the WIIN Act conversions, Reclamation nonetheless complied with the provision by incorporating federal Reclamation law into the converted contracts. Plaintiff's second sub-claim alleging that Reclamation is violating CVPIA § 3406 "by attributing certain costs of implementing Trinity River restoration activities in CVPIA section 3406(b)(23) to CVPIA section 3406(b)(1)" also fails because the CVPIA does not include any statutory requirements for how Reclamation must account for and collect CVPIA restoration costs.

### a.  Plaintiff's § 3404(c)(2) claim fails because that provision does not apply to converted contracts under the WIIN Act

Section 3404 of the CVPIA limits the Secretary's authority to enter into *new* water supply contracts and to *renew* existing long-term water supply contracts.  CVPIA, §§ 3404(a) and (c). Plaintiff's claim focuses on § 3404(c)(2), which according to its plain terms only applies to contract renewals for another term.  The text of the CVPIA is completely silent on the unique contract conversion process established by the WIIN Act.  It does not limit the Secretary's authority to convert existing water service contracts into repayment contracts and to modify the terms of the converted contract or an original long-term repayment contract to allow for accelerated repayment of original CVP infrastructure debt.  *Schroeder v. United States*, 793 F.3d 1080, 1083 (9th Cir. 2015) ("There is no need to look beyond the plain meaning in order to derive the purpose of the statute . . . [a]t least there is no need to do so when the result is not absurd." (citation omitted)).  Because the Secretary indisputably did not renew an existing long-term contract for another 25-year term as contemplated by § 3404(c)(2), the Secretary's conversion of contracts under the WIIN Act falls outside the scope of § 3404(c) and Plaintiff's § 3404(c)(2) claim should be dismissed.

**b. Plaintiff's § 3404(c) claim also fails because the disputed conversion contracts incorporate federal law**

Even if the Court were to find that § 3404(c)'s limitations on the Secretary's contracting authority apply to the disputed WIIN Act contract conversions, Plaintiff's CVPIA claim would still fail.  As shown by Westlands Water District Contract No. 14-06-200-495A-IR1-P, *see* ECF No. 125-2, the converted contracts incorporate all requirements imposed by existing Reclamation law.[4]  Specifically, Article 14 of Westlands' converted contract states that, "the delivery of Irrigation Water . . . . is subject to Federal Reclamation law, including but not limited to, the Reclamation Reform Act of 1982 (43 U.S.C. 390aa et seq.), as amended and supplemented, and the rules and regulations promulgated by the Secretary of the Interior under Federal Reclamation Law."  ECF No. 125-2 at 42.

To the extent Plaintiff suggests that Reclamation must specifically name all statutory provisions, agreements, and departmental memoranda that reference the Hoopa Valley Tribe when entering into a contract, that position would lack any statutory support and is simply unfeasible.  The CVPIA's requirement that the Federal Defendants incorporate "existing law" into the contracts does not require Reclamation to expressly incorporate specific statutes or agreements that are important to the Hoopa Valley Tribe.  In fact, if Reclamation were to incorporate specific statutory language at the time of execution, the contracts would remain static and would not embrace changes to Reclamation law.  The contractual provision, as written, contemplates and embraces potential statutory and regulatory changes.

---

[4] A Court may "appropriately consider the terms of a contract at the motion to dismiss stage when the contract is referenced in the complaint and its terms are not in dispute."  *See Razaghi v. Razaghi Dev. Co., LLC*, No. 2:18-CV-01622-GMN-DJA, 2020 WL 5821829, at *10 (D. Nev. Sept. 30, 2020).

In sum, Plaintiff's assertion that the Federal Defendants failed to incorporate federal Reclamation law into the converted contract is incorrect, and Plaintiff's CVPIA claim fails as a matter of law.

> ### c. Plaintiff's CVPIA § 3406(b)(23) claim (as articulated in Claim 1) fails because that provision does not mandate a particular accounting process

As noted above, Reclamation has not yet established a process for allocating and collecting CVPIA costs so Plaintiff's allegation that Reclamation will treat § 3406(b)(23) costs as § 3406(b)(1) costs is speculative at this point. But even if Plaintiff's § 3406 claim was not premature, it would still fail because it is contrary to the plain terms of the statute.

Section 3406(b)(23)'s only reference to costs is found in a single sentence: "[c]osts associated with implementation of this paragraph shall be reimbursable as operation and maintenance expenditures pursuant to existing law." CVPIA, § 3406(b)(23)(B). Congress' only direction to Reclamation is to treat § 3406(b)(23)(B) costs as O&M costs and to comply with existing law. Section 3406(b)(23)(B) does not explicitly or implicitly create a new accounting standard requiring Reclamation to segregate these costs from all other costs. In fact, § 3406(b)(23) itself appears to anticipate that these costs would be grouped alongside other § 3406(b) costs for at least some accounting purposes.[5] CVPIA, § 3406(b)(23).

Section 3406(b)(23)(B) contains no Congressional directive requiring Reclamation to separate § 3406(b)(23) costs from any other § 3406(b) costs when Reclamation accounts for restoration costs. Plaintiff invents such a requirement out of whole cloth. Accordingly, its claim

---

[5] Section 3406(b)(23) provides that contractors will receive credits to offset the costs of "this *subsection*" – which includes all § 3406(b) costs, not just (b)(23) costs – if the restoration efforts of "this *section*" – *i.e.* all of § 3406 – result in fish populations exceeding pre-CVP levels. Therefore, at least for some purposes § 3406(b)(23) anticipates grouping all § 3406(b) costs together.

that § 3406(b)(23) requires Reclamation, as a matter of internal accounting, to segregate those costs from all other restoration costs should be dismissed because it has no foundation in the statute.

> **B. The Court should dismiss Plaintiff's Second Claim for Relief (alleged violation of NEPA and the APA) for lack of jurisdiction and for failure to state a claim**

Plaintiff also claims that the WIIN Act contracts should be invalidated for failure to comply with the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA").[6]  SAC ¶¶ 132-38.  Plaintiff's WIIN Act-related NEPA claim should be dismissed for at least two reasons: first, Plaintiff has failed to allege a causal relationship between its purported injuries and the WIIN Act conversions and has also failed to show that its alleged injury is redressable; and second, the WIIN Act's statutory scheme leaves no room for Reclamation to change the contracts in a way that could impact the environment.

> **1. Plaintiff's WIIN Act-related NEPA claim fails for lack of jurisdiction and for failure to state a claim**

> > **a. Plaintiff does not have standing to challenge WIIN Act contract conversions under NEPA**

To have standing, a plaintiff who alleges that an agency violated NEPA's procedural requirements must still establish a redressable "injury-in-fact."  *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1013 (9th Cir. 2021).  The injury-in-fact requirement can be satisfied if Plaintiff claims the agency's action will result in an environmental impact and that impact will have a "geographically proximate" effect on Plaintiff.  *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005).  However, a plaintiff "[asserting a

---

[6] NEPA does not create an "independent cause[] of action. . .  rather, alleged violations of NEPA . . .  are addressed when a party challenges a final decision by a federal agency pursuant to the Administrative Procedure Act ('APA')[.]"  *See Shasta Res. Council v. U.S. Dep't of the Interior*, 629 F. Supp. 2d 1045, 1050–51 (E.D. Cal. 2009).

procedural harm] raising only a generally available grievance about government . . . and seeking relief that no more directly and tangibly benefits him than it does the public at large[,] does not state an Article III case or controversy." *Whitewater Draw*, 5 F.4th at 1014 (alterations in original) (citation omitted).  Additionally, while Article III's causation and redressability requirements are relaxed in procedural injury cases, they are not eliminated.  *Id.* at 1013. Specifically, plaintiffs must still "make some showing of how the agency's failure to account for environmental consequences affects them" and must show "that the agency was capable of redressing those harms."  *Id.*

The WIIN Act contract conversions do not affect water levels or impact restoration funding for the Trinity River in any way.  *See* ECF No. 125-1 ¶¶ 10, 12; *see also* WIIN Act § 4011(a)(4)(C).  Plaintiff is required to plead facts establishing a cognizable injury and has failed to identify how the prepayment of debt for preexisting infrastructure impacts the environment, or how those impacts, if any, specifically affect Plaintiff's individualized interests.  Because NEPA requires "'a reasonably close causal relationship' between the environmental effect and the alleged cause," *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004), and because Plaintiff has not shown how financial transactions between the United States and water contractors caused environmental injuries that are affecting Plaintiff's rights, Plaintiff has not met the injury-in-fact and causation requirements of standing.

But even if Plaintiff had pleaded an injury-in-fact and causation, Plaintiff still fails to satisfy standing's redressability requirement.  Plaintiff has not alleged how environmental analysis could have "influence[d] the agency's ultimate decision of whether to take or refrain from taking a certain action."  *Salmon Spawning & Recovery All. V. Gutierrez*, 545 F.3d 1220, 1226–27 (9th Cir. 2008).  Regardless of what a NEPA analysis could have said about the

potential environmental effects stemming from the water contractors' prepayment of
construction debts, the agency lacked discretion to alter the outcome of the conversion process
under Congress' mandate to convert the contracts upon the contractors' request and prescription
of the terms on which the contracts could be converted.  *See infra*, Section (III)(B)(1)(b).
Because NEPA review, and any order from this Court to perform NEPA review, could not alter
Reclamation's actions regarding the contract conversions, Plaintiff cannot satisfy the
redressability requirement for procedural injuries and lacks standing.

> **b. Plaintiff's WIIN Act-related NEPA claim also fails as a matter of
> law because Congress mandated the contracts be converted on
> terms that precluded Reclamation from changing the contracts'
> environmental impacts**

In addition to lacking standing, Plaintiff's NEPA claim must also be dismissed for failure
to state a claim.  NEPA review is not required where an agency would not have discretion to
alter its course of action based on that review.  *Pub. Citizen*, 541 U.S. at 767 ("Where the
preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a
whole, no rule of reason worthy of that title would require an agency to prepare an EIS.").
Section 4011(a)(1) of the WIIN Act requires the Secretary, upon the request of any water
contractor, to convert 9(e) or 9(c)(2) renewable water service contracts into repayment contracts.
*See* WIIN Act § 4011(a)(1).  Likewise, § 4011(a)(2) requires the Secretary to convert any 9(d) or
9(c)(1) repayment contracts into permanent prepayment contracts.  *Id.* § 4011(a)(2).  Neither §
4011(a)(1) nor § 4011(a)(2) vests the Secretary with any discretion on whether to convert CVP
water contracts.  If the contractor requests conversion, the existing contracts must be converted
to allow for the prepayment of construction debts to the United States.  And importantly, §§
4011(a)(2)–(4), (b) and (c) dictate how the Secretary must convert the contracts.  While those
provisions vested the Secretary with limited discretion on how to implement conversion, that

discretion was constrained to negotiating certain financial terms of prepayment.  The Secretary could not make contractual modifications that affect the environment and thereby lacked any discretion that would trigger NEPA's procedures.

Plaintiff's Second Amended Complaint suggests that § 4011(a)(1) vested the Secretary with discretion because it allowed the Secretary to convert contracts "under mutually agreeable terms and conditions."  SAC ¶¶ 44, 136.  But both logic and the statutory canon of *ejusdem generis*[7] counsel that § 4011(a)(1)'s general reference to "mutually agreeable terms and conditions" is limited by the preceding specific language – "to allow for prepayment of the repayment contract pursuant to paragraph (2)."  In other words, reading the statute as a whole, Reclamation's discretion was limited to negotiating narrow, "mutually agreeable" financial terms outlined in paragraph 2 of § 4011(a).  *Cf. Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001).

Paragraph (2) of Section 4011(a) demonstrates that rather than contemplating a wholesale revision of the contract terms, Congress intended Reclamation to take specific actions to negotiate *some* "mutually agreeable" *financial* terms for the prepayment of construction costs.  Paragraph (2) allows Reclamation to agree to have the contractor's repayment obligation prepaid through either a lump sum payment or an accelerated repayment schedule, provided that all payments are made within three years.  WIIN Act § 4011(a)(2).  Paragraph (2) also sets out the specific terms by which the repayment obligation will be determined.  *Id.*  Reclamation had no discretion to negotiate the amount to be repaid; its discretion was limited to determining, within the limits set by the statute, the timing and means (lump sum or on a schedule) of the repayment.

---

[7] "Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991).

*See* ECF No. 125-1 ¶ 7.  Because the timing and means of repayment could have no effect on the environment, Reclamation's limited discretion could not have been informed by an environmental analysis under NEPA.

Moreover, Section 4011(a)(4) of the WIIN Act curtails any discretion available to Reclamation by imposing three specific "conditions" on "all contracts" entered into pursuant to the Act.  Most importantly, Section 4011(a)(4)(C) mandates that the WIIN Act contracts shall "not modify other *water service*, repayment, exchange and transfer contractual rights between the water users' association [Contractor], and the Bureau of Reclamation . . . ."  WIIN Act § 4011(a)(4)(C) (emphasis added).  The listed rights which cannot be modified in conversion encompass effectively all substantive terms of the contract other than the payment terms Congress expressly authorized to be changed, and certainly reach any contract terms relating to the delivery of water to the contractors and the payment of operation and maintenance and restoration costs.  Because this condition deprives Reclamation of any discretion to act for the benefit of the environment, it precludes the application of NEPA.  *E.g.*, *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 977 (9th Cir. 2003); *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1017 (9th Cir. 2012) (holding that NEPA does not apply to annual plans because the plans do not change the status quo).

Section 4012 of the WIIN Act, *i.e.* the "savings clause," further supports the conclusion that NEPA does not apply.  In § 4012 Congress stated that the WIIN Act should not be interpreted or implemented in a way that (i) modifies the United States' obligations under state law; (ii) overrides an obligation under the CVPIA; (iii) overrides an obligation under the ESA; (iv) would cause additional harm to listed fish species; or (v) overrides the obligation of the Pacific Fisheries Management Council to manage fisheries on the west coast.  WIIN Act §

4012(a).  Notably absent from the list of provisions that § 4011 does not displace is NEPA.

Congress could have directly referenced NEPA as it did for § 4007(b)(4), but chose not to.  *See*

*id.* § 4007(b)(4) (requiring compliance with "all applicable environmental laws, including

[NEPA]" when participating in a federally owned storage project under the Act).  The fact that

Congress referenced NEPA compliance for water storage activities under § 4007 but did not

similarly do so for § 4011 contract conversions is indicative that Congress did not believe that

NEPA applied to the mandatory conversions under § 4011.  *See Russello v. United States*, 464

U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute

but omits it in another section of the same Act, it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

     Despite the mandatory nature of the WIIN Act's conversion provisions, the statutory

limitations on the Secretary's discretion in implementing the conversions, and the statute's

silence on NEPA, Plaintiff asserts that the Secretary erred by following Congress' express

direction to convert the contracts upon the request of the contractors.  SAC ¶¶ 132-37.  But

Plaintiff's allegations ignore the plain language of the WIIN Act and assume that Secretary had

discretion on whether or not to convert the contracts and on how to implement the conversions.

As explained above, the WIIN Act vests the Secretary with no such discretion; the WIIN Act

mandated conversion and curtailed the Secretary's discretion on how to implement conversion in

such a way that the Secretary could not negotiate provisions that would positively impact the

environment.  Because NEPA does not apply to the mandatory contract conversions, Plaintiff's

Second Claim for Relief must be dismissed pursuant to Rule 12(b)(6).

**C.  The Court should dismiss Plaintiff's Third Claim for Relief (alleged violation of the WIIN Act and the CVPIA and the APA) for lack of jurisdiction and for failure to state a claim**

Plaintiff claims that Reclamation violated § 4011 of the WIIN Act and §§ 3404(c)(2) and 3406 of the CVPIA "by not allocating to CVP contractors at least $340,872,120.00 of CVPIA costs in Reclamation's [2020 Central Valley Project Final Cost Allocation Study], and providing for its repayment in WIIN Act contracts."  SAC ¶ 146.  Plaintiff's concerns about allocation and collection of costs appear to be motivated by Plaintiff's mistaken belief that Federal Defendants have forgiven $340,872,120.00 in CVPIA facilities costs that are being carried on Reclamation's balance sheet.  *See id.*  This concern pervades Plaintiff's Second Amended Complaint and is the subject of no less than four of its ten claims.  *See* First, Third, Fourth, and Fifth Claims of SAC. However, Plaintiff's concerns about how Reclamation accounts for Trinity River restoration costs are not ripe for adjudication.

The CVPIA facilities costs identified by Plaintiff are separate and distinct from CVP capital costs that were the focus of the 2020 Cost Allocation Study and which the WIIN Act allowed to be prepaid.  As noted above, the Cost Allocation Study deferred the allocation of the disputed CVPIA costs to the development and final approval of Business Practice Guidelines.[8] *See supra* at (II)(C)(2) and (3).  As Plaintiff's own Second Amended Complaint concedes, the original draft 2020 Business Practice Guidelines have been withdrawn, and the Federal Defendants have not begun the process of developing new Business Practice Guidelines.  SAC ¶ 157.  Because Reclamation has not finalized the Business Practice Guidelines or taken any action to allocate and collect the CVPIA facilities costs identified in Plaintiff's Amended Complaint,

---

[8] Because Plaintiff incorporated the 2020 Cost Allocation Study, *see* ECF No. 125-5, into its Amended Complaint by reference, the Court can see that the Study excludes CVPIA costs from its analysis.  *See, e.g.*, SAC ¶ 47.  The Court can also consider this extrinsic evidence in support of Federal Defendants' factual challenge to the Court's jurisdiction.  *See Ruffino*, 374 F. Supp. 3d at 967.

there is no final agency action upon which Plaintiff can sue.  *See Dietary Supplemental Coal., Inc. v. Sullivan*, 978 F.2d 560, 562 (9th Cir. 1992) (requiring that for a claim to be ripe, Plaintiff must be challenging "the final administrative work").

In addition to not being ripe, Plaintiff's claim that Reclamation has failed to collect $340,872,120.00 in restoration costs is not an individualized injury to the Tribe, but instead a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  A generalized grievance, as opposed to "a palpable injury to [one]self," normally "does not warrant exercise of jurisdiction."  *Id.* at 500-01.  When Reclamation "recovers" CVPIA costs it is recovering Congressional appropriations spent on CVPIA activities that generate a reimbursable obligation that exceeds the upfront payments Reclamation collects from CVP water and power contractor for the CVP Restoration Fund.  ECF No. 125-6 ¶ 12.  When Reclamation recovers Congressional appropriations that exceed CVP Restoration Fund payments, that money is deposited into the United States Treasury's Reclamation Fund, not the CVP Restoration Fund.  *Id.*  Those funds then become available for Congress to re-appropriate, and nothing requires Congress to re-appropriate those funds for Trinity River restoration.  Therefore, when Plaintiff complains that Reclamation has failed to recover $340,872,120.00 in monies allegedly owed to the United States for CVPIA construction projects, it has not identified a concrete, individualized injury, and its claim is not justiciable.  *See Handy v. Bernanke*, No. 3:11CV672-HEH, 2012 WL 7964216, at *2 n.2 (E.D. Va. Jan. 26, 2012), *aff'd*, 474 F. App'x 141 (4th Cir. 2012) (dismissing complaint when plaintiff failed to "claim to have personally suffered any individualized, concrete injury-in-fact, . . . [and instead] merely alleg[es] generalized grievances on behalf of United States citizens.").

Moreover, Plaintiff's factual contention that these funds will be lost forever if the Court

does not invalidate the WIIN Act contracts – which did not specifically account for the $340,872,120.00 in accrued restoration costs – is factually and legally incorrect.  As noted in Section III(B)(2), § 4011(a)(2) of the WIIN Act only applies to the prepayment of CVP construction costs – not accrued or future operation and maintenance or restoration costs – and only allows Reclamation to negotiate the timing and means (lump sum or on a schedule) of the prepayment of those capitalized CVP construction costs to be paid by 2030.  Moreover, Section 4011(a)(4) of the WIIN Act specifically forbids Reclamation from changing any other substantive terms of the existing contracts, including any terms relating to the collection of restoration costs.  Accordingly, the contractors' obligations – as they relate to O&M and restoration costs (including the disputed CVPIA facilities costs) – could not be and were not altered by the WIIN Act conversions.  Additionally, the contracts themselves provide the mechanism for Reclamation to collect accrued and future operation and maintenance and restoration costs.  *See* ECF No. 125-1 ¶ 10.

In sum, Plaintiff's Third Claim for Relief fails because it is not ripe, Plaintiff has not identified an individualized injury, and neither the CVPIA nor the WIIN Act compelled Reclamation to include a provision in the converted WIIN Act contracts providing for the repayment of accrued CVPIA facilities costs.

### D. The Court should dismiss Plaintiff's Fourth Claim for Relief (alleged violation of the WIIN Act, the CVPIA, and the APA) for lack of jurisdiction and for failure to state a claim

Plaintiff's fourth claim is closely related to its first and third claims and is also based on its allegation that Reclamation failed to collect $340,872,120.00 of CVPIA restoration costs. Plaintiff alleges that the 2020 CVP Cost Allocation Study improperly applied the separable costs-remaining benefit ("SCRB") method by concluding that fish and wildlife restoration costs should be treated as non-reimbursable joint costs rather than fully reimbursable separable costs.

According to Plaintiff, this allegedly improper designation of fish and wildlife restoration costs – which CVPIA Section 3406(a) treats as distinct project "purpose" – renders the converted WIIN Act contracts invalid.  SAC ¶¶ 149-152.  Plaintiff's fourth claim fails for the same reasons its first and third claims fail, as it is unripe and Plaintiff lacks standing to bring it.  Federal Defendant incorporate the arguments they have already made regarding Claims One and Three.

Additionally, Plaintiff misunderstands the scope of the 2020 CVP Cost Allocation Study, which it incorporated into its Second Amended Complaint by reference.  The 2020 CVP Cost Allocation Study did not designate capitalized CVPIA restoration costs as non-reimbursable joint costs rather than fully reimbursable separable costs.  *See* Cost Allocation Study, ECF No. 125-5; *see also* ECF No. 125-4 ¶¶ 7-8, 10.  Instead, Reclamation excluded CVPIA facilities costs from the 2020 CVP Cost Allocation Study because CVPIA is a separate and distinct program with its own cost allocation and recovery framework founded on the reimbursability provisions outlined throughout the CVPIA itself.  *Id.*

**E.  The Court should dismiss Plaintiff's Fifth Claim for Relief (alleged violation of Executive Order 12866 and the APA) for lack of jurisdiction and for failure to state a claim**

Like its first, third, and fourth claims, Plaintiff's fifth claim also turns on its belief that Reclamation did not properly take into account the $340,872,120.00 in accrued CVPIA facilities costs before converting contracts pursuant to the WIIN Act.  Specifically, Plaintiff argues that Reclamation acted arbitrarily and capriciously by violating Executive Order No. 12866, which instructs agencies to assess all costs and benefits of available regulatory alternatives.  Plaintiff asserts Reclamation failed to have the Office of Management and Budget ("OMB") review the Business Practice Guidelines before converting the water contracts pursuant to the WIIN Act.  SAC ¶¶ 154-160.  This claim fails for all of the same reasons Plaintiff's first, third, and fourth claims fail – including that the claim is not ripe, Plaintiff has only alleged a generalized

grievance, and the WIIN Act precluded Reclamation from altering any terms relating to restoration costs. Federal Defendants have already discussed these jurisdictional defects at length, and incorporate the arguments they have already made regarding Plaintiff's First, Third, and Fourth Claims for Relief.

Additionally, Plaintiff's fifth claim fails because Executive Order No. 12866 does not create a cause of action; and in fact, the Executive Order specifically disclaims creating any enforceable substantive or procedural right. The order is "intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States." Exec. Order No. 12866, § 10, 58 Fed. Reg. 51,735 (Sept. 30, 1993). Several courts have recognized that Executive Order 12866 and similar Executive Orders do not create causes of action. *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 9 (D.C. Cir. 1999) (equivalent language in another Executive Order precluded plaintiff from suing for violation of the order or invoking the order's provisions as evidence of arbitrary and capricious agency action); *Trawler Diane Marie, Inc. v. Brown*, 918 F. Supp. 921, 932 (E.D.N.C. 1995), *aff'd*, 91 F.3d 134 (4th Cir. 1996) (Executive Order 12866 does not permit private lawsuits to challenge an agency's compliance); *see also All. for Nat. Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 135 n.10 (D.D.C. 2011) ("By the terms of the Executive Order [12866], the plaintiffs may not sue for any alleged violations."). Because no claim – whether procedural or substantive – can flow from Executive Order 12866, Plaintiff's fifth claim should be dismissed.

### F. The Court should dismiss Plaintiff's Sixth Claim for Relief (alleged violation of the Reclamation Act of 1922, 43 U.S.C. § 511) for lack of jurisdiction and for failure to state a claim

Plaintiff's sixth claim argues that Reclamation violated the Reclamation Act of 1922, 43 U.S.C. § 511, by refusing to void Westlands' contract after the Fresno County Superior Court

declined to validate the contract.  SAC ¶ 162.  Plaintiff's validation-related claim should be dismissed because: (1) it is not ripe for adjudication, (2) Plaintiff has not alleged how Reclamation's decision to adhere to a voidable contract causes the Tribe to suffer a particularized concrete injury, and (3) neither § 511 nor the contractual language in Westlands' converted contract supports Plaintiff's argument that a non-validated contract is void *ab initio*.

### 1.   Plaintiff has failed to adequately plead standing to bring its § 511 claim

Plaintiff's § 511 claim is premature because, although the state trial court denied Westlands' request for validation, Westlands appealed the trial court's decision and its appeal is still pending.  SAC ¶ 162 n.46 (Plaintiff admits that "Westlands' appeal is pending").  It would be a waste of this Court's resources to adjudicate a claim that future state court proceedings could render moot.  *Cf. Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 530 (7th Cir. 2005) ("As the underlying state action remains pending on appeal in the Illinois courts, Premcor is correct—the district court acted precipitously. . . . [t]he question of whether the insurer has a duty to indemnify the insured for a particular liability is only ripe for consideration if the insured has already incurred liability in the underlying claim against it." (citation omitted)).

But even if the Court finds Plaintiff's § 511 claim is ripe, it should still dismiss that claim because Plaintiff has not alleged how Reclamation's adherence to Westlands' WIIN Act contract causes the Tribe any individualized, concrete harm.  As noted above, to have standing Plaintiff must connect the agency's action (or inaction) to a palpable injury plaintiff has suffered or will suffer.  *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996) ("Because the Supreme Court thus considered the 'particularized injury' as the normal focus of standing analysis even in procedural-rights cases, we must examine the causal connection between the substantive government action and the asserted injury to the plaintiff's particularized interest.").  Here,

Plaintiff has not connected the government's adherence to the contract it executed with Westlands to a particularized injury to Plaintiff, including any injury to its water or fishing rights.  Plaintiff's failure to show harm flowing from the agency's action is fatal to its claim.

### 2. Plaintiff's § 511 claim fails as a matter of law because the statute does not provide that unvalidated contracts are void *ab initio*

Even if the Court decides it has jurisdiction to adjudicate Plaintiff's sixth claim, which it should not, Plaintiff's § 511 claim should still be dismissed because that provision does not require Reclamation to void contracts that do not receive state court validation.  Section 511 merely states that: "no contract with an irrigation district under this section and sections 512 and 513 of this title *shall be binding on the United States* until the proceedings on the part of the district for the authorization of the execution of the contract with the United States shall have been confirmed by decree of a court of competent jurisdiction."  43 U.S.C. § 511 (emphasis added).  Westlands' converted WIIN Act contract tracks the language of § 511 and provides that "this amended Contract shall not be binding on the United States until the Contractor secures a final decree."  *See* ECF No. 125-2 at 71, 47.  Neither the statute nor the contract provides that the contract is void *ab initio* simply because the state court denied validation.  Rather, the plain language of the statute and the contract reflect that a non-validated contract is voidable at the discretion of the United States.

This construction of § 511 (and the Westlands' contract at issue) is supported by a recent decision in a closely related case –*Center for Biological Diversity v. United States Bureau of Reclamation*, No. 1:20-cv-00706-DAD-EPG, 2021 WL 600952, at *5–6 (E.D. Cal. Feb. 16, 2021).  In the *Center For Biological Diversity* case, Judge Drozd addressed this exact same issue.  After studying § 511's plain terms and the terms of the contract, Judge Drozd held that "the WIIN Act conversion contracts can create legal rights even in the absence of judicial

confirmation." *Id.* at *6.  In reaching his decision, Judge Drozd relied, at least in part, on the

Eighth Circuit's decision in *Concerned Irrigators v. Belle Fourche Irrigation Dist.*, 235 F.3d

1139, 1144 (8th Cir. 2001), which held that "even when an executed water repayment contract

may be voidable by one party, this does not mean that it is void."  *Ctr. for Biological Diversity,*

2021 WL 600952, at *5 (emphasis omitted).  In *Concerned Irrigators*, the Eighth Circuit

reasoned that "[e]ven if the United States is not bound by the [] contract because it was not

judicially confirmed, the contract is not necessarily invalid," especially when there was "no

evidence that the United States [] ever attempted to escape any obligation created by the

contract."  235 F.3d at 1144.  Here, Reclamation has never attempted to escape any obligation

created by Westlands' WIIN Act contract, even though the United States could void the contract;

and Plaintiff cannot force Reclamation to abandon a contract against Reclamation's will.  *See*

ECF No. 125-1 ¶ 11.

     In its response in opposition to Westlands' motion to intervene, Plaintiff reiterated its

disagreement with Judge Drozd's decision in *Center For Biological Diversity* and the Eighth

Circuit's decision in *Concerned Irrigators*.  *See* Pl.'s Resp. Opp. Mot. to Intervene, ECF No. 104

at 7-8.  Plaintiff continued to assert that "federal law has required that federal water contracts be

validated by state court decree, [and that] [a]bsent such required validation, water contracts are

not binding on the United States and *are thus unenforceable.*"  *Id.* at 7 (emphasis added).  In

granting Westlands' motion to intervene, this Court rejected Plaintiff's argument *in toto*:

"[Hoopa's argument] ignores the distinction between a 'voidable' contract and an

'unenforceable' one–the distinction relied upon in *CBD*, *North Coast*, and *Concerned Irrigators*.

. . . [A]bsent any indication that the United States disclaims Westlands' WIIN Act Repayment

Contract, that contract creates legally enforceable rights . . . ."  ECF No. 116 at 7.  This Court's reasoning in its December 29, 2022 Order undercuts Plaintiff's sixth claim.

In a last-ditch effort to show the non-validated contract is unenforceable, Plaintiff claims that Reclamation cannot deliver water to Westlands under a non-validated contract.  SAC ¶ 163.  Plaintiff cites Section 46 of the Omnibus Adjustment Act of 1926, codified at 43 U.S.C. § 423e, to argue that water cannot be delivered pursuant to a contract that has been denied state court validation.  However, 43 U.S.C. § 423e does not apply here.  By its plain terms, § 423e only applies when a new project or new division is completed and the Secretary is contracting with water users for the first time.  Because the CVP is not a new project or division, § 423e does not apply to Westlands' converted WIIN Act contracts and Reclamation is free to continue to deliver water to Westlands even under non-validated contracts.

## G. The Court should dismiss Plaintiff's Seventh Claim for Relief (alleged violation of the WIIN Act and the APA) for lack of jurisdiction and for failure to state a claim

Plaintiff's seventh claim is virtually indistinguishable from its sixth claim, except instead of relying on a purported violation of the Reclamation Act of 1922, Plaintiff claims Reclamation violated the APA by representing that Westlands' contract is "binding" and refusing to invalidate said contract.  SAC ¶¶ 177-178.  A representation from an agency official about whether a contract is binding or not is not a final agency action, *Dietary Supplemental Coal., Inc.*, 978 F.2d at 562, and therefore this issue is not ripe for adjudication.  This claim is also unripe for all the reasons discussed *supra* Section (F).  Moreover, to the extent Plaintiff is only seeking a judicial declaration that "Westlands' contract is not binding on the United States," SAC ¶ 178, the issue is moot because the Federal Defendants readily concede that Westlands' contract is not binding on the United States, *see* Ernest Conant Letter to Thomas Birmingham, May 28, 2020, ECF No.

125-8.  Thus, Plaintiff is not legally entitled to a judicial declaration on an issue the parties agree upon.

Moreover, no federal law – including the common law of contracts – provides that a water delivery contract is void simply because it has not been confirmed by a state court of competent jurisdiction.  Plaintiff may want Reclamation to exercise its discretion to void Westlands' non-validated contract, but regardless of Plaintiff's preferences, Reclamation's adherence to the contract does not violate any statute.  *See* ECF No. 125-1 ¶ 11 (Federal Defendants have not voided any converted contracts on the basis of being unvalidated).  Because Westlands' contract is only voidable and Reclamation has consistently honored the terms of the contract, Plaintiff's seventh claim should be dismissed.

### H.  The Court should dismiss Plaintiff's Eighth Claim for Relief (challenging former Secretary Bernhardt's CVPIA completion memos) for lack of jurisdiction

Plaintiff's eighth claim argues that departmental memoranda issued between January 15 and 19, 2021 ("CVPIA completion memos") were unlawful.  SAC ¶¶ 180-181.  Setting aside the merits, Plaintiff's eighth claim is now moot.  *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) ("Mootness can be characterized as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (citation omitted)).  On December 15, 2022, Secretary of the Interior Deb Haaland withdrew the CVPIA completion memos.  *See* Secretary Haaland Mem. Withdrawing Secretary Bernhardt's January 19, 2021 concurrence memo, ECF No. 125-9 ("[T]his memorandum withdraws the Bernhardt memorandums, its associated directives, and any supporting documents.").  Because there is no longer a live controversy, the Court does not have jurisdiction over Claim Eight.  *Foster*, 347 F.3d at 745 ("[F]ederal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists." (citation omitted)).

**I.   The Court Should Dismiss Plaintiff's Ninth Claim (Alleged Violation of CVPIA § 3406(b)(23)) For Failure to State a Claim**

Plaintiff claims it has permanent authority to concur "in all decisions involving Reclamation's management of the Trinity River Division operation and maintenance that affect Hoopa's fishery and its timely restoration to pre-project levels of abundance." *E.g.*, SAC ¶ 197. The Court has already addressed this issue in its February 8th Order Denying Plaintiff's original preliminary injunction motion:

> Nothing in the statutory language suggests that Hoopa retains an ongoing "concurrence right" regarding recommendations made or actions taken within the scope of the TRROD's AEAM procedures—procedures with which Hoopa has already concurred. On the present record, the Court finds that the text of § 3406(b)(23) is simply not amenable to Plaintiff's position. Moreover, to the extent extrinsic evidence is even relevant given what appears at this stage to be unambiguous statutory language, the Court could not locate any reference in any of the relevant decision documents (the Flow Study, the TRROD, and the lengthy FEIS/EIR) that suggests Hoopa retains a veto power over decisions that fall within the scope of the TMC's authority.

ECF No. 144 at 15-16.  The Court is correct and should dismiss Plaintiff's CVPIA concurrence claim for the reasons stated in its February 8th Order.

As the Court has already recognized, under Plaintiff's expansive reading of CVPIA § 3406(b)(23) Plaintiff would have the final word over most management decisions affecting the Trinity River Division.  *See* SAC ¶¶ 197-203.  As relevant here, § 3406(b)(23) simply provided that, if "the Secretary and the Hoopa Valley Tribe concur in the[] recommendations [of the Flow Study], any increase to the minimum Trinity River instream fishery releases established under this paragraph and the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly."  CVPIA, § 3406(b)(23)(B).  Conversely, if the Hoopa Valley Tribe and the Secretary "do not concur" on which Flow Study recommendations to implement, §

3406(b)(23) specifically provided "the minimum Trinity River instream fishery releases established under this paragraph shall remain in effect." *Id.* Thus, Section 3406(b)(23) unambiguously created a mechanism for the Secretary to implement the recommendations of the Flow Study without further legislation upon the mutual concurrence of the Secretary and Plaintiff; absent concurrence, however, the pre-Flow Study *status quo* would be preserved pending further action by Congress or the courts or separate agreement between the Secretary and Plaintiff.[9]

Federal Defendants do not dispute that Congress provided Plaintiff with a statutory right to concur (or not) in the Flow Study's recommendations. Plaintiff expressly concurred in the 2000 ROD as envisioned by CVPIA § 3406(b)(23), including its recommendations and overall decision. *See* ECF No. 111-2 at 26; *see also* Pl.'s Memo. Supp. Mot. Prelim. Inj., 1, 10, 13-15, ECF No. 108-1; Decl. of Joe Davis, ¶ 12, Dec. 16, 2022, ECF No. 110. As part of the decision, the 2000 ROD established the Trinity Management Council (with members from federal and state agencies, Trinity County, Yurok Tribe, and Plaintiff) to oversee the adaptive management program and recommend any changes. The 2000 ROD fully implements § 3406(b)(23)'s vision, and the ROD and its procedures now govern Trinity River Division restoration efforts. Beyond

---

[9] Section 3406(b)(23) does several things. First, it established minimum, annual instream releases of 340,000 acre-feet of water to the Trinity River for the years between 1992 and 1996. Second, it established a deadline for the U.S. Fish and Wildlife Service to complete the Trinity River Flow Evaluation Study. Third, it instructed the Secretary to consult with the Hoopa Valley Tribe about the Flow Study before completing it. Fourth, it set a deadline for the Secretary to forward the recommendations of the Flow Study to several Congressional committees. Fifth, it provided that if the Secretary agreed and the Hoopa Valley Tribe concurred with the recommendations of the Flow Study, those recommendations – including increases to the minimum 340,000 acre-feet of water established by § 3406(b)(23)(A) to be released into the Trinity River from the Trinity River Division – shall be implemented without further Congressional action. Sixth, it provided that if the Secretary and the Hoopa Valley Tribe did not mutually agree with the recommendations of the Flow Study, the minimum annual volume of 340,000 acre-feet of water established by § 3406(b)(23)(A) would remain in effect unless increased by further Act of Congress, a judicial decree, or by the agreement of the Secretary and the Hoopa Valley Tribe at a later date.

its role on the Trinity Management Council and its single vote as a member of that Council, the Hoopa Valley Tribe did not retain ultimate authority to decide what restoration activities occur on the Trinity River.  The 2000 ROD also explicitly confirmed that the Secretary retained ultimate control over implementation of the restoration efforts.[10]  *See* ECF No. 111-2 at 11.

Plaintiff's argument relies primarily on its broad and unsupported interpretation of the concurrence authority provided in CVPIA § 3406(b)(23), as discussed above.  But Plaintiffs also make a sweeping argument rooted in Congressional authority over Indian affairs, relying on the decision in *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1210 (9th Cir. 2001).  *See* SAC at ¶ 197 n.52.  Federal Defendants do not dispute that the U.S. Constitution vests Congress with plenary authority over Indian affairs.  *See, e.g.*, *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 764 (1985) ("The Constitution vests the Federal Government with exclusive authority over relations with Indian tribes.").  Consistent with that authority, Congress may recognize tribes' inherent tribal sovereignty to regulate and may delegate authority to Indian tribes.  *See*, *e.g.*, *Bugenig*, 266 F.3d at 1209-10 (discussing cases).  Nonetheless Plaintiff's argument fails for two reasons.  First, CVPIA § 3406(b)(23) has no language indicating delegation of federal authority to Plaintiff or recognition of Plaintiff's inherent tribal authority to manage the entire CVP.  Rather, as discussed above, the statute created a specific mechanism for the Secretary and the

---

[10] Plaintiff's argument also suggests that Congress implicitly divested Reclamation of the power to manage the CVP and the Trinity River Division.  This interpretation finds no support in the plain language of the CVPIA overall or § 3406(b)(23) in particular.  *See HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2181 (2021) (giving statutory text its plain and ordinary meaning without "surmis[ing] about legislative purpose and arguments from public policy"); *see also Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 627 F.3d 1268, 1270 (9th Cir. 2010) ("When determining statutory meaning, we look first to the plain meaning of the text.").  Additionally, Plaintiff itself agreed in the 2000 ROD that the Secretary retains ultimate control over the Trinity River Division – which is contrary to the argument Plaintiff is now making that it can freeze Trinity River decision-making by withholding its alleged permanent right of concurrence.  *See* 2000 ROD at 11; *see also* Am. Compl. ¶¶ 15, 33; *see also* Mem. in Supp. Pl.'s Mot. for Prelim. Inj., ECF No. 108-1 ("Hoopa concurred in the recommendations, signing the Trinity River ROD along with the Secretary of the Interior in 2000. . . .").

Hoopa Valley Tribe to implement the recommendations of the Flow Study without further legislation.  Second, even if there were such a delegation or recognition of tribal authority in § 3406(b)(23), *Bugenig* and all the cases it cited involved something very different – an Indian tribe's ability to regulate activities on or within the boundaries of its own reservations where Indian tribes unquestionably hold "attributes of sovereignty."  *See United States v. Mazurie*, 419 U.S. 544, 557 (1975).  In contrast, where Congress intends to delegate authority to a tribe or expand a tribe's inherent authority, it must do so clearly.  *See United States v. Lara*, 541 U.S. 193, 199 (2004).

Here, Plaintiff claims that Congress provided it with regulatory authority over the Trinity River Division and the broader CVP, which implicates a massive federal program affecting thousands if not millions of Indian and non-Native people who reside outside the boundaries of the Hoopa Valley Tribe's reservation.  *Bugenig*, which addressed the proposition that the Hoopa Valley Tribe may assert sovereign authority within the borders of its reservation, does not address this situation.  There, the question was whether the Hoopa Valley Tribe had the power to "regulate logging by a non-Indian on fee land that she own[ed], located wholly within the borders of the Tribe's Reservation."  266 F.3d at 1204.  The Court found that Congress had "ratified" and "confirmed" the Hoopa Valley Tribe's constitution, which provided that "[t]he jurisdiction of the Hoopa Valley Tribe shall extend to all lands within the confines of the Hoopa Valley Reservation boundaries . . . and to such other lands as may hereafter be acquired by or for the Hoopa Valley Indians."  *Id.* at 1207. The Court viewed Congress' ratification of the Tribe's constitution as a valid delegation of power allowing the Hoopa Valley Tribe to regulate logging within the borders of its reservation.  *Id.* at 1212-13, 1216-18.

Here instead, the Trinity River Division lies and virtually all Trinity River restoration program efforts occur well outside the Hoopa Valley Reservation.  The Trinity River Division itself lies 86 miles upstream of the Reservation, and the bulk of restoration efforts occur within the first 40 miles below the Trinity River Division's Lewiston Dam to the confluence with the North Fork of the Trinity River.  *See* Suppl. Decl. of Michael Dixon at ¶ 6, ECF No. 125-10. Inherent tribal authority over non-Indians only extends to conduct within or affecting Indian country.  *See Montana v. United States*, 450 U.S. 544, 565-66 (1981).  Congress may delegate or expand such authority, but only if its intent to do so is clear.  *Lara*, 541 U.S. at 202, 211.  In this case, there is simply no language in the CVPIA delegating broad, or any, off-reservation regulatory authority to the Hoopa Valley Tribe.  In light of this, Plaintiff's allegation that Congress implicitly delegated it permanent authority over a large federal program that operates outside its reservation raises questions regarding not only congressional intent, but potentially the complex issue of the scope of Congress's authority, especially where, as here, Plaintiff alleges the federal government retained no control to override Plaintiff's decision to block any restoration measure it chooses.  To avoid any potential constitutional questions, the Court should reject Plaintiff's reading of § 3406(b)(23), which also has no basis in the text of the statute.  *See Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1106 (9th Cir. 2001) ("[C]ourts should interpret statutes in a manner that avoids deciding substantial constitutional questions.").

Although referencing other tribal decisions, Plaintiff's Second Amended Complaint does not reference the Ninth Circuit's decision in *Hoopa Valley Indian Tribe v. Ryan*, 415 F.3d 986 (9th Cir. 2005), which directly addresses implementation of the Trinity River restoration program.  There Plaintiff asserted that CVPIA § 3406(b)(23) provided Plaintiff special status under the Indian Self-Determination and Education Assistance Act and entitled it to mandatory

contracts to implement the restoration program.  *Id.* at 987, 989.  The Ninth Circuit rejected

Plaintiff's arguments, holding instead that the restoration program benefits not only the Hoopa

Valley and Yurok Tribes but also a far wider range of interests under the 1984 and 1996 Acts

(upon which Plaintiff's Second Amended Complaint also relies). The restoration program thus

did not represent a program "specifically targeted" to Plaintiff only.  *Id.* at 990-92.  "Had

Congress wished to establish any entitlement to or preference for restoration contracts

throughout the Trinity River basin, it easily could have done so."  *Id.* at 993.  Thus, Ninth Circuit

precedent related to implementation of the Trinity River restoration program run directly counter

to Plaintiff's arguments.

       Plaintiff previously asked this Court to imply a permanent right of concurrence out of

thin air, citing to the Indian canon of construction.  *See* ECF No. 108-1 at 13-14.  But the Indian

canon does not apply here for at least two reasons.  First, the Indian canon only applies when a

statute is ambiguous and provides that the doubt should be resolved in favor of the tribe.  *See*

*Blackfeet Tribe*, 471 U.S. at 766; *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 506

(1986) ("The canon of construction regarding the resolution of ambiguities in favor of Indians,

however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard

of the clearly expressed intent of Congress.").  Here, there is no ambiguity, so there is no doubt

to resolve in favor of Plaintiff.  Second, even if the statute were ambiguous, the fact that Hoopa

may benefit does not, standing alone, mean that the Indian canon would apply to favor the

interpretation that Hoopa seeks.  When the statute in question implicates the interests of multiple

tribes, application of the canon is not so straightforward, as in contexts like this, it does not

generally require a court to favor one tribe over another.  As a result, this Court has been

reluctant to apply the Indian canons where "tribal interests are not aligned." *Redding Rancheria v. Jewell*, 776 F.3d 706, 713 (9th Cir. 2015).

In addition to the clear statutory interpretation arguments against Plaintiff's alleged, permanent right of concurrence, Plaintiff, as a factual matter, cannot justify claims regarding issues that fall either wholly outside the CVPIA and 2000 ROD (*i.e.*, WIIN Act contract conversions)[11] or that fall within the explicit recommendations and procedures set forth in the 2000 ROD (*e.g.*, the Winter Flow Project).[12]  Because Plaintiff's positions find no support in the plain language of CVPIA § 3406(b)(23) or the 2000 ROD, the Court should dismiss Plaintiff's Ninth Claim.

**J.   The Court should dismiss plaintiff's Tenth Claim for Relief (Alleged Violation of the Violation of 1984 Act, 1996 Act, and APA) as moot, or stay the Claim pending completion of Federal Defendants' intended modernization efforts**

Plaintiff claims Reclamation has failed to meet "its statutory obligation to design, construct, operate and maintain facilities to modernize and otherwise increase the effectiveness of the Trinity River Fish Hatchery."  SAC ¶ 207.  Plaintiff contends this purported failure constitutes "agency action unlawfully withheld or unreasonably delayed under the APA."  *Id.*  Even if this were an appropriate claim under the APA, which Federal Defendants do not concede, Federal Defendants are nonetheless taking active steps to modernize the Trinity River Fish Hatchery.

---

[11] Even assuming § 3406(b)(23) gave Plaintiff a permanent right to concur, which it did not, Plaintiff's Second Amended Complaint concedes that any such right would be limited to concurring in those actions affecting the Tribe's fishery resources and the restoration goals of the Act of October 24, 1984.  *See* SAC ¶ 33.  Nothing in § 3406(b)(23) gives Plaintiff any rights related to the Secretary's implementation of the WIIN Act, which simply allowed contractors to pre-pay their capitalized construction debt and does not affect the Tribe's fishery resources or the restoration goals of the 1984 Act.

[12] Federal Defendants incorporate by reference the arguments made in their Response in Opposition to Plaintiff's Original Preliminary Injunction Motion.  *See* ECF No. 118.

For example, Reclamation is requesting substantial funding for the Trinity River
Hatchery from the recently enacted Infrastructure Investment and Jobs Act and the Inflation
Reduction Act to continue its modernization and maintenance efforts.  *See* Decl. of Donald
Bader ¶ 5, ECF No. 125-11.  The initial step in beginning the modernization process is an
infrastructure technical review that was completed in September 2022.  *Id.* ¶ 4.  This technical
review is a comprehensive analysis of all the infrastructure upgrades needed to bring the Trinity
River Hatchery up to present day standards.  *Id.*  Reclamation has secured $2.75M in funding to
initiate the upgrades beginning with the Trinity River Hatchery water intake system and work is
scheduled to begin during fiscal year 2023.  *Id.* ¶ 6.  Reclamation also recently requested
$65,900,000 for the Trinity River Hatchery from the Infrastructure Investment and Jobs Act to
continue its modernization and maintenance efforts.  *See* Decl. Donnie Bader, March 6, 2023 ¶ 2,
attached as Ex. A.

 In sum, regardless of whether Federal Defendants are required to take agency action,
Federal Defendants are actively taking the necessary steps to modernize the Trinity River
Hatchery.  Because the Federal Defendants are already doing what Plaintiff asks the Court to
require the Federal Defendants to do, there is no action to compel at this time.  *See Toor v.
Holder*, 717 F. Supp. 2d 100, 104 n.2 (D.D.C. 2010) (holding that even if "it is undisputed that
agency action was unlawfully withheld or unreasonably delayed, then once the agency takes
action, no live controversy remains as to its delay").  Plaintiff's tenth claim is therefore moot.

### IV.    CONCLUSION

The claims discussed herein should be dismissed either for lack of jurisdiction, failure to
state a claim, or both.  Accordingly, Federal Defendants respectfully request that the Court grant
their Motion to Dismiss Plaintiff's Second Amended Complaint.

Respectfully submitted this 6th day of March, 2023,

TODD KIM
Assistant Attorney General

*/s/ J. Scott Thomas*
JEFFREY SCOTT THOMAS
Trial Attorney
U.S. Department of Justice

*Attorney for Federal Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 6, 2023, I electronically filed the **FEDERAL DEFENDANTS' NOTICE OF MOTION**, **MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT, AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** with the Clerk of Court using the ECF system, which will automatically send email notification to the attorneys of record.

*/s/ J. Scott Thomas*
JEFFREY SCOTT THOMAS