1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   HOOPA VALLEY TRIBE,                    Case No.: 1:20-cv-01814-JLT-EPG

12              Plaintiff,                   ORDER DENYING RENEWED MOTION FOR
                                             PRELIMINARY INJUNCTION
13        v.
                                             (Doc. 146)
14   UNITED STATES BUREAU OF
     RELCAMATION, et al.,
15
                Defendants.
16

17                          **I.    INTRODUCTION**

18         This lawsuit concerns a range of issues pertaining to the Trinity River Division of the

19   federal Central Valley Project ("CVP"), including allegations that the United States Bureau of

20   Reclamation ("Reclamation") and related federal entities and officials (collectively, "Federal

21   Defendants") violated various provisions of federal law by entering into certain contracts with

22   water users for delivery of water from the CVP. (*See* Doc. 142 (second amended complaint

23   ("SAC")), ¶¶ 126–78.) Before the Court for decision is a motion for preliminary injunction that

24   addresses only one aspect of this broader action: the adoption and implementation by Federal

25   Defendants of a set of measures known as the Winter Flow Variability Project ("WFV Project")

26   that modify the daily flow regime for the Trinity River set forth in the 2000 Record of Decision

27   on Trinity River Mainstem Fishery Restoration ("TRROD"). (*See id.*, ¶¶ 106–125; 146.)

28         On December 7, 2022, the Trinity Management Council ("TMC"), an advisory body set

                                        1

1   up by the TRROD, voted 7-1 in favor of recommending implementation WFV Project. (*See id.*,

2   ¶ 112; *see also* Docs. 118-2 at 10 (12/7/22 TMC minutes), 118-1 (TMC Bylaws).) Hoopa was the

3   sole "no" vote. (SAC, ¶ 112.) The TMC then then forwarded its recommendation to Reclamation

4   for review and possible approval. (SAC, ¶¶ 109, 112.)

5        In its first amended complaint, Hoopa alleged that Reclamation violated the "delegated

6   sovereignty" set forth in Section 3406(b)(23) of the of the Central Valley Project Improvement

7   Act ("CVPIA"), Public Law 102-575 (1992), by taking steps to implement the WFV Project

8   without Hoopa's concurrence (hereinafter referenced as the "CVPIA Concurrence" claim). (Doc.

9   97 at ¶ 168–175.) On December 16, 2022, Hoopa filed a motion for preliminary injunction

10  premised upon the CVPIA Concurrence claim, seeking to block Reclamation from implementing

11  the WFV Project. (Doc. 108.) On January 11, 2023, the Court issued an order holding the motion

12  in abeyance and requesting that the parties brief the issue of ripeness, given that Federal

13  Defendants had yet to formally approve the WFV Project for implementation. (Doc. 124.) On

14  January 30, 2023, before the Court had an opportunity to address the ripeness issue, Federal

15  Defendants adopted the TMC's recommendation to implement the Project, over Hoopa's

16  objections. (Doc. 132.) Implementation was planned to commence sometime after February 13,

17  2023. (*Id.*; *see also* Doc. 127 at 2 n.1.) The Court immediately indicated it would rule on the

18  preliminary injunction as expeditiously as possible. (Doc. 133.)

19       On February 1, 2023, Hoopa filed a motion to amend its complaint to add a new claim

20  about the WFV Project. (Doc. 134.) Specifically, the proposed new claim alleged that the WFV

21  Project is subject to review under the National Environmental Policy Act ("NEPA"), 42 U.S.C.

22  §§ 4321 et seq., but that Federal Defendants never engaged in the requisite NEPA analysis. (Doc.

23  134-1 at 34–39, 43.) Hoopa made no mention at that time of any intent to supplement its then-

24  pending motion for injunctive relief with any argument regarding the new NEPA claim. (*See*

25  *generally* Doc. 134.) The Court granted the motion to amend on February 7, 2023. (Doc. 140.)

26  That same day, the Court signed an order denying the initial motion for preliminary injunction,

27  finding that Plaintiff had failed to establish likelihood of success on its claim that Federal

28  Defendants could not proceed with the WFV Project in the absence of Hoopa concurrence,

though the order was not docketed until the next day. (Doc. 144.) Meanwhile, after formally filing its SAC earlier that day, Hoopa filed a revised motion for preliminary injunction on the evening of February 7, 2023, adding argument based upon their new NEPA claim. (Doc. 143.) The Court denied this revised motion outright as untimely under Local Rule 231(b), finding that: (a) under the circumstances, the motion operated as a request for a temporary restraining order; and (b) Plaintiffs had unduly delayed the request given that it was aware of the new NEPA claim at least a week prior but took no steps to notify the Court or the parties of its intention to revise its motion for injunctive relief, despite the Court's indication that it would be ruling imminently. (Doc. 145.)

On February 13, 2023, Hoopa renewed its request for injunctive relief by way of a properly noticed motion. (Doc. 146.) The renewed motion ("Renewed PI") argues that Hoopa is likely to succeed on its NEPA claim and that it will suffer irreparable harm if the WFV Project is not enjoined. (*Id.*) The Renewed PI is supported by the February 13, 2023 declaration of Michael Orcutt. (*See* Doc. 146-3.)[1] Federal Defendants filed an opposition supported by the declarations of Seth Naman and Dr. Michael Dixon,[2] (Doc. 149), and Defendant Intervenor filed a brief response addressing a narrow issue. (Doc. 153.) Hoopa filed its reply along with another declaration from Mr. Orcutt. (Doc. 156.) On March 13, the Court requested additional declarations on factual matters. (Doc. 156.) Supplemental declarations were received from Mr. Orcutt (Doc. 158) and Mr. Dixon (Doc. 160-1).

The matter came on for an evidentiary hearing on March 22, 2023, which was, at the parties' request, held via Zoom teleconference. Thane D. Somerville appeared for the Plaintiff; Jeffrey S. Thomas appeared for Federal Defendants; and Daniel J. O'Hanlon and Cynthia J. Larsen appeared for Defendant Intervenor Westlands Water District. Testimony was taken from Plaintiff's witness Michael Orcutt and Federal Defendants' witness Dr. Michael Dixon. For the reasons set forth below, and based upon the entire record, the motion for preliminary injunction is

---

[1] For simplicity and to ensure clarity of the record, the Court refers to declarations by their date, followed by the declarant's last name. The first time any declaration is referenced, the Court will also provide the Docket Number.

[2] Mr. Dixon specifically incorporates by reference his prior declarations filed January 13, and January 25, 2023. (Docs. 125-10, 129-1, 149-2.)

1   **DENIED**.

2                                    **II.      LEGAL STANDARD**

3            "The proper legal standard for preliminary injunctive relief requires a party to demonstrate

4   'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

5   absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

6   is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting

7   *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v.*

8   *Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that

9   irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'"); *Am.*

10  *Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth

11  Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that

12  serious questions going to the merits were raised and the balance of hardships tips sharply in the

13  plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)

14  (quoting *Lands Council v. McNair*, 537 F.3d 981, 97 (9th Cir. 2008) (en banc)).[3] The party

15  seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*,

16  584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d

17  668, 674 (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than merely allege

18  imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened

19  injury as a prerequisite to preliminary injunctive relief."). Finally, an injunction is "an

20  extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

21  to such relief." *Winter*, 555 U.S. at 22. These standards are not relaxed for plaintiffs asserting

22  NEPA violations. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010).

23                                    **III.     DISCUSSION**

24  **A.      Timeliness of the Renewed PI Motion**

25          As detailed above, the Court denied as untimely Plaintiff's February 7, 2023 injunctive

26  ──────────────────

27  [3] The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives
    "when applied as part of the four-element *Winter* test." *All. for the Wild Rockies*, 632 F.3d at 1134. "That is, 'serious

28  questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance
    of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that
    the injunction is in the public interest." *Id*. at 1135.

1  relief request. Federal Defendants have requested that the Court also find the now-pending

2  Renewed PI untimely. (Doc. 149 at 17.) The Court declines to do so.

3          After construing the February 7, 2023 injunctive relief request as a temporary restraining

4  order because its practical effect would have been to require judicial action on an extremely short

5  timeline, the Court based its finding of untimeliness on Local Rule 231(b), which provides as

6  follows:

7              Timing of Motion. In considering a motion for a temporary
              restraining order, the Court will consider whether the applicant
8              could have sought relief by motion for preliminary injunction at an
              earlier date without the necessity for seeking last-minute relief by
9              motion for temporary restraining order. Should the Court find that
              the applicant unduly delayed in seeking injunctive relief, the Court
10             may conclude that the delay constitutes laches or contradicts the
              applicant's allegations of irreparable injury and may deny the
11             motion solely on either ground.

12  E.D. Cal. L.R. 230(b). On its face, this Rule applies only to motions for temporary restraining

13  orders. The Renewed PI was properly noticed pursuant to Local Rule 230, meaning that the

14  parties and the Court have had more than thirty days to consider the matter. Application of Rule

15  230(b) would therefore be inappropriate.

16          Federal Defendants cite one potentially relevant case, *Associated Press v Otter*, 2012 WL

17  12977323 at *3 (D. Idaho June 5, 2012), for the proposition that the Renewed PI should

18  nonetheless be rejected as untimely. (*See* Doc. 149 at 17.) In *Otter*, members of the media sought

19  an injunction against restrictions imposed by Idaho on how witnesses could view an execution.

20  2012 WL 12977323 at *1. The plaintiffs requested an "expedited" preliminary injunction

21  nineteen days before the scheduled execution. *Id*. at *3. Plaintiffs failed to explain why they

22  waited to file their motion, particularly given that their First Amendment claim would have

23  existed whether an execution had been scheduled. *Id*. The *Otter* court found that discovery and a

24  full evidentiary hearing thereafter would be needed to resolve the motion properly and that this

25  could not be accomplished before the execution in question. *See id*. at *4. For all these reasons,

26  the motion was deemed untimely. *Id*. at *3–*4. In addition, the court denied the motion under the

27  *Winter* factors in the alternative. *Id*. at *4–*7.

28          The circumstances here are distinguishable. Most notably, as mentioned, the Renewed PI

5

1   was properly noticed pursuant to Local Rule 230, and the Court and the parties have had

2   sufficient time to consider the matter. Moreover, though the issues are not straightforward, no

3   party has requested discovery prior to a ruling, and the Court does not believe discovery would be

4   appropriate. Federal Defendants appear to be suggesting that *Otter* controls here because

5   "according to Plaintiff's own logic," Plaintiffs here could have brought their NEPA claim

6   "months ago," just like the parties in *Otter* could have brought their First Amendment claim at an

7   earlier date. (Doc. 149 at 18.) This, however, presumes that the NEPA claim in this case would

8   have been ripe before Federal Defendants formally adopted the WFV Project, a presumption

9   Federal Defendants certainly dispute on the merits and one the Court will not adopt here. In sum,

10  there is no practical reason why the Court should not rule on the fully noticed motion at this time.

11  Federal Defendants' request that the Court reject the pending motion as untimely is **DENIED**.

12  **B.      Likelihood of Success on the Merits**

13          1.      CVPIA Right of Concurrence Claim

14          Plaintiff does not appear to be relying on its CVPIA Right of Concurrence claim in

15  relation to its Renewed PI. To the extent the Court has misunderstood Plaintiff's intention in this

16  respect, the Court nonetheless sees no reason to depart from its previous ruling that Plaintiff is not

17  likely to succeed on this claim. (*See* Doc. 144 at 8–16.)

18          2.      NEPA Claim

19                  a.      *Statutory Framework*

20          NEPA "is our 'basic national charter for protection of the environment.'" *Ctr. for*

21  *Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)

22  (quoting 40 C.F.R. § 1500.1). "Although NEPA does not impose any substantive requirements on

23  federal agencies, it does impose procedural requirements." *N. Idaho Cmty. Action Network v. U.S.*

24  *Dept. of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). "Through these procedural requirements,

25  NEPA seeks to make certain that agencies will have available, and will carefully consider,

26  detailed information concerning significant environmental impacts, and that the relevant

27  information will be made available to the larger public audience." *Id.* (internal citations and

28  quotations omitted).

NEPA requires federal agencies to analyze the potential environmental impacts of any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). When an agency takes major federal action, the agency must prepare an Environmental Impact Statement ("EIS") "where there are substantial questions about whether a project may cause significant degradation of the human environment." *Native Ecosystems Council v. U.S. Forest Serv*., 428 F.3d 1233, 1239 (9th Cir. 2005).

An agency may choose to prepare an environmental assessment ("EA") to determine whether an EIS is needed. 40 C.F.R. §§ 1501.5. An EA is meant to be a "concise public document. . .that serves to," among other things, "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.1(h); *see also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir. 1988). Based on the EA, the agency "may conclude that the action will not significantly affect the environment and issue a 'Finding of No Significant Impact' ('FONSI') in lieu of an EIS." *Bob Marshall*, 852 F.2d at 1225.

b.    *Final Agency Action*

As the Court explained in the context of the CVPIA Concurrence claim (*see* Doc. 144 at 4), the Court's jurisdiction to adjudicate Plaintiff's NEPA claim derives from the APA. This is because NEPA does not itself create a private right of action, so the APA governs judicial review of any claim premised upon NEPA's requirements. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1102 (9th Cir. 2005), as amended (Aug. 17, 2005); *Cent. Delta Water Agency v. U.S. Fish & Wildlife Se*rv., 653 F. Supp. 2d 1066, 1089 (E.D. Cal. 2009). Under section 702 of the APA, "[a] person suffering wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review." 5 U.S.C. § 702. "When, as here, review is sought not pursuant to specific authorization in the substantive statute . . . the 'agency action' in question must be 'final agency action.'" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (citing 5 U.S.C. § 704)); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61–62, (2004) ("To maintain a cause of action under the APA, a plaintiff must challenge 'agency action' that is

7

'final.'"). In the Ninth Circuit, the final agency action requirement "has been treated as jurisdictional." *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 571 (9th Cir. 2019).

In connection with the initial request for injunctive relief, Federal Defendants argued that the case is unfit for adjudication because there has been no "final agency action" as contemplated by the Administrative Procedure Act ("APA"). (Doc. 129 at 6–10.) In its February 7, 2023 order, the Court found this argument unconvincing, explaining as follows:

> "Agency action" is defined in the APA, 5 U.S.C. § 551(13), to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." An "agency action" falls under one of "five categories of decisions made or outcomes implemented by an agency—'agency rule, order, license, sanction [or] relief.'" *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (quoting 5 U.S.C. § 551(13)). As the Supreme Court explained in *Norton*:
>
>> All of those categories involve circumscribed, discrete agency actions, as their definitions make clear:
>>
>> 1. "[a rule is] an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy;
>>
>> 2. [an order is] a final disposition . . . in a matter other than rule making;
>>
>> 3. [a license is] a permit . . . or other form of permission;
>>
>> 4. [a sanction is] a prohibition . . . or taking [of] other compulsory or restrictive action; and
>>
>> 5. [a relief is] (a) a grant of money, assistance, license, authority, etc., or (b) recognition of a claim, right, immunity, etc., or (c) a taking of other action on the application or petition of, and beneficial to, a person."
>
> *Norton*, 542 U.S. at 62 (quoting 5 U.S.C. §§ 551(4), (6), (8), (10), (11)). "While this definition is 'expansive,' federal courts "have long recognized that the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800–01 (9th Cir. 2013) (citing *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)).
>
> For an action to be "final agency action" under the APA, two conditions must be met:
>
>> 1. The action must mark the 'consummation' of the agency's

decision making process and must not be of a merely tentative or interlocutory nature, and

2. The action must be (a) "one by which rights or obligations have been determined," or (b) "from which legal consequences flow."

*Bennett v. Spear*, 520 U.S. 154, 178 (1997). In other words, if the agency action is purely advisory and in no way affects the legal rights of the relevant actors it is not a "final agency action" under the APA. *Id.* In the Ninth Circuit, the core question is whether the agency has completed its decision-making process and whether the result of that process is one that will directly affect the parties. *Oregon Nat. Desert As'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). There are at least three circumstances in which an agency's action may be deemed final:

1. If the action "amounts to a definitive statement of the agency's position" or

2. If the action "has a direct and immediate effect on the day-to-day operations" of the subject party, or

3. If, based on the action, "immediate compliance with the terms is expected."

*Id.* A reviewing court should "focus on the practical and legal effects of the agency action" and should interpret the finality requirement "in a pragmatic and flexible manner." *Id.*

Federal Defendants argue that there has been no final agency action here, but the cases they rely upon are distinguishable. First, Federal Defendants cite a Fourth Circuit case, *Village of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186 (4th Cir. 2013), in which a community challenged how the U.S. Army Corps ("Corps") maintained an area within Wilmington Harbor. In 2000, the Corps formally approved revisions to a plan to widen, deepen, and realign Wilmington Harbor. *Id.* at 193. Concerned that the project would worsen ongoing effects of channel maintenance on nearby beaches, local communities sought and obtained commitments from the Corps, including that the Corps would make use of sand recovered from maintenance dredging by "nourishing" nearby beaches with that sand. *See id.* 189–90, 193. Crucially, the plaintiffs did not challenge the 2000 approval of the project plans; rather, they challenged the Corps' performance of the "nourishment" activities in 2010. *Id.* at 193–94. The Fourth Circuit held that the alleged action did not fall within any of the categories that qualify as "agency action" because that kind of day-to-day operational activity was not a "determination." *Id.*

Relatedly, Federal Defendants cite *Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997). In the late 1980s, the Army adopted a plan to dispose of chemical weapons on-site at a particular location by means of incineration. *Id.* at 1487. In 1996, the plaintiffs sued to block the

Army from conducting trial burns in accordance with the original plan. *Id.* at 1488. Among other things, the Tenth Circuit found that the claim was non-justiciable because the Army's decision to commence trial burns did not qualify as final agency action given that the record did not suggest "the Army has ever revisited the question of how precisely it planned to destroy the chemical weapons [ ] since its 1989 Final Environmental Impact Statement." *Id.* at 1494.

Similarly, in *Wild Fish Conservancy*, the Ninth Circuit found no discrete agency action where the plaintiffs were "merely" alleging that Federal Defendants operated two dams in a manner that obstructs fish passage through a particular creek during some or all parts of the year. 730 F.3d at 801. This was in part because, though "the act of closing the gates" on the dams "has immediate physical consequences, such action is not fairly analogous to a 'rule, order, license, sanction, [or] relief.'" *Id.* In addition the act was not "final" because it did not mark the consummation of the agency's decisionmaking. Rather, the opening and closing of the dam gates constituted "day-to-day operations that merely implemented [existing] operational plans" for those dams. *Id.*

Federal Defendants argue that these cases control here because the WFV Project will "implement actions already contemplated by the 2000 ROD" and therefore is simply a form of performance under the ROD, rather than a "final disposition." (Doc. 129 at 8.) However, unlike the projects discussed in *Village of Bald Head*, *Chemical Weapons Working Group*, or *Wild Fish Conservancy*, the record here suggests that recommendations made by the TMC—at least those related to the WFV Project—*were formally adopted by Federal Defendants*. (Doc. 132 (notifying the Court and the parties that "Federal Defendants have adopted the Trinity Management Council's recommendation"); *see also* Doc. 118-7 (TRROD Implementation Plan) ("All agencies will retain their existing authorities. However, when the TMC recommends a particular project or program, agencies will be expected to undertake those projects. If agencies do not implement the recommended actions or projects, they must explain to the TMC in writing why they have not done so.").) On the present record, the Court is unable to see how Reclamation's "adoption" decision would not constitute an "order" insofar as it is "a final disposition . . . in a matter other than rule making" that qualifies as an "agency action" under the APA. The record also suggests that the determination to proceed with the WFV Project is the "consummation" of a decision-making process that has real, practical, consequences and is therefore "final agency action."

(Doc. 144 at 5–8.) Nonetheless, the Court declined to issue a definitive decision on the final agency action issue because the initial injunctive relief motion failed on other, more obvious grounds. (*Id.* at 8.)

Federal Defendants renew this argument here, maintaining that because the WFV Project

1    is "precisely the type of river management undertaking that was contemplated by the [TR]ROD"

2    it is therefore "not a new final agency action as that term is defined by the APA." (Doc. 149 at

3    12.) Federal Defendants cite three cases in support of this argument: *Mayo v. Reynolds*, 875 F.3d

4    11 (D.C. Cir. 2017*)*; *County Commissioners of County of Sierra v. United States Department of

5    the Interior*, No. CV 21-611 GBW/CG, ___ F. Supp. 3d ___, 2022 WL 2754297, at *6 (D.N.M.

6    July 14, 2022) ("*Sierra*"); *Oregon Natural Desert Association v. BLM*, No. 08-1271-KI, 2011 WL

7    5830435, at *1 (D. Or. Nov. 15, 2011).

8         The Court begins its consideration of this argument by examining *Sierra* because that case

9    relies upon and discusses authorities the Court already addressed in its prior order. In *Sierra*, the

10   U.S. Fish and Wildlife Service ("FWS") previously promulgated a rule, codified at 50 C.F.R.

11   § 17.84(k), concerning conservation of Mexican wolves. *See* 2022 WL 2754297, *1–2. That rule

12   defined "problem wolves" to include individuals that were involved in depredation of domestic

13   animals and permitted the translocation of problem wolves to new locations under certain

14   conditions. *Id*. Pursuant to that rule, FWS translocated two wolves in 2021. *Id*. at *2. Plaintiffs,

15   residents and ranchers in the area where the wolves were moved, challenged the translocation. *Id*.

16   The defendants moved to dismiss, arguing that plaintiffs were not challenging a final agency

17   action and therefore the court lacked jurisdiction under the APA. *Id*. at *5. The district court

18   ultimately found that the translocations were "[a]n implementation decision . . . that merely

19   carrie[d] out a broader agency plan that marked the consummation of the relevant decision-

20   making process." *Id*. at *6. In so holding, the court analogized the translocation decisions to the

21   situation in *Chemical Weapons Working Group*, where the Tenth Circuit found that

22   commencement of trial burns at a chemical weapons incineration plant was not a final agency

23   action because the Army had already determined in a 1989 NEPA document how it would destroy

24   chemical weapons at that plant and because the plaintiffs provided no indication that the Army

25   had ever revisited its planned method of destruction. *Id*. (citing *Chemical Weapons Working

26   Group*, 111 F.3d at 1487-88, 1494).[4] The district court acknowledged that the wolf translocation

27

28   _____

[4] *Sierra* also relied on *Wild Fish Conservancy* for similar reasons, namely because that case found no final agency action where the physical act of closing the gates of a dam were simply day-to-day operations that implemented pre-existing operational plans for a hatchery. *Id*. (citing *Wild Fish*, 730 F.3d at 801).

1    decision could be distinguished from the situation in *Chemical Weapons Working Group* "on the

2    basis of how definitive it was with respect to the manner in which the alleged final action should

3    be undertaken." *Id*. at *8. This is because the 1989 NEPA document at issue in *Chemical*

4    *Weapons Working Group* "indicated 'precisely' how the challenged federal action would be

5    undertaken, *see* 111 F.3d at 1494, while the [applicable Mexican wolf rule] only 'explains how

6    problem wolves will be managed in general' and provides that additional management plans

7    containing additional procedures will be forthcoming, *see* 80 Fed. Reg. at 2533." *Id*. Crucially,

8    however, *Sierra* found no indication in the Mexican wolf rule that the "future management plans

9    it describes may revisit the question of whether FWS has authority to translocate problem wolves

10   to private land," and therefore the rule itself—not the translocation decisions—was FWS's "final

11   disposition of the matter" of whether problem wolves may be translocated to private property. *Id*.

12           The Court finds *Sierra* (and the cases it relies upon) distinguishable. Even the district

13   court in *Sierra* acknowledged that "not all agency decisions made pursuant to a broader agency

14   plan are unreviewable implementation decisions." *Id*. at *7. More specifically,

15           When a decision has independent legal force because it
16           substantially changes, modifies, or imposes conditions upon an
             agency's previous disposition of a matter, and such changes have
17           "clear and definite" legal consequences, the decision can no longer
             be viewed as "mere implementation" and should be subjected to
18           judicial review under the APA. *See Ctr. for Native Ecosystems v.*
             *Cables*, 509 F.3d 1310, 1330-31 (10th Cir. 2007); *cf. Or. Nat.*
19           *Desert Ass'n v. U.S. Forest Serv*., 465 F.3d 977, 985 (9th Cir. 2006)
             (finding that Annual Operating Instructions for grazing allotments
20           were final agency decisions because they consummated the
             agency's decisionmaking process for managing these allotments by
21           "put[ting] . . . additional modifications [and] restrictions" on the
             terms of grazing permits).

22   (*Id*.) Here, it is undisputed that the WFV Project changes the timing of releases for a substantial

23   fraction of the annual flow of the Trinity River when compared to the timing of those flows under

24   the TRROD flow regime without the WFV Project. It is also undisputed that it does so in ways

25   that are unprecedented, namely, by increasing releases before the water year can be definitively

26   determined in early April. This is, in fact, the stated purpose of the WFV Project, which is

27   designed to alleviate what the WFV Project identifies as a central problem of the TRROD—that

28   "[t]he ROD as implemented . . . results in the vast majority of annual water volume released after

April 15" while maintaining a baseflow of 300 cubic feet per second (cfs) "for 7 months of the year (October to April, when streams in the region [normally] experience their largest and most variable flow events." (*See* Doc. 118-8 (Trinity River Winter Flow Project Final Report, Abel., et al. (Aug. 2022) ("Abel Report")) at p. 5.[5]) The WVF Project is *by design* a significant change to the flow patterns set forth in the TRROD. Given these facts, the Court finds that the WFV Project is not "mere implementation" of the TRROD for purposes of the APA's final agency action requirement.

The Court now turns to the remaining cases relied upon by Federal Defendants.[6] In *Mayo*, federal wildlife agencies had previously adopted a fifteen-year plan for managing an elk herd in Grand Teton National Park. 875 F.3d 11, 14 (D.C. Cir. 2017). That long-term plan contained an adaptive management provision that anticipated weaning the herd off supplemental feed and managing the herd through variable annual "harvest" quotas. *Id*. at 17-18. The plaintiffs (local wildlife photographers) argued that the agencies were violating the law by not issuing a new NEPA document each year the harvesting quotas were set. *Id*. at 19. After a detailed evaluation of the existing (15-year) EIS and whether that document encompassed the annual harvest limits challenged by the plaintiffs, *see id*. at 20–24, the DC Circuit held:

> [A]n agency is not required to make a new assessment under NEPA every time it takes a step that implements a previously studied action. So long as the impacts of the steps that the agency takes were contemplated and analyzed by the earlier NEPA analysis, the agency need not supplement the original EIS or make a new assessment. The 2007 EIS was clearly sufficient to cover elk hunting during the ensuing fifteen years under the 2007 Plan absent a material change causing unforeseen environmental consequences.

*Id*. at 21 (internal citations omitted). Crucial to the D.C. Circuit's reasoning was the fact that the

---

[5] Where the Court references a record document's internal pagination, it refers to the page as "p. ___." Otherwise, page references are to the .pdf page reference provided by the Court's CM/ECF system.

[6] The Court notes that *Mayo* does not actually discuss the APA's "final agency action" requirement; rather, it addresses the NEPA-specific issue of whether a particular management act was encompassed by an existing NEPA document, while also considering the concept of "tiering" NEPA analyses. 875 F.3d at 22–23. Likewise, though *Oregon* mentions the term "final agency action," the reasoning relied upon by Federal Defendants also focuses on whether a pre-existing EIS encompassed the alleged final agency action, 2011 WL 5830435, at *17–*19. There is connectivity between these two concepts, *see Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 561 (9th Cir. 2006) (discussing connection between a parties' final agency action challenge and the fact that NEPA is only triggered for "major Federal actions"), but they are not identical. The Court will not belabor this point or disturb the parties' organizational structure, however, because it finds that neither case is analogous to the present circumstances.

agency had elected to comply with NEPA by performing a NEPA analysis at the outset of the

long-term project. *See id.* at 22. The *Mayo* court observed:

> To be sure, agencies are not always free to comply with NEPA by issuing a single EIS at the outset of a long-term project. An environmental analysis that occurs too early in the planning process may lack "meaningful information" necessary for informed consideration. *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1093–94 (D.C. Cir. 1973). Thus, if a program "involves . . . separate sub-projects and will take many years," NEPA's implementing regulations allow the agency to "evaluate[ ] each sub-project as it becomes ready" and tailor its subsequent analyses to particularized considerations not already addressed in a prior "programmatic EIS." *Nevada*, 457 F.3d at 91; see CEQ regulations, 40 C.F.R. § 1508.28. "Tiering"—as this process is known—is "appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe." CEQ regulations, 40 C.F.R. § 1508.28(b) (emphasis added).

*Id.* at 22–23.

 *Oregon* discussed similar concepts. There, the relevant federal agency issued an EIS that studied the reduction of "juniper-related fuels" and the restoration of "various plant communities" on a large area of federal land. 2011 WL 5830435, at *2. The EIS did not detail when, where and how junipers would be reduced, but instead adopted an adaptive management approach that allowed the agency to make annual decisions about juniper thinning. *See id.* at *16. The plaintiffs argued that the annual implementation actions required separate NEPA analyses. *Id.* at *17. The *Oregon* court did not agree, concluding that the annual decisions were "analyzed in the [existing programmatic] EIS," and specifically finding that EIS "evaluates the methods of treatment, annual acreage targets, and effects of the treatment on the environment by habitat type and by each Steens Mountain resource (e.g.[,] air, soils, water, forests, weeds, etc.)." *Id.*

 Federal Defendants invoke *Mayo* and *Oregon* here but fail to do the hard work required to demonstrate that those two cases are analogous, particularly given the language contained in the EIS prepared in connection with the 2000 ROD (hereinafter the "TRROD EIS"), which, in the Court's reading, suggests that modifications like the WFV Project are <u>not</u> covered by the existing EIS. It states:

> The adaptive management program could result in minor

modifications to the Flow Evaluation hydrographs described in this DEIS/EIR. ***Modifications to the proposed restoration activities (flow schedules and channel rehabilitation projects) resulting from the AEAM program could be subject to additional NEPA and CEQA analysis as required by law***. All mechanical ground-disturbing actions originating from the adaptive management program, regardless of whether they are described in this document, would be subject to site-specific environmental review.

(Doc. 118-7 (TRROD EIS) at 2-25 (emphasis added).) Though this language does not absolutely preclude a finding that the WFV Project was encompassed by TRROD EIS, Federal Defendants make no effort to argue or demonstrate how the analysis in the TRROD EIS encompasses the flow regime under the WFV Project.[7] The TRROD EIS is more than two thousand pages long, including attachments. It is not the Court's job to parse the record for the parties.

Put another way, contrary to Federal Defendants' assertions (*see* Doc. 149 at 11 ("Plaintiff's NEPA claim is likely to fail because the Winter Flow Project is exactly what the ROD anticipated – an operational decision by the Trinity Management Council to adjust the schedule for daily releases."), the caselaw demonstrates that it is not enough simply to have an adaptive management protocol in place. An agency that attempts to modify an existing program under adaptive management is only exempt from NEPA compliance if the proposed changes fall within the scope of an existing NEPA document, or if the changes are otherwise exempt from NEPA. Federal Defendants have failed to demonstrate that either exemption scenario applies to the WFV Project, which is particularly problematic in the face of the TRROD's suggestion to the contrary.

3.   NEPA Claim

As noted, an EIS must be prepared for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The TRROD was subjected to NEPA review in the form of the TRROD EIS. Federal Defendants have argued that no NEPA document is required here because the WFV Project is covered by the TRROD EIS. But, as discussed above, the TRROD EIS itself seems to suggest otherwise and Federal Defendants do

---

[7] Federal Defendants do point out that the TRROD EIS "expressly recognized the importance of replicating natural river conditions" (Doc. 149 at 11–12), but this is a far cry from demonstrating that the TRROD EIS anticipated—let alone evaluated the potential impacts to the human environment of—the kind of flow regime contemplated by the WFV Project.

1   not make any effort to explain how the TRROD EIS encompasses the flow regime under the

2   WFV Project. Federal Defendants make no other substantive argument against a finding of likely

3   success on the NEPA claim.

4          Nonetheless, it is Plaintiff's burden to establish likelihood of success on their NEPA

5   claim. *Klein*, 584 F.3d at 1201. They maintain here that a separate NEPA document should have

6   been prepared for the WFV Project. (SAC, ¶ 123.) It is undisputed that Federal Defendants have

7   not issued any independent NEPA document for the WFV—no EA, no FONSI, and no EIS. This

8   is notable because the record suggests that at various times managers believed NEPA compliance

9   was required. For example, Federal Defendants commenced NEPA review for the WFV Project

10  in 2021, and thereafter issued a scoping notice and prepared a lengthy Draft EA. (Doc. 142-31.)

11  Yet, Federal Defendants did not complete the NEPA process in 2021 or for the 2023 Water Year,

12  nor did they provide any explanation for not finalizing a NEPA document. In addition, the Abel

13  Report, which is relied upon extensively by Federal Defendants, indicates in its Introduction that

14  the TRROD and the TRROD EIS "do not provide a logistical framework necessary to implement

15  changes to the ROD flow regime. This lack of guidance and *perceived lack of environmental*

16  *permitting compliance under the current [TRROD EIS]* has stifled previous efforts to shift flow

17  from the spring period to the winter months." (Abel Report, at p.1.) Moreover, Plaintiff has

18  submitted communications from the TMC in 2019 indicating that managers would decline to

19  implement a small pulse flow in late September because "it does not appear that this was

20  anticipated and analyzed in the 2000 EIS or BO," and therefore that it would not be "prudent to

21  deviate from summer baseflow at that time of year until we have conducted further NEPA

22  review." (Doc. 146-6.) Though not dispositive, the Court finds that these circumstances, at the

23  very least raise "serious questions"[8] regarding Federal Defendants' compliance with NEPA. The

24  Court finds it unnecessary to delve deeper into this analysis, however, because even assuming

25  Plaintiffs have established likelihood of success, they have not established that the balance of

26

---

27   [8] "Serious questions are those which cannot be resolved one way or the other at the hearing on the injunction."
*Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 926–27 (9th Cir. 2003) (internal quotation marks omitted) (citing

28   *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)). They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Marcos*, F.2d at 1362.

1   harms warrants an injunction.

2   **C.      Irreparable Harm/Balance of the Harms**

3          Plaintiff asserts two forms of injury to support its request for injunctive relief: procedural

4   and substantive. (*See* Doc. 146 at 19–21.)

5          1.      Procedural Injury

6          NEPA is a procedural statute and "[t]here is no doubt that the failure to undertake an

7   [environmental review] when required to do so constitutes procedural injury to those affected by

8   the environmental impacts of a project." *See Save Strawberry Canyon v. Dept. of Energy*, 613 F.

9   Supp. 2d 1177, 1187 (N.D. Cal. 2009). However, to the extent Plaintiff is contending that

10  procedural injury, standing alone, can justify injunctive relief, such a position "has not been

11  accepted by the courts." *Earth Island Inst. v. Muldoon*, No. 1:22-CV-00710-AWI-EPG, 2022 WL

12  4388197, at *4 (E.D. Cal. Sept. 22, 2022); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d

13  1113, 1124 (9th Cir. 2005) ("there is no presumption of irreparable harm in procedural violations

14  of environmental statutes"); *Native Songbird Care & Conservation v. LaHood*, 2013 WL

15  3355657, at *12, (N.D. Cal. July 2, 2013) ("If Plaintiffs assert that a 'procedural' injury suffices

16  to grant plaintiffs irreparable harm even in the absence of a threat to a species, it would seem that

17  anyone challenging an agency's failure to prepare an EIS or a Supplemental EIS (or, indeed, to

18  take any action allegedly required by NEPA) would automatically satisfy one fourth of the

19  requirements for achieving a preliminary injunction. It is doubtful that this is the rule of this

20  circuit."); *Conservation Cong. v. United States Forest Serv.*, 2016 WL 6524860, at *5 (E.D. Cal.

21  Nov. 2, 2016) ("A NEPA violation, without more, does not establish the requisite likelihood of

22  irreparable harm.").

23          Nonetheless, even though a procedural deprivation may not be sufficient to warrant the

24  issuance of an injunction, a showing of environmental harm may be "compounded by the

25  procedural injury." *Ctr. for Food Safety v. Vilsack*, No. C 10-04038 JSW, 2010 WL 11484449, at

26  *4 (N.D. Cal. Nov. 30, 2010); *see also Citizens for Better Forestry v. United States Dept. of

27  Agriculture*, 341 F.3d 961, 970-71 (9th Cir. 2003) (explaining that the procedural injury from a

28  NEPA violation "is tied to a substantive harm to the environment—the harm consists of added

1   risk to the environment that takes place when governmental decisionmakers make up their minds

2   without having before them an analysis (with public comment) of the likely effects of their

3   decision on the environment.") (internal quotations marks and citations omitted); *Los Padres*

4   *Forestwatch v. U.S. Forest Serv.*, 776 F. Supp. 2d 1042, 1051 (N.D. Cal. 2011) (same); *Brady*

5   *Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24–26 (D.D.C. 2009)

6   ("Although a procedural violation of NEPA is not itself sufficient to establish irreparable injury, it

7   is certainly a relevant consideration").

8         2.    <u>Substantive Harm/Balance of the Harms</u>

9         a.   *Relevant Factual Background*

10      Some additional background is necessary to frame Plaintiff's assertions of harm. First, it is

11   beyond dispute that the Hoopa Tribe has a special, long-standing relationship with the Trinity

12   River and its fisheries, and that members of the Tribe both depend on and have established rights

13   to take fish from the Trinity and Klamath rivers for ceremonial, subsistence, and commercial

14   purposes. (*See* Doc. 146-1 at 8 (providing citations).)

15      It is also well established that the construction of the Trinity River Division of the CVP

16   significantly impacted the natural production of anadromous fish on the Trinity River. (TRROD

17   EIS pp. 1-1–1-4.) The TRROD was designed to implement actions "determined to be necessary

18   and appropriate to restore and maintain the anadromous fishery resources of the Trinity River."

19   (TRROD at p. 2.)

20      The TRROD is built upon a 1999 study completed by Federal Defendants and Plaintiff.

21   (Doc. 138-1 ("Flow Study").) The Flow Study recommended that flows dedicated for fishery

22   restoration be increased significantly, according to water year type, as follows:

23

24
25
26
27

| Water Year Class | Annual Instream Volume |
|---|---|
| Extremely Wet | 815,200 |
| Wet | 701,000 |
| Normal | 646,900 |
| Dry | 452,600 |
| Critically Dry | 368,600 |

28   (Flow Study at p. xxxi.) The Flow Study included in its Appendix M a daily flow schedule that

prescribed specific, daily release volumes from Lewiston Dam to the Trinity River. Specifically, from October 1 through October 15 each year, releases were set at 450 cubic feet per second (cfs); from October 16 through April 21 of each year, releases were set at 300 cfs. (*Id*. at p. M-2– M-3.) Finally, the Flow Study recommended the use of Adaptive Environmental Assessment and Management (AEAM) to "guide future management and ensure the restoration and maintenance of the fishery resources of the Trinity River." (*Id*. at p. xxv.)

In 2000, Reclamation issued the TRROD, which adopted the Flow Study's recommendations. (TRROD at p. 8; *see also* TRROD EIS.) This included adoption of the increased annual instream volumes provided in the table above. (TRROD at p. 12-13, set forth in "Table 1"). In addition, the TRROD included the recommended daily flow schedule as Appendix B to the TRROD and adopted the AEAM program. (*See id*. at pp. 10, B-1.)

> AEAM Program, guided by a Trinity Management Council (TMC) established as part of this decision and by sound scientific principles, will ensure the proper implementation of these measures, conduct appropriate scientific monitoring and evaluation efforts, and recommend possible adjustments to the annual flow schedule within the designated flow volumes provided for in this ROD or other measures in order to ensure that the restoration and maintenance of the Trinity River anadromous fishery continues based on the best available scientific information and analysis.

(*Id*. at p.3.) The TRROD also specifically delineates what can and cannot be modified by the AEAM program:

> Based on subsequent monitoring and studies guided by the Trinity Management Council, the schedule for releasing water on a daily basis, according to that year's hydrology, may be adjusted but the annual flow volumes established in Table 1 may not be changed.

(*Id*. at p. 12.)

b.      *WFV Project Generally & WFV Project Releases*

According to the Abel Report, the purpose of the WFV Project is, generally "to refine the timing of restoration flows using the principle of adaptive management to better meet geomorphic, fish habitat, and temperature objectives of the ROD." (Abel Report at p. 1.) The WFV Project is designed to proceed in two steps: a Flow Synchronization Period which, if triggered, would consist of releases from December 15 – February 15; and an Elevated Baseflow

Period, which would involve releases from February 15 – April 15. (2/27/23 Naman Decl., Doc. 149-1, ¶ 5.) The Flow Synchronization Period did not get implemented this year.[9] Elevated baseflow releases began on February 15, 2023. The exact volume of water scheduled for release during this period is determined using a "decision tree." (3/17/23 Dixon Decl., Doc. 160-1, ¶ 4.c.) Two decision points (one on February 15, and another on March 15) trigger various levels of releases depending on available information about the anticipated water year type. (*Id*.) Given the available water supply information as of early February 2023, 60,000 acre feet ("AF")[10] of water was scheduled for release from February 15 to April 15, 2023; then, due to updated information obtained in early March 2023, an additional 60,000 AF was scheduled for release from March 15 to April 15, 2023, for a total of 120,000 AF. (*Id*. at ¶ 4.d.) Counsel for the Federal Defendants confirmed that as of March 22, 2023 (the date of the hearing) slightly more than 60,000 AF had already been released pursuant to the WFV Project.

It undisputed that any volume of water released under the WFV Project would count toward the total volume dedicated to restoration purposes this year. Though managers cannot formally determine what the water year classification will be until early April, Dr. Dixon testified at the hearing that currently available data strongly suggests that 2023 will be a "wet" year. If this designation holds, under the TRROD's framework described above, a total of 701,000 AF will be available for restoration purposes this year. Members of the Flow Work Group, a component of the overall Trinity River Restoration Program, (*see* 2/27/23 Naman Decl., ¶ 6.e), are in the process of reviewing various "candidate" flow schedules (depicted as flow graphs or "hydrographs") for the remainder of the water year designed to utilize the remaining volume of restoration flows dedicated under the TRROD; all of the candidate hydrographs continue elevated flows to some degree through early June, eventually tapering off to the "summer baseflow" level of 450 cfs. (3/17/23 Dixon Decl., ¶ 5.a.)

---

[9] Presumably this is because Federal Defendants did not approve the WFV Project for implementation until January 30, 2023 and had reached an agreement with Plaintiffs to not begin to implement the flow changes until at least fifteen days thereafter. (*See* Doc. 144 at 2 n.1.)

[10] An acre foot of water is the volume of water required to cover one acre of surface area to the depth of one foot, or approximately 43,560 cubic feet. *United States v. Westlands Water Dist*., 134 F. Supp. 2d 1111, 1139 n. 61 (E.D. Cal. 2001).

1          c.      *Asserted Harms/Benefits of the WFV Project*

2          Plaintiff maintains that shifting 120,000 AF of the total volume of water available for

3  restoration from the spring/summer to the winter will cause irreparable harm. Plaintiff presented

4  its harm evidence through its witness Michael Orcutt, who is both a fisheries biologist and a

5  member of the Hoopa Tribe, with more than 35 years of experience in Trinity River fisheries

6  issues. (*See* 2/13/23 Orcutt Decl., Doc. 146-3, ¶ 1.) From a very general perspective, Mr. Orcutt

7  relies on the 1999 Flow Study, on which the TRROD is premised, to assert that the flows set forth

8  in the TRROD at Appendix B are the most appropriate flows to protect and restore the fisheries of

9  the Trinity River. (*See id*., ¶¶ 7–11.) He indicates the flows recommended in the Flow Study are

10 "carefully balanced" and "designed to maximize benefits with available water at all times of [the]

11 year for different fish species and their life history requirements." (*Id*., ¶ 11.) He maintains that

12 the WFV Project is not consistent with these requirements or with the scientific analysis that

13 supported the Flow Study, which was supported by decades of scientific review and "which

14 remains the best available comprehensive science regarding fishery restoration flows in the

15 Trinity River." (*Id*., ¶¶ 7–8.)

16        Federal Defendants' witness, Dr. Michael Dixon, the current Executive Director of the

17 Trinity River Restoration Project, (2/27/23 Dixon Decl., Doc. 149-2, ¶2), opines that this

18 continued reliance on the conclusions of the 1999 Flow Study is inappropriate because that

19 science is outdated. (3/17/23 Dixon Decl., ¶ 4.c.) Rather, Dr. Dixon opines that subsequent

20 monitoring and updated studies have concluded the flow schedule set forth in Appendix B of the

21 TRROD, which placed emphasis on spring releases, had "unintended negative consequences" for

22 juvenile salmon rearing in and outmigrating from the Trinity River because of artificially reduced

23 instream temperatures. (*Id*.) Dr. Dixon explained in his declarations and at the hearing that

24 extensive research supports this conclusion. (*See id*.)

25        As mentioned, the WFV Project is designed to address these "unintended negative

26 consequences." Federal Defendant's other declarant, Seth Naman, explained in detail the various

27 "ameliorative" benefits of the WFV Project. First, according to the Abel Report:

28             [S]ince the adoption of the [TRROD], the annual flows that have

21

been released in the spring [have] artificially reduce[d] water temperatures, and those cooler temperatures are below the optimum ranges for rearing salmonids, thereby reducing the growth of juvenile salmonids. The faster juvenile salmonids can grow, the earlier they can migrate out of the Trinity River and through the lower Klamath River, which will increase their survival by reducing their exposure to warm summer water temperatures and high disease rates.

(2/27/23 Naman Decl., ¶ 6.a (citations omitted).) Modeling described in the Abel Report anticipates that juvenile salmon will increase in weight by the end of June by between 6-19 with WFV Project releases in place. (*Id*.) In addition, releases of hatchery coho salmon into the Trinity River began in mid-March. (*Id*., ¶ 6.b.) The WFV Project releases are designed to increase habitat for and therefore decrease the density of juvenile fish in the river following these releases, thereby decreasing competition for food and space between natural and hatchery fish. (*Id*.) The WFV Project is also anticipated to decrease the chance of salmonids that had yet to spawn before WFV Project releases began laying their eggs on top of those salmonids that had already spawned, a phenomenon called "redd superimposition," which can crush the eggs that were deposited earlier. (*Id*., ¶ 6.c.) High and variable flows in the winter under the WFV Project are meant to mimic the way a "natural" river provides habitat for insects upon which salmonids feed. (*Id*., ¶ 6.d.) These flows also allow juveniles to access productive floodplains and side channels, where they can access more food. (*Id*.) Finally, the WFV Project flows are anticipated to help transport sediment out of the spawning grounds for salmonids. (*Id*., ¶ 6.e.) Too much sediment can suffocate salmon eggs; some studies have indicated 40% of eggs laid in the Trinity River in 2018 were impacted by fine silt. (*Id*.)

Plaintiff's moving papers provide only conclusory critiques of the scientific underpinnings of the WFV Project, which appear to represent the most up-to-date science on these issues. Overall, the Court finds that the WFV Project identifies real problems with the pre-existing flow regime and sets forth a scientifically supported approach to addressing those problems.

Mr. Orcutt raises other somewhat more specific critiques of the WFV Project that merit further discussion. He opines that the WFV Project would return the Trinity River to summer baseflow levels several weeks earlier than would have been the case without the WFV Project and

1   that this will have a variety of negative impacts on the fisheries of the Trinity River and on the

2   Hoopa Tribe and its members. (3/16/23 Orcut Decl., ¶¶ 8–27.) These related opinions depend on

3   Mr. Orcutt's underlying assertion that the WFV Project will shift the timing of the return to

4   summer baseflows back several weeks. There are hydrographs in the Abel Report that appear to

5   support Mr. Orcutt's opinion. (*See* Abel Report at p. 22–25.) But, as Dr. Dixon explained in his

6   declaration, those graphs are "derived from a retrospective application of winter flow

7   methodology to previous years' hydrographs." (3/17/23 Dixon Decl., ¶ 5.a.) Dr. Dixon presented

8   a graph showing actual hydrographs from the past 14 years alongside the competing hydrographs

9   for the remainder of 2023, which assume implementation of the WFV Project in full. (*Id*. at p. 7.)

10  Both of the alternative 2023 hydrographs "reach baseflow squarely within the range of dates on

11  which [the system has] previously reached baseflow." (*Id*., ¶ 5.a.)[11] Put another way, the record

12  does not definitively demonstrate that the WFV Project will shift the return to summer baseflows

13  in a significant, unprecedented way.

14      Yet even assuming that Mr. Orcutt is correct that the chosen hydrograph for 2023 will

15  reach summer baseflows earlier than would have been the case without the WFV Project, it is not

16  clear that irreparable harm will be the likely result. Mr. Orcutt initially asserted that flows under

17  the WFV Project would "result in more frequently missed temperature targets for salmon holding

18  in the river" during the summer months. (3/16/23 Orcutt Decl., ¶ 13 (citing Abel Report at pp 36–

19  37).) Federal Defendants convincingly pointed out that the exceedances anticipated by the

20  modeling discussed in the Abel Report would be very minor and infrequent and, according to that

21  Report, would "not pose a threat to holding spring Chinook Salmon." (*Id*.)

22      Mr. Orcutt also discussed some potential risks that appear unlikely to materialize this year

23  given the wet hydrology.[12] For example, he discusses the fact that conditions in 2021 (a dry year)

24  required managers to make emergency releases to mitigate risks to fish downstream of the area

25  _____

26  [11] It is notable that one of these competing hydrographs was apparently proposed by scientists from the Hoopa Tribe. (*See* 3/17/23 Dixon Decl., ¶ 5.a.) Their proposal would return flows to summer baseflow levels earlier than the alternative hydrograph proposed by other managers. (*Id*.) Though not dispositive, this does suggest to the Court that the harms from summer baseflows asserted by Mr. Orcutt are not obvious or universally accepted.

27  [12] To Mr. Orcutt's credit, when this motion was initially filed, it was still not clear how the water supply situation

28  would develop.

covered by the TRROD. (*Id*. at ¶ 16.) Though Mr. Orcutt opined that the WFV Project could exacerbate such risks, he did not explain how that would be likely in a wetter year.

At the hearing, Mr. Orcutt focused most intensely on potential impacts to the tribal community. Every other summer/fall, the Hoopa Tribe hosts a significant ceremonial event on its Reservation. (3/16/23 Orcutt Decl., ¶ 27.) One such biennial event will occur this year. (*Id*.) It is undisputed that salmon are an irreplaceable element of these ceremonies; members of the Tribe traditionally share salmon they harvest from the Trinity River with those who attend the ceremonial events. (*Id*.) Relatedly, members of the Tribe have relied on a variety of salmonid runs for subsistence fishing, with fall run Chinook predominating. (*Id*., ¶ 19.) However, in recent years, fall run Chinook abundance has been declining, shifting reliance onto the spring run Chinook (*Id*., ¶ 19 & Ex. 2.) In 2023, permissible harvest of fall run will be significantly restricted to one of the lowest on record. (*Id*., ¶ 20.) As a result, accessing spring run Chinook harvest opportunities will be particularly important this year. (*See id*.)[13]

However, the record does not clearly establish how the WFV Project will impede fishing opportunities. Mr. Orcutt mentions the growth of filamentous algae, which can interfere with traditional fishing methods. (*Id*., ¶ 17.) He opines that in his experience algae growth is "exacerbated" in times of low flow. (*Id*.) Though he does not discount the fact that fishers struggle with algae blooms, Dr. Dixon does call into question the assertion that the algae growth is associated with low flows. He opines that algae growth is more closely correlated with other factors, such as whether there was a "scouring flow" in the winter. (3/17/23 Dixon Dec., ¶ 4.d.)

Mr. Orcutt also explained that a particular reach of the Trinity River used commonly for fishing can become hazardous (at least to fishing boats) when flows are too low. In early declarations, he put a number on this by indicating that fishing in this reach of the river required at least 800-900 cfs. (3/16/23 Orcutt Decl., ¶ 18.) In response, Dr. Dixon pointed out that even if the WFV Project is allowed to proceed, flows are anticipated remain within or above that range for all but one day. (3/17/23 Dixon Decl., ¶ 4.e.) At the hearing, Mr. Orcutt further explained that members of the tribe are not inclined to take risks when conditions are marginally favorable for

---

[13] Dr. Dixon indicated at the hearing that the spring run Chinook fishing period will be over by mid-July.

their equipment and thus the planned flows would discourage fishing even though 800-900 cfs would be present for most of the relevant period. The Court does not discount this asserted harm.

Crucially, the harms asserted by Plaintiff do not stand in a vacuum. They must be balanced against the potential benefits of leaving the WFV Project in place, as well as the potential harms of discontinuing the WFV Project mid-stream. The asserted benefits of the WFV Project are articulated above. Dr. Dixon admitted at the hearing that it may be many months before data will be available to allow managers to determine whether (or not) the WFV Project had its intended effects. Nonetheless, as discussed above, there is sufficient scientific support for the Project overall. In addition, Dr. Dixon opined in some detail about the potential risks of discontinuing the WFV Project at this stage. Of most concern to the Court is the likelihood that steelhead are currently laying eggs in habitat created by the high WFV Project flows. If the WFV Project flows are discontinued prematurely, these eggs are likely to be "stranded." (Naman 2/27/23 Decl., ¶ 5.a; Dixon 2/27/23 Decl., ¶ 4.c.) Though no on-the-ground surveys have observed individual fish engaged in this behavior—in part because such surveys would be difficult and/or dangerous at this time of the year—Dr. Dixon convincingly explained at the hearing why the available science on the timing and biology of steelhead in these watercourses suggests the risk is real.

Overall, though some harm to Plaintiff's fishing interests seems possible, those harms are outweighed by the likely benefits of allowing the WFV Project to proceed, along with the likely risks of discontinuing the Project. As a result, the Court finds that Plaintiff has not met its burden to justify the "extraordinary remedy" of an injunction under the present circumstances.

## IV.   CONCLUSION AND ORDER

For the reasons set forth above, Plaintiff's renewed motion for a preliminary injunction is **DENIED**.

IT IS SO ORDERED.

Dated:   **March 23, 2023**

UNITED STATES DISTRICT JUDGE