Thane D. Somerville WSBA #31468 *pro hac vice*
Thomas P. Schlosser WSBA #06276 *pro hac vice*
MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE
811 First Avenue, Suite 218
Seattle, WA 98104
Tel:    206-386-5200
Fax:    206-386-7322
t.somerville@msaj.com
t.schlosser@msaj.com
Attorneys for Plaintiff Hoopa Valley Tribe

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOOPA VALLEY TRIBE,<br><br>     Plaintiff,<br><br>     v.<br><br>UNITED STATES BUREAU OF RECLAMATION; DEBRA ANNE HAALAND, in her official capacity as Secretary of the Interior; MARIA CAMILLE CALIMLIM, in her official capacity as Commissioner of the United States Bureau of Reclamation; ERNEST A. CONANT, in his official capacity as United States Bureau of Reclamation California-Great Basin Regional Director; and  UNITED STATES DEPARTMENT OF THE INTERIOR<br><br>     Defendants. | Civ. No. 1:20-cv-1814-JLT-EPG<br><br>HOOPA VALLEY TRIBE NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>Date: June 13, 2023<br>Time: 9:00 AM<br>Courtroom: 4, 7th Floor, Fresno<br>Judge: Hon. Jennifer L. Thurston<br><br>Trial Date: None<br>Date Action Filed: Aug. 13, 2020 |

1

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

2

3   TO THE COURT AND ALL PARTIES HEREIN:

4   PLEASE TAKE NOTICE that on June 13, 2023 at 9:00 AM, or as soon thereafter as the

5   matter may be heard, before the Honorable Jennifer L. Thurston of the United States District

6   Court for the Eastern District of California, Courtroom 4, 7th Floor, located at 2500 Tulare Street,

7   Fresno, California 93721, the Plaintiff Hoopa Valley Tribe will and hereby does move for partial

8   summary judgment on all of its claims for relief in its Second Amended and Supplemental

9   Complaint for Declaratory and Injunctive Relief (SAC), Dkt. #142.  As related to the contracts

10  challenged in this action, this Motion for Partial Summary Judgment is limited in scope to the

11  following contracts of Defendant-Intervenor Westlands Water District: Contract #14-06-200-

12  495A-IR1-P (dated February 28, 2020) and Contract #14-06-200-7823J-LTR1-P.   See Statement

13  of Undisputed Facts, Exhibits A, B; *see also* Dkt. #125-2; 113-2.  This motion does not address

14  the contracts of any non-party contractor; however, Plaintiff reserves its right to seek summary

15  judgment relating to all other contracts within the scope of this lawsuit at a future date.

16  This motion is made pursuant to Federal Rule of Civil Procedure 56 and is based on this

17  Notice, the accompanying Memorandum of Points and Authorities, the concurrently filed

18  Statement of Undisputed Facts, the papers, declarations, records, and pleadings on file in this

19  case, and other such documentary and oral evidence which may be supplied before or at the

20  hearing.  Plaintiff seeks declaratory and injunctive relief as detailed in its Second Amended

21  Complaint (ECF Dkt #142).

22  Plaintiff's counsel has conferred with opposing counsel in advance of filing this motion.

23  Defendants and Defendant-Intervenor take the position that the summary judgment motion is

24  premature due to their pending Motions to Dismiss.  Plaintiff disagrees as previously explained

25  in Dkt. #130, Dkt. #171, and in the accompanying Memorandum in Support of Summary

26  Judgment.

1    DATED this 17th day of April, 2023.

2

3                     MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE

4                     */s/ Thane D. Somerville*

5                     Thane D. Somerville

                        Thomas P. Schlosser

6                     811 First Avenue, Suite 218

                        Seattle, WA 98104

7                     Tel: 206-386-5200

8                     t.somerville@msaj.com

                        t.schlosser@msaj.com

9                     Attorneys for Hoopa Valley Tribe

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ................. ii

TABLE OF AUTHORITIES ........................................................................ vi

**MEMORANDUM OF POINTS AND AUTHORITIES**........................................................ 1

**I.       INTRODUCTION**..................................................................................... 1

**II.      FACTUAL AND LEGAL BACKGROUND** ....................................................... 6

    A. The United States Established the Hoopa Valley Reservation to Provide a Homeland
       for Hupa Indians Where They Could Achieve a Moderate Living Based on Fish. 6

    B. The 1955 Act Prioritized In-Basin Flows and Required Protection and Mitigation of
       the Trinity Basin Fishery. ..................................................................... 7

    C. Following Decades of Damage Caused by the TRD, Congress Mandated Restoration
       of the Trinity River Fishery ................................................................. 8

    D. The CVPIA Altered the Structure and Purpose of the CVP to Restore and Protect the
       Environment, the Trinity River, and the Hoopa Valley Tribe. ......................... 10

    E. In 2016, Congress Authorized Conversion of CVP Contracts but Retained Pre-
       Existing Legal Requirements Including the CVPIA and NEPA. ........................ 12

    F. Federal Law and the WIIN Act Contracts Require State Court Validation; In the Case
       of Westlands' Principal Contract, Validation Has Been Denied. ....................... 13

    G. Defendants Approved the Trinity River Winter Flow Variability Project Without
       Obtaining Hoopa Concurrence or Complying with NEPA.................................. 13

**III.     LEGAL STANDARD** ................................................................................ 13

**IV.      ARGUMENT**........................................................................................ 14

    A. Hoopa Is Entitled to Summary Judgment on Its First Claim for Relief:  Reclamation
       Failed to Comply With CVPIA Section 3404(c)(2) in its Approval and Execution
       of the Permanent Contract Conversions. ................................................. 14

        1.       The CVPIA, and the Requirements of § 3404(c)(2), Apply to
            Reclamation's Contract Approvals Under the WIIN Act. ..................... 14

        2.       The Converted WIIN Act Contracts Fail to Incorporate Applicable Legal
            Requirements of Critical Importance to Hoopa and the Trinity River. .... 16

    B. Hoopa Is Entitled to Summary Judgment on its Second Claim for Relief:  Reclamation
       Violated NEPA By Approving and Executing the Permanent WIIN Act Contract
       Conversions Without Preparing an EIS or EA. ......................................... 19

        1.       Reclamation's Contract Conversions are Major Federal Actions with
            Significant Environmental Impacts That Require Compliance with NEPA
            .................................................................................. 20

2.      Reclamation Has Discretion Regarding the Contract Conversions. ......... 22

3.      The WIIN Act's Savings Language Confirms that NEPA Compliance is Required. ................................................................................................. 23

C. Hoopa Is Entitled to Summary Judgment on its Claim That Defendants Approval of the Trinity River WFV Project Is In Violation of NEPA. ...................................... 23

D. Hoopa Is Entitled to Summary Judgment on its Third, Fourth, and Fifth Claims: Reclamation Unlawfully Failed to Include Terms Requiring Contractors to Repay and Prospectively Pay Costs of Implementing the CVPIA and Trinity River Restoration ............................................................................................................ 25

1.      Reclamation Unlawfully Failed to Include or Require Payment of Costs Associated with Implementing CVPIA § 3406(b)(23) as Ongoing Operation & Maintenance Costs in the Converted Contracts. ................. 25

2.      The WIIN Act Contracts Unlawfully Excuse and Fail to Require Payment of Over $340 Million of Accrued CVPIA Implementation Costs. ........... 27

3.      Reclamation Acted Arbitrarily and Capriciously in Approving the Contracts By Acting in Violation of Executive Order 12866 and by Failing to Adhere to the Separable Costs Remaining Benefits (SCRB) Methodology. ...................................................................................... 29

4.      Reclamation Has Acted Arbitrarily and Capriciously by Attributing Certain Costs of Implementing Trinity River Restoration Activities to CVPIA 3406(b)(1) Instead of 3406(b)(23) ....................................... 32

E. Hoopa is Entitled to Summary Judgment on its Sixth and Seventh Claims for Relief: Reclamation Violated 43 U.S.C. §511 by Declaring Westlands' Contract Binding and Enforceable Despite Affirmative Denial of State Court Validation. ............. 35

F. Hoopa Is Entitled to Summary Judgment on its Eighth Claim for Relief:  Defendants Concede That the 2021 Completion Memos Were Unlawful. .............................. 39

G. Hoopa Is Entitled to Summary Judgment on its Ninth Claim:  CVPIA §3406(b)(23) Prohibits the Secretary From Modifying Permanent Fishery Flow Requirements or Operating Criteria and Procedures in the Trinity River ROD Absent Hoopa Concurrence. ................................................................................................... 39

H. Hoopa Is Entitled to Summary Judgment on Its Tenth Claim for Relief:  Reclamation Has Unlawfully Withheld and Unreasonably Delayed Its Duty to Modernize and Otherwise Increase Effectiveness of Trinity River Hatchery. .............................. 44

V.         CONCLUSION .................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**

*Aluminum Co. of Am. v. Central Lincoln Peoples Utility District*
    467 U.S. 380 (1984).......................................................................................... 28

*Blake v. Arnett*
    663 F.2d 906 (9th Cir. 1981) ............................................................................... 8

*Bugenig v. Hoopa Valley Tribe*
    266 F.3d 1201 (9th Cir. 2001) ........................................................................... 53

*Cal. ex rel. Lockyer* v. *U.S. Dep't of Agric.*
    575 F.3d 999 (9th Cir. 2009) ............................................................................. 24

*California v. U.S. BLM*
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) ............................................................... 6

*Choate v. Trapp*
    224 U.S. 665 (1912) .......................................................................................... 42

*Clean Air Carolina v. U.S. DOT*
    2017 U.S. Dist. LEXIS 189866 (S.D.N.Y., Sept. 14, 2017)................................. 6

*County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*
    502 U.S. 251 (1992) .......................................................................................... 52

*Ctr. For Biological Diversity v. U.S. Bureau of Reclamation*
    No. 1:20-cv-706-DAD-EPG, 2021 WL 600952 (E.D. Cal. Feb. 16, 2021) ............ 44

*DeJohn v. Temple University*
    537 F.3d 301 (3d Cir.2008).............................................................................. 48

*Gluth v. Kangas*
    951 F.2d 1504 (9th Cir. 1991) ........................................................................... 48

*Klamath Siskiyou Wildlands Center v. Boody*
    468 F.3d 549 (9th Cir. 2006) ............................................................................. 26

*Klamath Water Users Ass'n v. Patterson*
    204 F.3d 1206 (9th Cir. 2000) ........................................................................... 11

*McClanahan v. Arizona State Tax Comm'*
    411 U.S. 164 (1973) .......................................................................................... 42

*Minn. Pub. Interest Research Grp. v. Butz*
    498 F.2d 1314 (8th Cir. 1974) ........................................................................... 26

*Montana v. Blackfeet Tribe of Indians*
    471 U.S. 759 (1985)..................................................................................... 42, 52

*Natural Resources Defense Council v. Houston*
    146 F.3d 1118 (9th Cir. 1998)
    *cert. denied*, 526 U.S. 1111 (1999) .................................................................. 28

*Pacific Coast Fed. of Fishermen's Assn's v. U.S. Dep't of the Interior*
   929 F.Supp.2d 1039 (E.D. Cal. 2013)
   *aff'd in part, rev'd in part on other grounds,* 655 Fed.Appx. 595 (9th Cir. 2016)................... 26

*Parravano v. Babbit*
   70 F.3d 539 (9th Cir. 1995)
   *cert. denied*, 518 U.S. 1016 (1996);................................................................. 7, 8

*People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*
   194 F. Supp. 3d 404 (E.D.N.C. 2016)............................................................... 6

*Ramah Navajo School Board v. Bur. of Revenue*
   458 U.S. 832 (1982)...................................................................................... 52

*Robertson v. Methow Valley Citizens Council*
   490 U.S. 332 (1989)...................................................................................... 24

*San Luis & Delta-Mendota Water Authority v. Salazar*
   686 F. Supp. 2d 1026 (E.D. Cal. 2009)........................................................ 7, 17

*United States v. Eberhardt*
   789 F.2d 1354 (9th Cir. 1986).......................................................................... 8

*United States v. Winans*
   198 U.S. 371 (1905)......................................................................................... 8

*Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*
   439 U.S 463 (1979).......................................................................................... 51

*Westlands Water Dist. v. U.S. Dep't of the Interior*
   850 F. Supp. 1388 (E.D. Cal. 1994)............................................................... 12

*Westlands Water District v. U.S. Dept' of Interior*
   376 F.3d 853-863 (9th Cir. 2004) ...................................................... 10, 18, 23

**Statutes**

1955 Trinity River Division Central Valley Project Act ("1955 Act")
   Pub. L. 84-386, 69 Stat. 719 (August 12, 1955) ................................. passim

25 U.S.C. §1901.............................................................................................. 42

42 U.S.C. § 4332 .................................................................................... passim

43 U.S.C. § 511 ...................................................................................... passim

470 U.S. 226 (1985)........................................................................................ 34

5 U.S.C. 706.......................................................................................... 13, 20

Act of August 26, 1937 ("1937 Act")
   50 Stat. 844 (1937)........................................................................................ 30

Central Valley Project Improvement Act ("CVPIA")
   Pub Law No. 102-575, § 3404-3406, (1992)................................... passim

*Forelaws on Board v. Johnson*

743 F.2d 677 (9th Cir. 1984)
*cert. denied*, 478 U.S. 1004 (1986) ................................................................ 20, 23

Hoopa-Yurok Settlement Act,
Pub. L. 100-580, 102 Stat. 2924 (1988) ................................................................ 43

National Environmental Policy Act ("NEPA") ............................................. 4, 20, 21, 25

The Trinity River Basin Fish and Wildlife Management Reauthorization Act ("1995 Act")
Pub. L. 104-143, 110 Stat. 1338 (May 15, 1996) ........................................... 9, 17, 32

Trinity River Basin Fish and Wildlife Management Act ("1984 Act"),
Pub. L. 98-541, 98 Stat. 2721 (October 24, 1984) ............................................. passim

Water Infrastructure Improvements for the Nation Act ("WIIN Act")
Pub. L. No. 114-332, §§ 4011-4014, 130 Stat. 1878 (December 16, 2016) .................... passim

**Other Authorities**

Executive Order 12866 (58 FR 51735, October 4, 1993) .................................... 29, 31, 32

Solicitor Opinion
M-36979 (October 4, 1993) ............................................................................. 6

Solicitor's Opinion
71 Interior Decisions 496 (1964) .................................................................... 36

**Rules**

*Federal Rules Civil Procedure*

Rule 56 ....................................................................................................... 5, 13

Moore's Federal Practice

Vol. 15 (3d ed. 2018) ..................................................................................... 39

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Federal Defendants (herein, "Defendants" or "Reclamation") have harmed Plaintiff Hoopa Valley Tribe (Hoopa) by their actions set out in Hoopa's Second Amended and Supplemental Complaint (SAC), Dkt. #142. Those actions violate specific and detailed federal trust responsibilities to protect Hoopa's vested property rights in, and sovereignty related to, the fishery resources of the Trinity River that the United States holds in trust for Hoopa.  The facts supporting Hoopa's claims are set forth in the record to date and in Hoopa's Statement of Undisputed Facts (SUF) filed herewith. Hoopa is entitled to judgment as a matter of law.

Hoopa is a sovereign, federally recognized Indian tribe.  SUF ¶ 1. The Trinity River is the Klamath River's largest tributary. Both rivers flow through the Hoopa Valley Reservation. SUF ¶3. The Klamath/Trinity River is the source of Hoopa's fishery from which Hoopa has benefited since time immemorial, and in which Hoopa has a vested property right that Federal Defendants have recognized and confirmed, and hold in trust. SUF ¶ 4.

The Bureau of Reclamation's Trinity River Division (TRD) of the Central Valley Project (CVP) is located in the Trinity River Basin. Defendants' construction and operation of the TRD directly impacts Hoopa's rights that are protected by federal laws including the Law of the Trinity River, a body of statutes, regulations, and administrative court decisions intended to protect Hoopa and Trinity River resources from TRD/CVP impacts.

By means of the TRD [1], the Bureau of Reclamation diverts Trinity River water away from Hoopa's Reservation, out of the Klamath-Trinity Basin, and 400 miles into the Central Valley.  The diverted water would otherwise flow downstream through the Hoopa Valley Reservation.

---

[1] Pub. L. 84-386, 69 Stat. 719 (August 12, 1955) (1955 Act) authorized the TRD. SUF ¶ 6

In 1984[2], Congress found that the TRD had devastated Hoopa's fishery[3], notwithstanding Congress' mandate that the Defendants operate the TRD for the preservation and propagation of the fishery.[4] The 1984 Act provided detailed direction to the Defendants to restore the Trinity River fishery. SUF ¶ 16

Eight years later, in the Central Valley Project Improvement Act (CVPIA)[5], Congress: (1) established a new CVP purpose and priority to "protect, restore, and enhance, fish, wildlife, and associated habitats in the . . . Trinity River basin[] of California"[6]; (2) required the Defendants to "address the impacts of the [CVP] on fish, wildlife and associated habitats"[7]; (3) established a step-by-step process for the Defendants and Hoopa to develop, adopt, and implement a Trinity River fishery restoration plan "in order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe"[8]; (4) eliminated any actual or apparent conflict between the Defendants' Reclamation and Indian Affairs program responsibilities by creating a specific trust duty to Hoopa in reclamation law;[9] and (5) delegated sovereign authority to Hoopa to enforce the trust duty by requiring Defendants to obtain Hoopa's concurrence in Defendants' actions regarding mitigation, restoration and protection of Hoopa's rights in the Trinity River fishery.[10] SUF ¶¶ 19-26.

The federal government has repeatedly acted through statute, regulation, and agency

---

[2] Pub. L. 98-541, 98 Stat. 2721 (October 24, 1984) (1984 Act). SUF ¶ 16

[3] 1984 Act § 1.

[4] 1955 Act § 2. In recognition that Trinity River is exported to the Central Valley, the 1955 Act specifically limited the financial and operational integration of the TRD with other features of the CVP in order to ensure Federal Defendants' ability to preserve and propagate the Trinity River fishery. SUF ¶¶ 7-10.

[5] Central Valley Project Improvement Act Pub. L. 102-575 Title XXXIV 106 Stat.4706 (October 30, 1992).

[6] CVPIA § 3402(a). SUF ¶¶ 19-20.

[7] CVPIA § 3402(b).

[8] CVPIA § 3406(b)(23).

[9] *Id*.

[10] CVPIA § 3406(b)(23)(B).

action to protect and enforce Hoopa's rights in the Trinity River fishery from the impacts of Reclamation's TRD/CVP out-of-basin diversions.  At issue in this motion are the following laws, with which Defendants have failed to comply:

First, CVPIA §3404(c)(2) states:

Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the Central Valley Project, the Secretary *shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts*.  The Secretary *shall also administer all existing, new, and renewed contracts in conformance with the requirements and goals of this title*.  (Emphasis added)

Here, Hoopa seeks summary judgment on its claims that its rights are "existing law" and that Reclamation failed to comply with: (1) the CVPIA, including CVPIA § 3404(c)(2); and (2) the now expired Water Infrastructure Improvements of the Nation (WIIN) Act[11] in acting to convert specific CVP water contracts into permanent repayment contracts.

Second, CVPIA § 3406(b)(23) requires the Secretary of the Interior to take specific actions "in order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the [1984 Act[12]]."  Pursuant to Section 3406(b)(23), in the year 2000, the Secretary executed, and Hoopa concurred in, the Trinity River Record of Decision (ROD).  Dkt. #142-8.  The ROD calls for a continued program of habitat restoration and fish monitoring that is being implemented by the Trinity River Restoration Program (TRRP), of which Hoopa is co-manager.  CVPIA § 3406(b)(23) mandates: "*costs associated with implementation of this paragraph shall be reimbursable as operation and maintenance* [O&M] *expenditures pursuant to existing law*."  Pursuant to CVPIA § 3406(b)(23), all costs of TRRP activities are to be charged to and collected as reimbursable O&M from CVP contractors.  The contracts at issue here fail to include terms requiring collection of these costs to implement Section 3406(b)(23) as required by law.  In addition, the contracts unlawfully excuse

---

[11] Pub. L. No. 114-322, §§ 4011-4014, 130 Stat. 1628, 1989-184 (2016). The WIIN Act expired pursuant to § 4013 on December 16, 2021.

[12] The 1984 Act refers to the Trinity River Basin Fish and Wildlife Management Act, Pub. L. No. 98-541, 98 Stat. 2721, which was reauthorized in Pub. L. 104-143, 110 Stat. 1338 (1996).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 3

the contractors from past-accrued reimbursable costs of implementing the CVPIA and TRRP.

Third, in CVPIA § 3406(b)(23), Congress directed the Secretary of the Interior, in consultation with the Hoopa Valley Tribe to develop "permanent instream fishery flow requirements and Trinity River Division operating criteria and procedures [OCAP] for the restoration and maintenance of the Trinity River fishery." *Id.* Congress conditioned the Secretary's authority to implement those permanent flow requirements and OCAP on Hoopa's concurrence in them. If Hoopa did concur then the Secretary was to implement the permanent flow requirements and OCAP prescriptions for restoration "accordingly"; that is, according to their terms. CVPIA § 3406(b)(23)(B). Hoopa concurred on December 19, 2000. Defendants now take the position that the Secretary can unilaterally modify the ROD's flow requirements and OCAP restoration prescriptions without Hoopa's concurrence. If allowed to stand, Defendants' position would unlawfully terminate Hoopa's concurrence right.

Fourth, federal law and the text of the WIIN Act contracts require validation of federal water contracts by state court decree. 43 U.S.C. § 511; *e.g.* Article 47 of Defendant Intervenor Westlands' contract. Absent such required validation, water contracts do not bind the United States and are voidable. Here, Reclamation has unlawfully declared the principal WIIN Act contract held by Defendant-Intervenor Westlands Water District ("Westlands") "will govern the rights and obligations of the United States and [Westlands]" even though the Fresno County Superior Court had denied validation of the contract via final judgment.[13]

Fifth, the National Environmental Policy Act ("NEPA") requires that an environmental impact statement (EIS) be prepared for all "major actions significantly affecting the quality of the human environment." 42 U.S.C. § 4322(c). Preparation of an Environmental Assessment

---

[13] Westlands' appeal from the validation denial is pending. *Westlands Water District v. All Persons Interested Etc. et al.* (CON/F084202) California Fifth Appellate District. The court issued a notice that the appeal was "fully briefed" on December 20, 2022. https://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=5&doc_id=2369740&doc_no=F083632&request_token=NiIwLSEmPkw2WzBBSCM9UE9JQFQ7UExbKyIuXzlTUCAgCg%3D%3D. The Fifth Appellate District Court had not ruled on the appeal as of the date of this filing.

(EA) is mandatory unless the agency has decided to prepare an EIS.  Here, it is undisputed that Reclamation failed to prepare either an EA or an EIS for the contract conversions because Reclamation claims it is not legally required to do so here.  Reclamation also failed to comply with NEPA prior to approving the Trinity River Winter Flow Variability (WFV) Project, which unlawfully re-allocated water prescribed in the ROD for Spring/Summer releases to earlier winter months. Plaintiff is entitled to summary judgment on its NEPA claims.

Hoopa brings this case pursuant to the Administrative Procedures Act (APA); however, this motion for partial summary judgment need not await completion of the administrative record.  Pursuant to FRCP 56(b), summary judgment motions may be filed at any time.  In APA cases, a court need not wait for compilation of an administrative record to decide a pure question of law.  *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 194 F. Supp. 3d 404, 409 (E.D.N.C. 2016).  In APA cases, early summary judgment motion practice is "routine."  *Clean Air Carolina v. U.S. DOT*, 2017 U.S. Dist. LEXIS 189866 (S.D.N.Y., Sept. 14, 2017).  Here, the Court can adjudicate Plaintiff's motion by review of the executed contracts addressed in this motion and a determination of whether they are, on their face, legally deficient as alleged by Plaintiff.  *California v. U.S. BLM*, 277 F. Supp. 3d 1106, 1115-16 (N.D. Cal. 2017) (motions for summary judgment in APA proceeding not premature where limited to legal issues that did not depend on administrative record, aside from certain key documents that Court took judicial notice of).  The Court may take judicial notice of the contracts at issue and certain other key documents, which have already been filed as exhibits in this proceeding and evaluate whether the contracts comply with the statutory requirements of the CVPIA addressed in this suit and motion.  The question of Hoopa's concurrence right presents a question of law that need not await the full administrative record.  Similarly, as it is undisputed that Reclamation has not prepared an EIS, or an EA, relating to any of the contract approvals, or relating to the WFV Project, the NEPA claims present pure questions of law that need not await completion of the administrative record.  *San Luis & Delta-Mendota Water Authority v. Salazar*, 686 F. Supp. 2d

1026, 1044, 1050 (E.D. Cal. 2009) (adjudicating NEPA and ESA legal claims prior to completion of administrative record).

## II.      FACTUAL AND LEGAL BACKGROUND

"Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the Central Valley Project, the *Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts*. The Secretary *shall also administer all existing, new, and renewed contracts in conformance with the requirements and goals of this title*." (Emphasis added.)  CVPIA §3404(c)(2).  Summarized below are relevant requirements of existing law, relating to the CVP/TRD and its impacts on Hoopa, including those legal requirements that are unlawfully omitted from the contracts challenged herein, and which Reclamation has failed to comply with and administer. This background is relevant to all claims for which Hoopa seeks judgment.

### A.      The United States Established the Hoopa Valley Reservation to Provide a Homeland for Hupa Indians Where They Could Achieve a Moderate Living Based on Fish.

Since time immemorial, Hoopa and its members, the Hupa people, have used and continue to use the Klamath-Trinity River system and its anadromous fishery resource for subsistence, cultural, ceremonial, religious, and commercial purposes.  *Parravano v. Babbitt*, 70 F.3d 539, 542-46 (9th Cir. 1995), *cert. denied*, 518 U.S. 1016 (1996); *United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986). The lower twelve miles of the Trinity River and a stretch of the Klamath River flow through the Hoopa Valley Reservation.  The fishery resources of the Trinity and Klamath Rivers have been the mainstay of the life and culture of Hoopa and its people.  The fishery is "not much less necessary to the existence of the Indians than the atmosphere they breathed."  *Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir. 1981) (quoting *United States v. Winans*, 198 U.S. 371, 381 (1905)).  The salmon fishery holds significant commercial and economic value in Hoopa's culture and economy.  *See* Memorandum from John D. Leshy, Solicitor of the Dept. of the Interior to the Secretary of the Interior (Oct. 4, 1993) (M-36979).

SUF ¶ 4.[14]

The principal purpose of Hoopa's Reservation was to set aside sufficient resources of the Trinity and Klamath Rivers for the Indians to be self-sufficient and achieve a moderate living based on fish. *Id.*, at 3, 15, 18-21, *cited with approval, Parravano*, 70 F.3d at 542. Hoopa's federal reserved fishing right carries with it a corresponding right to Trinity and Klamath River flow levels that are sufficient to support a productive habitat for Hoopa's anadromous fishery, including but not limited to salmon and steelhead, including those produced by the Trinity River Hatchery, and other culturally important salmon and non-salmonid species.

### B. The 1955 Act Prioritized In-Basin Flows and Required Protection and Mitigation of the Trinity Basin Fishery.

When Congress considered the TRD in 1955[15], it recognized that "an asset to the Trinity River Basin, as well as to the whole north coastal area, are the fishery resources of the Trinity River." S. Rep. No. 1154, 84 Cong., 1st Sess. (1955 Senate Report) at 5; H.R. Rep. No. 602, 84th Cong., 1st Sess. (1955 House Report) at 4. The 1955 Act, itself, required use of TRD water to preserve and propagate the Trinity River fishery. In addition, it expressly subordinated diversions from the Trinity River basin to the preservation and propagation of fish and wildlife within the Trinity River basin. 1955 Act, § 2. SUF ¶ 10. This statutory authority remains applicable and effective as a limitation on the TRD and Central Valley Project (CVP) today.

The Secretary of the Interior used the authority in the first proviso (Proviso 1) (SUF ¶ 8) in Section 2 of the 1955 Act, along with the CVPIA, to establish the 2000 ROD's flow requirements. In addition, in 2017, the Secretary, acting through Reclamation, used Proviso 1 to approve a Record of Decision (the 2017 FARS ROD) for long-term augmentation of flows from the TRD to the Lower Klamath River for the purpose of protecting salmon from disease. *San*

---

[14] An M-Opinion issued by the Solicitor of the Department of the Interior is "binding on all Departmental offices . . . " SUF ¶5.

[15] Trinity River Division Central Valley Project Act, Pub. L. No. 84-386, 69 Stat. 719 (August 12, 1955) (1955 Act).

*Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216 (9th Cir. 2017) (affirming Secretary's broad authority under the 1955 Act to release protective flows from the TRD).

Separately and in addition, the second proviso of Section 2 of the 1955 Act (Proviso 2) requires the annual release of not less than 50,000 acre-feet from Trinity Reservoir to be made available to Humboldt County and downstream water users, including Hoopa. 1955 Act, § 2; Memorandum from Hilary C. Tompkins, Solicitor of the Dept. of the Interior to the Secretary of the Interior (Dec. 23, 2014) (M-37030) (advising that Provisos 1 and 2 are independent authorizations and limitations on diversions to the CVP from the TRD). SUF ¶ 9. In 1979, Interior Solicitor Krulitz explained that the provisos of Section 2 of the 1955 Act limit the integration of the TRD into the CVP and require the Secretary to exercise a priority for use of all TRD water necessary to protect fish and other in-basin needs over TRD exports to the Central Valley for CVP use. Memorandum from Solicitor to Assistant Secretary, Land and Water Resources (Dec. 7, 1979).  Dkt. #142-4. SUF ¶ 10. Here, the challenged contracts fail to incorporate or bind contractors to the in-basin priorities demanded by Provisos 1 and 2; nor do they even refer to them.

### C.  Following Decades of Damage Caused by the TRD, Congress Mandated Restoration of the Trinity River Fishery

Construction and operation of the TRD radically altered the Trinity River environment by blocking, destroying, and degrading river habitats that supported once-abundant fish populations. *Westlands*, 376 F.3d at 862; 1984 Act § 1(1) and (2). In addition to obstructing 109 miles of habitat upstream of Lewiston Dam previously used for holding, spawning and rearing, the TRD diverted an average of 88% of the annual inflow out of the Trinity River and into the Sacramento River Basin during its first 10 years of operation.  *Westlands*, 376 F.3d at 861.  "Within a decade, the TRD had significantly diminished the salmon and steelhead populations in the Trinity River." *Haugrud*, 848 F.3d at 1223.  The reduction in salmon populations had a devastating impact on Hoopa, whose members have depended since time immemorial on the fishery resources of the Trinity and Klamath Rivers.

The United States, as trustee for the Tribe, has a fiduciary duty to protect and preserve the Tribe's federally reserved fishing and water rights and associated trust resources. *Klamath Water Users Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 2000). In addition to the in-basin flow priorities discussed above, Congress authorized development of the Trinity River Hatchery (TRH) in the 1955 Act to mitigate lost anadromous fish production upstream of the TRD, which blocked fish passage to 109 river miles of the most productive fish habitat in the Trinity River basin. SUF ¶ 15. Fish produced at the TRH are essential to Hoopa's exercise of its reserved fishing right.

In 1981, to address damage caused by the TRD, the Secretary of the Interior relied on an environmental study, authority provided by Proviso 1 of the 1955 Act, and the fiduciary trust obligation, to order an increase in annual flow releases from the TRD to the Trinity River downstream of Lewiston Dam for the benefit of Hoopa and its fishery and directed initiation of a study to develop a flow regime and other measures to improve Trinity River habitat conditions. Dkt. #142-7. Thereafter, the 1984 Act enhanced the Secretary's administrative action. Section 2(a) of the 1984 Act directed the Secretary to formulate and implement a program to restore the Trinity Basin fish and wildlife populations to pre-TRD levels. Section 2(1)(c) of the 1984 Act established a mandate for the Federal Defendants to "modernize and otherwise increase the effectiveness of the [TRH]." A subsequent amendment to the 1984 Act's hatchery modernization and improvement mandate included an objective to "best serve [the hatchery's] purpose of mitigation of fish habitat loss above Lewiston Dam [of the TRD] while not impairing efforts to restore and maintain naturally reproducing anadromous fish stocks within the basin." Trinity River Basin Fish and Wildlife Management Reauth. Act of 1995, Pub. L. 104-143, 110 Stat. 1338 (1996), §3(c) (1995 Act). SUF ¶¶ 17-18. Congress also clarified that Trinity fishery restoration is to be measured in part by the ability of Indian tribes to participate fully in fish harvest. *Id*., §2.

The contracts challenged herein fail to incorporate or bind the contractors financially and operationally to the requirements of the 1984 Act, including the directive that the TRD must be operated in a manner that will help restore TRD fish and wildlife to pre-TRD levels and the obligation to modernize and improve the efficiency of TRH as mitigation for TRD impacts. Reclamation has wholly failed in its obligations to achieve the mandates of the 1984 Act.

### D. The CVPIA Altered the Structure and Purpose of the CVP to Restore and Protect the Environment, the Trinity River, and the Hoopa Valley Tribe.

The CVPIA dramatically altered the structure and purpose of the CVP. Section 3406(a) added "mitigation, protection, and restoration of fish and wildlife" as a CVP purpose. Section 3406(a)(2) gave equal priority for use of CVP water to irrigation, domestic uses and fish and wildlife mitigation, protection and restoration purposes, which all have priority over use of CVP water for power uses. CVPIA § 3406(a)(2) reassigned, from the federal taxpayers to CVP contractors, financial responsibility for environmental costs associated with developing CVP water and managing deliveries to CVP contractors. *Westlands Water Dist. v. U.S. Dep't of the Interior* 850 F. Supp. 1388, 1404 (E.D. Cal. 1994).

CVPIA §3406(b) expressly enumerated a suite of environmental restoration, protection, and mitigation measures designed to ameliorate environmental impacts of the CVP. As to Hoopa, CVPIA § 3406(b)(23) required the Secretary to take specific actions "in order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the [1984 Act]." The 1984 Act actions incorporated in section 3406(b)(23) included completion by the Secretary, in consultation with Hoopa, of the Trinity River Flow Evaluation Study ("Flow Study") ordered by the Secretarial Decision of January 14, 1981, and, if Hoopa concurred, implementing the recommendations and associated operating criteria and procedures accordingly. The 1984 Act, as amended, also requires the Secretary to modernize and increase the effectiveness of the TRH to integrate fishery mitigation upstream of the TRD with natural fish restoration downstream of the TRD. CVPIA §

3406(b)(23) established a specific trust duty to Hoopa in Reclamation's management of TRD/CVP operations and finances. It also required the Secretary to consult with and obtain Hoopa's concurrence in a plan and measures to restore the Trinity River fishery. The 1984 Act and the CVPIA complement the 1955 Act. *Haugrud*, 848 F.3d at 1230.

Pursuant to Section 3406(b)(23), following completion of the mandated flow study, government-to-government consultation, and completion of an EIS under NEPA, the Secretary executed, and Hoopa concurred in, the ROD. Dkt. #142-8. The ROD set forth a flow regime below Lewiston Dam on the Trinity River designed to restore fish habitat between Lewiston Dam and Weitchpec – at the confluence of the Klamath River. The ROD also called for a continued program of habitat restoration and fish monitoring that is being implemented by the TRRP, of which Hoopa is co-manager.

Finally, CVPIA §3406(b)(23) provides: "[c]osts associated with implementation of this paragraph shall be reimbursable as operation and maintenance [O&M] expenditures pursuant to existing law" (emphasis added); that is, all costs of TRRP activities are reimbursable by CVP contractors in the form of annual O&M charges.

To achieve its purposes, the CVPIA also imposed new limitations and requirements on CVP water contracting in CVPIA § 3404. In general, Congress barred new contracts for purposes other than fish and wildlife and placed limitations and conditions, including environmental review, on renewal of existing CVP contracts. As part of its fundamental alteration of status quo CVP contracting, Congress mandated in CVPIA § 3404(c)(2) that: "Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the [CVP], the Secretary shall incorporate all requirements imposed by existing law, including provisions of [the CVPIA], within such renewed contracts", and administer them accordingly. The CVPIA barred renewal of long-term CVP contracts until Reclamation completed review of their environmental impacts pursuant to NEPA. CVPIA, § 3404(c) . Because Reclamation has not completed required environmental reviews, the United States has

repeatedly approved short-term interim renewal contracts of 2 - 3 years in length.  *See* Dkt. # 19-3 (Westlands interim contract).

The contracts challenged here unlawfully fail to incorporate or bind the contractors to the requirements of the CVPIA.  For example, the contracts fail to acknowledge the project purpose of fish and wildlife mitigation, protection, and restoration, the requirements of the contractors' obligations to pay for costs of implementing the TRRP as annual reimbursable O&M, and Hoopa's right of concurrence in matters affecting implementation of the ROD and TRRP.

### E.  In 2016, Congress Authorized Conversion of CVP Contracts but Retained Pre-Existing Legal Requirements Including the CVPIA and NEPA.

In 2016, Congress passed the Water Infrastructure Improvements for the Nation Act ("WIIN Act"), Pub. L. No. 114-332, 130 Stat. 1628.  Section 4011 of the WIIN Act authorizes the conversion of existing water service contracts to repayment contracts "under mutually agreeable terms and conditions."  The WIIN Act further authorizes prepayment of certain contracting costs, which, upon prepayment, will allow such CVP contractors to avoid acreage limitations and full cost pricing that would otherwise apply.  WIIN Act, § 4011(c)(1).  These changes will enable water users to increase the acreage of lands served by CVP deliveries at a lower cost, thereby inducing additional demand for CVP water.  Section 4011(a)(2)(D) of the WIIN Act further provides that the converted contracts shall "continue so long as the contractor pays applicable charges . . . ."  Thus, the term of the contracts converted under the WIIN Act is permanent, making inclusion of required legal protections as contract terms critical to the protection of Hoopa's fishery, which the Federal Defendants hold in trust.

The WIIN Act sharply limits modifications to existing law.  Section 4011(d)(4) provides: "Implementation of [the WIIN Act] shall not alter . . . except as expressly provided in this section, any obligation under the reclamation law . . . ."  Section 4012(a)(2) provides that the WIIN Act "shall not be interpreted or implemented in a manner that . . .  affects or modifies any obligation under the CVPIA [with one exception not relevant here]."  Thus, the requirements in CVPIA § 3404 regarding mandatory environmental review prior to entry into long-term contracts

and incorporation of existing legal requirements as express terms in CVP contracts remain in effect.  Here, Reclamation has failed to comply with CVPIA § 3404(c)(2)  and failed to conduct environmental review pursuant to NEPA; thus, their contract approvals are unlawful.

### F. Federal Law and the WIIN Act Contracts Require State Court Validation; In the Case of Westlands' Principal Contract, Validation Has Been Denied.

On February 28, 2020, Reclamation entered into a WIIN Act Contract (No. 14-06-200-495A-IR1-P) with Defendant-Intervenor Westlands Water District. Consistent with 43 USC § 511, Article 47 states: "This amended Contract shall not be binding on the United States until the Contractor secures a final [validation] decree." Dkt. #125-2.  Through a series of decisions from February 27, 2020, through a final judgment entered March 15, 2022, the Fresno County Superior Court has denied validation to Westlands' principal WIIN Act Contract.  Dkt. #142-2. Despite this denial of validation, Reclamation has unlawfully declared the Westlands Contract to be binding and enforceable.

### G. Defendants Approved the Trinity River Winter Flow Variability Project Without Obtaining Hoopa Concurrence or Complying with NEPA.

On January 30, 2023, Defendants approved the Trinity River WFV Project, which will re-allocate 60,000 – 220,000 acre-feet of water prescribed for release in Spring/Summer months pursuant to the ROD to earlier winter months.  It is undisputed that Defendants did not obtain Hoopa concurrence or engage in any NEPA review prior to taking this action.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Plaintiff alleges that Reclamation's action of approving and executing contracts without including terms and conditions required by federal law, specifically the CVPIA, violates the APA, which mandates that agency action will be set aside where it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(a).  Approval and execution of the contracts without terms required by CVPIA § 3404(c)(2)  and CVPIA §

3406(b)(23) violates the APA and requires the contracts be set aside.

There is no dispute as to what terms exist within the challenged contracts as approved and executed by Reclamation. The administrative record is not necessary to determine whether those contracts comply with requirements of federal law.   It is also possible to determine that an agency must comply with NEPA as a matter of law without looking to the administrative record and prior to the record's finalization.  *San Luis & Delta-Mendota Water Authority v. Salazar*, 686 F. Supp. 2d 1026, 1044, 1050 (E.D. Cal. 2009).  Summary judgment is appropriate here.

## IV.   ARGUMENT

### A. Hoopa Is Entitled to Summary Judgment on Its First Claim for Relief: Reclamation Failed to Comply With CVPIA Section 3404(c)(2) in its Approval and Execution of the Permanent Contract Conversions.

The CVPIA imposed significant new limitations and requirements on CVP water contracting. As part of its fundamental alteration of status quo CVP contracting, CVPIA § 3404(c)(2) required that: "Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the [CVP], the Secretary *shall incorporate all requirements imposed by existing law, including provisions of [the CVPIA], within such renewed contracts*. The Secretary *shall also administer all existing, new, and renewed contracts* in conformance with the requirements and goals of this title." (Emphasis added)."  Here, the specific permanent water contracts challenged herein, as approved and entered into by Reclamation, fail to comply with CVPIA § 3404(c)(2).

There are no disputed facts that prevent adjudication of this claim on summary judgment; nor is there any need for preparation of the administrative record to address this claim.  A true and correct copy of Westlands' converted contracts are attached as Exhibits A and B to the Statement of Undisputed Facts.  See also Dkt. #125-2; #113-2. The questions before the Court are solely ones of law; that is, whether those converted contracts, as approved and executed, comply and are administered in conformance with the requirements of CVPIA § 3404(c)(2) .

#### 1. The CVPIA, and the Requirements of § 3404(c)(2), Apply to Reclamation's Contract Approvals Under the WIIN Act.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 14

The 1992 CVPIA was enacted, among other things, to "protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California." CVPIA, § 3402; *Westlands*, 376 F.3d at 863 (CVPIA confirmed Congress's commitment to restore and protect fish and wildlife habitat of Central Valley and Trinity River Basin).  The CVPIA established fish and wildlife mitigation and enhancement as purposes of the CVP. CVPIA § 3406(a) .

To achieve the purposes of the CVPIA, Congress imposed new express limitations and requirements on CVP water contracting in CVPIA § 3404.  First, Congress barred execution of almost all new contracts of any duration for any purpose other than fish and wildlife until certain conditions were met.  CVPIA, § 3404(a) .  Second, in section 3404(c)(1) , Congress prohibited renewal of any existing long-term repayment or water service contract until appropriate environmental review was completed.  The Bureau of Reclamation Policy Manual on Water Related Contracts and Charges (09/04/20) defines long-term contract as a "contract with a term of more than ten years."[16]  Pending completion of all required environmental review, Congress authorized only short-term renewal contracts of 2-3 year duration. CVPIA, §3404(c)(1) .  Third, upon completion of all required environmental review, the subsequent renewal of any long-term (i.e., more than ten years) repayment or water service contract was discretionary, not mandatory. CVPIA, § 3404(c)  (requiring Secretary to renew contracts for initial term of 25 years but granting Secretary discretion regarding subsequent renewals). Fourth, upon renewal of <u>any</u> long-term repayment or water service contract providing for water delivery from the CVP, Congress required that the Secretary shall incorporate all requirements imposed by existing law . . . within such renewed contracts."  CVPIA, § 3404(c)(2) .  This requirement, per Reclamation's manual, applies to any contract longer than ten years, which includes the contracts challenged here.[17]

---

[16] The Reclamation Policy Manual is at:  http://www.usbr.gov/recman/pec/pec-p05.pdf. *See also*, SUF ¶¶ 56-69.

[17] Defendant Reclamation Regional Director Ernest Conant, previously argued in his role as counsel for

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 15

The limitations and conditions on contracting are fundamental to achieving CVPIA purposes, which are focused on ameliorating adverse environmental impacts that resulted, and which continue to result, from CVP operations.  The WIIN Act expressly preserves all requirements of the CVPIA in full force.  Section 4012(a) of the WIIN Act expressly states that the WIIN Act "shall not be interpreted or implemented in any manner that . . . (2) affects or modifies any obligation under the [CVPIA] [except for a provision for Stanislaus River predator management not relevant here]."  This includes the requirement of CVPIA § 3404(c)(2)  to ensure that any long-term repayment or water service contracts expressly incorporate all requirements of existing law. *See also* WIIN Act, § 4011(d) (providing that WIIN Act does not alter any obligations under the reclamation law (of which CVPIA is part) unless expressly provided). The WIIN Act also reserves the Secretary's discretion to condition the converted contracts on "mutually agreeable terms and conditions." *Id.*, § 4011(a)(1).

CVPIA § 3404(c)(2)  applies to long-term contracts, which Reclamation's own manual defines as contracts with a term exceeding ten years. *Supra*, n. 16. The WIIN Act contracts, of potentially permanent duration, plainly are long-term.  In common parlance, something that may be permanent or last forever is long-term. CVPIA §3404(c)(2) applies to the WIIN Act contracts.

### 2.  The Converted WIIN Act Contracts Fail to Incorporate Applicable Legal Requirements of Critical Importance to Hoopa and the Trinity River.

CVPIA §3404(c)(2)  states that "the Secretary shall incorporate all requirements of existing law, including provisions of this title, within such renewed contracts."  This imposes a mandatory obligation to include as binding contract terms the relevant requirements of existing law within the four corners of the contract documents.  The converted contracts fail to do so.

---

California water districts that the contract renewal provisions of CVPIA § 3404(c) were "[s]ome of the most onerous provisions of CVPIA" from the water contractors' perspective and stood in sharp contrast to the prior normal course of water contracting by the United States. However, he recognized that the CVPIA is binding on Reclamation and that his disagreement with the CVPIA's contract reforms "can only be cured through legislation.", which has not been enacted, *See* Ernest A. Conant, The Central Valley Project Improvement Act Proposed Reforms, 6 San Joaquin Agricultural Law Review 27, 39-40, 43 (1996).

The CVPIA and specifically § 3404 imposed a fundamental change in long-term contracting in the context of a statute designed to mitigate past harms and provide future protection from ongoing CVP operations. A purpose of CVPIA § 3404(c)(2)  is to make clear the applicable environmental mitigation, restoration, and protection obligations and the related contractor payment obligations as terms in the contracts themselves to avoid or limit disputes about applicability of legal obligations during the life of the long-term contracts.  Federal law plainly applies to the CVP contractors and Reclamation regardless of what the contracts say.  But Congress determined that it was not enough to simply assume CVP contractors and Reclamation would adhere to applicable legal requirements.  Congress required those obligations be affirmatively specified in the contracts themselves, contractually binding the contractors.

There is no dispute that Reclamation approved and executed the WIIN Act contracts at issue in this motion, such as Westlands Contract #14-06-200-495A-IR1-P.   Thus, the question presented is a matter of law:  do the contracts, on their face, comply with and satisfy the requirements of CVPIA § 3404(c)(2)?  The answer is clear:  they do not.  For example, the contracts do not incorporate the terms and requirements of the 1955 Act, which limits and conditions the delivery of water to the CVP from the Trinity River Basin.  Nor do the contracts incorporate terms of the 1984 Act (or its 1996 reauthorization), which mandates the restoration of Trinity River fish populations to pre-TRD levels and requires the Secretary to "modernize and otherwise increase the effectiveness of the TRH."  Also omitted is the Trinity River ROD, which implements the "operating criteria", concurrence language, and cost collection mandate of CVPIA § 3406(b)(23) .   These are only some of the protective requirements of law that are omitted and not included as binding terms in the approved contracts. By not having provided for those terms, the Defendants further violate CVPIA §3404(c)(2)  by not administering those contracts "in conformance" with existing law, including the CVPIA.

To comport with the requirements of CVPIA §3404(c)(2) , the contracts must also contain terms that, consistent with requirements of existing law, establish priority for the

Secretary's use of all TRD water that is required for in-Trinity basin uses, including fish and wildlife preservation and propagation.  Existing laws and legal documents that confirm this in-basin priority include Provisos 1 and 2 of Section 2 of the 1955 Act, the 1979 Solicitor Opinion of Leo Krulitz, the 2000 ROD, and the 2017 Flow Augmentation Releases (FARs) Record of Decision.  As currently drafted, the contracts do not even reference these legal documents, nor do they affirmatively bind the contractors to their terms.

The contracts also fail to incorporate and bind the contractors, as a matter of contract law, to the statutory obligations contained in the CVPIA and the 1984 Act to restore the Trinity River fishery to pre-project levels and to modernize and increase the effectiveness of the Trinity River Hatchery.  While these are obligations to be undertaken by the Secretary, it is the contractors (as described below) who are responsible to reimburse the costs of these programs.  There is also no incorporation or recognition of Hoopa's concurrence authority, provided in CVPIA § 3406(b)(23), which requires the Secretary to obtain Hoopa concurrence in order to modify the permanent fishery flow requirements and OCAP prescribed in the ROD.  Through CVPIA § 3404(c)(2), Congress intended that the contractors affirmatively agree to be bound, as a matter of contract law, by these provisions of law that have the effect of limiting Reclamation's authority over CVP water supplies for irrigation use and power development.

The purpose of § 3404(c)(2) is not simply to recite the already-existing obligations of law; rather, it is to ensure that the contractors themselves are bound, and agree to be bound, by these provisions of law as terms of their water contracts.  Thus, here, the contracts must be set aside and reformed to obtain, with certainty and finality, the contractors' agreement to be bound by provisions of law that are protective of the Trinity River Basin and Hoopa's interests therein.

Notwithstanding the CVPIA's incorporation mandate, the contracts as currently drafted expressly reserve (in a negotiated term) the contractors' rights to "contest the validity or application in connection with the performance of the terms and conditions of this Contract of any Federal law or regulation."  *See* Westlands Contract, Article 37.  Thus, instead of binding

contractors to existing protective provisions of law, Reclamation agreed that contractors could challenge and contest any application of such laws to their converted contracts.   This is plainly unlawful and violates Congress' intent and directives to restore the Trinity River fishery and fulfill a trust duty to Hoopa.

When it prepared WIIN Act contracts, Reclamation was well aware of CVP contractors' repeated and aggressive challenges to federal laws that protect Hoopa and the Trinity River.  For example, Westlands and other CVP interests unsuccessfully sued to enjoin implementation of the ROD.  *Westlands Water District v. U.S. Dept' of Interior*, 376 F.3d 853 (9th Cir. 2004).  They have also sued to challenge protective releases of water under the 1955 Act.  *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216 (9th Cir. 2017).  Reclamation has failed to bind the contractors, in their contracts, to the protective legal requirements alleged herein and by instead expressly allowing the contractors to challenge those laws in connection with the contract implementation.  In doing so, Reclamation violated a central purpose of CVPIA § 3404(c)(2), which was to provide certainty and finality with respect to the environmental restoration mandates of federal law relating to the CVP, the TRD, and Hoopa.

Throughout the contract, Reclamation and the CVP contractors painstakingly negotiated terms and conditions related to their mutual interests.  The contracts specifically cite numerous applicable laws, court decisions, and agreements of interest to CVP contractors; the CVP contractors demanded these terms to protect their interests.  But Reclamation failed to demand inclusion of the existing legal requirements that protect Hoopa's interest as binding contract terms, as CVPIA § 3404(c)(2)  requires.  Reclamation's failure to comply with the requirements of CVPIA § 3404(c)(2)  renders the contracts in their current form unlawful.

**B.   Hoopa Is Entitled to Summary Judgment on its Second Claim for Relief: Reclamation Violated NEPA By Approving and Executing the Permanent WIIN Act Contract Conversions Without Preparing an EIS or EA.**

NEPA is "our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA is "a procedural statute intended to secure environmentally informed decision-

making by federal agencies." *Cal. ex rel. Lockyer* v. *U.S. Dep't of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009).  NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

NEPA requires federal agencies to prepare an Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  Federal agencies may first prepare an Environmental Assessment (EA) to determine whether the nature and extent of a proposed action's environmental effects requires an EIS.  40 C.F.R. § 1501.4(b)-(c).  Here, Reclamation failed to prepare either an EA or an EIS before converting the contracts pursuant to the WIIN Act.  This was legal error.

The Court must "set aside agency actions that are adopted 'without observance of procedure required by law.'" 5 U.S.C. §706(2).  Hoopa asks this Court to set aside Reclamation's approval and execution of the converted contracts due to its failure to comply with NEPA.[18]

### 1. Reclamation's Contract Conversions are Major Federal Actions with Significant Environmental Impacts That Require Compliance with NEPA

Federal agencies must prepare an EIS on "major federal actions" that are "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  Here, Reclamation failed to prepare either an EA or an EIS before converting the contracts.  Because of this legal violation, the contracts must be set aside and the Court must order compliance with NEPA.

The formation of contracts meets the standard for a major federal action under NEPA. *Forelaws on Board v. Johnson*, 743 F.2d 677, 681 (9th Cir. 1984), *cert. denied*, 478 U.S. 1004

---

[18] In addition to the arguments made herein, Plaintiff adopts the briefing related to NEPA filed by the Plaintiffs ("CBD") in *Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,1:20-cv-706-JLT-EPG, specifically CBD's briefs at ECF Dkt. #130, #170, #186.

(1986) (not disputed that power delivery contracts constituted major federal action); *Pacific Coast Fed. of Fishermen's Assn's v. U.S. Dep't of the Interior*, 929 F.Supp.2d 1039, 1047 (E.D. Cal. 2013), *aff'd in part, rev'd in part on other grounds,* 655 Fed. Appx. 595 (9th Cir. 2016) (not disputed that approval of two-year interim CVP contracts constituted major federal action under NEPA); *Minn. Pub. Interest Research Grp. v. Butz,* 498 F.2d 1314, 1322-23 (8th Cir. 1974) (contract modifications involving timber sales required preparation of EA).

Reclamation's decision to convert short-term, potentially renewable, water contracts into permanent contracts to deliver, cumulatively, more than 3 million acre-feet per year of CVP water, is clearly a major federal action warranting NEPA compliance. At minimum, Reclamation must prepare an EA to make the initial determination of whether the contracts may have a significant effect on the environment. *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

Preparation of an EA is mandatory unless the agency has decided to prepare an EIS. 40 C.F.R. §§1501.3, 1501.5. Here, Reclamation has taken no actions whatsoever towards NEPA compliance. It has not prepared an EA nor an EIS. Nor has it issued any categorical exclusion. Nor has it published any finding of no significant impact ("FONSI"). Reclamation has run roughshod over the principles and purposes of NEPA to evaluate impacts of federal action on the environment, in advance of taking action. Reclamation's unlawful action must be set aside.

The out-of-basin diversion of water to the Central Valley from the Trinity River basin, which would otherwise flow through the Trinity River, significantly impacts the fish, water, environmental, and socioeconomic resources of the Trinity River basin. The conversion of CVP contracts to permanent contracts will perpetuate these adverse impacts. Reclamation's failure to comply with NEPA means there has been no environmental analysis of the terms and conditions of the contracts or of the environmental impacts that will result from entering into these water contracts on a permanent basis. Nor has there been any analysis of the impacts of increasing water demand that may result from the relief from acreage limitations and full cost pricing. *See*

1  WIIN Act, § 4011(c)(1).

2         Nor has there been any analysis of alternatives, as NEPA requires.  42 U.S.C. §

3  4332(C)(iii).  NEPA expressly requires Federal agencies to, "study, develop, and describe

4  appropriate alternatives to recommended courses of action in any proposal which involves

5  unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(E).

6  Alternatives must be presented "in comparative form, thus sharply defining the issues and

7  providing a clear basis for choice among options by the decision-maker and the public."  40

8  C.F.R. § 1502.14.  Locking in the contracts as permanent contracts without NEPA review

9  forecloses inquiry into possible changes in climate and to species status and possible ways to

10  mitigate impacts from such changes.  See 40 C.F.R. § 1508.27(b)(5).  Reclamation's failure to

11  conduct any environmental analysis, in either an EIS or EA, has deprived the decision-makers

12  and public of critical information to inform choices relating to these permanent water contracts.

**2.  <u>Reclamation</u> <u>Has</u> <u>Discretion</u> <u>Regarding</u> <u>the</u> <u>Contract</u> <u>Conversions</u>.**

13

14         Reclamation has argued that NEPA is not required because Reclamation lacks discretion

15  in converting the contracts.  This is plainly wrong as a matter of law.  Reclamation has discretion

16  in determining what the terms of the contracts will be.  Section 4011(a)(1) of the WIIN Act

17  expressly provides that the Secretary of the Interior shall, upon the request of the Contractor,

18  convert CVP contracts "under mutually agreeable terms and conditions."    Thus, under the plain

19  language of the WIIN Act, Reclamation has discretion to determine and negotiate the terms and

20  conditions of the contracts.  And each of the contracts at issue in this case includes language

21  stating that "this amended Contract has been *negotiated* and reviewed by the parties."  *See*

22  Westlands Contract, Article 46.  Article 46 further explains that the "double-spaced articles of

23  this amended Contract [of which there are many] have been drafted, negotiated, and reviewed by

24  the parties."  *Id.*  Only the single space articles contain standard Reclamation language.  *Id.*

25         The Ninth Circuit has held that virtually identical statutory language to that at issue here

26  gave Reclamation sufficient discretion to trigger application of NEPA.  *Natural Resources*

*Defense Council v. Houston*, 146 F.3d 1118, 1123-1126 (9ᵗʰ Cir. 1998), *cert. denied,* 526 U.S. 1111 (1999).  Prior decisions further reinforce that federal agencies retain discretion in how they negotiate and finalize contracts.  In *Aluminum Co. of Am. v. Central Lincoln Peoples Utility District*, 467 U.S. 380, 383, 398 (1984), the Supreme Court held, because the applicable statute did not "comprehensively establish the terms on which power is to be supplied" under new contracts made by a federal agency marketing hydroelectric power, the agency's administrator had "broad discretion" with respect to negotiating the contracts, even where the statute required the agency to offer new contracts to its customers.

NEPA requires government agencies to comply with its mandates to the fullest extent possible.  42 USC § 4332; *Forelaws on Board v. Johnson*, 743 F.2d 677, 681-83 (9ᵗʰ Cir. 1998).  Reclamation has plentiful discretion to negotiate terms of contracts at issue here.  Reclamation has violated NEPA by failing to perform any NEPA analyses prior to converting the contracts.

### 3.   The WIIN Act's Savings Language Confirms that NEPA Compliance is Required.

The CVPIA requires that agencies conduct environmental review prior to the renewal of any existing "long-term" CVP contracts for a contract period of up to 25 years.  CVPIA § 3404(c)(1)  provides that "[n]o such [long-term CVP contract] renewal shall be authorized until appropriate environmental review . . . has been completed."  The WIIN Act expressly provides that its terms "shall not be interpreted or implemented in a manner that . . . affects or modifies any obligation under the [CVPIA] [except for Stanislaus River provisions not relevant here]." WIIN Act, Section 4011.  Thus, the WIIN Act expressly preserves the CVPIA requirement to conduct NEPA review in advance of renewal of any long-term contract, which the permanent contracts at issue here clearly are.  Reading the savings language of the WIIN Act together with the CVPIA and NEPA clearly shows that environmental review under NEPA is required before the contract conversions can be lawfully approved or executed.

### C.   Hoopa Is Entitled to Summary Judgment on its Claim That Defendants Approval of the Trinity River WFV Project Is In Violation of NEPA.

On January 30, 2023, Defendants approved an unprecedented proposal known as the Trinity River Winter Flow Variability (WFV) Project, which shifts between 16-27% of the entire annual flow volume prescribed by the ROD from intended Spring/Summer flow releases to earlier winter months. Dkt. #142, Exh. 36. Per the WFV Project, these earlier winter releases will occur before the April 1 water year type determination is made. The amount of water provided by the ROD is expressly limited. The re-allocation of substantial water called for in the WFV Project means that water intended to be released in Spring/Summer months under the ROD will not be available because it has been released in prior months pursuant to the WFV Project.

Although the WFV Project is an unprecedented action that will significantly affect the Trinity River environment, its fishery, tribal trust resources, and species listed under the Endangered Species Act, Defendants did not comply with NEPA prior to approving the WFV Project. Despite starting a NEPA process in 2021 for a prior version of the WFV Project, Defendants failed to conduct any NEPA analysis whatsoever for the recently-approved version of the WFV Project. Defendants did not issue any Finding of No Significant Impact (FONSI) or Environmental Impact Statement (EIS) prior to approving the WFV Project.

NEPA requires federal agencies to prepare an Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major Federal action" is defined as "an activity or decision subject to Federal control and responsibility [subject to exceptions not relevant here]." 40 C.F.R. §1508.1(q). Approval of specific projects, such as the WFV Project, qualify as major federal action under NEPA. 40 C.F.R. §1508.1(q)(3)(iv).

Federal agencies may first prepare an Environmental Assessment (EA) to determine whether the nature and extent of a proposed action's environmental effects requires an EIS. 40 C.F.R. § 1501.4(b)-(c). "An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is

unknown unless the agency finds that a categorical exclusion (§1501.4) is applicable or has decided to prepare an environmental impact statement."  40 C.F.R. §1501.5.

If, following an EA, the agency determines that the proposed action will not have significant effects, the agency must prepare and make publicly available a "finding of no significant impact" (FONSI).  40 C.F.R. § 1501.6(a).  The FONSI is the document that explains why the decision-maker found that the proposed action will not have significant effects.  *Id.* Unless an EIS is prepared, issuance of a FONSI (and disclosure of the reasons behind the finding of no significant effects) is mandatory under NEPA.  *Id.*

Where, as here, "the nature of the proposed action is one without precedent," the agency must make the FONSI available for 30 days before the agency makes its final determination whether to prepare an EIS and before the action may begin.  40 C.F.R. §1501.6(a)(2)(ii).

Here, Reclamation started NEPA compliance when the WFV Project was proposed in 2021 but then cancelled the NEPA process in 2022 and never resumed or completed NEPA prior to approving the WFV Project in 2023.  This is legal error that mandates summary judgment in Plaintiff's favor.

### D.  Hoopa Is Entitled to Summary Judgment on its Third, Fourth, and Fifth Claims:  Reclamation Unlawfully Failed to Include Terms Requiring Contractors to Repay and Prospectively Pay Costs of Implementing the CVPIA and Trinity River Restoration

#### 1.  Reclamation Unlawfully Failed to Include or Require Payment of Costs Associated with Implementing CVPIA § 3406(b)(23) as Ongoing Operation & Maintenance Costs in the Converted Contracts.

In the CVPIA, Congress required water contractors to bear responsibility for reimbursing costs of fishery mitigation activities, which had previously been treated as non-reimbursable. *See, e..g,* CVPIA §§ 3406(b)(1)(D), (b)(4), (b)(5), (b)(15), (b)(23) .  In the case of Trinity River restoration, provided for in CVPIA §3406(b)(23), Congress mandated that all "costs associated with implementation of this paragraph shall be reimbursable as operation and maintenance expenditures pursuant to existing law."  The contracts challenged here fail to provide for these

statutorily required reimbursements.  This violates both CVPIA § 3404(c)(2) and § 3406(b)(23) .

CVPIA § 3406(b)(23) created a continuing annual obligation to charge and collect from the contractors the costs of operating the TRRP and TRH as annual reimbursable O&M charges. The TRRP is the program created to carry out the restoration mandate of CVPIA § 3406(b)(23) and the restoration activities called for, and concurred in by Hoopa, in the ROD.  The TRH is a Project component developed pursuant to Congress' authorization in the 1955 Act for the purpose of mitigating the loss of upstream fishery habitat caused by TRD development.  SUF ¶15.  CVPIA § 3406(b)(23)  expressly confirms that "costs associated with implementation of [Section (b)(23)] (which includes the costs of implementing the TRRP) shall be reimbursable as operation and maintenance expenditures pursuant to existing law."  And CVPIA § 3404(c)(2) requires incorporation of all provisions of existing law as binding contract terms.

Yet, someone reading the WIIN Act contracts now (or fifty years from now) would have no idea that the CVP contractors' O&M payment obligations should include payments to fund the TRH or TRRP – project components that are essential to protection of Hoopa interests and the Trinity River Basin at large.  For example, Exhibit B of Westlands' principal contract contains annual per acre-foot rates and charges that specify Westlands' cost obligations down to the penny.  Yet, Exhibit B does not contain any reference or provision for payment of ongoing Trinity River restoration costs under § 3406(b)(23)  or other costs under § 3406 that are in excess of CVP Restoration Fund assessments. SUF ¶¶ 71-77.  The contracts must be reformed to expressly confirm that CVP contractors' reimbursable O&M obligations must fund costs of the TRRP and TRH pursuant to § 3406(b)(23).  In addition, as the contracts do for other contractor payment obligations, the contracts must specify the contractors' obligations to pay these charges in Exhibit B or elsewhere in the contract. Reclamation has longstanding procedures and requirements for cost collection. SUF ¶¶ 56-69. If not specified by contract terms, those costs will not be paid by the contractors.

Finally, separate from, and in addition to its violation of § 3404(c)(2) 's "incorporation"

requirement, since 1992—long-prior to enactment of the WIIN Act--Reclamation has failed to implement § 3406(b)(23) 's O&M reimbursement mandate through its administrative rate-setting procedures. *See* https://www.usbr.gov/mp/cvpwaterrates/ratebooks/irrigation/2023/index.html.

### 2. The WIIN Act Contracts Unlawfully Excuse and Fail to Require Payment of Over $340 Million of Accrued CVPIA Implementation Costs.

The contracts challenged here incorrectly and unlawfully state that the Contractor has fulfilled all of its obligations under the Existing Contract. *See, e.g.,* Recital 14 of Westlands' Contract. This is incorrect. Reclamation has failed to allocate and collect significant amounts of accrued reimbursable construction and other capitalized costs of implementing environmental restoration mandates in CVPIA § 3406, and in particular, the Trinity River restoration mandate in CVPIA § 3406(b)(23), which requires collection of those costs as annual operation and maintenance expenditures. The uncollected amounts, which exceed $340 million, will remain uncollected if the WIIN Act contracts are not invalidated and reformed to account for these reimbursable environmental restoration costs pursuant to existing law and Reclamation procedures. *E.g.*, SUF ¶¶ 56-69. In its Motion to Dismiss, Reclamation conceded that it failed to allocate and collect these costs. Dkt. #151, p. 24. This Court must not allow Reclamation to excuse payment of these costs through its unlawful contracting actions here.

In January 2020, Reclamation belatedly prepared a Central Valley Project Cost Allocation Study (CAS), which Congress directed in the Coordinated Operations Act of 1986 to have been completed by January 1, 1988. Dkt. #142-9. The purpose of the CAS was to allocate and provide for final repayment for CVP facilities. Despite being prepared 32 years late, the 2020 CAS remained wholly incomplete as it expressly failed to allocate over $340 million in costs associated with CVPIA implementation. CAS, Dkt. #142-9, p. 5 (identifying $340 million in CVPIA costs not allocated). Rather, the CAS stated the CVPIA cost allocation would occur "through a separate process." CAS, Dkt. #142-9, section 3.6.[19] But no such separate process

---

[19] See also "Central Valley Project Final Cost Allocation Study Frequently Asked Questions" at

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 27

occurred prior to execution of the WIIN Act contracts, and as discussed below, still has not occurred.  Moreover, the permanent contracts did not include provisions for future collection of these costs from the contractors.  Absent action from this Court, this $340 million, and likely several times that in future reimbursements will be permanently excused.[20]

Reclamation has admitted that it failed to allocate and require repayment of this amount (approximately $340 million) in the WIIN Act contracts.  ECF Dkt. #151, p. 24.  In its motion to dismiss, Reclamation concedes that "the [CAS] deferred the allocation of the disputed CVPIA costs to the development and final approval of Business Practice Guidelines [BPG]."  *Id.* Reclamation further concedes that more than two years after its unexplained withdrawal of proposed CVPIA BPG from regulatory review by the Office of Management and Budget (OMB), "Reclamation has not finalized the Business Practice Guidelines or taken any action to allocate and collect the CVPIA facilities costs identified in Plaintiff's Amended Complaint."  *Id.*  Yet, at the same time, Reclamation has executed permanent contracts that declare all the contractors' existing obligations fulfilled even though the contracts do not provide for reimbursement of CVPIA costs, which, to date, Reclamation has not allocated.

Reclamation violated the WIIN Act, CVPIA § 3404(c)(2) , and CVPIA § 3406(b)(23) by failing to allocate and require repayment of this $340 million in outstanding CVPIA costs in the WIIN Act contracts.  It violated the WIIN Act because Section 4011(a)(2) of the WIIN Act requires full repayment of construction costs or other capitalized costs.  It violated CVPIA § 3404(c)(2)  by failing to include terms and conditions that require collection of these outstanding

https://www.usbr.gov/mp/cvp/docs/faq-cvp-01-13-20.pdf, which states: "The [CVPIA] is not part of the cost allocation study.  The associated costs are carried through and addressed in a separate initiative." But that separate initiative never happened.  To date, now three years after the contracts were executed, Reclamation has taken no action to collect this money.

[20] CAS Table ES-1, PDF page 13. Note also that the CAS does not allocate $56,875,000 related to "authorized deferred use." The applicable legislation, Public Law 90-65 (August 19, 1967) provides, at a minimum, that the "deferred obligation is to be paid from other revenues of the Central Valley Project". So it is not clear why the CAS does not allocate this identified cost for repayment.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 28

sums. And it violated CVPIA § 3406(b)(23) by unlawfully failing to treat those costs in the contracts as reimbursable operations & maintenance expenditures, obtain reimbursement of accumulated restoration costs, or provide for reimbursement of such future costs.

It is undisputed that these costs are neither reimbursed nor accounted for in the contracts. For example, the costs are not reflected in either Westlands' contract Exhibit D (which addresses the contractors' repayment obligation) nor in Exhibit B (which addresses ongoing rates and charges). If the WIIN Act contracts are not invalidated and reformed, hundreds of millions of dollars owed by Contractors as reimbursement for implementing the environmental mitigation and restoration mandates of CVPIA § 3406, including the Trinity River restoration mandate of CVPIA § 3406(b)(23) to meet Federal trust responsibilities to Hoopa will go uncollected.[21]

There can be no dispute that the current contracts, as written, unlawfully fail to require contractors to pay amounts that are currently due and owing (in addition to the failure to prospectively require annual payment of the costs of Trinity River restoration as operation and maintenance). The contracts must be set aside and remanded to Reclamation with direction to include provisions for contractor payment of these reimbursable expenses, including those currently owing and those that arise in the future.

### 3. Reclamation Acted Arbitrarily and Capriciously in Approving the Contracts By Acting in Violation of Executive Order 12866 and by Failing to Adhere to the Separable Costs Remaining Benefits (SCRB) Methodology.

In approving the contracts without including terms and conditions for payment and reimbursement of outstanding CVPIA costs, Reclamation acted arbitrarily and capriciously by ignoring its own long-standing cost-allocation methodology, known as the Separable Costs Remaining Benefits (SCRB) methodology and by violating the regulatory review requirements

---

[21] To be clear, Plaintiff does not contend that Defendant-Intervenor Westlands is responsible for payment of the entirety of the unallocated costs. Nor is it necessary to determine the proportion of costs to which Westlands (or any individual contractor) is responsible in this motion. The contracts must be set aside and remanded to Reclamation for further appropriate action of allocating and requiring collection of the CVPIA costs in the contracts themselves.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 29

mandated in Executive Order 12866 (Oct. 4, 1993).  These failures constitute arbitrary and

capricious action in violation of the APA.

Reclamation adopted the SCRB method for allocating costs of multi-purpose projects in

1954 and used the method for CVP cost allocations in 1956, 1960, 1970, and 1975.  ECF Dkt.

#142-11.  A description of the SCRB method is found at page 2 of the CAS.  ECF Dkt. #142-9:

> The SCRB method is considered the most comprehensive and generally preferred
> method of allocating costs by Reclamation. The SCRB method is based on the
> goal of identifying and assigning all project costs that provide only one project
> benefit to the appropriate project purpose (separable costs), and then equitably
> distributing those costs that provide benefits to more than one purpose (joint
> costs) among authorized project purposes.

The SCRB method allocates project costs among its authorized purposes.  Thus, in

allocating costs in the CAS, the SCRB method required Reclamation to identify and assign all

project costs that provide only one project benefit to the appropriate project purpose (separable

costs) and then equitably distribute those costs that provide benefits to more than one purpose

(joint costs) among authorized project purposes.  In the case of the CVPIA, Congress specified

costs as reimbursable or non-reimbursable, and assigned reimbursable costs to water and power

contractors for repayment.  Non-reimbursable costs are not subject to repayment.

CVPIA §3406 amended the CVP's purposes and priorities set forth in 50 Stat. 844, 850,

§2 (Act of August 21, 1937) by adding as a new and separate purpose, "mitigation, protection,

and restoration of fish and wildlife," and by giving that purpose equal priority in the CVP with

irrigation and domestic uses and senior priority over power.  According to the SCRB method, the

costs associated with that new and separate CVP purpose are separable costs because they

provide only one project benefit to a specific project purpose:  mitigation, protection, and

restoration of fish and wildlife.  None of the expenditures benefit any other CVP purpose.  They

are reimbursable by CVP contractors as "specifically authorized under the CVPIA and have

specific cost recovery assignments."  Dkt. #142-9, CAS, § 5.12; CVPIA § 3406(b)(23) (directing

that costs associated with this paragraph "shall be reimbursable as operation and maintenance

expenditures pursuant to existing law").  But instead of allocating these CVPIA costs as reimbursable separable costs, Reclamation excluded (and admits it excluded) these costs entirely from its CAS, which reduced reimbursement by hundreds of millions of dollars of essential restoration funding on which completion of Trinity River restoration depends.  Dkt. #151, p. 24; CAS, p. 5 (identified approximately $340 million in CVPIA costs as "costs not allocated"). Executing the WIIN Act contracts without properly allocating and accounting for these funds violates the CVPIA and the APA and requires setting aside and remanding the contracts.

Reclamation also violated Executive Order 12866 (SUF ¶ 47), which requires the Office of Management and Budget to review any significant regulatory action having an annual effect on the economy of $100 million or more or that adversely and materially affects the environment, public health or safety, or tribal governments, before the action agency may act. Here, the CAS states that its results will be used to allocate CVPIA costs in the future pursuant to Business Practice Guidelines (BPG).  The only BPG currently in effect are the "Business Practices Guidelines for [CVPIA] Program Accounting and Cost Recovery"[22] (September 29, 2003) (2003 BPG) the purpose of which is  "to memorialize roles, responsibilities, and standard procedures associated with accounting and cost recovery for [CVPIA] Program (Program) activities in compliance with applicable laws, regulations, policies, and standards . . ." https://www.usbr.gov/mp/cvp/docs/bus_prac_guide_cvpia.pdf.   By their terms, "[t]hese Guidelines will remain in effect until formally revised or rescinded." *Id.* at 1. Defendants have neither revised nor rescinded the 2003 BPG. The 2003 BPG provide that all accounting by Defendants "must conform with Federal Accounting Standards Advisory Board (FASAB) standards and generally accepted accounting principles (GAAP). In particular, FASAB standards, GAAP, and related Federal regulations require that all costs incurred by the United

---

[22] Note that the 2003 BPG title is slightly different from the BPG referred to in the CAS that Reclamation withdrew from OMB review on February 11, 2021. Those BPG are entitled "Business Practice Guidelines for CVPIA Receipts, Program Accounting, Cost Allocation, and Cost Recovery." CAS at Acronyms and Abbreviations | vii.

States be either capitalized or expensed according to specific accounting criteria. The accounting treatment is significant to contractors since reimbursable capital costs are recovered over the useful life of the asset and reimbursable expenses are recovered in the year they are incurred." *Id.* at 6.

To date, Reclamation has not rescinded the 2003 BPG on the one hand, or complied with them, on the other hand. In the meantime, Reclamation has not obtained authority from OMB pursuant to Executive Order 12866 to write off approximately $340 million in accrued restoration costs owed by CVP contractors, or considerably more in such future costs.

**4. Reclamation Has Acted Arbitrarily and Capriciously by Attributing Certain Costs of Implementing Trinity River Restoration Activities to CVPIA 3406(b)(1) Instead of 3406(b)(23)**

As explained above, Defendants have failed to allocate or recover CVPIA program costs from contractors, including operation and maintenance charges that are reimbursable under CVPIA §3406(b)(23).  In addition, in their accounting of these costs to date, Defendants have arbitrarily and capriciously attributed certain costs of implementing Trinity River restoration activities under §3406(b)(23) to the different statutory authority of CVPIA §3406(b)(1).  On remand, Defendants must be ordered to account properly for Trinity River restoration costs under the proper statutory authority to ensure the costs are reimbursed as required by §3406(b)(23). The reasons for this are as follows:

First, CVPIA §3406(b)(23) established an explicit federal statutory fiduciary duty for Hoopa's benefit and prescribed a program to implement that duty with Hoopa's concurrence.  In contrast, there is no tribal trust provision in the Anadromous Fish Restoration Program (AFRP) under CVPIA §3406(b)(1) .  The fishery resources addressed by the AFRP are in a separate watershed unrelated to Hoopa's property rights in the Trinity River fishery and are not tribal trust resources.  Thus, the existence of a fiduciary interest in a Reclamation program, present in the TRRP but absent in the AFRP, requires agency decision-making that is attentive to the trust interest and enhances the Secretary's ability to fulfill her trust responsibility to Hoopa.

Second, CVPIA §3406(b)(23) incorporates the 1984 Act.  They and the 1995 Act are the legal foundation for the restoration of the Trinity River.  Together they establish a goal to restore fish populations to levels approximating those which existed immediately before the start of construction of the TRD.  The means for doing that include the restoration of natural fish production below Lewiston Dam, production of fish from a modernized and more effective Trinity River hatchery, and integrated management of the two means of production.

Third, CVPIA §3406(b)(1) 's AFRP for Central Valley rivers and streams is separate and distinct mitigation action from the Trinity River restoration program in 3406(b)(23).  Section 3406(b)(1)'s restoration criterion is natural fish production "on a long-term basis, at levels not less than twice the average levels attained during the period of 1967-1991."  In contrast, the Trinity River fishery restoration goal in the 1984 Act is fish population "levels approximating those which existed immediately before the start of construction" of the TRD, which was authorized in 1955.

Fourth, the TRD's environmental damage to the Trinity River is an "adverse environmental impact[] of the [CVP]" for which the restoration program specifically enumerated in CVPIA §3406(b)(23)  is authorized.

Fifth, the numbered paragraphs in section 3406(b)  enumerate mitigation activities to address adverse environmental impacts.  Congress was informed of the adverse environmental impacts and had an understanding of the needed mitigation activities required for the Trinity River when it passed the 1984 Act, the CVPIA, and the 1995 Act.

Sixth, the process of developing and implementing CVPIA 3406(b)(1) 's AFRP for the Central Valley rivers and streams would not result in discovery of an adverse environmental impact to the Trinity River's fishery resources that are in a different river basin.  In fact, the TRRP is the only CVPIA mitigation activity that is located outside of the Central Valley watershed and Bay-Delta.

Seventh, the AFRP in 3406(b)(1)  is a major, complex, costly and specific undertaking.

Congress recognized that the magnitude of the challenge presented by the AFRP could lead to undiscovered adverse environmental impacts that the program needed to address.

Eighth, Congress also recognized the distinction between Central Valley rivers and streams and the Trinity River.  Section 3406(b)(2) allocates annually 800,000 acre-feet of CVP water for the AFRP.  But §3406(b)(2)(A)  clarifies that "such quantity of water shall be in addition to the quantities needed to implement . . . paragraph (23) of this subsection for releases to the Trinity River for the purposes of fishery restoration, propagation and maintenance . . ."

Ninth, 3406(b)(1) 's first line requires the Secretary to "develop . . . *a program . . .*" [the AFRP] (emphasis added).  That proviso states that "in the course of developing and implementing *this program* [i.e., the AFRP] the Secretary shall make all reasonable efforts consistent with the requirements of this section to address other identified adverse environmental impacts of the [CVP] not specifically enumerated in this *section*" (emphasis added).

Tenth, canons of statutory construction "applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians.  *Oneida County v. Oneida Indian Nation* ,470 U.S. 226, 247 (1985) . . . statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit, e.g., *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174 (1973); *Choate v. Trapp*, 224 U.S. 665, 675 (1912)." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).

Attribution of Trinity River restoration costs to Reclamation's Habitat Restoration Program (HRP) under CVPIA §3406(b)(1)  is also unlawful for many of the same reasons addressed above.  In addition, Reclamation's HRP pertains to "[a]ctivities authorized under section 3406(b)(1)  to mitigate the other adverse environmental impacts of the CVP on ESA-listed species *other than anadromous fish* (emphasis added).  *See* Public Draft Workplan Fiscal Year 2021 Obligation Plan for CVPIA Authorities Central Valley Project, California Interior Region 10 – California Great Basin Exhibit 16, at https://www.usbr.gov/mp/cvpia/docs/fy2021-obligation-plan.pdf PDF page 8  *See also* Bay-Delta Office Completion memo, Dkt. #142-27, at

2 ("The objective of the HRP is to improve conditions for impacted federally listed species and habitats, with a focus on terrestrial species and aquatic species *other than anadromous fish*." (emphasis added).

### E. Hoopa is Entitled to Summary Judgment on its Sixth and Seventh Claims for Relief: Reclamation Violated 43 U.S.C. §511 by Declaring Westlands' Contract Binding and Enforceable Despite Affirmative Denial of State Court Validation.[23]

Since May 1922, federal law has required that federal water contracts be validated by state court decree. 43 U.S.C. § 511. Absent such required validation, water contracts are not binding on the United States and are thus unenforceable. *Id.* "[N]o contract with an irrigation district under [Title 43, §§ 511-513] shall be binding on the United States until the proceedings on the part of the district for the authorization of the execution of the contract with the United States shall have been confirmed by decree of a court of competent jurisdiction, or pending appellate action if ground for appeal be laid." *Id.*

Here, consistent with these century old requirements of federal law, Article 47 of Westlands' WIIN Act Contract No. 14-06-200-495A-IR1-P expressly requires validation and confirms that lack of validation renders the contract unenforceable against the United States:

"Promptly after the execution of this amended Contract, the Contractor will provide to the Contracting Officer a certified copy of a final decree of a court of competent jurisdiction in the State of California, confirming the proceedings on the part of the Contractor for the authorization of the execution of this amended Contract. *This amended Contract shall not be binding on the United States until the Contractor secures a final decree*."

Over three years have passed since contract execution; Westlands has plainly failed to "promptly" provide the Contracting Officer with evidence of validation, as required by Article 47. In fact, validation has been affirmatively denied by the state court. Dkt #142-2.

This affirmative denial of validation distinguishes the present facts from those that were evaluated by Judge Drozd in *Ctr. For Biological Diversity v. U.S. Bureau of Reclamation*, No.

---

[23] Reclamation concedes, in its motion to dismiss, that Westlands' contract is not binding on the United States. Dkt. #151, p. 32. Thus, Plaintiff is entitled to summary judgment on its Seventh Claim, which seeks a declaration that Westlands' contract is not binding on the United States.

1:20-cv-706-DAD-EPG, 2021 WL 600952, at *5-6 (E.D. Cal. Feb. 16, 2021) because at the time of Judge Drozd's decision, there was no state court judgment denying validation to Westlands. Judge Drozd's decision addressed a contract that had not yet been (but still ultimately could be) validated. In contrast, the present situation is that Westlands' contract has been finally denied validation. Thus, it is not binding and is unenforceable against the United States.

Congress requires validation to protect the public interest in the development and distribution of the nation's water resources and to ensure that water from federal facilities is only delivered to districts with judicially confirmed authority. As explained by the Office of the Solicitor of the Department of the Interior: "[t]he Act of May 15, 1922 requires the judicial confirmation of contracts with irrigation districts as a measure of protection for the United States. This confirmation assures the validity of the contract by making sure the irrigation district has complied with all state law requirements. . . . *Congress has required the proceeding to take place before the United States will be bound by the terms of the contract*." Memorandum of the Office of the Solicitor (July 9, 1984), pp. 1-2, citing Solicitor's Opinion, 71 Interior Decisions 496, 517-18 (1964) and 43 U.S.C. § 511 (emphasis added). Dkt. #105-5.

In recognition of this settled law and practice, Westlands Water District on October 25, 2019, filed a Complaint for Validation Judgment in Fresno County Superior Court seeking a court judgment validating Westlands' proposed WIIN Act contract with the United States. On March 16, 2020, Fresno County Superior Court Judge Simpson denied Westlands' request for validation, ruling that Westlands WIIN Act contract could not be validated under California law. Judge Simpson found the contract deficient and unlawful because the contract's "absence of the actual final [repayment] amount and payment schedule render the proposed contract lacking in material terms and incomplete" and the "validation statutes do not encompass judicial approval of incomplete contracts." Dkt. #142-2, p. 12 (March 16, 2020 Minute Order, Section 4)). The Court ruled that validation of Westlands' WIIN Act contract was not possible because "the

requested finding of compliance with the Brown Act [California Government Code 54950 et seq.] cannot be made." Dkt. #142-2, pp. 12-13 (March 16, 2020 Minute Order, Section 5)).

Westlands subsequently filed a renewed motion for validation judgment. Due to Judge Simpson's retirement, this renewed motion was heard by Judge Tharpe of the Fresno County Superior Court. But the conclusion was the same. Judge Tharpe denied Westlands' renewed motion for validation judgment because Judge Tharpe found no new or different facts, circumstances, or law that would justify renewal of Westlands' validation motion. Dkt. #142-2, pp. 16-20 (October 27, 2021, Minute Order)). Judge Tharpe found:

> "[n]one of plaintiff's purportedly new facts support the motion for renewal. . . . As Judge Simpson held, the contract considered by the Board in October 2019 was only a proposed, incomplete contract, because it lacked key terms like the final repayment price and the dates on which repayments would be due. . . . It was also uncertain and incomplete because the resolution adopted by the Board allowed the President of the Board, its General Manager, and its General Counsel to modify the agreement's terms after it had been approved by the Board. . . . The Board's subsequent resolution that the final contract was consistent with its earlier resolution does not cure these deficiencies, and does not create the type of new facts and circumstances that would justify renewal or reconsideration of the prior order."

Dkt. #142-2, p. 18 (Oct. 27, 2021, Minute Order). Again denying validation, Judge Tharpe found:

> "As discussed above, Westlands has failed to show that the court should reconsider or reject Judge Simpson's reasoning here. Therefore, as the court has already found that the [Westlands] Board's decision to approve and execute the contract was not the proper subject of a validation action, [the court] cannot now grant validation as to any portion of the Board's decision. As a result, the court intends to deny the renewed motion for a validation judgment, in its entirety."

Dkt. #142-2, p. 20 (October 27, 2021, Minute Order, p. 6).

On March 15, 2022, based on the Court's prior orders of March 16, 2020 and October 26, 2021, the Fresno County Superior Court entered final judgment against Westlands, ordering that: "Plaintiff's Complaint for Validation Judgment is DISMISSED" and that "Plaintiff shall take nothing by its Complaint." Dkt. #142-2, pp 5-6 (March 15, 2022, Judgment). Thus, Westlands has not only failed to obtain required validation of its WIIN Act contract, but it has affirmatively

requested and been affirmatively denied validation by the Fresno County Superior Court in a final judgment due to the inherent and uncured deficiencies in its WIIN Act Contract.

In spite of these facts, and subsequent to the Superior Court's March 16, 2020 order denying validation, Westlands' General Manager reported to Defendant Conant by letter of May 26, 2020, not that the court had *denied* validation but that, "for multiple reasons, the [Fresno County Superior] Court was not able to validate the [Westlands Water] District's proceedings prior to the Court closing for judicial business in response to the COVID-19 pandemic and the proclamations of emergency by Governor Gavin Newsom.  The Court announced it will remain closed until May 29, 2020; therefore, the District will not be able to obtain a validation judgment prior to the Repayment Contract's effective date of June 1, 2020." Dkt. #142-21.  Immediately after, on May 20, 2000, Defendant Conant replied to Westlands, adopting nearly verbatim Westlands' representation that "for various reasons, the court was not able to validate the District's proceedings prior to the court closing for business in response to the COVID-19 pandemic and emergency proclamations by California Governor Newsom, the District will not be able to obtain a validation judgment prior to the Repayment Contract's effective date of June 1, 2020."  Defendant Conant then stated that "the [WIIN Act] Repayment Contract will govern the rights and obligations of the United States and the District after the Repayment Contract's effective date, June 1, 2020, notwithstanding the District's inability to obtain a final [validation] decree." Dkt. #142-22.  This exchange is evidence of close cooperation between Defendants and Defendant-Intervenor to evade the requirement of the validation statute. Together they masked the Superior Court's validation denial decisions through an inaccurate and misleading representation of COVID-19's impact on the court's ability to function.

Reclamation has not rescinded or modified its position since the state court entered final judgment on March 15, 2022, denying validation of Westlands' contract. In its motion to dismiss, Reclamation continues to maintain that it intends to honor the contract terms despite the affirmative denial of validation. Dkt. #151, pp. 30-33.  If this is permissible, and if Reclamation

intends to simply ignore the requirements of federal law, one must ask what is the point of going through the validation process at all?

Hoopa seeks summary judgment on its claim that Reclamation has violated 43 U.S.C. § 511 and the APA by arbitrarily, capriciously, and unlawfully declaring that Westlands' principal contract will govern the rights and obligations of the United States despite the affirmative denial of validation of the contract in California state court.

### F.  Hoopa Is Entitled to Summary Judgment on its Eighth Claim for Relief: Defendants Concede That the 2021 Completion Memos Were Unlawful.

In Hoopa's Eighth Claim for Relief, Hoopa alleges that the 2021 so-called Completion Memos, in which Secretary Bernhardt concluded that nearly all CVPIA environmental restoration mandates are complete, are unlawful.  In December 2022, Defendant Secretary Haaland voluntarily withdrew the memos as inconsistent with law.  Dkt. #125-9.  However, the voluntary withdrawal of the completion memos does not moot Hoopa's underlying claim – that the initial declaration of completion was unlawful. Moore's Fed. Practice, 3d ed., Vol. 15, §101.99[2][a], citing *DeJohn v. Temple University*, 537 F.3d 301, 309-311 (3d Cir.2008) (university's voluntary modification of sexual harassment policy three weeks before dispositive motion deadline did not moot constitutional challenge to previous policy); *Gluth v. Kangas*, 951 F.2d 1504 (9th Cir. 1991) (voluntary cessation of challenged policy of denying prisoners meaningful access to law library was not sufficient to moot claim).  Because Defendants agree that the underlying declaration of completion was not consistent with current law, Hoopa is entitled to summary judgment.[24]

### G.  Hoopa Is Entitled to Summary Judgment on its Ninth Claim:  CVPIA §3406(b)(23) Prohibits the Secretary From Modifying Permanent Fishery Flow Requirements or Operating Criteria and Procedures in the Trinity River ROD

---

[24] The court needs to address this matter with certainty and finality. Following the Defendants' December 15, 2022 withdrawal of the CVPIA completion memos, members of Congress representing the Central Valley introduced the WATER for California Act, H.R. 215 (118th Cong., 1st Sess.). Section 401(b) of the bill, without any basis in fact, provides that the "Secretary of the Interior shall *deem complete* the fish, wildlife, and habitat mitigation and restoration actions mandated under section 3406" of the CVPIA (emphasis added).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 39

**Absent Hoopa Concurrence.**[25]

The 2000 Trinity River Record of Decision (ROD) prescribes specific permanent minimum flow releases and operating criteria and procedures (OCAP) designed to restore the fishery in specific portions of the Trinity River located below Lewiston Dam, which were devastated by the development and operation of the Trinity River Division (TRD) of the Central Valley Project (CVP). The ROD's schedule of minimum flow releases is based on recommendations of a comprehensive scientific flow study co-authored by the Hoopa Valley Tribe and completed in the 1990's, known as the Trinity River Flow Evaluation Report ("Flow Study"). In CVPIA § 3406(b)(23), Congress directed the Secretary of the Interior to implement the recommended flows and OCAP, but only if the Hoopa Valley Tribe concurred in the recommendations. Absent Hoopa's concurrence, as required by CVPIA § 3406(b)(23), the Secretary was powerless to implement the recommended flows and OCAP.

Hoopa concurred in the recommendations, signing the Trinity River ROD along with the Secretary of the Interior in 2000. In CVPIA § 3406(b)(23), Congress expressly required that the Secretary obtain Hoopa's concurrence before the permanent flow releases could be implemented. It would have been a shock, and entirely unlawful, if the Secretary, shortly after having obtained Hoopa's concurrence in the permanent flow regime, unilaterally proceeded to modify or disregard the mandated flow schedule the next week or the next month without Hoopa's approval. Such a unilateral modification of the restoration program concurred in by Hoopa would have made a mockery of the statutorily mandated concurrence requirement.

Little more than two decades after signing the ROD, the Defendants now take the position that they can unilaterally modify the flow regime called for in the ROD without obtaining Hoopa's concurrence.[26] This is no more lawful today than it would have been the day

---

[25] Hoopa incorporates by reference its prior briefing on this topic found at Dkt. #108-1 and Dkt. #120.
[26] Specifically, Reclamation has violated Hoopa's concurrence rights in the context of its recent approval, on January 30, 2023, of the Trinity River WFV Project, which approved (without Hoopa concurrence) a significant modification in the flow schedule contained in the ROD to which Hoopa concurred in 2000. Dkt. #142, Exh. 36.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT - 40

after the ROD was signed.  CVPIA § 3406(b)(23)'s express purpose is to fulfill Federal trust responsibilities to Hoopa and to protect Hoopa's fishery resources.  Hoopa is singularly identified by name in CVPIA § 3406(b)(23) to the exclusion of all other Indian tribes and all other interests in the Trinity River basin.  Congress required the affirmative concurrence of only one entity, Hoopa, in order to implement the flow recommendations. Congress delegated Hoopa that sovereignty to be a check on the Bureau of Reclamation, which for decades had over-diverted Trinity River water to the Central Valley with devastating consequences to the Trinity River fishery that the United States holds in trust for Hoopa. CVPIA §3406(b)(23) stated that the concurred-in flow regime and restoration measures would be permanent and implemented according to their terms.

Hoopa's concurrence right under CVPIA §3406(b)(23) is ongoing and permanent. CVPIA § 3406(b)(23)(A) directed the Secretary to complete the Flow Study, in consultation with the Hoopa Valley Tribe, "in a manner which insures the development of recommendations, based on the best available scientific data, regarding _permanent_ instream fishery flow requirements . . . for the restoration and maintenance of the Trinity River fishery." (Emphasis added).  Following completion of the flow recommendations by the Secretary, CVPIA § 3406(b)(23)(B) provides that: "_If the Secretary and the Hoopa Valley Tribe concur_ in these recommendations, any increase to the minimum Trinity River instream fishery releases established under this paragraph . . . _shall be implemented accordingly_." (Emphasis added).  In addition, if Hoopa did not concur in the flow release recommendations, the minimum instream fishery releases expressly specified under Section 3406(b)(23) could not be changed absent act of Congress, appropriate judicial decree, _or the agreement of the Hoopa Valley Tribe_.  CVPIA § 3406(b)(23)(B).  Congress expressly stated that these statutory provisions were promulgated "in order to meet Federal trust responsibilities and to protect the fishery resources of the Hoopa Valley Tribe."  CVPIA § 3406(b)(23).

The letter and intent of CVPIA § 3406(b)(23) are clear.  Congress acted to fulfill its trust

responsibility for Hoopa's fishery resources through a specified course of action. *Id.* Congress required Hoopa's concurrence in order for the Secretary to implement the fishery flow recommendations and OCAP for fishery restoration and maintenance developed pursuant to Section 3406(b)(23). Hoopa's concurrence triggered a mandate that the Secretary implement restoration actions according to their terms. Hoopa is the only Indian tribe referenced in the statute; Congress delegated concurrence authority exclusively to Hoopa. *Id.*

CVPIA § 3406(b)(23) is a statutory delegation of enhanced sovereignty to Hoopa by Congress that provides Hoopa with authority to ensure implementation of the Trinity River restoration mandated in that statute. The United States Constitution vests Congress with "plenary and exclusive power over Indian affairs." *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation,* 439 U.S 463, 470 (1979). Congress' authority over Indian affairs includes the responsibility for protecting tribal resources because of their vital importance to the existence and integrity of Indian tribes. Congress meets that responsibility through "statutes, treaties, and the general course of dealing with Indian tribes." 25 U.S.C. §1901. As a statute passed for the benefit of the Hoopa Valley Tribe, CVPIA § 3406(b)(23) is to be construed liberally in Hoopa's favor. *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992) (stating, "a principle deeply rooted in this Court's Indian jurisprudence [is that] 'Statutes are to be construed liberally in favor of the Indians . . . .'", quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 767-68 (1985); *Ramah Navajo School Board v. Bur. of Revenue,* 458 U.S. 832, 846 (1982) ("We have consistently admonished that federal statutes and regulations relating to tribes and tribal activities  must be construed generously in order to comport with . . . traditional notions of [Indian] sovereignty and with the federal policy of encouraging tribal independence.")

CVPIA § 3406(b)(23) affirmatively and expressly confirmed in reclamation law a trust responsibility to Hoopa. And further, Congress ensured that Reclamation would continue to carry out the provisions of § 3406(b)(23) in conformance with the federal trust responsibilities by

vesting Hoopa with sovereign authority to concur as a condition to implementing the recommended flows and OCAP discussed in § 3406(b)(23). This delegation of sovereignty in § 3406(b)(23) ensured that the Secretary and subordinate agencies would only implement the recommendations with Hoopa's approval and that, once approved, the permanent flow requirements and OCAP could only be modified with Hoopa's concurrence.[27]

Following the CVPIA's enactment, the Secretary complied with CVPIA § 3406(b)(23). The Secretary, acting through the U.S. Fish & Wildlife Service completed the flow recommendations together in partnership with Hoopa who was a co-author of the Flow Study. The Flow Study provided a comprehensive scientific analysis of the minimum flows, habitat restoration and maintenance actions, and monitoring needs to restore fish populations in the Trinity River below Lewiston Dam to pre-TRD levels as mandated in the 1984 Act.  The Flow Study not only evaluated and recommended quantity of flow releases but also the timing of flow releases.

In 2000, standing on sacred ground in Hoopa's homeland on the banks of the Trinity River, Secretary Babbitt signed the ROD, expressing the Secretary's intent to implement the recommendations of the Flow Study.  But Congress required more than the Secretary's approval to implement the recommended flows and OCAP; Congress required Hoopa's concurrence.  And Hoopa gave its concurrence, acting through the signature of Hoopa's Chairperson, on the ROD. Only with that signature of Hoopa's Chairperson, expressing Hoopa's concurrence, could the ROD be implemented.  And now, only with Hoopa's approval may the ROD be changed.

---

[27] The CVPIA was not the first time Congress made an explicit delegation of authority to Hoopa. Just four years prior to the CVPIA, Congress passed the Hoopa-Yurok Settlement Act, Pub. L. 100-580(1988), 102 Stat. 2924. In a case challenging Hoopa's delegated sovereignty, the Court of Appeals concluded that the delegation was valid and was needed to resolve confusion over who had the right to "make management decisions relating to the lands and resources of the . . . reservation as a whole." Senate Report at 9. The Senate Report explains that Congress' understanding of the law governing the Reservation was that, "absent statutory delegations," Hoopa could not manage the Square. *Id.* The ratification and confirmation of the Tribe's Constitution was exactly that: a "statutory delegation[ ]" of authority to the Tribe to "make management decisions relating to the lands and resources of the 'Square.'" *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1213 (9th Cir. 2001).

Pursuant to CVPIA § 3406(b)(23), the flow releases called for in the ROD, and concurred in by Hoopa, were to be permanent.  Now, little more than two decades later, the federal Defendants take the position that they can unilaterally change the ROD flows that were comprehensively studied and recommended in the Flow Study co-authored by Hoopa and ultimately concurred in by Hoopa in the ROD.  The federal Defendants position completely undermines the letter, spirit, and intent of § 3406(b)(23), which was to ensure that the permanent instream fishery flow releases would be implemented only if Hoopa concurred.

An illustration:  What if, one-week or one-month after signing the ROD, the Secretary decided to unilaterally modify the ROD flows, and started implementing a different flow regime or flow schedule not concurred in by Hoopa.  It should be obvious that this would have been unlawful.  Such an act by the Secretary, just shortly after obtaining Hoopa's concurrence to a specific flow regime (both volumes and timing), would have made a mockery of the concurrence requirement prescribed by Congress.   The fact that two decades have now passed since the ROD was signed and Hoopa's concurrence obtained, does not change the analysis.  Federal Defendants' disregard of Hoopa's concurrence right is unlawful.

Hoopa is entitled to summary judgment on its Ninth Claim for Relief and a declaratory judgment that the right of concurrence in CVPIA §3406(b)(23)  remains operative and that the Secretary may not unilaterally modify permanent flow requirements or operating criteria and procedures specified in the Trinity River ROD in the absence of Hoopa concurrence.

### H.  Hoopa Is Entitled to Summary Judgment on Its Tenth Claim for Relief: Reclamation Has Unlawfully Withheld and Unreasonably Delayed Its Duty to Modernize and Otherwise Increase Effectiveness of Trinity River Hatchery.

Section 2(a) of the 1984 Act, as amended in the 1995 Act, requires the "design, construction, operation, and maintenance of facilities to . . . modernize and otherwise increase the effectiveness of the Trinity River Fish Hatchery [TRH], so that it can best serve its purpose of mitigation of fish habitat loss above Lewiston Dam while not impairing efforts to restore and

maintain naturally reproducing anadromous fish stocks within the basin."  To date, Reclamation has failed to satisfy this mandatory statutory duty.  In its motion to dismiss, Reclamation argues that "[t]he *initial step* in beginning the modernization process is an infrastructure technical review that was completed in September 2022." Dkt. #151, p. 41 (emphasis added). Reclamation fails to mention that this initial step occurred nearly forty years after the statutory mandate was enacted.  Reclamation also fails to mention that the cost estimates for the needed modernization exceed $60 million while Reclamation has "secured $2.75M to initiate the upgrades. . . and work is scheduled to begin during fiscal year 2023."  Dkt. #151, p. 41.  Nor does Reclamation's assertion of a belated budget request to Congress satisfy Reclamation's duties.  Reclamation's concession that it is just beginning the modernization mandated by the 1984 Act now, in 2023, mandates that summary judgment be granted in Hoopa's favor and a declaratory judgment be entered that Reclamation has failed in its nearly 40-year old statutory obligation to "modernize and otherwise increase the effectiveness of the [TRH]."

## V.     **CONCLUSION**

For the reasons herein, the Court should grant Hoopa's motion for partial summary judgment.

Dated this 17th day of April 2023.

MORISSET, SCHLOSSER, JOZWIAK & SOMERVILLE

*/s/ Thane D. Somerville*
Thane D. Somerville
Thomas P. Schlosser
811 First Avenue, Suite 218
Seattle, WA 98104
Tel: 206-386-5200
t.somerville@msaj.com
t.schlosser@msaj.com
Attorneys for Hoopa Valley Tribe

1
2
3
**CERTIFICATE OF SERVICE**
4
        I hereby certify that on April 17, 2023, I electronically filed the foregoing with the Clerk
5
of the Court using the CM/ECF system, which will send notification of such to the attorneys of
6
record.
7
8
9
        _____*/s/ Thane D. Somerville*_____
        Thane D. Somerville
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26